1   TRACY S. COMBS (California Bar No. 298664)
    Email: combst@sec.gov
2   CASEY R. FRONK (Illinois Bar No. 6296535)
    Email: fronckc@sec.gov
3   SECURITIES AND EXCHANGE COMMISSION
    351 South West Temple, Suite 6.100
4   Salt Lake City, Utah 84101
    Tel: (801) 524-5796
5   Fax: (801) 524-3558

6   **UNITED STATES DISTRICT COURT**
    **FOR THE DISTRICT OF NEVADA**
7

8   SECURITIES AND EXCHANGE
    COMMISSION,                                    Case No.: 2:22-cv-00612
9
                Plaintiff,                          **PLAINTIFF SECURITIES AND**
10                                                  **EXCHANGE COMMISSION'S**
        vs.                                         **MEMORANDUM OF POINTS AND**
11                                                  **AUTHORITIES IN SUPPORT OF *EX***
    MATTHEW WADE BEASLEY; BEASLEY                   ***PARTE* APPLICATION FOR ENTRY**
12  LAW GROUP PC; JEFFREY J. JUDD;                  **OF TEMPORARY RESTRAINING**
    CHRISTOPHER R. HUMPHRIES; J&J                   **ORDER AND ORDERS: (1) FREEZING**
13  CONSULTING SERVICES, INC., an Alaska            **ASSETS; (2) REQUIRING**
    Corporation; J&J CONSULTING                     **ACCOUNTINGS; (3) PROHIBITING**
14  SERVICES, INC., a Nevada Corporation; J         **THE DESTRUCTION OF**
    AND J PURCHASING LLC; SHANE M.                  **DOCUMENTS; (4) GRANTING**
15  JAGER; JASON M. JONGEWARD; DENNY                **EXPEDITED DISCOVERY; AND (5)**
    SEYBERT; and ROLAND TANNER;                     **ORDER TO SHOW CAUSE RE**
16                                                  **PRELIMINARY INJUNCTION**
                Defendants,
17
    THE JUDD IRREVOCABLE TRUST; PAJ
18  CONSULTING INC; BJ HOLDINGS LLC;
    STIRLING CONSULTING, L.L.C.; CJ
19  INVESTMENTS, LLC; JL2
    INVESTMENTS, LLC; ROCKING HORSE
20  PROPERTIES, LLC; TRIPLE THREAT
    BASKETBALL, LLC; ACAC LLC;
21  ANTHONY MICHAEL ALBERTO, JR.; and
    MONTY CREW LLC;
22
                Relief Defendants.
23

24

25

26

27

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION**............................................................................................1

**STATEMENT OF FACTS**................................................................................3

I.    THE DEFENDANTS AND THEIR ENTITIES...........................................3

  A.  Individual Defendants ..............................................................................3

  B.  Defendant Entities ..................................................................................3

  C.  Relief Defendants ....................................................................................4

II.   DEFENDANTS' FRAUDULENT "PURCHASE AGREEMENT" INVESTMENT SCHEME. .............................................................................5

III.  DEFENDANTS' SUBSEQUENT ATTEMPTS TO LIQUIDATE ASSETS. ....................9

**ARGUMENT** .....................................................................................................10

I.    THE SEC IS SEEKING EMERGENCY RELIEF IN THE PUBLIC INTEREST ...........10

II.   THE SEC HAS MADE A *PRIMA FACIE* SHOWING THAT DEFENDANTS HAVE VIOLATED THE FEDERAL SECURITIES LAWS.......................................11

  A.  Defendants Beasley, Judd, Humphries, Beasley Law Group, J&J Alaska, J&J Nevada, and J and J Purchasing Have Violated the Anti-Fraud Provisions of Section 17(a), Section 10(b), and Rule 10b-5 ...........11

     1.  The "Purchase Agreements" Are Investment Contracts, Which Are Securities. ......12

     2.  The Fraud Defendants Engaged in a Scheme to Defraud. .........................13

     3.  Defendants Judd, Humphries, and the J&J Entities Made Materially False Statements And Omissions, With Scienter.................................14

     4.  The Fraud Defendants Are Also Negligent. ..........................................16

     5.  The Fraud Defendants Engaged In Fraud In Connection With The Purchase And Sale And In The Offer And Sale Of Securities.................................16

     6.  The Fraud Defendants Used Interstate Commerce. ..................................16

  B.  All Defendants Have Violated The Registration Provisions of Section 5(a) and (c) of the Securities Act. ..................................................16

i

C.   Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner Violated The Broker Registration Provisions of § 15(a)(1) ................................................................. 17

D.   The SEC Has Shown The Violations Are Likely To Be Repeated. ................................. 19

III.   THE OTHER RELIEF SOUGHT BY THE SEC IS NECESSARY. ................................. 19

A.   The Court Should Freeze Defendants' and Relief Defendants' Assets............................ 20

1.   The Court Has The Equitable Power To Enter An Asset Freeze............................... 20

2.   The State Court And Bankruptcy Proceedings Are Not Sufficient To Preserve Investor Assets. ................................................................................................. 21

B.   The Court Should Also Order Accountings, Document Preservation, And Expedited Discovery.................................................................................................................. 24

**CONCLUSION** ................................................................................................................ 24

**INTRODUCTION**

Plaintiff Securities and Exchange Commission (the "SEC") brings this emergency action to stop a securities offering fraud perpetrated by Defendants Matthew Wade Beasley, Christopher Ronn Humphries, Shane Michael Jager, Jason Myers Jongeward, Jeffrey Jason Judd, Denny Seybert, Roland Tanner, Beasley Law Group PC, J&J Consulting Services, Inc. (Alaska), J&J Consulting Services, Inc. (Nevada), and J and J Purchasing LLC (collectively, "Defendants"). As Defendant Beasley confessed during a highly publicized March 3, 2022 standoff with the FBI, Defendants—who since 2016 obtained millions of dollars from numerous investors, purportedly for a "purchase agreement" litigation finance investment business—were in fact running a "Ponzi scheme." Bank records and witness testimony obtained in the SEC's investigation confirm that investors have invested millions of dollars in Defendants' "purchase agreement" investment scheme, based on false and misleading promises (both orally and in writing) that their investments would generate annual returns of 50 percent from litigation finance arrangements with attorneys and litigation plaintiffs around the country. In fact, as Defendant Beasley confessed in March, and as is evidenced by bank records for Beasley's attorney trust ("IOLTA") account (the "Beasley Account") and by supporting declarations of some of the same attorneys who were purportedly generating profits for the scheme, there was no network of attorneys or plaintiffs generating profits for investors, and investor money was instead spent making payments to earlier investors and promoters and supporting Defendants' lavish lifestyles (including purchases of prime real estate, luxury vehicles, and a private jet).

Shortly after Beasley's confession, certain Defendants began what can only be described as a focused and systematic attempt to liquidate their numerous luxury assets. For example, shortly after the FBI standoff, Defendant Judd began attempting to liquidate his real estate holdings—as one of many examples, his $6.7 million home was listed for sale on March 22, and as of April 7 is listed online as pending. Judd has represented to the SEC—through his counsel—that he is doing this to create a "victim's fund," but there is no evidence he has done so. And records of the Beasley Account—which appears to have been the primary hub for money

invested into the scheme—indicate that of the approximately $490 million in funds flowing through that account since 2016, only approximately $4 million remain: making it essential that all available additional assets controlled by Defendants and Relief Defendants be frozen to prevent further dissipation of investor funds.

Recently, the investment scheme's former accountant filed a state court receivership action, and investors filed an involuntary bankruptcy petition (in this District), in attempts to prevent dissipation of certain assets owned and controlled by certain Defendants. Neither action, however, is in any way sufficient to preserve the numerous investor assets at issue. As detailed below, the state court receivership action involves only five of the proposed eleven Defendants in this action, and was filed by a company insider who, along with investing himself, appears to have personally solicited other investors into the scheme. And the involuntary bankruptcy petition against only two of the eleven Defendants here (J&J Nevada and J & J Purchasing), is ongoing, and Defendant Judd (who controls those entities) has indicated he will oppose the petition absent the parties' agreement to approve his selected Chief Restructuring Officer. Thus, it appears there will be additional and potentially time-consuming litigation in the Bankruptcy Court regarding the selection of a trustee; and in the meantime Judd continues to control those two Defendants and their assets. SEC counsel is prepared to intervene in the bankruptcy proceedings and is willing to work to coordinate between this Court and the Bankruptcy Court, but neither that action nor the state receivership action can provide the relief the SEC seeks here.

The SEC thus seeks emergency relief to stop this offering fraud and protect investors' assets and funds. Without the Court's intervention, Defendants and Relief Defendants will continue to be free to dissipate millions of dollars in investor funds that would be available to satisfy the claims alleged in the SEC's Complaint. Thus, the SEC seeks emergency relief in the form of a temporary restraining order; and orders (1) freezing Defendants' and Relief Defendants' assets, (2) requiring Defendants to provide an accounting, (3) prohibiting Defendants' destruction of documents; (4) permitting expedited discovery; and (5) requiring Defendants to show cause why the Court should not enter a preliminary injunction.

## STATEMENT OF FACTS

### I.   THE DEFENDANTS AND THEIR ENTITIES

#### A.   Individual Defendants

**Matthew Wade Beasley** ("Beasley") is a resident of Las Vegas, Nevada. He is the President, Secretary, Treasurer, and Director of Defendant Beasley Law Group PC, and has been licensed to practice law in Nevada since May 2006. (*See* Ex. C, Declaration of Joni Ostler ("Ostler Decl.") ¶ 44.) **Jeffrey Jason Judd** ("Judd"), is a resident of Henderson, Nevada. He is director, president, and treasurer of Defendant J & J Consulting Services, Inc. (Nevada) and director, president, shareholder, and treasurer of Defendant J & J Consulting Services, Inc. (Alaska). Judd is also a manager of Defendant J and J Purchasing, LLC. (*See* Ostler Decl. ¶¶ 45, 47-48.) **Christopher Ronn Humphries** ("Humphries") is a resident of Henderson, Nevada. He is a managing member of Relief Defendant CJ Investments LLC. (Ostler Decl. ¶ 55.) **Shane Michael Jager** ("Jager") is a resident of Henderson, Nevada. He is the managing member and owner of Relief Defendant **Stirling Consulting, L.L.C.** (Ostler Decl. ¶ 54.) **Jason Myers Jongeward** ("Jongeward") is a resident of Washington, Utah. He is the governor of Relief Defendant JL2 Investments LLC. (Ostler Decl. ¶ 56.) **Roland Tanner** ("Tanner") is a resident of Henderson, Nevada. **Denny Seybert** ("Seybert") is a resident of Henderson, Nevada. He is the manager of Relief Defendant Rocking Horse Properties, LLC. (Ostler Decl. ¶ 57.)

#### B.   Defendant Entities

**Beasley Law Group PC** ("Beasley Law Group") is a professional corporation organized in Nevada in 2011 with its principal place of business in Nevada, and which is controlled by Defendant Beasley. (Ostler Decl. ¶ 44.) **J&J Consulting Services, Inc.** is a Nevada corporation formed in 2005 with its principal place of business in Nevada ("J&J Nevada"), and is controlled by Defendant Judd. (Ostler Decl. ¶ 47.) **J&J Consulting Services, Inc.** is also the name of an Alaska corporation, incorporated in 2019, with its principal place of business in Nevada ("J&J Alaska"), also controlled by Defendant Judd. (Ostler Decl. ¶ 45.) **J and J Purchasing LLC** ("J

and J Purchasing") is a Florida Limited Liability Company formed in October 2021 with its principal place of business in Nevada, controlled by Defendant Judd. (Ostler Decl. ¶ 48.)

### C.     Relief Defendants

**The Judd Irrevocable Trust** is a trust of unknown date and domicile, believed to be under the control of Beasley, Judd, and/or Judd's wife, Jennifer Judd. (Ostler Decl. ¶ 46.) It received at least $1.4 million in transfers from the Beasley Account at Wells Fargo. (Ex. D, Declaration of Amir Salimi ("Salimi Decl.") ¶ 13.) **PAJ Consulting Inc** ("PAJ Consulting") is a Nevada corporation controlled by Judd's son, Preston Judd. (*See* Ostler Decl. ¶¶ 49–51.) PAJ Consulting received over $1 million in disbursements from J&J Nevada, and at least $824,500 from the Beasley Account. (*Id.* ¶ 52.) PAJ Consulting's bank records suggest it has no legitimate business operations, as it received large inflows from J&J Nevada and Beasley Law Group followed by lavish spending on, among other things, travel, gaming, cryptocurrencies, shopping, restaurants, entertainment, and gambling. (*Id.*)

**BJ Holdings LLC** is a Nevada limited liability company. Its managing members are J&J Nevada and Beasley Law Group. (Ostler Decl. ¶ 53.) This entity is believed to hold assets that were purchased using investor funds, including a 2008 Hawker Beechcraft 900XP private jet. It received at least $500,000 in disbursements from the Beasley Account. (*See* Salimi Decl. ¶ 13.) **Stirling Consulting, L.L.C.** is a Nevada limited liability company controlled by Defendant Jager. (Ostler Decl. ¶ 54.) It received at least $37 million from the Beasley Account. (Salimi Decl. ¶ 14.) **CJ Investments LLC** is a Nevada limited liability company controlled by Defendant Humphries and his wife Jessica. (Ostler Decl. ¶ 55.) It received at least $31 million in disbursements from the Beasley Account. (Salimi Decl. ¶ 14.) **JL2 Investments, LLC** is a Washington limited liability company controlled by Defendant Jongeward. (Ostler Decl. ¶ 56.) Jongeward used an account in the name of JL2 Investments, LLC to move investor funds. (*Id.*, Ostler Decl. at Ex. 19 (Declaration of Marshall Gibbs, D.D.S.) ¶ 9.) **Rocking Horse Properties LLC** is a Nevada limited liability company controlled by Defendant Seybert. (Ostler Decl. ¶ 57.) It received at over $690,000 in disbursements from the Beasley Account. (Salimi Decl. ¶ 13.)

**Triple Threat Basketball, LLC** is a Nevada limited liability company controlled by Warren Rosegreen and his wife Priscilla. (Ostler Decl. ¶ 58.) It received disbursements of over $12 million from the Beasley Account. (Salimi Decl. ¶ 13.) **ACAC LLC** is a limited liability company of unknown domicile, believed to be controlled by Christopher Madsen. (Ostler Decl. ¶ 59.) A bank account in the name of ACAC LLC received at least $11.7 million in disbursements from the Beasley Account. (Salimi Decl. ¶ 13.)

**Anthony Michael Alberto, Jr.** ("Alberto") is believed to be a resident of Nevada or Pennsylvania. He received at least $6.8 million in transfers from the Beasley Account. (Salimi Decl. ¶ 13.) Beasley confessed to an FBI negotiator that he used investor funds to pay gambling debts he owed to Alberto. (Ostler Decl. ¶ 7.) **Monty Crew LLC** was a Nevada limited liability company, now revoked, that was controlled by Relief Defendant Alberto. (Ostler Decl. ¶ 60.) Monty Crew LLC received nearly $3 million from the Beasley Account. (Salimi Decl. ¶ 13.)

## II.   DEFENDANTS' FRAUDULENT "PURCHASE AGREEMENT" INVESTMENT SCHEME.

Beginning at least 2017, and continuing through at least March 2022, Defendant Judd, directly and through the Defendant J&J Entities, along with Defendant Humphries, who worked for Judd as a promoter, offered investments in purported personal injury settlement contracts called "Purchase Agreements." (*See* Ostler Decl. ¶¶ 21–22 & Ex. 11, ¶¶ 23-25, 27–30 & Exs. 13–18, ¶ 31 & Ex. 19, ¶¶ 32–33.) When promoting this investment scheme, Judd told investors that he started a litigation financing business with his attorney, Defendant Beasley of Beasley Law Group PC, whereby Judd invested money in contracts with personal injury plaintiffs while Beasley procured those contracts through his relationships with other attorneys around the country. Judd also told investors he was responsible for raising funds for the business, and that Beasley was responsible for supplying the settlement contracts. (*See id*. ¶ 33, Exs. 11, 15.)

Judd and Humphries described the investment opportunity business to investors as follows: An injured party would receive a settlement from an insurance company and would want to obtain a portion of the settlement funds before the settlement check arrived. To do so, the

injured party, through a personal injury attorney, would enter into a settlement contract called a "Purchase Agreement" with one of the J&J Entities. The contracting J&J Entity would advance funds, which the injured party repaid 90 days later plus interest and fees. (Ostler Decl. ¶¶ 23, 25, 33 & Exs. 11, 12, 7, 9, 15.) Judd and Humphries further represented to investors that investors could invest in a settlement contract for $80,000 or $100,000 dollars, and would receive a 12.5% return (and sometimes more) in 90 days. (*Id.*) According to Judd and Humphries, the investor's principal would automatically be reinvested in a new settlement contract, such that investors would receive an annual return of at least 50%. (*Id.* ¶ 33 & Ex. 19 (Gibbs Decl.) Ex. 12.)

In addition to Humphries, Judd retained other promoters, including Defendants Jager and Seybert, to solicit additional investors for the scheme. (*See* Ostler Decl. ¶¶ 23–24, 27–30, 34–35, & Exs. 13–18, Ex. 19 (Gibbs Decl.) and exhibits thereto.) Jager, in turn, recruited Defendants Jongeward and Tanner to work under him as solicitors to find additional investors. (*Id.* ¶¶ 23–24 & Exs. 13, 15–19.) Operating through word of mouth, Judd, Humphries, Jager, Jongeward, Seybert, and Tanner—none of whom were registered with the SEC as brokers or dealers— collectively raised millions of dollars for the scheme from hundreds of investors. (*See* Ostler Decl. at Ex. 15 (Judd states he has done "over 16,000" contracts and raised $475 million); Ostler Decl. at Ex. 13 at pp. 58–60 (Jager and Jongeward stating they and other "guys" who work with them have "about a thousand" investors; that Roland Tanner alone has raised over $50 million).) As compensation for soliciting new investors into the scheme, Humphries, Jager, Jongeward, Seybert, and Tanner earned commissions. (*See* Ostler Decl. ¶ 23 (Seybert was paid $1,500 per contract), ¶ 42 (Humphries got 15% of what he raised); Ex. 19 (Gibbs Decl.), ¶ 8 (Jongeward said he was paid more than he deserved for finding investors); Ex. 13 at p. 29.)

Judd and his promotors generally instructed investors to wire their investment funds to the Beasley Account but they sometimes told investors to send funds to accounts in the name of J&J Consulting Services, Inc. or entities controlled by the promoters, such as Rocking Horse Properties LLC (controlled by Seybert). (Ostler Decl. ¶ 35, Ex. 11 at 33, 35 (Taylor Richards

Testimony); Ex. 19 (Gibbs Decl.) at ¶ 5). In such instances, the promoter would purportedly pass the investor funds along to Beasley. (*Id*. ¶ 35.)

Besides making oral representations regarding the investment to potential investors, Judd and the promotors would often send copies of documents describing the investment to investors, typically via email. Prior to December 2021, Judd and his promoters provided investors a two-page "Buyer Agreement" that included the representations that Judd and J&J Consulting invested money in contracts with personal injury plaintiffs who had entered settlements. (Ostler Decl. at Ex. 7 ("Buyer Agreement" Humphries gave to investor) and Ex. 12 ("Buyer Agreement" Tanner gave to investor).) The Buyer Agreements also instructed investors that investors were prohibited from contacting any of the parties related to the settlements or the Purchase Agreements without written consent from Judd. (*Id.*)

Starting in December, 2021, Judd and his promoters distributed offering documents to new and existing investors, including a private placement memorandum ("PPM"). (Ostler Decl. at Ex. 19 (Gibbs Decl.) Ex. 12.) The PPM repeated the description of the "investment" as a "partial beneficial interest" in a "purchase contract" in a personal injury settlement. (*Id*., Gibbs Decl. Ex. 12 at 1.) The PPM also stated that J and J Purchasing LLC negotiated and entered into "Purchase Contracts" with the beneficiaries of insurance settlement agreements, and that the investors were investing in a "partial beneficial interest" in those "Purchase Contracts" for a 12.5% return at the expiration of each "90-Day Placement Period." (*Id.* at 1, 14.)

Contrary to these representations made by Judd, Humphries, and the J&J Entities to investors both orally and in the distributed written materials, the evidence gathered in the SEC staff's investigation indicates that there was no network of personal injury attorneys and no settlement agreements supporting the investment scheme. For example, an investor solicited by Defendant Humphries was given a "Purchase Agreement" with the name of a local attorney and that attorney's purported "slip and fall" client. However, as attested to by the attorney named in the "Purchase Agreement," the attorney never had a client of that name, and never entered into any such agreement with J&J Consulting Services. (Ostler Decl. ¶¶ 18–19 and Ex. 6.) Likewise,

when a confidential source who was solicited by Humphries and given copies of Purchase

Agreements showing the attorneys as parties to the agreements, telephoned those attorneys, those

attorneys and their law firm staff were unable to locate any records of either the Purchase

Agreements or the clients listed on the Agreements. In essence, the attorneys indicated that the

Purchase Agreements were fake. (*Id*. ¶ 23.)

In addition, accounting analysis of the Beasley Account—the account that appears to

have been the central hub for the investment funds entering the scheme—indicates that there

were no transactions consistent with investment activities, including investments in litigation

settlements. (*See* Salimi Decl. ¶¶ 12–13.) Instead, the Beasley Account shows a pattern of

repeated deposits in increments of $40,000, $50,000, $80,000 or $100,000 (the typical

investment amounts for investors in the "purchase agreement" scheme) followed by immediate

transfers to those Defendants involved in promoting the scheme. (*Id*. ¶ 12.) Between January

2017 and March 15, 2022, approximately $487 million was disbursed from the Beasley

Account—and there is no indication that any of those account transactions are consistent with

making disbursements to litigation plaintiffs or their lawyers (as purportedly was being done as

part of the investment scheme). (*Id*. ¶ 13.) Instead, most of the money (approximately $411

million, or 84 percent of the total funds disbursed from the Beasley Account) was disbursed to

Defendants and Relief Defendants. (*Id*. ¶ 14.)  For example, Judd received disbursements of

$315.3 million; Jager received disbursements of at least $37.3 million; Humphries received

disbursements of at least $31.1 million; Beasley received disbursements of at least $17.2 million;

and Seybert received disbursements of at least $746,000. (*Id*. ¶ 13.) Further analysis of the

Beasley Account shows that disbursements made to Defendants and Relief Defendants were for

personal expenses—such as a September 8, 2021 cash purchase from an entity named "CFJ

Automotive, LLC" and over $4 million in payments made to title companies, presumably to

purchase real estate for Defendants. (*Id*. ¶ 16.)

On March 3, 2022, FBI agents attempted to execute a search warrant at Beasley's home.

(Ostler Decl. ¶ 6.) During the ensuing standoff, Beasley spoke with an FBI agent negotiator in a

1   series of telephone calls. (*Id*.) Recordings of those calls were provided to SEC staff by the FBI.

2   In the calls, Beasley confessed that since 2016 or 2017 he ran a "Ponzi scheme" related to

3   personal injury settlements, which he started because he had gambling debts. (*Id*. at Ex. 1,

4   Beasley Tr. at 6:14-15; 19:23-22:9, 33:10.) Beasley said that investors were promised that their

5   money would be given to someone who had settled a personal injury case but had not received

6   their settlement money yet. (*Id*. at Ex. 2, Beasley Tr. at 33:9-23.) Beasley admitted that he "got

7   names of attorneys" for the scheme but "never actually talked to them." (*Id*. at Ex. 2, Beasley Tr.

8   at 32:19–20.) Beasley said that as Judd found more investors, "I made up more attorney's deals

9   and just kept growing it." (*Id*. at Ex. 2, Beasley Tr. at 14:21–23.) Beasley admitted that investors

10  "would give their money to me, and I would supposedly send it to a bunch of attorneys" but

11  actually "I kept it and used it to pay, basically pay them back to pay off gambling debts,"

12  including to Relief Defendant Anthony Alberto, Jr. (*Id*. at Ex. 2, Beasley Tr. at 15:5–16:13.)

13      **III.    DEFENDANTS' SUBSEQUENT ATTEMPTS TO LIQUIDATE ASSETS.**

14          Following the March 3, 2022 standoff between Beasley and the FBI, both Beasley and

15  Judd took steps to liquidate or otherwise transfer assets. On March 17, 2022, Beasley and his

16  wife, Paula Beasley, filed a joint petition for divorce. (Ostler Decl. ¶ 14.) While the case remains

17  sealed, a Decree of Divorce was granted on March 21, 2022, and SEC staff was informed that

18  Beasley transferred at least one home and one vehicle to Paula Beasley as part of the divorce.

19  (*Id*.) In addition, SEC staff learned that Judd—through a "Judd Nevada Trust"—listed a $6.7

20  million home at Sky Arc Court for sale on or around March 28, 2022: and the online listing for

21  that property indicated that "[t]he seller has accepted an offer, and this property is now pending

22  or under contract." (*Id*. ¶ 16, Ex. 5.) Likewise, Judd, on or about March 28, 2022, listed a real

23  estate property located at 8 Twisted Rock Court, Henderson, NV 89012 for sale for $2.7 million,

24  and later lowered the list price by $250,000. (*Id*. ¶ 17, Ex. 5.)

25          Judd has in fact already sold at least one real estate holding in Heber City, Utah, for

26  $2,895,000 on March 24, 2022. (Ostler Decl. ¶ 9, Ex. 4.) SEC staff also learned that Judd

27

attempted to transfer at least $1 million from that sale into an account held by Judd at U.S. Bank, but U.S. Bank refused to accept the funds. (*Id*. ¶ 13.)

On or about March 25, 2022, counsel for Judd spoke with SEC staff, and said that Judd intended to liquidate his assets to purportedly place the proceeds into two new accounts he established at US Bank: one account being a "Potential Victim Fund" for victims of the fraud, and the other being an "IRS Account" to pay Judd's 2021 taxes. (Ostler Decl. ¶ 8.) Judd's counsel emailed a list of properties and luxury vehicles that Judd apparently plans to imminently sell. (*Id*. at Ex. 3.) To date, however, there is no indication that any sale proceeds from the sale of Judd's assets are in fact being set aside for investors.

In addition, on April 8, 2022, SEC staff participated in a WebEx call that included Judd's counsel. (Ostler Decl. ¶ 10.) Judd's counsel stated that Judd intended to sell at least one property owned by one of Mr. Judd's various trusts, and that the transaction was to close on or around Saturday, April 16, 2022. (*Id*. ¶ 11.) Counsel further stated that Judd did not intend to provide the sale proceeds to the state court receivership but instead put them in the purported "victims fund"—but Judd's counsel was unable to provide information about which bank held the purported "victims fund", the signatory on the account, or the account number. (*Id*.)

## **ARGUMENT**

### I. THE SEC IS SEEKING EMERGENCY RELIEF IN THE PUBLIC INTEREST

Section 20(b) of the Securities Act of 1933) and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") authorize the SEC to obtain a preliminary injunction or restraining order without a bond. *See* 15 U.S.C. §§ 77t(b) & 78u(d). In SEC emergency actions, the SEC need only make a two-prong showing: (1) a *prima facie* case that defendants have violated the federal securities laws, and (2) a reasonable likelihood that the defendants will repeat their violations. *See, e.g., SEC v. Blockvest, LLC*, No. 18CV2287-GPB(BLM), 2019 WL 625163, at *4 (S.D. Cal. Feb. 14, 2019). That is because the SEC appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). This

enforcement action is brought in the public interest, and thus, the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989) (quoting *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982)).

The SEC has made its required *prima facie* showing.

## II.   THE SEC HAS MADE A *PRIMA FACIE* SHOWING THAT DEFENDANTS HAVE VIOLATED THE FEDERAL SECURITIES LAWS.

### A.   Defendants Beasley, Judd, Humphries, Beasley Law Group, J&J Alaska, J&J Nevada, and J and J Purchasing Have Violated the Anti-Fraud Provisions of Section 17(a), Section 10(b), and Rule 10b-5

The SEC has made a *prima facie* showing that Defendants Beasley, Judd, Humphries, Beasley Law Group, J&J Alaska, J&J Nevada, and J and J Purchasing (herein collectively, the "Fraud Defendants") have violated the antifraud provisions of the Securities Act and the Exchange Act. Securities Act § 17(a) [15 U.S.C. § 77q(a)] prohibits (1) the employment of devices, schemes, or artifices to defraud; (2) obtaining money or property by means of untrue statements of fact or omitting to disclose material facts; or (3) engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon a purchaser, in the offer or sale of a security. Exchange Act § 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] make it unlawful (1) for any person to employ any device, scheme or artifice to defraud; (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. Judd, Humphries, J&J Alaska, J&J Nevada, and J and J Purchasing have violated each of these provisions, and Beasley and Beasley Law Group have violated at least Section 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c).

1.      **The "Purchase Agreements" Are Investment Contracts, Which Are Securities.**

Defendants sold securities in the form of "Purchase Agreements," which are investment contracts. Securities Act § 2(a)(1) and Exchange Act § 3(a)(10) define "security" to include "investment contracts," which involve (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-299 (1946). The "purchase agreements" Defendants offered satisfy all three elements and are "securities" under the Securities Act and the Exchange Act.

*First*, the sale of the "purchase contracts" involved the investment of money.

*Second*, the investment at issue was in a common enterprise, which exists where there is either vertical or horizontal commonality. *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991). Vertical commonality requires "that the fortunes of the investors are linked with those of the promoters." *Id.* Horizontal commonality exists where "[t]he participants pool their assets; they give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise; and . . . their collective fortunes [depend] on the success of a single common enterprise." *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989). Here, vertical commonality exists because investors' profits were directly linked to the profits of the J&J Entities. Investors on each contract shared with the J&J Entities the alleged profits on the litigation settlement contracts. As represented to investors, they were entitled to a 12.5% return every 90 days, and the J&J Entities received an additional 12.5% return. Thus, investors' fortunes and the J&J Entities' fortunes were linked. Horizontal commonality also exists, because, as the bank records show, investor funds were pooled into the Beasley Account.

*Third*, a reasonable investor would have expected profits to be derived solely from the efforts of Beasley and the purported personal injury attorneys who were counterparties on the "Purchase Agreements," or that "the efforts made by those other than the investor are the undeniably significant ones." *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980). The

investors were entirely passive and expected returns solely based on Judd's and Beasley's

managerial or entrepreneurial efforts. Thus, the "purchase agreements" are securities.

### 2.      The Fraud Defendants Engaged in a Scheme to Defraud.

Defendants Beasley, Judd, Humphries, Beasley Law Group, J&J Alaska, J&J Nevada,

and J and J Purchasing have engaged in a scheme to defraud investors. Securities Act § 17(a)(1)

prohibits any person, "in the offer or sale of any securities," from employing "any device,

scheme, or artifice to defraud," 15 U.S.C. § 77q(a)(1), or from engaging in "any transaction,

practice, or course of business which operates, or would operate, as a fraud or deceit upon the

purchaser." 15 U.S.C. § 77q(a)(3). Likewise, Exchange Act § 10(b) and Rules 10b5(a) and (c)

make it unlawful for any person, "in connection with the purchase or sale of any security," "[t]o

employ any device, scheme or artifice to defraud," or "[t]o engage in any act, practice, or course

of business which operates or would operate as a fraud or deceit upon any person." 15 U.S.C.

§ 78j(b); 17 C.F.R. §§ 240.10b-5(a), (c). To be liable for a scheme to defraud, a defendant "must

have engaged in conduct that had the principal purpose and effect of creating a false appearance

of fact in furtherance of the scheme." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048

(9th Cir. 2006), vacated on other grounds sub nom., *Avis Budget Group Inc. v. Cal. State

Teachers' Ret. System*, 552 U.S. 1162 (2008).

The extensive evidence submitted in support of this motion provide a *prima facie* case

that the Fraud Defendants engaged in a scheme to defraud. Defendants Judd, Humphries, and the

J&J Entities made material misrepresentations to investors regarding the investment. Defendants

provided investors with fraudulent purchase agreements falsely stating that the J&J Entities had

arrangements with litigation plaintiffs and their attorneys.

In addition, as described above and in the attached declaration of Amir Salimi, the bank

records from the Beasley Account make clear that Defendants Beasley and Beasley Law Group

made payments to earlier investors to create the false impression that the profits purportedly

supporting the investment scheme were real. Such actions amount to a scheme to defraud. *See

SEC v. Wang*, 2015 U.S. Dist. LEXIS 192319, *48 (C.D. Cal., Aug. 18, 2015) (citing *United

*States v. Brown*, 578 F.2d 1280, 1285 (9th Cir. 1978) (finding that "activities tending to lull investors, either to prevent discovery of fraud or to permit further fraudulent activities to progress unhindered have been held to constitute a part of the execution of the fraudulent scheme and to be integral to the offense rather than incidental to it.").

### 3.   Defendants Judd, Humphries, and the J&J Entities Made Materially False Statements And Omissions, With Scienter.

To establish a *prima facie* case that a person made false or misleading statements in connection with the offer, purchase, or sale of securities under Securities Act § 17(a)(2), Exchange Act § 10(b) and Rule 10b-5, the SEC must prove by a preponderance of the evidence four basic elements: (1) a material misrepresentation or omission; (2) in connection with the offer, purchase, or sale of a security; (3) with scienter; and (4) in interstate commerce. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1092 (9th Cir. 2010); *see also SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993). Each of these requirements is satisfied here.

As outlined above, Defendants Judd, Humphries, and the J&J Entities made material misrepresentations[1] to investors in order to induce them to invest in the "Purchase Agreements." Misrepresentations regarding the use of investor funds are material. *See SEC v. Merrill Scott & Assocs., Ltd.*, 2011 U.S. Dist. LEXIS 134010, at *41–42 (D. Utah Nov. 21, 2011) (failure to disclose that funds were being misappropriated and used for purposes other than those stated in solicitations were material); *SEC v. Chemical Trust*, 2000 U.S. Dist. Lexis 19786 (S.D. Fla. 2000) (use or misuse of investor proceeds is material). It cannot be disputed that any reasonable

---

[1] A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Platforms Wireless*, 617 F.2d at 1092. Liability arises not only from affirmative representations but also from failures to disclose material information. *SEC v. Dain Rauscher, Inc.*, 254 F.3d at 855–56. The antifraud provisions impose "'a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)). *See also SEC v. Murphy*, 626 F.2d at 653 (profitability of an issuer was material to investors).

investor would consider it important to know that the money they invested was not used for litigation finance, but was instead used to make payments to other investors and promoters, and pay the personal (and luxury) expenses of certain Defendants. These misstatements were also "in the offer or sale" of securities under Section 17(a)(2) of the Securities Act and "in connection with" the purchase and sale of securities under Section 10(b) and Rule l0b-5 thereunder, because they were made to investors at the time Defendants were offering and selling the "Purchase Agreements" and when investors were deciding whether to invest.

It is also clear that Defendants Judd, Humphries, and the J&J Entities are "makers" of these false and misleading statements under Exchange Act Rule 10b-5(b). *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").  As discussed above, each of these Defendants made direct misstatements about the nature of the investment to investors, both orally (in the case of Judd and Humphries) and through written materials (in the case of the J&J Entities, which themselves were controlled by Judd). *Id.* ("the maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

Finally, the SEC's *prima facie* case, as set forth in the accompanying declarations and exhibits, establishes that these Defendants acted with the requisite scienter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); and can be established by showing "knowing or reckless conduct." *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003). There can be no doubt that these Defendants' misrepresentation of the basic elements of their purported investment scheme—such as the names of the litigation attorneys involved in generating profits for the scheme—while spending investor funds on personal expenses, establishes knowing or reckless conduct. *See, e.g., Lowry v. SEC*, 340 F.3d 501, 505 (8th Cir. 2003) (the fact that a principal spends investor funds on personal expenses establishes the requisite state of mind for committing securities fraud). In addition, the scienter of Judd is imputed to the J&J Entities because the scienter of an entity's

management can be imputed to the entity. *See ChinaCast Educ. Corp. Sec. Litig.,* 809 F.3d 471, 477 (9th Cir. 2015); *SEC v. Manor Nursing Ctrs., Inc*., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

### 4.   The Fraud Defendants Are Also Negligent.

Exchange Act § 10(b) and Securities Act § 17(a)(1) require scienter, while claims under Securities Act §§ 17(a)(2) and 17(a)(3) only require negligence. *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980). To show negligence, the SEC must show the defendant failed to conform to the standard of care that would be exercised by a reasonable person. *See Dain Rauscher*, 254 F.3d at 856; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir.1997). Here, the Fraud Defendants' actions fall far below the standard of care of any reasonable person.

### 5.   The Fraud Defendants Engaged In Fraud In Connection With The Purchase And Sale And In The Offer And Sale Of Securities.

The Fraud Defendants' activities were "in the offer or sale" and "in connection with the purchase or sale" of securities and in interstate commerce. *See SEC v. Zandford*, 535 U.S. 813, 822 (2002) (fraud that "coincide[s]" with the securities transactions satisfies the "in connection with" requirement); *United States v. Naftalin*, 441 U.S. 768, 777-78 (1979) ("in the offer or sale" is broad enough to cover the entire selling process). The Fraud Defendants made false statements and engaged in deceptive conduct to induce investors to purchase securities. The fraud therefore coincides with, and took place in, the offer and sale, and in connection with the purchase and sale, of securities. *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rules 10b-5(a) and (c) and § 17(a)(1)); *see also Malouf*, 933 F.3d at 1260 (applying *Lorenzo* to Section 17(a)(3)).

### 6.   The Fraud Defendants Used Interstate Commerce.

The Fraud Defendants' activities occurred in interstate commerce, by soliciting investors through e-mail and over telephone conversations. *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004).

## B.   All Defendants Have Violated The Registration Provisions of Section 5(a) and (c) of the Securities Act.

The SEC has established a *prima facie* case that all Defendants violated the registration provisions of the securities laws. To establish such a violation, the SEC must demonstrate that Defendants, directly or indirectly, offered or sold securities without a registration statement having been filed or in effect. *See SEC v. International Chem. Dev. Co.*, 469 F.2d 20, 27 (10th Cir. 1972). "The elements of [an] action for violation of Section 5 are (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*¸147 F.3d 118, 124 (2d Cir. 1998) (quoting *In re Command Credit Corp.*, No. 3-8674, 1995 SEC LEXIS 989, at *2 (S.E.C. Apr. 19, 1995)). Scienter is not an element. *See Aaron*, 446 U.S. at 714 n.5; *SEC v. Parkersburg Wireless Ltd. Liab. Co.*, 991 F. Supp. 6 at 9 ("whether [defendant] was an unwitting participant in this complex scheme [is] of no moment"). The "Purchase Agreements" offered and sold by Defendants are securities. Defendants never filed a registration statement as to those securities, and no exemption to the registration provisions applies. Each Defendant (in roles as promotor and solicitor) offered and sold securities to investors. That is sufficient to state a *prima facie* case for violations of Section 5 as to each of the Defendants.

> **C.** **Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner Violated The Broker Registration Provisions of § 15(a)(1)**

Finally, the SEC has made a *prima facie* case that Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner (collectively herein, the "Broker Defendants") have violated the broker/dealer registration provisions of Exchange Act Section 15(a)(1), which makes it unlawful for a broker "to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless registered with the SEC. 15 U.S.C. § 78o(a)(1). Section 15(a) is strict liability statute; neither scienter nor negligence is required. *SEC v. Interlink Data Network*, No. 93 3073 R, 1993 WL 603274, *10 (C.D. Cal. Nov. 15, 1993).

Exchange Act § 3(a)(4)(A) defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A); *see also* 15 U.S.C. § 78c(a)(9) (defining "person" to include a company). This definition "should be construed broadly" and exemptions should be 'narrowly drawn in order to promote both investor protection and the integrity of the brokerage community.'" *In the Matter of Frederick W. Wall*, Exchange Act Release No. 52467, 2005 SEC LEXIS 2380, *8 n.9 (Sept. 19, 2005) (Comm. Op.) (quoting Exchange Act Release, No. 22172, 33 SEC Docket 685, 686 (June 27, 1985)).

The Ninth Circuit, in determining "whether a person has engaged in the business of being a broker," "applies conduct-based factors and a 'totality of the circumstances approach.'" *SEC v. RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923, 926 (S.D. Cal. 2020), quoting *SEC v. Feng*, 935 F.3d 721, 731 (9th Cir. 2019). These factors, called the "*Hansen* factors," consider whether the person, for example, received transaction-based income (such as commissions) as opposed to a salary, and regularly participated in securities transactions.[2] *See Feng*, 935 F.3d at 732; *see also SEC v. Small Bus Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at *14 (N.D. Cal. Aug. 16, 2013). No one factor is dispositive and a person may have acted as a broker even where only one or two of the factors are met. *See, e.g., SEC v. Collyard*, 154 F. Supp. 3d 781, 789 (D. Minn. 2015) (*reversed on other grounds* 935 F.3d 721 (8th Cir. 2019)).

Courts particularly emphasize two of the *Hansen* factors as most important: (1) regularity of participation in securities transactions and (2) receipt of transaction-based compensation. *See, e.g., SEC v. Bravata*, No. 09–12950. 2009 WL 2245649 at *2 (E.D. Mich. July 27, 2009) ("regularity of participation [in securities transactions] is the primary indicia of being 'engaged in the business.'") (internal quotations omitted).

---

[2] In sum, the *Hansen* factors are whether an individual: "(1) is an employee of the issuer; (2) received commissions as opposed to a salary; (3) is selling, previously sold, the securities of other issuers; (4) is involved in negotiations between the issuer and the investor; (5) makes valuations as to the merits of investment or gives advice; and (6) is an active rather than passive finder of investors." *RMR Asset Mgmt.*, 479 F. Supp. 3d at 926, citing *Hansen*, 1984 WL 2413, at *10.

Here, Defendants Judd, Humphries, Jager, Jongeward, Seybert, and Tanner each acted as a broker in repeatedly soliciting investors to purchase the "Purchase Agreement" securities. The Broker Defendants received transaction-based payments for the contracts they sold, and sold numerous contracts to numerous investors in what was essentially a full-time job. None was registered with the SEC as a broker. (Ostler Decl. ¶ 62.) The Broker Defendants thus violated § 15(a)(1). *See Interlink Data Network*, 1993 WL 603274, at *10.

### D.     The SEC Has Shown The Violations Are Likely To Be Repeated.

The SEC has demonstrated a likelihood that Defendants' violations will be repeated. Whether a likelihood of future violations exists depends upon the totality of the circumstances. *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *Fehn*, 97 F.3d at 1295–96. The existence of past violations may give rise to an inference there will be future violations. *See Murphy*, 626 F.2d at 655; *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358–59 (9th Cir. 1973). Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that, because of the defendant's occupation, future violations may occur. *See Murph*y, 626 F.2d at 655.

Here, Defendants' fraud has been ongoing since 2016, with funds being raised right up until Beasley's March 2022 standoff with the FBI. Since then, Defendants continue to attempt to misappropriate investor funds by liquidating assets. A temporary restraining order is necessary to protect investors from Defendants' fraudulent conduct.

### III.     THE OTHER RELIEF SOUGHT BY THE SEC IS NECESSARY.

In addition to the restraining order, the SEC seeks an asset freeze over Defendants' assets, an accounting, and expedited discovery. Federal courts have "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). "[O]nce the equity jurisdiction of the district court properly has

been invoked, the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

### A.      The Court Should Freeze Defendants' and Relief Defendants' Assets.

#### 1.      The Court Has The Equitable Power To Enter An Asset Freeze.

The Court's equitable powers include the authority to freeze assets of both parties and nonparties. *See SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003); *SEC v. Int'l Swiss Invest. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990). The purpose of a freeze order is to prevent the dissipation of assets so they may be available for the benefit of victims. *See*, *e.g.*, *Hickey*, 322 F.3d at 1132 (affirming asset freeze over nonparty brokerage firm controlled by defendant to effectuate disgorgement order against defendant). "[T]he public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999). "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

Here, bank account records confirm that approximately $490 million in funds flowed through the Beasley Account, a large percentage of which appear to be investor funds (which were deposited in round increments of $40,000, $50,000, $80,000 or $100,000, relating to the price of the securities investments Defendants offered and promoted). The bank records confirm that funds from the Beasley Account were used to purchase real estate and luxury vehicles, and that each of the Relief Defendants listed in the above caption received funds from the Beasley Account that cannot be reasonably tied to any funds other than investor deposits. (*See* Salimi Decl. ¶ 16.) An asset freeze is necessary to preserve the remaining assets of Defendants and Relief Defendants for investors. Moreover, because of the emergency nature of this action, the SEC has not yet located the all of the possible assets and accounts under Defendants' and Relief Defendants' control. A freeze over all of Defendants' and Relief Defendants' accounts is necessary to prevent them from further dissipating the investor funds.

**2.      The State Court And Bankruptcy Proceedings Are Not Sufficient To Preserve Investor Assets.**

Although the investment scheme's former accountant has have filed a receivership case in state court, and investors have filed an involuntary bankruptcy petition in this District, those actions do not diminish in any way the need for the SEC's requested relief.

On March 17, 2022, Mark Murphy filed a receivership action in the District Court for Clark County, Nevada. *See generally Mark Murphy v. Matthew Beasley, et al.*, Case No. A-22-849806 (Clark County, NV). On March 30, 2022, the state court judge appointed a receiver to take control of the assets of five of the eleven Defendants named in this action: Beasley, Beasley Law Group, Judd, J&J Nevada, and J and J Purchasing. However, Murphy appears to be a corporate insider: he performed accounting services for both J&J Consulting and J and J Purchasing. Though he claims he was a victim, he apparently also solicited friends, family, and clients to invest through an entity he controlled (American Colocation Services, LLC). In addition, the state court receivership does not include six Defendants named in this action (Humphries, Jager, Jongeward, Seybert, Tanner, and J&J Alaska), and none of the eleven Relief Defendants. While Murphy has argued that one of the eleven Relief Defendants named in this action—The Judd Irrevocable Trust—is subject to the receivership, Judd is taking the position that the Trust is not subject to the state receivership and that the receivership has no jurisdiction over J&J Consulting Services Inc. (Nevada) or J and J Purchasing because those entities are subject to the pending involuntary bankruptcy petition. Also, the state court receiver is not a fiduciary to all investors, but to Murphy. As such, the state court receivership order cannot replace or substitute for the far broader and necessary relief that this Court can grant.

Also on March 17, 2022, certain investors filed involuntary Chapter 11 petitions against J&J Nevada and J and J Purchasing in bankruptcy court in this District. *See In re J&J Consulting Services, Inc.*, No. 22-10942-mkn (Bankr. D. Nev.). That case, which involves two of the eleven defendants here, cannot substitute for the relief the SEC requests here, for several reasons.

In particular, Judd remains in control of those two J&J entities and may continue to retain

control for some time. The petitioning creditors are seeking the appointment of a trustee and an asset freeze over some (but not all) of the Defendants and Relief Defendants, but Judd—in an effort that appears to be aimed at opposing appointment of a bankruptcy trustee—recently passed a corporate resolution appointing a Chief Restructuring Officer ("CRO") and said he will oppose the bankruptcy unless his selected CRO is approved. Thus, it appears that, absent further (and time-consuming) litigation in the Bankruptcy Court, J&J Nevada and J and J Purchasing will proceed in Chapter 11 only if the two entities are controlled by Judd's selected CRO. Even if the case ultimately proceeds in Chapter 11, it only involves J&J Nevada and J and J Purchasing, and the CRO or a bankruptcy trustee would need to take further action to take control over the assets of other Proposed Defendants or Proposed Relief Defendants.

In the meantime, the SEC—which is prepared to intervene in the bankruptcy case and will coordinate with this Court and the Bankruptcy Court regarding the entry of the proposed TRO and asset freeze here—cannot stand by and await the litigation in the Bankruptcy Court while Judd (and the many other Defendants and Relief Defendants not currently subject to the Bankruptcy Court's jurisdiction) continues to sell properties and liquidate investor assets.

This Court can enter an asset freeze to prevent Defendants from continuing to dissipate assets while the parties' disputes are resolved in the Bankruptcy Court. In drafting the Bankruptcy Code, Congress was ever mindful not to allow the bankruptcy court to become a haven for wrongdoers. *SEC v. Elmas Trading Corp.,* 620 F. Supp. 231, 240 (D. Nev. 1985), *aff'd,* 805 F.2d 1039 (9th Cir. 1986), *quoting CFTC v. Co. Petro Mktg. Group, Inc.,* 700 F.2d 1279, 1283 (9th Cir. 1983). The Bankruptcy Code reflects this policy through an exception to the automatic stay codified under 11 USC Section 362(b)(4) which allows regulatory, police and criminal actions to proceed in spite of the automatic stay and which exception is designed to prevent wrongdoers from frustrating police and regulatory action, including SEC enforcement actions, by seeking refuge in bankruptcy court. *See S.E.C. v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000); *see also SEC v. First Fin. Grp. of Texas, 645 F.2d 429, 439 (5th Cir. 1981)*; *SEC v.*

*Towers Fin. Corp,* 205 B.R. 27, 30 (S.D.N.Y.1997)(primary purpose of SEC enforcement actions is to promote public policy and safety by ensuring fair and equitable securities markets).

The Section 362(b)(4) exception includes a governmental unit's right to take action to control or take possession of property of a defendant-debtor, such as seeking an asset freeze or the appointment of a receiver in district court. Specifically, Congress expanded the scope of the governmental exception to the automatic stay so that governmental regulatory actions are explicitly excepted from Section 362(a)(3) which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." This amendment codified well settled case law that interpreted the automatic stay exception to permit governmental units to freeze assets and appoint receivers. *See SEC v. Tyler,* No. Civ.A. 3:02 CV 0282, 2002 WL 32538418 (N.D.Tex. Feb. 21, 2002) (issuing order for asset freeze after bankruptcy filing); *SEC v. Morriss,* 2012 WL 2154903, at *1 (noting that asset freeze was issued against relief defendant after bankruptcy filing).[3]

Thus, the Court should use its well-established authority to enter the TRO and asset freeze; and counsel for the SEC will ensure that the Bankruptcy Court is made aware of this Court's order and coordinate with both Courts to expeditiously resolve the issue.

---

[3] *See also S.E.C. v. Wyly,* 73 F. Supp. 3d 315 (S.D.N.Y. 2014), *aff'd in part and remanded sub nom. S.E.C. v. Miller*, 808 F.3d 623 (2d Cir. 2015), and *vacated in part sub nom. SEC v. Wyly,* No. 1:10-CV-05760-JPO, 2017 WL 4119282 (S.D.N.Y. June 12, 2017) (in civil enforcement action brought by SEC against chairman of board of directors and executor of will and estate of board's former vice-chairman, the temporary asset freeze and other relief sought by SEC, including expedited discovery, preservation of financial documents, and accounting of assets, were warranted in order to preserve SEC's ability to enforce a final judgment, even though chairman and widow of former vice-chairman had sought bankruptcy relief while SEC's application was pending); *CFTC v. Co Petro Marketing Grp., Inc.,* 700 F.2d 1279, 1283 (9th Cir.1983)(governmental unit exception to the automatic stay provision "extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment."); *SEC v. First Fin. Grp. of Texas,* 645 F.2d at 439 (district court properly granted relief sought by the SEC requesting appointment of a temporary receiver to prevent dissipation of assets); *S.E.C. v. Wolfson,* 309 B.R. 612, 620 (D. Utah 2004) (automatic stay exception permits district court to appoint a receiver); *Elmas Trading,* 620 F. Supp. at 240-41 (exception to the automatic stay provisions found in U.S.C. § 362(b)(4) enabled district court to properly rule on Receiver's motion to include debtor corporation in the Receivership).

**B.     The Court Should Also Order Accountings, Document Preservation, And Expedited Discovery.**

The Court's broad equitable powers in SEC enforcement actions include the ability to order ancillary relief to require an accounting and prohibit document destruction. *See Wencke*, 622 F.2d at 1369. Here, the Court should enter an order prohibiting the destruction of documents to prevent Defendants from destroying evidence of their violations and ongoing fraud. The Court should also allow the SEC to conduct expedited discovery—primarily for the purpose of tracing additional assets and ensuring that the asset freeze can be used to freeze all available funds for investors. Expedited discovery is authorized by Rules 30 and 34 of the Federal Rules of Civil Procedure and a court's broad equitable powers in SEC enforcement actions to order all necessary ancillary relief. *See Wencke*, 622 F.2d at 1369. For similar reasons, the Court should also require Defendants to prepare accountings, so the SEC can identify all available assets to help ensure that funds and assets are frozen properly and available to satisfy any future order of disgorgement or civil penalties against them. *See Int'l Swiss Invs. Corp.*, 895 F.2d at 1276.

## <u>CONCLUSION</u>

For the foregoing reason, the SEC respectfully asks the Court to grant the SEC's Motion and enter the proposed Temporary Restraining Order and other requested relief.

DATED this 13th day of April, 2022.

> \_\_*/s/ Tracy S. Combs*_____
> Tracy S. Combs
> Casey R. Fronk
> Attorney for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION