# Exhibit 19

## <u>Declaration of Marshall Gibbs, D.D.S.</u>

I, Marshall Gibbs, pursuant to 28 U.S.C. § 1746, declare as follows

      1.     I am over the age of 21 and a resident of Cheney, Washington.  I make this declaration based upon my personal knowledge.  If called to testify, I could and would competently testify to the following facts.

      2.     I became acquainted with Jason Jongeward in approximately 2018 when I bought the home in which I currently live from Jongeward. Jongeward later moved into home he built in my neighborhood.

      3.     In late 2020, during a conversation I had with Jongeward while walking in the neighborhood, Jongeward told me that he would like to share an investment opportunity that, in his words, "changed his life." In a couple of subsequent telephone conversations in November or December 2020, Jongeward told me that the investment opportunity he referenced in our prior conversation was offered through J & J Consulting Services, Inc. ("J&J Consulting"), and involved investments in "settlement contracts" for "slip and fall claims." During these conversations, Jongeward told me that Jeffrey Judd operated the business with an attorney named Matthew Beasley, and that Jongeward's long-time friend, Shane Jager, was also involved. Also during these conversations, Jongeward told me that the "settlement contracts" involved plaintiffs who had settlements with insurance companies for slip and fall claims and who wanted a portion of their settlement money quickly without waiting for the insurance company to pay. During these conversations, Jongeward told me my investment, as with other investors' investments, would enable these plaintiffs to get money quickly, and that I would receive investment returns as the plaintiffs repaid the principal, plus interest, once the insurance companies paid the settlements. Jongeward further told me that there was, in his words, "little to no risk" on the investment since the investment would involve cases in which insurance companies had already entered the settlements with the plaintiffs.

4.      In these conversations in November or December 2020, Jongeward also told me the following: that the settlement contracts were $80,000 or $100,000 each, and paid 25% returns every 90 days; that Judd kept half of the returns and gave the remaining 12.5% to the investors; and that Judd was willing to give 12.5% of the 25% return to investors as a way to "pay it forward" to help others. Thus, Jongeward said, I would get 12.5% return every 90 days on my investment, for an annual return of 50%. Jongeward also said in these conversations that I could "split" a contract with another investor if I wanted to invest less than $80,000. Jongeward told me in these conversations that at the end of each contract's term of 90 days, I would receive payment of 12.5% and my principal would "roll" into a new settlement contract with a different slip and fall victim. He further told me that I could get my principal back if I gave notice at least three weeks before the expiration of the current 90-day settlement contract. In December 2020 I decided to make my first investment. He instructed me that I should invest through a limited liability company. Relying on Jongeward's instruction, I invested through my limited liability company Crestview Capital. My initial investment was for $70,000 in December 2020. I invested additional money at various points for a total of $940,000.

5.      On December 20, 2020, Jongeward emailed me the wiring instructions. He instructed me to wire the money to the Beasley Law Group IOLTA account at Wells Fargo Bank with "Jager" in the "wire line memo." The wiring instructions for my additional investments stayed the same until September 13, 2021, when Jongeward instructed me by email that there were "NEW wire instructions" and that I should now wire my investment money to a Wells Fargo account in the name of J and J Consulting Services instead, with an address of 9 Sky Arc Ct., Henderson Nevada. True and correct copies of Jongeward's emails dated December 20, 2020 and September 13, 2021 are attached as **Exhibit 1** and **Exhibit 2**. Shortly after getting the new wire instructions in September 2021 and before I wired another investment using the new wire instructions, I asked Jongeward why the wire instructions changed. Jongeward replied that too much money was flowing through a single bank account and the bank would not allow it, so they needed to have investments flow through other bank accounts.

6.      Beginning with my first investment in December 2020 and continuing to January 5, 2022, Jongeward provided me two-page documents stating that my entity Crestview Capital would be purchasing portions of "Purchase Agreements," named according to the purported name of the tort plaintiff. Attached as **Exhibit 3** is true and correct copy of one of these documents along with Jongeward's email sending it to me.

7.      On January 5, 2022, Jongeward told me in an email that going forward, he would no longer provide me written contracts like **Exhibit 3** for each investment, and would instead just send me emails stating that my contracts had been "replaced," and stating the last names of the slip and fall victims for the prior contract and the "replacement" contract, along with the amount of my investment. A true and correct copy of Jongeward's January 5, 2022 email is attached as **Exhibit 4.**

8.      I spoke with Jongeward numerous times because he was my neighbor. In various conversations I had with him, the specific dates of which I do not recall, Jongeward also told me additional details about the investment. He suggested that investors should not contact Judd or Jager. He said investors were prohibited from contacting any of the attorneys or individuals who were parties to the settlement contracts. Jongeward also suggested that investors should not disclose to anyone the way that the investments worked, and the reason for nondisclosure was that they did not want someone else to start a competing business. He said this type of business was competitive. Jongeward characterized this as a "gentleman's investment club." Jongeward said that he received payment from Jager for finding new investors. He never told me how much Jager paid him for finding new investors, but he said sometime in the winter of 2021-2022 that the payments, in his words, were "more than he felt he deserved for the amount of work he did."

9.      After investing, I always received my interest payments on time. My interest payments came from a variety of bank accounts, including JL2 Investments LLC and Stirling Consulting, LLC. Jongeward told me that Stirling Consulting, LLC was Shane Jager's entity and JL2 Investments LLC was Jongeward's entity. Jongeward told me in an email dated December 13, 2021 that I would receive Forms 1099 from both JL2 Investments LLC and Stirling

Consulting LLC. On February 2, 2021, Jongeward forwarded to me and other "undisclosed recipients" an email from Jager reiterating that we would receive Forms 1099 from those two entities. A true and correct copy of that February 2, 2021 email is attached as **Exhibit 5.**

10.     I never requested the return of any of my investment.

11.     On July 7, 2021, Jongeward emailed a non-disclosure agreement to me and other "undisclosed recipients," saying that we must sign the NDA to participate in the investment. True and correct copies of Jongeward's July 7, 2021 email and the attached NDA are attached hereto as **Exhibit 6.**

12.     On October 16, 2021, Jongeward emailed a document entitled "Update for Owners of Settlement Liens," a true and correct copy of which is attached as **Exhibit 7.**

13.     In October and November 2021, Jongeward sent additional emails to me and other investors stating that "J & J Consulting Group" was undergoing a "Business Review." True and correct copies of Jongeward's emails to me and others on October 4, November 5, and November 17, 2021 are attached as **Exhibit 8, Exhibit 9, and Exhibit 10.**

14.     On December 18, 2021, Jongeward sent me two emails, attaching documents for a new entity called J&J Purchasing, LLC:  a Private Placement Memorandum; Non-Compete, Non-Disclosure and Non-Solicitation Agreement; Mutual Confidentiality and Non-Disclosure Agreement, and a Confidential Subscription Agreement. True and correct copies of his emails and the attachments are attached as **Exhibits 11 and 12.**

15.     At various points in 2021 and 2022, Jongeward would introduce other investment opportunities to me. For example, in an email dated February 8, 2021 that Jongeward sent to me and other "undisclosed recipients," Jongeward forwarded documents regarding an investment opportunity in a company called "SkyBell." Attached as **Exhibit 13** are true and correct copies of this email and its attachments. On September 6, 2021, Jongeward sent an email to me and other "undisclosed recipients" regarding an investment opportunity in a project called the "Grand Desert Behavioral Hospital" and mentioning investments in other companies called "Magic spoon, Kinder beauty box, and others." A true and correct copy of the September 6, 2021 email

is attached as **Exhibit 14.** On November 5, 2021, Jongeward sent an email to me and other "undisclosed recipients" regarding an investment opportunity in a company called Spacestation Mining, a true and correct copy of which is attached as **Exhibit 15.** On January 14, 2022, Jongeward sent an email to me and other "undisclosed recipients" regarding an investment opportunity in a company called Eco Battery, a true and correct copy of which is attached as **Exhibit 16.** Jongeward sent additional emails about the Eco Battery investment (including wire instructions) in January, February, and March 2022 as well. True and correct copies of Jongeward's additional emails about Eco Battery are attached as **Exhibit 17** (January 27, 2022), **Exhibit 18** (February 24, 2022), **Exhibit 19** (February 24, 2002, second email),[1] and **Exhibit 20** (March 3, 2022).

16.     In the winter of 2021-2022, Jongeward and his family moved out of their home in our neighborhood in Cheney, Washington. Jongeward told me he was moving to the St. George, Utah area. I kept in touch with him by email and telephone after he moved away, and Jongeward would also periodically travel to Washington State and visit me. I saw him in January or February 2022 during one of his visits. At that time, he told me that he thought the settlement contract investment program had about 2-5 years more, but he did not think it would continue indefinitely. He said it was becoming management-intensive, and that Matthew Beasley had made suggestions about not wanting to continue as the attorney. Jongeward said that if Beasley decided not to continue, they would just look for another attorney. He pitched me the investment in a different company called Eco Battery. He also said he was thinking of taking some of his money out of the settlement contract investment to move it into the Eco Battery investment instead.

17.     A week or two after the meeting in January or February 2022, on a phone call with Jongeward, Jongeward and I were discussing how long it would take for Jongeward to place an additional $400,000 investment from me into new settlement contracts with slip and fall

---

[1] Portions of Exhibit 19 have been redacted to hide the private information of another investor.

plaintiffs. Jongeward suggested that I could consider buying out another investor's settlement contracts if I wanted to invest more money into settlement contracts faster. Jongeward also said that he was considering having his settlement contracts bought out by other investors to free up cash to place in the Eco Battery investment.

18.     On March 8, 2022, Jongeward emailed me and other investors about the FBI standoff with Matthew Beasley. A true and correct copy of that email is attached as **Exhibit 21.** This is how I learned that the FBI shot Beasley.

19.     Jongeward sent additional update emails to me and other investors on March 11, March 13, and March 22, 2022. True and correct copies of these emails are attached as **Exhibits 22, 23, and 24** respectively.

20.     On March 17, 2022, Jongeward visited me in my home in Cheney. Jongeward said he had driven up from St. George, Utah. Jongeward said that he had multiple phone conversations with Jager, and that Jager had said he was considering selling his assets so he could start paying some "restitution" to investors. Jongeward said that his wife and children were in Mexico on a family trip, but that Jongeward chose to stay behind to "take care of some things." He mentioned that if he were in an investor's shoes, he would likely not reach out to speak with authorities about the investment, saying something to the effect that he himself would not want to talk to the FBI or SEC because it may complicate things. Jongeward showed me a purported settlement agreement on the screen of his smart phone, and claimed that he thought it was legitimate. He said that it would be easy for him to start up a settlement contract investment business again. He said "we" still have many settlement agreements that "we" were able to

recover. He claimed that some of the attorneys whose names appear on the settlement agreements purportedly confirmed that they had worked with Beasley in the past. He said he never got paid for finding new investors for the settlement agreements, which was contrary to what he had previously told me. He also continued to pitch the Eco Battery investment to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Cheney, Washington on April 4, 2022

Marshall Gibbs (Apr 4, 2022 08:02 PDT)

Marshall Gibbs

# Exhibit 1

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** December 20, 2020 at 4:33:11 PM PST
**To:** █████████████
**Subject: Fwd: Wire instructions**

Marshall,   Here is the wiring instructions for the contract investment. You should receive the investor agreement by Tuesday for your review. Please have your captial wired by 12 noon tomorrow. Remember to put "Jager" in the wire line memo. LMK if you have any q's.

       Wells Fargo Bank
       Routing/swift code: 121000248
       420 Montgomery St.
       San Francisco CA, 94104

       Beasley law Group IOLTA
       Acct# █████5598
       3090 s. Durango Drive
       Las Vegas, NV 89117



**Jason Jongeward**
509-768-4990
[www.jcdspokane.com](http://www.jcdspokane.com)

--



**Jason Jongeward**
509-768-4990
[www.jcdspokane.com](www.jcdspokane.com)

# Exhibit 2

From: Jason Jongeward <jason.jcd@gmail.com>
Date: September 13, 2021 at 8:33:55 AM PDT
To: Marshall Gibbs ▮▮▮▮▮▮▮▮
Subject: Fwd: Reminder email- 9-13-21

Morning Marshall, I have you for 1- 80k contract this week.

Please see the NEW wire instructions as they have been adjusted from Beasley law firm to J and J Consulting Services.

After your wire is sent, please send me a confirmation text.

We ask that the wire be sent before noon on Wed.
Please put "Jager" on the Wire memo line.

Capital should be wired to:

Wells Fargo Bank
Routing/swift code: 121000248
420 Montgomery St.
San Francisco CA, 94104

J and J Consulting  Services
Account #▮▮▮▮▮▮0153
9 Sky Arc Ct.
Henderson, NV 89012

Also, this is what the week looks like:

Saturday- Available contract notification.
Monday- Reminder email with instructions.
Tuesday- Investor receives the buyers agreement to approve, sign, and return.
Wednesday- Capital associated with each agreement needs to be transfered to J and J Consulting Services Account by 12 Noon Wed.

If you have any questions, let me know.

Regards,

Jason Jongeward

# Exhibit 3



**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** December 29, 2020 at 2:45:43 PM PST
**To:**
**Subject:** Crestview Capital - Sanford 80k split.pdf

Hi Marshall, Here is the 70k Investor agreement for you this week. Please review, sign and return. You should have received the wire instructions yesterday. Please confirm when wire has been completed. Thanks , Jason

December 29, 2020

Attn: Crestview Capital

Re: Sanford Investment Agreement between J&J Consulting/Jeffrey Judd and Crestview Capital

J&J Consulting/Jeffrey Judd has a business where he purchases contracts (Purchase Agreements) for attorney's clients once a settlement has been reached and an award has been granted. Jeffrey Judd uses his own money and money from friends and family to purchase these contracts. Jeffrey Judd uses the services of Matthew Beasley Esq. to assist him in finding these agreements and also to write the contracts. The Purchase Agreement act as a lien on the client's settlement.

Crestview Capital (Entity) and TJI LLC will be purchasing part of the Sanford Purchase Agreement. This will be a split Purchase Agreement (See Attachment) for $80,000 and the term of the contract will be for 90 days. Crestview Capital will be investing $70,000 and TJI LLC will be investing $10,000 to equal the said amount. If the agreement closes within 90 days, the Entity will receive a return of $8,750. If this agreement extends over 90 days, the Entity will receive $3,250 for each additional month the contract goes over the 90 days.

Marshall Gibbs will represent the Entity and be instructed by Shane Jager, representing J&J Consulting, as to where to wire the funds and other matters.

The Entity and their members are prohibited from contacting any parties related to the injury settlement or Purchase Agreement, without the written consent of Jeffrey Judd.

Force Majeure. No Party shall be deemed in default of any Purchase Agreement or, unless otherwise expressly provided therein, any Ancillary Agreement for any delay or failure to fulfill any obligation hereunder or thereunder so long as and to the extent to which any delay or failure in the fulfillment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure.  In the event of any such excused delay, the time for performance of such obligations shall be extended for a period equal to the time lost by reason of the delay. A Party claiming the benefit of this provision shall, as soon as reasonably practicable after the occurrence of any such event, (a) provide written notice to the other Party of the nature and extent of any such Force Majeure condition; and (b) use commercially reasonable efforts to remove any such causes and resume performance under this Agreement and the Ancillary Agreements, as applicable, as soon as reasonably practicable.

Shane Jager, acting through Stirling consulting LLC, will represent the Entity (instructed by Shane Jager, representing J&J Consulting) limited to such matters as to where to wire incoming

funds, issuing ACH returns and the return of principal (upon the Entity exit) to the Entity as provided by J&J Consulting per this Investment Agreement. Shane Jager and Stirling consulting LLC are hereby indemnified and held harmless in all other matters pertaining to the Purchase Agreement's and the Investor Agreement's now and in future agreements.

_____        12/29/2020
Jeffrey Judd                                                    Date

_____
Marshall Gibbs                                                Date

Attachment A

Purchase Agreement

# Exhibit 4

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** January 5, 2022 at 6:01:41 AM PST
**To:** Marshall Gibbs ██████████████ >
**Subject: Contract replacement 1-6-22 - Hirschman 40k and trager 100**


Hi Marshall, Your contracts have been replaced this week. The Hirschman 40 is now the Kuschel 40 and the Trager 100 is now the Williamson 100. Both payments have been sent this morning. We will now simply send an email with contract names and dates for your records. The subscription addendum will be used when you add or subtract from you invested amount.  Take Care,   Jason

Sent from my iPad

# Exhibit 5

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** February 2, 2021 at 9:13:57 PM PST
**Subject:** Investment Tax Information

Turn off for: English

Hello Everyone,
I just received this email from Shane today.

"Fellow Investors-
We now have agreement among four separate accountants (who also purchase settlement liens) on their opinion of the proper treatment of this "asset purchase". As you may know Jeff Judd revised the "Investor Agreement" language this year to clarify that these settlement lien purchases are an asset purchase, they are not loans. In fact going forward they will be called "Buyer Agreements" not "Investor Agreements" for additional clarification. The accountants we have discussed this with all agree that the accounting for these asset purchases should be reflected on Schedule D, as short term capital gains. For example, an $80k purchase has proceeds of $90k, therefor in one year the tax base would be 4 x $80k = $320k with proceeds of 4 x $90k = $360k resulting in a $40k short term capital gain.  The title used for this asset purchase should be something generic such as Asset Purchase, Lien Purchase, Settlement Lien Purchase, etc. This type of tax treatment does not require a 1099.  Therefor you can discuss this with your accountant but we do not plan on sending out 1099s.
Thank you for your interest.
Shane Jager"



**Jason Jongeward**
509-768-4990
www.jcdspokane.com

# Exhibit 6

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** July 7, 2021 at 7:51:07 PM PDT
**To:** undisclosed-recipients:;
**Subject: Contract Investment Non-disclosure Agreement to be signed**

Greeting Fellow Investors,

Please see the attached non-disclosure agreement required by J&J Consulting Services in order to participate in the personal injury contract investment.

**Please sign, date, and email back to me at your earliest convenience.**

Purchase agreements are not shared with investors as they contain private information that is confidential.  Under no circumstance is any investor or their CPA allowed to contact the client or their participating attorney.

Respectfully,

**Jason Jongeward**
509-768-4990

## NON-COMPETE, NON-DISCLOSURE AND NO

## SOLICITATIONAGREEMENT

This Non-Compete, Non-Disclosure and Non-Solicitation Agreement (hereinafter referred to as the "Agreement") is entered into this day of _____, by and between J & J Consulting Services, Inc. (hereinafter referred to as the "Business") and_____(hereinafter referred to as the "Potential Investor").  The Business and the Potential Investor are sometimes referred to hereinindividually as a "Party" and collectively as the "Parties".

## TERMS

For good consideration and as an inducement for the Business to disclosevaluable and confidential information to the Potential Investor, the undersignedPotential Investor hereby agrees as follows:

### Non-Compete:

The Potential Investor understands that the Business operates throughout the United States. As such, the Potential Investor agrees not to directly or indirectly compete with the Business and its successors and assigns within the United States for aperiod of two (2) years following the communication of the confidential information tothe Potential Investor.

The term "not to directly or indirectly compete" as used herein shall mean thatthe Potential Investor shall not own, manage, operate, consult or be employed in a business substantially similar to or competitive with, the Business or such other business activity in which the Business may substantially engage.

The Potential Investor acknowledges that the Business shall or may in reliance ofthis Agreement provide the Potential Investor access to trade secrets, customers, attorneys, and other confidential data and/or information and good will. Potential

Investor agrees to retain said information as confidential and not to use said information on his/her own behalf or disclose the same to any third-party.

This non-compete agreement shall be binding upon and inure to the benefit ofthe Parties, their successors, assigns and personal representatives.

**<u>Non-Disclosure:</u>**

Confidential information as it relates to this Agreement refers to all information,whether provided in writing or verbally, that is not generally known to the public.
Confidential information includes, but is not limited to the Business's trade secrets, customers, customer lists, attorneys, attorney lists, vendors, good will, financial information, concepts, techniques, manuals, syllabi, designs, data, computer programs and business activities and operations.

The Potential Investor agrees that the confidential information to be provided bythe Business constitutes valuable information and is the exclusive property of the Business. Potential Investor agrees not to directly, or indirectly, without the express written consent of the Business, communicate, copy, disclose or make available any confidential information provided by the Business or relating to the Business. The Potential Investor further agrees to not use any of the confidential information for his/her purposes or on his/her own behalf for any purpose whatsoever.

The Potential Investor agrees that the term of this Non-Disclosure portion of thisAgreement is for a period of ten (10) years unless cancelled in writing by the Business.

**<u>Non-Solicitation:</u>**

Potential Investor agrees that after receiving the confidential information fromthe Business and/or during the term of this Agreement, that he/she will not engage, employ, solicit for employment, interfere with, or endeavor to entice away from the Business, directly or indirectly, any employee, independent contractor,

attorney, vendor, client, student, or any and all other person(s) with any affiliation whatsoeverwith the Business.

The Potential Investor agrees that the term of this Non-Solicitation portion of theAgreement is for a period of ten (10) years unless cancelled in writing by the Business.

**<u>Miscellaneous Terms:</u>**

(a)     The Parties agree and acknowledge that they have carefully read and fullyunderstand all of the terms and provisions of this Agreement and have reviewed the same with their attorney of choice, if any, prior to execution of this Agreement.

(b)     The Parties agree and acknowledge that this Agreement was determinedafter negotiations and that the Parties' attorney, if any, participated in the drafting of this Agreement, and as such, should not be strictly construed for or against any of the Parties hereto.

(c)     The Parties agree and acknowledge that they are knowingly andvoluntarily agreeing to **<u>all</u>** of the terms set forth in this Agreement.

(d)     The Parties agree and acknowledge that they knowingly and voluntarilyintend to be legally bound by the same and that they entered into this Agreement voluntarily and not as a result of coercion, duress, or undue influence.

(e)     The Parties agree and acknowledge that this Agreement shall become binding and effective as of the date and time that it is fully executed by both Parties.

(f)     The Parties agree and acknowledge that this Agreement may be executedin counterparts, and each executed counterpart shall have the efficacy and validity of asigned original and with the same effect as if all Parties hereto had signed the same document. All counterparts so executed shall be deemed to be an original, shall be construed together and shall constitute the entire Agreement.

Photographic copies of such executed counterparts may be used in lieu of the original.

(g)     The Parties agree and acknowledge that this Agreement shall be binding upon the Parties hereto and upon their heirs, administrators, representatives, executors,successors, and assigns, and shall inure to the benefit of said Parties and each of them and to their heirs, administrators, representatives, executors, successors, and assigns.

(h)     The Parties agree and acknowledge that this Agreement constitutes the complete and entire agreement between the Parties and supersedes any and all prior communications, agreements and understandings, written or oral, between the Parties.

(i)     The Parties agree and acknowledge that this Agreement may not be altered, amended, supplemented, modified or otherwise changed in any way whatsoever, except by a separate written agreement authorized and executed by allParties.

(j)     The Parties agree and acknowledge that this Agreement shall be governedby and construed in accordance with the laws of the State of Nevada, without regard toconflict of law principles.

(k)     The Parties agree and acknowledge that in executing this Agreement theydid not rely upon any representation or statement made by either Party or by any of theParties agents, attorneys, or representatives with regard to the subject matter, basis, or effect of this Agreement or otherwise other than those specifically stated in this written Agreement.

(l)     The Parties agree and acknowledge that should any term and/or provision of this Agreement be declared or determined by a Court of competent jurisdiction to be wholly or partially illegal, invalid or unenforceable as a result of any action or proceeding, the validity of the remaining terms, releases and provisions

shall not be affected and said illegal or invalid term, release or provision shall be deemed notto be a part of this Agreement.

(m)     The Parties agree and acknowledge that the waiver by either of the Partieshereto of any term, release or provision of this Agreement shall not be construed as a waiver of any other or subsequent term, release or provision.

(n)     The Potential Investor understands that his/her failure to comply with this Agreement in any way will cause the Business irreparable harm.  As such, PotentialInvestor agrees that the Business is entitled to immediate injunctive relief should any such violation of this Agreement occur.

DATED this day of_____.

**J & J CONSULTING SERVICES, INC.**

_____          _____
By:  JEFFREY JUDD, President          By: Potential Investor

# Exhibit 7

10-16-21

Update for Owners of Settlement Liens,

As J&J Consulting (Jeff Judd) Settlement Lien business has matured, Jeff has consulted with an attorney who has worked for the SEC. Jeff is in the process of implementing the following modifications:

- All purchasers of settlement liens, aka "contract investment", need to become an **"Accredited Investor"**. If you have any questions regarding the definition of an Accredited Investor you will need to consult with your accountant (I have included a link for your reference below). Jeff is having a document prepared which will need to be signed by anyone who wants to remain a purchaser of settlement liens. If you are unable to sign the document(s) as an accredited investor, your capital will be returned at the expiration of your Buyer's Agreements.

- https://www.investopedia.com/terms/a/accreditedinvestor.asp

- There will also be language either in the same document or an additional document indicating that the funds used to purchase settlement liens are from a legitimate/legal source.

- Stirling Consulting pays the weekly settlement lien returns to JL2 Investments LLC and will provide JL2 Investments LLC a Form 1099 for the 2021 Tax Year. Likewise, JL2 Investments LLC will generate a Form 1099 for you.

- Weekly payments from Stirling Consulting to JL2 Investments LLC now exceed Wells Fargo's Business Direct $250,000 maximum daily transfer limit. Sterling has and will continue to request Wells Fargo to increase that limit but in the interim payments to JL2 Investments LLC will be split and paid over two days. This will delay payments to lien owners by 1-3 days.  Investors should expect payment no later than Friday afternoon.

Thank you,

Jason Jongeward
jason.jcd@gmail.com

# Exhibit 8

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** October 4, 2021 at 12:14:16 PM PDT
**Subject:** Extended capital placing period

Fellow investors,

I wanted to inform each of you that there will be an additional capital placing period for the next 3-4 weeks. As all of you are aware, we were anticipating the "pause" of new capital as of Oct 1st, during a Business Review of J and J Consulting Services LLC with the personal injury settlement contract purchasing investment.  I am excited for this additional period of time in order to help each of you reach your individual goals with the investment.

That being said, I would like to prepare for this additional period and need to update each investor and their current status. For those that are looking to capture additional contracts and those who are content. Those who I have spoken to, I would ask you to confirm as well.  I look forward to hearing from each of you. As always if you have any questions, please don't hesitate to email me.

Regards,

Jason Jongeward
JL2 Investments LLC

# Exhibit 9

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** November 5, 2021 at 12:21:52 PM PDT
**To:** undisclosed-recipients:;
**Subject: Settlement Lien Investment Update**

Case 2:22-cv-00612-JCM-EJY    Document 2-6    Filed 04/13/22    Page 34 of 309

Good morning fellow and future investors,

I wanted to provide an update for the Settlement Lien Investment. As you know, Jeff Judd, has been reviewing the investment to ensure that it stays healthy and strong moving forward into the future. Jeff had considered pausing new capital temporarily to control the very heavy growth trajectory.

J and J Consulting has seen a surge in additional contracts in Sept. and October and has stayed flexible to handle this additional contract volume by extending the window of new capital placement. That pause has been delayed through October and now is pushing through November and December. We are seeing a larger contract request volume from firms now more than ever before. That being said, the opportunity for all investors continues to stay open through the end of the year. I suspect that may continue into the new year as well. As we progress through the next months, I will continue to update each of you on the overall status and availability of additional contract placement.

We also expect to see the additional documents soon regarding the accredited investor requirement and disclosure of funds.

We are grateful to have such a great group of investors and appreciate your flexibility as we continue to manage and adjust with the incredible growth of this unique investment moving forward.

Please email me at Jason.jcd@gmail.com if you have any questions or inquiry to the current contract waiting list and timeframes. I look forward to hearing from you.

Regards,
Jason Jongeward

# Exhibit 10

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** November 17, 2021 at 2:41:20 PM PST
**To:** undisclosed-recipients:;
**Subject: Personal Injury contract investment update**

Hello Fellow investors and Friends,

   I hope all is well with each of you. I wanted to provide an update as alot of you have asked about the "Business Review" that is currently ongoing by the J and J consulting group. The question is how much larger does this Investment  become as we crest 325M. They discussed slowing capital placement in order to control growth, however Jeff Judd is keeping the window open for the time being due to a large surge of new contracts over the last few months. We haven't added any additional firms, but are seeing a larger production from current participating firms. The window will stay open through the end of the year and we will monitor our capital vs contract flow to make adjustments as needed. Capital placement currently sits at 1-3 weeks after requested.

   We also understand that we will have adjustments in paperwork. We will see new NDA's, investor questionnaire, and qualification. We look to get these new Doc's out after thanksgiving and would like to get them back by Christmas. As I have additional information, I will keep you informed. Feel free to reach out if you have any additional questions.

Best,

 Jason Jongeward

# Exhibit 11

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** December 18, 2021 at 7:02:08 PM PST
**To:** Marshall Gibbs <█████████████████>
**Subject: New Investor Subscription Agreement**

Hello. Marshall,

Please see the new subscription agreement attached from J and J Purchasing.  This document will be replacing the current 2-page Buyers Agreement.

Please review, sign, and return this subscription agreement to me with a cc to Jeff Judd at jeffreyjudd13@icloud.com.

Please take note on page 2, under subscription 1A "NEED AMOUNT", you will need to put your total investment amount here.  Your current invested amount is $940,000.

This document will need to be returned to Jeff and I by December 27th.

Please direct all questions to me via email and I will get with you next week.

Regards,

Jason

# J AND J PURCHASING, LLC
# CONFIDENTIAL SUBSCRIPTION AGREEMENT

THE INVESTMENT OFFERED HEREIN HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF THE INVESTMENT IS SUBJECT TO ABSOLUTE RESTRICTIONS.

IT IS IMPOSSIBLE TO ACCURATELY FORECAST TO A PURCHASER THE RESULTS FROM AN INVESTMENT IN PARTIAL BENEFICIAL INTERESTS UNDER THIS OFFERING.

NO ONE CAN PREDICT WHETHER OR TO WHAT EXTENT THE COMPANY'S PROPOSED BUSINESS MIGHT BE SUCCESSFUL. THE INVESTMENT IN THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF AN ENTIRE LOSS OF THEIR INVESTMENT.

Unless otherwise indicated, the terms used herein shall have the meanings set forth in the Private Placement Memorandum issued on behalf of the Company dated January 1, 2022 (the "Memorandum"), the Company's Operating Agreement, the Company's Code of Ethics and Business Conduct, and Company Policies (collectively, the "Subscription Documents").

References herein to the "Subscriber" has the same meaning as "Investor" and means the individual or entity executing this Subscription Agreement as the Subscriber and which defined term is not meant to include his or her spouse or any Third Party or other interest holder, if any, unless his or her spouse or Third Party or other interest holder is specifically referenced herein and becomes bound to and certifies all relevant documents evidencing the Subscriber's investment described herein including all Subscription Documents and as satisfying all other Company Due Diligence matters.

The undersigned Subscriber understands that **J and J Purchasing, LLC**, organized pursuant to the laws of the State of Florida (the "Company") is offering for Investment such Partial Beneficial Interests in Purchase Contracts germane to Third-Party Beneficiary Insurance Settlement Agreements in the increment amounts of $80,000.00 or $100,000.00 for each such Partial Beneficial Interest with a minimum amount to be invested is $80,000.00 as further described herein and pursuant to the governance established by the Company's Operating Agreement (the "Operating Agreement") which the Subscriber joins (as Investor and not Member) concurrent to this Subscription Agreement.

The Partial Beneficiary Interests are being offered to Subscriber pursuant to the Memorandum at the investment price set forth in the Memorandum to be paid in exchange for the Investment Return and a Right of Redemption, which exchange will be designated through the "Closing." The Subscriber acknowledges its receipt and review of the Memorandum and Subscription Documents, including the Company Operating Agreement and Code of Business Ethics and Business Conduct, and understands that the Partial Beneficiary Interest in Purchase Contracts is offered only pursuant to the terms and conditions and in the manner described herein and all Subscription Documents.

The Subscriber acknowledges that it, he, or she is not acting based on anyone's oral representations, certifications, or warranties and understands that this Offering is being made without registration of the Partial Beneficial Interests under the Securities Act of 1933, as amended (the "Securities Act"), or any securities, "blue sky" or other similar laws of any state ("State Securities Laws"). The Subscriber further understands and acknowledges that the Partial Beneficial Interests are being offered by the Company acting through its principals only and that the opportunity to invest in Partial Beneficial Interests is offered by the Company with no commission or other remuneration paid to any person, directly or indirectly, for solicitation of Investors or otherwise for the offering and sale of Partial Beneficial Interests under the Offering/the Subscription Documents. Any "Finder" directly or indirectly affiliated with the Company may not serve or act in any way as a financial or investment advisor, any of which act would be prohibited under the Act or any other SEC limitations, including without limitation that any Finder may not: (1) provide investment advice or recommendations to potential investors; (2) negotiate any of the terms of this offer; (4) create or modify the materials related to this offering; (4) have substantial prior involvement in the sale of securities, either by affiliation with a registered broker-dealer or in any

other capacity; (5) receive, directly or indirectly, possession or custody of any funds in connection with the issuer transaction.

If any Finder may be related to the Company or this offering, such Finder may or will have to provide to any potential accredited investor such advisable or required disclosures; provide services as a Finder only under a written agreement explicitly defining the role of the Finder and the compensation; the Finder may not engage in general solicitation; the Finder will only relate to potential investors that are "accredited investor" as defined in Rule 501 of Regulation D or the Finder has a reasonable belief that the potential investor is an "accredited investor;" the Finder is not an associated person of a broker-dealer; and, the Finder is not subject to statutory disqualification, as that term is defined in Section 3(a)(39) of the Exchange Act, at the time of his or her participation.

The expected beneficial interest inuring to Investor under Purchase Contracts (the "Partial Beneficial Interest") for the Investment Return is offered to Subscriber at a price and the variable increment amounts of $80,000.00 or $100,000.00 for each such Partial Beneficial Interest with a minimum amount to be invested of $80,000.00.

(1) ***Subscription***. Subject to this Subscription Agreement's terms and conditions and the provisions of the **Memorandum**, the Company Operating Agreement, the Investor Questionnaire and as satisfying all other Company Due Diligence matters:

(A) **The Subscriber elects to invest** in __x__ $ 80,000.00 and/or _x_ $ 100,000.00 incremental **Partial Beneficial Interests (*enter number of Partial Beneficial Interests to be purchased in accordance with the minimum set out in this PPM and as singularly or collectively relevant to the amount(s) of the relevant Purchase Contract*) with a total Investment Principal cash investment of $ NEED AMOUNT.**

(B) The Subscriber hereby tenders: (1) one completed and signed copy of this ***Subscription Agreement*** (the "Subscription Agreement"), (2) a completed ***Investor Questionnaire***, (3) if applicable, a completed ***Purchaser Representative Questionnaire***, (4) a joiner to the ***Company Operating Agreement*** in the form attached as ***Exhibit B*** to the **Memorandum**, and [after Company has certified its Due Diligence and Investor is informed that this Subscription Agreement has been accepted and countersigned] (5) ***confirmation of the wired Investment Principal*** in the amount equal to the number of Partial Beneficial Interests being subscribed for hereunder and made payable to J and J Purchasing, LLC to the following **Well Fargo Bank NA (Nevada) Routing Number: 121000248, Account Name, Beasley Law Group IOLTA** (noting that, upon the Company's acceptance by Company of the Subscription Documents, an authorized Company officer will inform the prospective Investor of the Account Number).

(2) ***Acceptance of Subscription***. The Subscription and all other items in Section 1(B) above will be deemed accepted by the Company only after review, acceptance, and execution of all relevant items by the Company.

(3) ***Subscriber's Adoption of the Company Operating Agreement and Grant of Power of Attorney***. The Subscriber hereby ratifies, adopts, accepts, and agrees to be bound by all the sections, terms, and provisions of the Company Operating Agreement and to perform all obligations therein imposed, including but not limited to, with respect to the **Partial Beneficial Interests** to be negotiated and secured by Company through Purchase Contracts. Moreover:

(A) The Subscriber hereby consents to the disposition of the proceeds from the Offering of the Partial Beneficial Interests as described in the **Memorandum**. Upon acceptance of this Subscription by the Company and the satisfaction of the conditions set forth in this Subscription Agreement, including Para. 1(B) above, the Subscriber will become a **Partial Beneficial Interest** beneficiary under the Investor specific Purchase Contract, *provided however, the Company retains the right, in its sole discretion and for any reason whatsoever, to modify, amend, and/or withdraw all or a portion of the Offering and/or to accept or reject, in whole or in part, any prospective Partial Beneficial Interest investment or to allot to the Subscriber fewer than the number of Investment Partial Beneficial Interests that the Subscriber desires to Subscribe*. The Company will have no liability whatsoever to the Subscriber if any of the foregoing occurs.

(B) The Subscriber hereby makes, constitutes and appoints the Company, its successors and assigns, with full power of substitution and re-substitution, the Subscriber's agent and true and lawful attorney-in-fact to sign on the Subscriber's behalf and to sign, execute, certify, acknowledge, file and record any other instruments that may be required of the Company by law including as germane to Purchase Contracts, the Transacting of Partial Beneficial Interests/Insurance Settlement Agreements, the issuance of Investment Return, the effectuating of

any Right of Redemption and the admission of additional or substituted Investors, provided such admission or substitution is in accordance with the terms of the Company Operating Agreement, resolution, or as allowed by law. The Subscriber authorizes Company as attorney-in-fact to take any further action as Company will consider necessary or advisable in connection with the foregoing, hereby giving such attorney-in-fact full power and authority to act to the same extent as if the Subscriber were personally present, and hereby ratifying and confirming all that such attorney-in-fact will lawfully do or cause to be done by virtue hereof. The power of attorney granted hereby is a special power of attorney coupled with an interest, is irrevocable, and will survive the death, insanity, or incapacity of the Subscriber. Execution of any document by the Company as attorney-in-fact for the Subscriber will be deemed by Third Parties to be conclusive evidence of the authority of the Company to so act.

(4) ***Representations, Covenants, Agreements, and Warranties of the Subscriber***. Acknowledging and certifying that the Company intends to and shall rely on the Subscriber's Representations, Certifications, Covenants, Agreements, and Warranties (collectively the "***Subscriber's Representations and Warranties***") — which will survive any acceptance of the subscription and admission of the Subscriber as Partial Beneficial Interest Investor — the Subscriber hereby represents, certifies, covenants, agrees, and warrants to the Company as follows:

(A) ***Representation of Subscriber by Purchaser Representative. The Subscriber certifies that***:

1. _____ has acted as his, her, or its "**Purchaser Representative**" as defined in Regulation D promulgated under the Securities Act of 1933, as amended [***complete if Subscriber used a Purchaser Representative, otherwise insert "n/a"***];

2. The Subscriber has relied upon the advice of such Purchaser Representative as to the merits of an investment in the Company and the suitability of that investment for the Subscriber; and

3. Such Purchaser Representative has heretofore disclosed to the Subscriber in writing during this transaction any past, present, or future relationship, actual or contemplated, between the Purchaser Representative and his, her, or its affiliates and the Company. Subscriber certifies that the Purchaser Representative has disclosed no such relationship.

(B) ***Restrictions on Transfer, Hypothecation, Sale or any Transfer of a Partial Beneficial Interest or part of a Partial Beneficial Interest or Investment***.

1. The Subscriber acknowledges and certifies that: (a) the Company is relying on the ***Subscriber's Representations and Warranties*** as well as Subscribers' acknowledgements, certifications, and agreements contained in this Subscription Agreement and otherwise (and any supplemental or amended information germane to the preceding) for the purpose of determining whether this transaction meets the requirements of this Offering and/or for such exemption as required by the Securities Act; and (b) the offer and sale of the **Partial Beneficial Interests** have not been registered under the Securities Act by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of the Subscriber and of the other Representations and Warranties made by the Subscriber in this Subscription Agreement or as germane to the Company Operating Agreement; and

2. The Subscriber acknowledges and certifies that the Partial Beneficial Interests in Purchase Contracts will be deemed to constitute a restricted security under (a) the Securities Act, (b) the rules and regulations of the Securities and Exchange Commission promulgated thereunder, and (c) state securities laws and regulations. According to such deemed restrictions, the Subscriber acknowledges that Subscriber may dispose of the Partial Beneficial Interest in Purchase Contract only pursuant to this Memorandum and the terms of the Company Operating Agreement. The Subscriber acknowledges that the Company has made no representation regarding the registration of any Partial Beneficial Interest invested for hereunder and the Company shall not be obliged to so register the Partial Beneficial Interest any time; and

3. The Subscriber understands that it is deemed that there exists no public market for the Partial Beneficial Interests in Purchase Contract which may only be transacted by the President of the Company or his designee. Moreover, the Subscriber understands that it is deemed that no public market for the Partial Beneficial Interests in Purchase Contract will develop. The Subscriber certifies his agreement that he shall bear all economic risks of the investment in the Partial Beneficial Interests, including pursuant to any Event of Default. The Subscriber acknowledges that no term or condition of this Subscription Agreement or the Company Operating Agreement allows Subscriber to expect or require repurchase the Subscriber's Partial Beneficial Interests and

Right of Redemption except as described in this Memorandum, specifically, that Investors retain an absolute right to call back ("Redeem" through a "Right of Redemption") their Investment Principal any time after the expiration of the 90-day Placement Period through this Offering, subject to an Event of Default. Any redemption will be made and settled as soon as reasonably practicable which means five (5) business days after the Placement Period and when Investor informs Company in writing of their exercise of their Right of Redemption and as concomitant to the Investor's receipt of the Investment Return.

4.    The Subscriber shall not — nor make any attempt to — sell, assign, pledge, give, transfer or otherwise dispose, alienate, or diminish any Partial Beneficial Interest or part of a Partial Beneficial Interest, or Investment subscribed for herein. The Company shall in no case be required to recognize any such transfer or attempted transfer of any Partial Beneficial Interest or part of a Partial Beneficial Interest, or Investment until and except upon compliance of all legal and Company Operating Agreement requirements, including, at the discretion and approval of the Company's President.

5.    Stop transfer restrictions may be issued with respect to the Partial Beneficial Interests to restrict the resale, pledge, hypothecation, or other transfer thereof, subject to the further terms hereof, including pursuant to the Subscription Documents. During the existence or term of the Company, such restrictions and stop transfer instructions described above shall be placed upon any relevant document that may issue hereafter.

6.    The Subscriber has not offered or sold any portion of any Partial Beneficial Interest or part of a Partial Beneficial Interest or Investment subscribed for hereunder and has no past, present or future intention of dividing any Partial Beneficial Interest or part of a Partial Beneficial Interest or Investment with any other person or entity or of reselling or otherwise disposing of any Partial Beneficial Interest or part of a Partial Beneficial Interest or Investment either currently or after the passage of a fixed or determinable period of time or upon the occurrence or nonoccurrence of any predetermined event or circumstance. Accordingly, the Partial Beneficial Interests for which the Subscriber hereby subscribes are and will be acquired only and specifically for his, her, or its own account for investment and not with the view toward resale or redistribution or partition of any kind, and he, she, or it does not presently have any reason to anticipate any change in his, her, or its circumstances or other particular occasion or event that would cause him, her, or it to sell, alienate or otherwise transfer Subscriber's interest in any Partial Beneficial Interest in a Purchase Contract or part of a Partial Beneficial Interest in a Purchase Contract or the Investment.

(C) ***Financial Ability to Bear Loss Risk***. The Subscriber has (or, if applicable, the Subscriber and his, her, or its Purchaser Representative have) such significant and material knowledge and experience in financial and business matters that he, she, or it is (or are) capable of evaluating the merits and risks of an investment in the Partial Beneficial Interests in Purchase Contracts and the Investment in this Offering and the suitability of same as an investment for the Subscriber and the Subscriber is able to fully bear the economic risk of an Investment hereunder and that:

1.    The Subscriber's total Investment (including the full amount of any personal guarantees required in connection therewith) does not exceed 10% of Subscriber's net worth (excluding house, home furnishings and automobiles); and

2.    The Subscriber meets all additional suitability standards and financial requirements that may be required in the jurisdiction in which the Subscriber resides or is purchasing in a fiduciary capacity for a Person meeting such suitability standards and/or financial requirements and the Subscriber is not a minor; and

3.    The Subscriber has and will retain the ability to bear the economic risks of Subscriber's prospective investment, including a complete loss of the Investment, Investment Principal, and Investment Return. The Subscriber has and will retain the ability to bear the economic risk of the Investment hereunder because the Subscriber has sufficient net worth to sustain a loss of the any Investment Return without economic hardship if such loss should occur; and

4.    The Subscriber has not been offered the Partial Beneficial Interests or Investment by any form of: (a) advertisement, article, notice, or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or any seminar or meeting whose attendees have been invited by any such media, or (b) through any direct or indirect financial benefit as offered by any person or entity; and

5.    The Subscriber understands that no federal agency, including the Securities and Exchange Commission, and no state securities regulatory agency has approved or disapproved the Partial Beneficial Interests in Purchase Contracts or Investment set for in this Memorandum, passed upon or endorsed the merits of the offering or the accuracy or adequacy of the Memorandum or made any finding or determination as to the fairness of the Partial Beneficial Interests or Investment set out herein; and

6.    The Subscriber and its Purchaser Representatives, if any, have been solely responsible for the Due Diligence or any other investigation of the Company and its management and business, for Subscriber's own analysis of the merits and risks of this investment, the Partial Beneficial Interests in Purchase Contracts, activities of and relationship to the Company or its President, all Conflicted Parties matters, and for Subscriber's own analysis of the fairness and desirability of the terms of the Investment. In taking any action or performing any role relative to the proposed Investment, the Subscriber has acted solely in Subscriber's own interest, and the Subscriber (or any of its agents or employees) has not acted as an agent of the Company.

(D) ***Subscriber's Acknowledgements Regarding Reliance on the Memorandum and Company Operating Agreement***. The Subscriber has not relied on any representations or warranties from the Company, its President or its employees or agents, other than those contained in — or any supplement or addenda to — the Memorandum, the Company Operating Agreement, this Subscription Agreement, or Investor Questionnaire, and:

1.    The Subscriber has received, read, and is fully familiar with the Company Operating Agreement and Memorandum, including the exhibits attached thereto and any amendments, supplements thereof, and confirms that all documents, records, and books pertaining to the proposed investment in the Company have been made available to the Subscriber and/or Subscriber's Purchaser Representative; and

2.    The Subscriber and/or its Purchaser Representative have had an opportunity to ask questions regarding: (a) the various matters discussed in the Company Operating Agreement and Memorandum and any amendments or supplements thereof, (b) the terms and conditions of this Subscription Agreement and the Partial Beneficial Interests and the Investment, (c) the business prospects of the Partial Beneficial Interests in Purchase Contracts germane to Third-Party Beneficiary germane Insurance Settlement Agreements, Mr. Jeffrey Judd and the Company, and (d) any such other questions as the Subscriber, Subscriber's legal, financial, tax, investment or other representative, and anyone has or may have had deemed necessary to Subscriber's investment decision with respect to the Partial Beneficial Interests and Investment pursuant to this Offering (and that all such questions have been answered to the full satisfaction of the Subscriber). The Subscriber has not relied on any representation or statement by anyone associated with the Company, including its President, Mr. Jeffrey Judd. Indeed, in making a decision to invest in the Partial Beneficial Interests/this Investment/germane to the securing of Purchase Contracts germane to Third-Party Beneficiary Insurance Settlement Agreements, the Subscriber has relied solely on independent investigations by the Subscriber including Subscriber's legal, investment, financial and tax counselor's or representative's review of the Memorandum, Company Operating Agreement, this Subscription Agreement and all other addenda or supplements to these documents and all other relevant information; and

3.    The Subscriber has had called to Subscriber's attention, both in the Memorandum and by those individuals with whom the Subscriber has dealt in connection with this Offering's Investment that: (a) an investment hereby in Partial Beneficial Interests as germane to the securing of Purchase Contracts involving Third-Party Beneficiary Insurance Settlement Agreements by the Company involves a substantial degree of risk and is suitable only for Investors with adequate means who have no need for liquidity for their investments all of which may be subject to loss pursuant to an Event of Default, (b) the sale or any transfer of the investment germane to Partial Beneficial Interests is restricted and it is deemed that there is no market for the sale or transfer of Partial Beneficial Interests and none may be expected, and (c) the fact that the Subscriber meets the suitability standards described herein and in the Memorandum does not necessarily mean that the purchase of an interest in the Company is a suitable investment for the Subscriber; and

4.    The Subscriber represents that: (a) no assurances are being made or have been made regarding the tax advantages or disadvantages that may inure to the benefit or detriment of the Investor and no assurance has been made that existing tax laws and regulations will not be modified in the future, potentially denying to the Investor of the Company any relevant or tax benefits that may presently be available under existing tax laws and regulations, and (b) no assurances are or have been made concerning cash or other Investment Return or

payments by the Company to the Investor; and

    5.   The Subscriber acknowledges that the Company has made available to the Subscriber or Subscriber's Purchaser Representative the opportunity to obtain additional information to verify the accuracy of the information contained in the Memorandum and to evaluate the merits and risks of this investment including, but not limited to, the income or other tax consequences of the Investment and holding or benefiting or loss of the benefit of or in Partial Beneficial Interests. The Subscriber without reservation confirms that Subscriber has consulted with legal, investment, financial and tax advisors regarding the Partial Beneficial Interests and Investment herein, the Company Operating Agreement and the documents relating thereto. The Subscriber represents that Subscriber has made other investments of a similar nature and, by reason of Subscriber's significant and material business and financial experience and the business and financial experience of those persons the Subscriber has retained to advise Subscriber with respect Subscriber's investment pursuant to this Offering and has acquired the capacity to protect Subscriber's own interest in investments of this nature. In reaching the conclusion that the Subscriber desires to invest in this Offering, the Subscriber has carefully evaluated the financial resources and investment position of the Subscriber, and the risks associated with this investment and represents that Subscriber is able to bear the economic risks of this investment.

    (E) **_Subscriber's Representations and Warranties_**.

    1.  **FINANCIAL DUE DILIGENCE MATTERS**.

    (a)  Subscriber has not received or been offered (directly or indirectly) loans or any financial or property benefit of any kind — from: (i) the Company, or (ii) its Manager, Managing Member President, Treasurer or Secretary, or (iii) any person affiliated with the Company, or (iv) from any potential, current or former Company Member or Owner, or (v) any person or entity holding a direct or indirect, individually or entity held ownership in interest in any Member, or (vi) any current or past Investor in the Company — for the purpose of enabling or otherwise promoting such Subscriber to invest in the Company or otherwise; and

    (b)  Subscriber has: (i) not filed or is planning to file for any type of bankruptcy, (ii) no outstanding arrest warrant; and (iii) not been criminally convicted of, or pled guilty or _nolo contendere_ to, any state or federal felony or misdemeanor offense of moral turpitude or related in any way to the purchase or sale of any security in the last ten (10) years from the time of signing this Agreement; and

    (c)  Subscriber is not subject to any order, judgment, or decree, entered within the last five years, that restrains or enjoins Subscriber (i) from any conduct or practice related to the purchase or sale of any security, (ii) as related to the making of any false filing with the SEC, or (iii) arising out of the conduct of the business of the Subscriber as, but not limited to, an underwriter, broker, or dealer of securities; and

    (d)  Subscriber is not subject to any order of: (i) a state securities commission; (ii) a state authority that supervises or examines banks or similar institutions; (iii) a state insurance commission; (iv) a federal banking agency; or (v) the National Credit Union Administration; and

    (e)  Subscriber is not subject to an SEC order entered pursuant to section 15(b) _or_ 15B(c) of the Securities Exchange Act of 1934 [15 U.S.C. 78o(b) or 78o-4(c)) _or_ section 203(e) _or_ (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) _or_ (f)] and Subscriber has never acted in violation of any investment advisor or financial advisor laws or regulations;   and

    (f)  Subscriber has not been suspended or expelled from membership in, or suspended or barred from association with a member of a registered national securities exchange or a registered national or affiliated securities association; and

    (g)  Subscriber has not filed (as a registrant or issuer), or was not named as an underwriter in, any registration statement filed with the SEC that, within five years before such relevant sale, was the subject of any action, investigation or proceeding and Subscriber is not subject to a US Postal Service false representation order; and

    (i)  Subscriber acknowledges and certifies their understanding of restrictions of transferability of Partial Beneficial Interests.

2. **NO CONFLICTED SOURCE OF ANY FUNDS TRANSFERRED**.

(a)  Investor has reviewed the Company's Code of Ethics and Business conduct and AML Policies and adopts both in all respects regarding this Offering and their Investment. Investor certifies that no aspect of Investor's investment under this Offering will violate any content in the Subscription Documents and that all information certified in Investor's Questionnaire or otherwise is complete and accurate and further certifies that Subscriber has never acted directly or indirectly as a financial or investment advisor germane to any Third Party at any time and will not do so in the future unless Subscriber is legally allowed to do so under all applicable laws and regulations.

(b)  Subscriber further certifies that any investment made in Partial Beneficial Interests or funds that Subscriber may transfer germane to this Offering are sourced solely as consistent with Subscriber's representations and warranties under this Subscription Agreement and the underlying Investor Questionnaire which is fully incorporated into this Subscription Agreement and otherwise, and whether as germane to Subscriber's certified status as an Accredited Investor or otherwise, Subscriber's certifications remain true and accurate that any source of investment funds relating directly or indirectly to any Partial Beneficial Interest is compliant with all of Subscriber representations and warranties made herein and the Investor Questionnaire.

(c)  Subscriber warrants to Company that any funds or amounts that Subscriber transfers to Company for investment germane to Partial Beneficial Interests shall be consistent with all, without limitation, Accredited Investor status and Anti-Money Laundering warranties and certifications that Subscriber certifies or makes otherwise in this and any other document relevant to the Offering.

(c)  Subscriber warrants that any funds, however or from wherever sourced, that Subscriber transfers to the Company shall only be sourced and originate from an Accredited Investor and that directly or indirectly, however sourced, the Accredited Investor is in compliance with all Anti-Money Laundering standards, warranties and certifications set out as a condition of this Offering and as consistent with Company's Compliance Program, and further all of which Subscriber will transparently disclose to the Company if any action by Subscriber, or fact or circumstance, deviates from the preceding standards. Nonetheless, Subscriber certifies to Company that any funds transferred to Company under this Offering do not conflict with the Company's compliance program, as not subject to forfeiture by any Government or any other Third Party and have no connection to any criminal activity or violation by anyone, anywhere, anytime.

(F) *Additional Representations and Warranties.* The Subscriber certifies that Subscriber will as soon possibly notify the Company of any material fact or circumstance that causes in the future or would cause any *acknowledgement, representation, covenant, agreement, certification, acts or actions, warranty, or any statement of the Subscriber* in this Subscription Agreement, as germane to the Company Operating Agreement or any other supplement or addendum to same be untrue, incomplete, or misleading, and furthermore:

1. The Subscriber certifies that no person or entity has offered or given, directly or indirectly, anything of value for the Subscriber's investment in the Company; and

2. The Subscriber certifies that by reason of Subscriber's significant and material knowledge and experience in financial and business matters in general, and investments in particular, the Subscriber and Subscriber's legal, investment, financial and tax advisors can evaluate the merits and risks of the investment in the Partial Beneficial Interests. Nonetheless, the Subscriber acknowledges that none of the information or discussion contained in the Memorandum constitutes or is to be construed as legal advice or financial or investment advice; and

3. THE SUBSCRIBER ACKNOWLEDGES AND AGREES THAT THE COMPANY'S OUTSIDE LEGAL COUNSEL HAS PARTICIPATED IN THE PREPARATION OF THE MEMORANDUM AND EXHIBITS THERETO. SUBSCRIBER UNDERSTANDS THAT THE CREATION OF SUBSCRIBER'S DOCUMENTS, INCLUDING THE PRIVATE PLACEMENT MEMORANDUM, THE QUESTIONNAIRE, THE SUBSCRIPTION AGREEMENT, AND THE COMPANY OPERATING AGREEMENT, CODE OF ETHICS AND BUSINESS CONCUT AND ANY OTHER DOCUMENTATION AND, IF ANY, COMMUNICATIONS BETWEEN OUTSIDE COUNSEL AND PROSPECTIVE, ACTUAL, OR PAST INVESTOR TO COMPANY, DO NOT CREATE AN ATTORNEY-CLIENT RELATIONSHIP BETWEEN ANY SUBSCRIBER OR INVESTOR AND SUCH LEGAL COUNSEL.SUCH LEGAL COUNSEL DOES NOT PURPORT TO HAVE MADE ANY INVESTIGATION OR TO HAVE ACTED INDEPENDENTLY ON BEHALF OF THE SUBSCRIBER OR INVESTOR OR MADE ANY

INDEPENDENT INVESTIGATION OF THE PARTICULARS, VALIDITY OR POTENTIAL OUTCOMES OF ANY INVESTMENT PURSUANT TO THIS OFFERING. EACH SUBSCRIBER MUST CONSULT WITH HIS OR HER OWN LEGAL, FINANCIAL, INVESTMENT, AND TAX COUNSEL IN CONNECTION WITH AN INVESTMENT IN THE COMPANY; and

4. As of the date of this Subscription Agreement and at the Closing, the Subscriber has and shall have all requisite legal power and authority to enter into — and perform Subscriber's obligations under — this Subscription Agreement and the as germane to the Company Operating Agreement all of which constitute valid and binding obligations inuring to the Subscriber and enforceable against Subscriber in accordance with their terms except as relevant and limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other laws of general application relating to or affecting rights and remedies of creditors generally and to general legal principles (regardless of whether in equity or at law; and

5. No consent, approval, or authorization of or designation, declaration, registration, qualification or filing with any governmental or professional authority on the part of the Subscriber is required in connection with the valid execution and delivery of this Agreement; and

6. THE SUBSCRIBER HAS BEEN ADVISED THAT CONFLICTS OF INTERESTS MAY OR DO EXIST BETWEEN THE SUBSCRIBER'S INTERESTS AND THOSE OF THE COMPANY, THE PRESIDENT, ITS OFFICERS, THE COMPANY'S OTHER INVESTOR OR OWNERS OF SUCH INVESTOR EITHER HOLDING A DIRECT OR INDIRECT AND INDIVIDUALLY OR ENTITY HELD OWNERSHIP INTEREST IN OTHER BUSINESS VENTURES OR AFFILIATED ENTITIES OR OTHER AFFILIATES OF THE COMPANY AND AS INVESTOR OF PARTIAL BENEFICIAL INTERESTS OR AS GERMANE TO COMPANY ALL OF WHICH RELATIONSHIPS AND CONFLICTS HAVE BEEN FULLY DISCLOSED TO SUBSCRIBER TO THE SUBSCRIBER'S FULL SATISFACTION; and

7. The Subscriber certifies that the Company's **Memorandum**, Company Operating Agreement, Business Plan, Subscription Agreement and any supplements or addenda thereto constitute strictly confidential documents and information all of which are subject to Subscriber's and Company's prior executed Non-Disclosure Agreement.

(5) *Indemnification*. The Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties in this Subscription Agreement, and in particular Para. 4 hereof, and the Investor Questionnaire, and hereby agrees to indemnify and hold harmless the Company, the Company's Director, President, Treasurer or Secretary and any other Investor, and the Company's agents and employees, from and against any and all loss, damage, or liability due to or arising out of a breach of any Representation and Warranty. Notwithstanding the foregoing, however, no representation, warranty, acknowledgment, or agreement made herein by the Subscriber will in any manner be deemed to constitute a waiver of any rights granted to the Subscriber under federal or state securities laws.

(6) *Limitation on Transfer of Interests*. The Subscriber acknowledges that Subscriber is aware that there are restrictions on the transferability of any Partial Beneficial Interests. Since the Partial Beneficial Interests will not be, and the Subscriber has no right to require that they be, registered under the Securities Act, Florida securities laws or the securities laws of any other state or jurisdiction, the Partial Beneficial Interests may not be, and the Subscriber agrees that they will not be, sold unless such sale is exempt from registration under said Act and laws or the applicable securities laws of any other state or other jurisdiction. The Subscriber further acknowledges that the Partial Beneficial Interests may not be sold and the purchaser substituted, except in accordance with the Company Operating Agreement and pursuant to Director, President, Treasurer or Secretary's approval, which includes mandates that in any divorce or other action whereby an interest of another person or entity may encroach on the valuation of the ownership of any Partial Beneficial Interest, that the Subscriber shall not deviate from required action to protect such Partial Beneficial Interests. Accordingly, the Subscriber confirms that if married, the Subscriber shall cause his or her spouse joins the Company Operating Agreement (*infra*). The Subscriber also acknowledges that the Subscriber will be responsible for compliance with all conditions of transfer imposed by any federal or state blue sky or securities law or regulation and for any expenses incurred by the Company for legal or accounting services in connection with reviewing such a proposed transfer.

(7) *Cooperation*. Each Subscriber must cooperate with any financial or other institutions providing financing for the Company and must make every reasonable effort to support the overall efforts of the Company and its Investors in securing such financing. In furtherance of this objective, each Subscriber's obligations include, but are not limited to, providing financial statements and other documentation required for the lending institution's credit analysis as may be relevant to the purchase of Insurance Settlement Agreements.

(8) *Compliance and Interstate Disclosure of Adverse Legal Risk*. The Subscriber and/or Subscriber's Representative hereby certify that Subscriber has had the opportunity to and did seek independent legal and tax counsel regarding the entirety of **Memorandum** and enters into this relationship, Subscription Agreement and Company Operating Agreement and executes all pursuant to such legal and tax advice. In addition, pursuant to the Subscriber's independent legal counsel's review of this **Memorandum**'s **Interstate Disclosure of Adverse Legal Risk**, Subscriber and their legal counsel have concluded to their satisfaction that — regarding or in the State in which subscriber resides, in the case of an entity investor, the State in which the investor does business in or is incorporated, the Investor, through his or her or its investment in the Company or in relation to the business activities of the Company as related to the Investor or otherwise — all questions regarding federal or state laws and any other applicable statute, laws, rules, regulations, or case law have been answered to the full satisfaction of the Subscriber and/or its Representative prior to making this investment.

(9) *Investor Representative*. If Subscriber is an entity, the Subscriber hereby designates _____ as the "Investor Representative" under Subscription Agreement or as germane to Subscriber's joinder to the Company Operating Agreement (the "Investor Representative"). By signing this Subscription Agreement, the Investor Representative accepts such designation and unconditionally agrees to abide by, and be subject to, the provisions of the Company Operating Agreement, including but not limited to the representations and warranties, covenants and obligations set forth in Article VII of the Company Operating Agreement, as applicable. The Investor Representative may only be changed or replaced with the prior written approval of the Company.

(10) *Representations and Warranties of the Investor Representative*. The Investor Representative represents and warrants to the Company as follows:

(A) The Investor Representative controls or is the main beneficiary of the Subscriber and, as such, he will receive direct and indirect benefits derived from the subscription of the **Partial Beneficial Interests** by the Subscriber;

(B) The Investor Representative understands that he will have no rights whatsoever to the **Partial Beneficial Interests** or as a Member or otherwise in the Company; and

(C) The Investor Representative has received a copy of the Company Operating Agreement and recognizes and acknowledges the joinder obligations, covenants, limitations, and restrictions as the Investor Representative pursuant to the same. The Investor Representative expressly acknowledges and represents that he or she fully understands the scope of such obligations, covenants, limitations, and restrictions and agrees to abide by the same.

(11) *Survival*. All representations, warranties, and covenants contained in this Subscription Agreement and the indemnification contained herein will survive: (a) the acceptance of the Subscription hereunder pursuant to the offer described in the **Memorandum**, (b) changes in the transactions, documents, and instruments described in the **Memorandum** that are not material, and (c) the bankruptcy or dissolution of the Subscriber.

[*INTENTIONALLY LEFT BLANK*]

(12)     ***Subscriber Contact Information***. The Subscriber's contact information is as follows:

| | |
|---|---|
| **Legal Name of Holder of Interest:** | |
| **Tax Identification Number (i.e., SSN or EIN):** | |
| **Primary Address:** | **Mobile:** |
| | **Email:** |
| Please send the following information to my **PRIMARY ADDRESS** (check all applicable boxes):<br>☐ _____ ☐**Tax Information** | |
| **Secondary Address:** | **Mobile:** |
| | **Email:** |
| Please send the following information to my **SECONDARY ADDRESS** (check all applicable boxes):<br>☐ _____ ☐ **Tax Information** | |

13. ***Investor Representative Contact Information***

| | |
|---|---|
| **Full Name:** | |
| **Tax Identification Number (i.e., SSN or EIN):** | |
| **Primary Address:** | **Mobile:** |
| | **Email:** |

(14)     ***Adoption of the Company Operating Agreement***. The Subscriber, by execution of this Subscription Agreement, accepts and agrees to be bound by all of the terms and provision of the Company Operating Agreement and does hereby agree to perform all obligations therein imposed upon Subscriber of the Company and germane to Partial Beneficial Interests, Investment Return, and any Right of Redemption.

(15)     ***Governing Law, Jurisdiction and Venue***. The Subscriber acknowledges and certifies Subscriber's agreement that the primary place of business of the Company shall be its corporate offices in Florida. This Agreement is governed by and will be construed in accordance with the law of the State of Florida, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction. Unless otherwise mutually agreed to by the parties, Florida shall be — and the parties agree to submit themselves to Florida. personal and subject matter jurisdiction — the exclusive venue for any proceeding involving the Subscriber and the Company that may be brought, or arise out of, or in connection with or by reason of this Subscription Agreement including its interpretation, construction, and enforcement. The parties hereby waive the claim or defense that the Courts of Florida constitute an inconvenient or inappropriate forum or venue.

(16)     ***No Assignment***. This Subscription Agreement is not assignable by the Subscriber, and may not be modified, waived, or terminated except by an instrument in writing signed by the party against whom enforcement of such modification waiver or termination is sought. Any attempted assignment of this subscription by the Subscriber without obtaining the prior written consent of the Company shall be null and void. The fact that the Company refuses to consent to an assignment will not give rise to any claim for damages against the Company, its Members, or any of their respective Director, President, Treasurer or Secretary or officers, agents, or representatives, and any such claims against the Company, its Members, or any of their respective Director, President, Treasurer or Secretary or officers, agents or representatives are hereby expressly waived by the Subscriber.

(17)     **Notification Regarding Any Change**. The Subscriber agrees and covenants to notify the Company immediately upon the occurrence of any event prior, during, and after the Closing that would cause any certification, acknowledgement, representation, covenant, agreement, and/or warranty of the Subscriber in this Subscription Agreement or other statement contained in this Subscription Agreement to be false or incorrect.

(18)     **Notices**. Unless otherwise provided in this Subscription Agreement all communications, notices, approvals, requests or consents under this Agreement or under any statute or other law shall be in writing and shall be deemed to have been duly given when received by the Company. All communications to the Company shall be addressed to the Company's interim office at **J AND J PURCHASING, LLC 9 SKY ARC COURT, HENDERSON, NV 89012 - ATTN: MR. JEFFREY JUDD – PRESIDENT.**

(19) **No Cancellation**. The Subscriber certifies that Subscriber shall not cancel, terminate, or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder. This Subscription Agreement or any agreement of the Subscriber made hereunder will survive the death or disability of the Subscriber and will be binding upon the Subscriber's heirs, executors, administrators, successors, and assigns.

(20)     **Binding Effect**. Except as otherwise provided herein, this Subscription Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and assigns, and the agreements, representations, warranties, and acknowledgments contained herein shall be deemed to be made by and be binding upon such heirs, executors, administrators, successors, legal representatives, and assigns. If the Subscriber is more than one person, the obligations of the Subscriber shall be joint and several and the *Representations, Covenants, Agreements, Warranties,* agreements, and acknowledgements contained herein shall be deemed to be made by and be binding upon each such person and his or her heirs, executors, administrators, and successors.

(21)     **Entire Agreement**. This Agreement, including the Exhibits hereto (each of which is incorporated herein by this reference), constitutes the entire agreement of relating to the internal affairs of the Company and supersedes all prior contracts or agreements with respect to the internal affairs of the Company, whether oral or written.

(22)     **Explicit Waiver of Damages**. Each Subscriber explicitly and irrevocably waives damages under this Subscription Agreement including but not limited to incidental, punitive, exemplary, consequential, special, or indirect damages of any nature (including damages associated with lost profits, business interruption and loss of goodwill) arising at any time, whether in tort (including negligence or gross negligence), warranty, strict liability, or by contract or statute.

(23)     **Severability**. If any provision of this Agreement would, under applicable law, be invalid or unenforceable in any respect, such provision shall (to the extent permitted by applicable law) be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with and possible under applicable law. The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision of this Agreement.

(24)     **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.

[*INTENTIONALLY LEFT BLANK*]

**IN WITNESS WHEREOF**, intending to irrevocably bind the Subscriber and the Investor Representative, personal representatives, successors and assigns of the Subscriber and to be bound by this Subscription Agreement, the Subscriber has executed this Subscription Agreement on the date indicated and adopts all aspect of the Subscription Agreement under penalties of perjury, and further the Subscriber or Investor Representative certifies that (i) the social security and/or taxpayer identification number shown on this or other forms is correct, and (ii) I am not subject to backup withholding because (a) I have not been notified that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (b) the Internal Revenue Service has notified me that I am no longer subject to backup withholding (If you have been notified that you are subject to backup withholding and the Internal Revenue Service has not advised you that backup withholding has been terminated, strike out item (ii)).

EXECUTED this _____ day of _____, 202_, at _____ County, State of [_____].

| SUBSCRIBER | INVESTOR REPRESENTATIVE (*if applicable*) |
|---|---|
| By: | By: |
| Name: | Name: |
| Title | Title: |

## JOINDER TO THE COMPANY AGREEMENT OF J AND J PURCHASING, LLC

THE UNDERSIGNED HEREBY REPRESENTS THAT HE OR SHE HAS READ THE SUBSCRIPTION AGREEMENT AND COMPANY OPERATING AGREEMENT OF *J AND J PURCHASING, LLC* (THE "COMPANY") AND AGREES TO HEREAFTER ABIDE BY AND BE GOVERNED BY THE TERMS OF SUCH COMPANY OPERATING AGREEMENT. THIS JOINDER TO THE COMPANY OPERATING AGREEMENT SHALL BE EFFECTIVE UPON THE ASSINGMENT OF PARTIAL BENEFICIAL INTERESTS GERMANE TO THE COMPANY AND TO THE SUBSCRIBER AND THE APPROVAL AND ADMISSION OF THE UNDERSIGNED AS A SUBSCRIBER UNDER THIS OFFERING AND PURSUANT TO THE TERMS THIS MEMORANDUM, AGREEMENT AND TERMS AND CONDITIONS OF SAID COMPANY OPERATING AGREEMENT AND ANY AMENDED COMPANY OPERATING AGREEMENT. THIS JOINDER SHALL BE ATTACHED TO THE COMPANY OPERATING AGREEMENT AND DEEMED TO BE A PART THEREOF FOR ALL PURPOSES.

| SUBSCRIBER/SPOUSE OF SUBSCRIBER | REGARDING ANY TRUST |
|---|---|
| By: | By: |
| Name: | Name: |
| Title | Title |

**ACCEPTANCE OF SUBSCRIPTION AGREEMENT**

BASED ON A REVIEW OF THE SUBSCRIPTION AGREEMENT SET FORTH ABOVE, IT IS ACCEPTED BY:

J AND J PURCHASING, LLC- AN FLORIDA CORPORATION


BY:



NAME: JEFFREY JUDD

TITLE: PRESIDENT

DATE RECEIVED & ACCEPTED: _____

EFFECTIVE DATE: _____


**ACCEPTANCE OF SUBSCRIPTION**

BASED ON A REVIEW OF THE INVESTOR QUESTIONNAIRE SET FORTH ABOVE AND, IF APPLICABLE, THE COMPLETED PURCHASER REPRESENTATIVE QUESTIONNAIRE, THE UNDERSIGNED CERTIFIES THAT IT HAS REASONABLE GROUNDS TO BELIEVE THAT THE PERSON WHOSE SIGNATURE APPEARS ABOVE MEETS THIS OFFERING'S INVESTOR SUITABILITY STANDARDS.

**ACCEPTED BY:**

J AND J PURCHASING, LLC - A FLORIDA LIMITED LIABILITY COMPANY


By:



NAME: JEFFREY JUDD

TITLE: MANAGER/PRESIDENT

DATE RECEIVED & ACCEPTED: _____

EFFECTIVE DATE: _____

# Exhibit 12

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** December 18, 2021 at 12:14:42 PM PST
**Cc:** jeffreyjudd13@icloud.com
**Subject: Updated Investor Packet**

Fellow Investors,

Please see the attached 3 documents as a part of the new investor packet that will take effect on January 1, 2022.

You will also receive a second email containing the new subscription agreement which will replace the current 2-page buyers agreement.

*It is very important that you cc Jeffrey Judd at jeffreyjudd13@icloud.com as you return these documents to me.  This will simplify things as Jeff will need his own copy for each of your 4 completed documents.*

Here is the information on the attached docs:

**1) PPM Final**-  You will need to review this document and sign pages **50** (Exhibit B-Operating Agreement), **100** (Code of Ethics and Business Conduct), and pages **102-111** which is the Confidential Investor Questionnaire.
**\* The accredited investor requirements are located on page 103. If you have any questions on qualifying, please let me know.**

**2) Revised NDA-** Please review, sign, and return.

**3) Mutual General NDA-** Please review, sign, and return.

We will need these documents returned as soon as possible, but not later than December 27th.

Regards,
Jason Jongeward

**Name of Prospective Investor:** _____

# J & J PURCHASING, LLC

### (“THE COMPANY”)

### A LIMITED LIABILITY COMPANY FORMED UNDER THE LAWS OF FLORIDA
### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
### AGGREGATE OFFERING AMOUNT: UNLIMITED

### JANUARY 1, 2022

### (“EFFECTIVE DATE”)

THE COMPANY OFFERS TO PROSPECTIVE INVESTORS ("**INVESTORS**") PURSUANT TO THIS PRIVATE PLACEMENT MEMORANDUM ("**MEMORANDUM**") AN OPPORTUNITY TO INVEST IN A **PARTIAL BENEFICIAL INTEREST** OF A "**PURCHASE CONTRACT**." PURCHASE CONTRACTS ARE NEGOTIATED BY COMPANY AND ENTERED INTO WITH **"THIRD-PARTY BENEFICIARIES**" OF CERTAIN "**INSURANCE SETTLEMENT AGREEMENTS**." THE CONSIDERATION FOR A COMPANY NEGOTIATED AND SECURED PURCHASE CONTRACT IS FUNDED BY THE INVESTOR'S $80,000.00 OR $100,000.00 "**INVESTMENT PRINCIPAL**." THIS OFFERING IS ONLY OPEN TO "**ACCREDITED INVESTORS**" AND SUBJECT TO ALL COMPANY SUBSCRIPTION DUE DILIGENCE STANDARDS.

A PURCHASE CONTRACT TIED TO AN INSURANCE SETTLEMENT AGREEMENT IS NEGOTIATED AND SECURED BY COMPANY IN $80,000.00 OR $100,000 VALUES. ACCORDINGLY, THE MINIMUM SUBSCRIPTION INVESTMENT UNDER THIS OFFERING IS EIGHTY THOUSAND DOLLARS ($80,000.00) (THE "**MINIMUM OFFERING AMOUNT**") AND UP TO THE MAXIMUM SUBSCRIPTION INVESTMENT OF FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) (THE "**MAXIMUM OFFERING AMOUNT**") (COLLECTIVELY, THE "**OFFERING**"). THE COMPANY'S MANAGING MEMBER/PRESIDENT HAS THE SOLE DISCRETION TO ACCEPT INVESTMENTS UNDER THIS OFFERING IN ANY PARTICULAR AMOUNT OR REQUIRE A HIGHER AMOUNT ALL OF WHICH MATTERS ARE SUBJECT TO COMPANY'S DUE DILIGENCE UNDER ITS COMPLIANCE PROGRAM.

AN INVESTOR UNDER THIS OFFERING, AND AS RELEVANT TO A PURCHASE CONTRACT, INVESTS IN A "**PARTIAL BENEFICIAL INTEREST**." SPECIFICALLY, A PARTIAL BENEFICIAL INTEREST IN THE REVENUE SECURED UNDER THE TERMS OF THE PURCHASE CONTRACT. THE INVESTOR'S PARTIAL BENEFICIAL INTEREST IS EQUAL TO THE "**INVESTMENT RETURN**" WHICH, AFTER THE EXPIRATION OF THE "**PLACEMENT PERIOD**," THE INVESTOR WILL RECEIVE IN A LUMP SUM. AT THAT TIME, THE INVESTOR MAY CHOOSE TO EXERCISE THE "**RIGHT OF REDEMPTION**" FOR THE REFUND OF THEIR INVESTMENT PRINCIPAL. IF SO EXERCISED, THE INVESTOR WILL CEASE TO BE AN INVESTOR. AT SUCH TIME, THE INVESTOR MAY, IN COMPANY'S DISCRETION, AND AS FURTHER DESCRIBED IN THE MEMORANDUM, HAVE THE BENEFIT OF THE "**OPTION TO REINVEST**" THE INVESTMENT PRINCIPAL. THE OPTION TO REINVEST IS NOT AUTOMATIC AND IS SUBJECT TO COMPANY APPROVAL. ALL PROFITS OR REVENUES CAPTURED OR OTHERWISE SECURED UNDER THE TERMS OF ANY PURCHASE CONTRACT, **OTHER THAN THE INVESTMENT PRINCIPAL AND INVESTMENT RETURN**, WILL BELONG SOLELY TO THE COMPANY.

## INVESTOR NOTICES AND DISCLOSURES

THIS **PRIVATE PLACEMENT MEMORANDUM** CONTAINS CONFIDENTIAL INFORMATION. BY ACCEPTING DELIVERY OF THE MEMORANDUM, AS CONSISTENT WITH YOUR PRIOR EXECUTED NON-DISCLOSURE AGREEMENT(S), YOU AGREE NOT TO COPY, DISTRIBUTE, OR DISCLOSE ITS CONTENTS TO UNAUTHORIZED PERSONS OR ENTITIES. SPECIFICALLY, YOU AGREE THAT ANY REPRODUCTION OR DISCLOSURE FOR ANY PURPOSE OTHER THAN FOR THE NAMED PROSPECTIVE INVESTOR'S CONSIDERATION OF AN INVESTMENT UNDER THE OFFERING DESCRIBED HEREIN IS STRICTLY PROHIBITED. IF THE NAMED PROSPECTIVE INVESTOR DECIDES NOT TO PARTICIPATE IN THIS OFFERING, OR IF COMPANY TERMINATES THIS OFFERING, YOU MUST PROMPTLY RETURN THIS MEMORANDUM AND ANY OTHER MATERIAL THE COMPANY MAY SUBSEQUENTLY OR CONCOMITANTLY PROVIDE TO YOU AND TO THE ADDRESS NOTED HEREIN.

THE INVESTMENT DESCRIBED IN THIS CONFIDENTIAL **MEMORANDUM** PURSUANT TO THIS OFFERING IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. THIS MEMORANDUM SETS OUT THE MATERIAL RISKS IN CONNECTION WITH AN INVESTOR'S INVESTMENT UNDER THIS OFFERING FOR THE **PARTIAL BENEFICIAL INTEREST** IN COMPANY NEGOTIATED AND SECURED PURCHASE CONTRACTS TIED TO THIRD-PARTY BENEFICIARY INSURANCE SETTLEMENT AGREEMENTS. THE INVESTOR'S INVESTMENT (THE "**INVESTMENT PRINCIPAL**") WILL BE USED AS CONSIDERATION FOR A "PURCHASE CONTRACT" (SEE GENERALLY, EXHIBIT C) AND, UNDER ITS TERMS AND THOSE OF THIS OFFERING, A PARTIAL BENEFICIAL INTEREST RELEVANT TO SUCH THIRD-PARTY INSURANCE PAID CLAIMS UNDER SUCH THIRD PARTIES' INSURANCE SETTLEMENT AGREEMENT. NO SUCH THIRD-PARTY CLAIMS UNDER ANY INSURANCE SETTLEMENT AGREEMENTS STEM FROM CURRENT COURT LITIGATION, BUT RATHER FROM SETTLEMENT OF SUCH CLAIMS BEFORE ANY RELEVANT LAWSUIT IS FILED BY SUCH THIRD PARTIES. FROM THE PROFITS AND REVENUES SECURED UNDER THE TERMS OF A PURCHASE CONTRACT FUNDED BY THE INVESTOR'S INVESTMENT PRINCIPAL, THE INVESTOR MAY EXPECT TO RECEIVE BACK **ONLY** THEIR "**INVESTMENT PRINCIPAL**" AND THE "**INVESTMENT RETURN**." SPECIFICALLY, UNDER THIS OFFERING, THE INVESTOR MAY **ONLY EXPECT TO RECEIVE THE INVESTMENT PRINCIPAL AND INVESTMENT RETURN** WITH THE COMPANY RETAINING **ALL OTHER PROFIT OR OTHER AMOUNTS REALIZED BY COMPANY OR OTHERWISE SECURED UNDER THE TERMS OF ANY PURCHASE CONTRACT** OR GERMANE TO THE CLAIMS SETTLED IN THE RELEVANT INSURANCE SETTLEMENT AGREEMENT (SEE "**RISK FACTORS AND OTHER DISCLOSURES**").

THE INVESTMENT, UPON EXECUTION AND ACCEPTANCE OF THE ENCLOSED SUBSCRIPTION DOCUMENTS, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), THE LAWS OF THE STATE OF FLORIDA OR THE SECURITIES LAWS OF ANY OTHER STATE AND IS BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH JURISDICTIONS AND LAWS. MOREOVER, THE INVESTMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, THE FLORIDA DIVISION OF SECURITIES, THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, OR ANY OTHER STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION BY ANYONE TO THE CONTRARY IS UNAUTHORIZED AND UNLAWFUL. THE OFFERING DESCRIBED HEREIN IS BEING MADE **ONLY** TO **ACCREDITED INVESTORS** AS DEFINED IN RULE 501 OF REGULATION D OF THE SECURITIES ACT OF 1933, AS AMENDED AND SUBJECT TO COMPANY'S COMPLIANCE PROGRAM DUE DILIGENCE.

SUBJECT TO THE **INVESTOR QUALIFICATION REQUIREMENTS AND VARIOUS OTHER DUE DILIGENCE CONDITIONS** DESCRIBED HEREIN, THIS MEMORANDUM CONSTITUTES AN OFFER **ONLY TO THE PERSON TO WHOM THE MEMORANDUM IS PURPOSEFULLY DISTRIBUTED BY THE COMPANY**. THE COMPANY DOES NOT, UNDER ANY CIRCUMSTANCES, INTEND THIS MEMORANDUM TO CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, TO ANYONE IN ANY STATE IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION. **THE COMPANY RESERVES THE RIGHT, IN ITS SOLE DISCRETION**, TO: (A) MODIFY, AMEND, OR WITHDRAW ANY PORTION OF THE OFFERING, OR (B) TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT UNDER THIS OFFERING, OR (C) TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF INVESTMENT SUCH PROSPECTIVE INVESTOR DESIRES TO INVEST. IN CASE ANY OF THE FOREGOING OCCURS, THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY PROSPECTIVE INVESTOR/SUBSCRIBER.

THE INVESTMENT FOR PARTIAL BENEFICIAL INTERESTS DESCRIBED IN THIS MEMORANDUM IS SUBJECT TO **ABSOLUTE RESTRICTIONS ON TRANSFERABILITY OR RESALE OR REFUND** AND MAY NOT BE TRANSFERRED OR RESOLD WITHOUT EXPLICIT APPROVAL OF COMPANY, WHICH, IF EVER PERMITTED MUST BE COMPLIANT AND PURSUANT ALL STATE AND FEDERAL LAWS AND REGULATIONS AND THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND PURSUANT TO COMPANY MANAGING MEMBER'S/PRESIDENT'S APPROVAL. THE INVESTMENT AND INVESTMENT PRINCIPAL IS FURTHER **SUBJECT TO CERTAIN RETENTION AND ILLIQUIDITY RESTRICTIONS PURSUANT TO THE SUBSCRIPTION DOCUMENTS AND THE COMPANY'S OPERATING AGREEMENT** AND ANY SUPPLEMENT OR AMENDMENT THERETO. PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THEY MIGHT BE REQUIRED TO **BEAR FINANCIAL RISKS OF THIS INVESTMENT** FOR THE DURATION OF THEIR INVESTMENT.

IN ACCORDANCE WITH THE TERMS OF THIS MEMORANDUM, ALL INVESTMENTS ARE STRICTLY SUBJECT TO THE COMPANY'S ACCEPTANCE OF PROSPECTIVE INVESTOR'S SUBSCRIPTIONS TO INVEST. ANY DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS TO OTHER THAN SUCH PROSPECTIVE INVESTOR OR HIS, HER OR ITS ADVISORS, IS STRICTLY PROHIBITED. NEITHER THE

DELIVERY OF THIS MEMORANDUM, NOR ANY INVESTMENT MADE PURSUANT HERETO, WILL IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE SET FORTH ON THE COVER HEREOF. HOWEVER, COPIES OF THE MEMORANDUM DELIVERED AFTER THE OCCURRENCE OF ANY SUCH MATERIAL CHANGE WILL BE AMENDED OR SUPPLEMENTED ACCORDINGLY.

NO OFFERING LITERATURE SHALL BE USED IN CONNECTION WITH THIS OFFERING EXCEPT THE INFORMATION CONTAINED IN THIS MEMORANDUM. **NO PERSON HAS BEEN AUTHORIZED BY THE COMPANY TO MAKE ANY REPRESENTATIONS OR GIVE ANY INFORMATION WITH RESPECT TO THE INVESTMENT EXCEPT THE INFORMATION CONTAINED HEREIN.  IN NO CASE MAY ANY COMPANY REPRESENTATIVE SERVE AS AN INVESTMENT OR FINANCIAL ADVISOR TO ANYONE, AND NO THIRD-PARTY MAY ACT AS SUCH IN RELATION TO THE COMPANY.**

IN MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS **MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY, ITS EXPECTED BUSINES OPERATIONS, AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.** PROSPECTIVE INVESTORS MAY NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY OTHER DOCUMENTS DELIVERED HEREWITH AS INVESTMENT, TAX, ACCOUNTING, FINANCIAL, OR LEGAL ADVICE. THIS MEMORANDUM, AS WELL AS THE NATURE OF ANY INVESTMENT, SHOULD BE REVIEWED BY EACH PROSPECTIVE INVESTOR AND SUCH INVESTOR'S INVESTMENT, TAX, LEGAL, ACCOUNTING AND OTHER ADVISORS AS A FUNCTION OF THE INVESTOR'S RELATIONSHIP TO SUCH ADVISORY INDIVIDUALS OR ENTITIES AND NO ONE ELSE.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, THE PROSPECTIVE INVESTOR CERTIFIES AN OBLIGATION PURSUANT TO A PRIOR EXECUTED NON-DISCLOSURE AGREEMENT AND FURTHER AGREES TO: (I) KEEP THE MEMORANDUM AND ITS CONTENTS CONFIDENTIAL, (II) NOT DISSEMINATE THE MEMORANDUM OR DISCLOSE ITS CONTENT OR TERMS TO ANY THIRD PARTY, (III) NOT USE THE MEMORANDUM OR ITS CONTENT OR TERMS FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH PROSPECTIVE INVESTOR OF A POTENTIAL PRIVATE INVESTMENT IN THE COMPANY. MOREOVER, THE PROSPECTIVE INVESTOR AGREES TO RETURN THE **MEMORANDUM** TO THE COMPANY AS FOLLOWS: C/O **MR. JEFFREY JUDD, PRESIDENT, J AND J PURCHASING, LLC AT 9 SKY ARC COURT, HENDERSON, NV 89012**. IF: (A) THE PROSPECTIVE INVESTOR DOES NOT SUBSCRIBE PURSUANT TO THE TERMS HEREOF, (B) THE PROSPECTIVE INVESTOR'S SUBSCRIPTION IS NOT ACCEPTED BY THE COMPANY, OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN. THE SUMMARIES AND DESCRIPTIONS OF DOCUMENTS IN THIS MEMORANDUM DO NOT PURPORT TO BE COMPLETE AND THE FULL TEXT OF SUCH DOCUMENTS IS EITHER ATTACHED AS EXHIBITS HERETO OR AVAILABLE FOR INSPECTION THOUGH COMPANY'S PRESIDENT, MR. JEFFREY JUDD.

THERE IS NO TRADING MARKET FOR A **PARTIAL BENEFICIAL INTEREST** AND THERE IS CURRENTLY NONE EVER ANTICIPATED. MOREOVER, ANY BENEFICIAL INTEREST DOES NOT HAVE AN ESTABLISHED PUBLIC MARKET NOR WILL ANY SUCH MARKET DEVELOP ANY OF WHICH IS NONETHELESS RESTRICTED PURSUANT TO THE TERMS OF THIS OFFERING. PROSPECTIVE INVESTORS MUST CONSIDER THIS INVESTMENT TO BE ILLIQUID **FOR THE THREE-MONTH "PLACEMENT PERIOD"** AND THE UP TO FIVE (5) BUSINESS DAY INVESTMENT PRINCIPAL RETURN PERIOD SUBSEQUENT INVESTOR'S EXERCISE OF INVESTOR'S **RIGHT OF REDEMPTION**. INVESTMENT IN THE SECURITIES IS SUITABLE ONLY FOR PERSONS WITH **SUBSTANTIAL FINANCIAL RESOURCES** WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT **AND WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT**. SEE CONFLICTS OF INTEREST AND INVESTOR SUITABILITY STANDARDS.

THE INVESTMENT UNDER THIS OFFERING FOR ONE OR MORE **PARTIAL BENEFICIAL INTERESTS** WILL BE OFFERED AND SOLD SOLELY TO **ACCREDITED INVESTORS** WHO REPRESENT THAT THE **PARTIAL BENEFICIAL INTEREST(S)** ARE BEING ACQUIRED FOR HIS, HER, OR ITS OWN ACCOUNT FOR INVESTMENT ONLY AND NOT WITH A VIEW TOWARD THE SALE OR DISTRIBUTION THEREOF. COMPANY EXPECTS AND HIGHLY RECOMMENDS THAT INVESTORS HAVE SUFFICIENT KNOWLEDGE AND EXPERIENCE IN BUSINESS AND FINANCIAL MATTERS TO EVALUATE THE MERITS AND RISKS OF THIS INVESTMENT, AND NONETHELESS, INVESTORS SHOULD SEEK SEPARATE AND INDEPENDENT LEGAL, FINANCIAL, ACCOUNTING, INVESTMENT AND TAX ADVICE. EACH INVESTOR SHOULD BE ABLE TO BEAR THE SUBSTANTIAL ECONOMIC RISKS OF THIS INVESTMENT AND AT THE PRESENT TIME CAN AFFORD A COMPLETE LOSS OF SUCH INVESTMENT.

THIS OFFERING CAN BE MODIFIED, WITHDRAWN OR TERMINATED AT ANY TIME WITHOUT NOTICE AND ANY OFFER IS SPECIFICALLY MADE SUBJECT TO THE CONDITIONS DESCRIBED IN THIS **MEMORANDUM**. IN CONNECTION WITH THE OFFERING AND SALE OF THE PARTIAL BENEFICIAL INTERESTS, COMPANY RESERVES THE RIGHT, IN PRESIDENT'S SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART, AND TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF PARTIAL **BENEFICIAL INTERESTS** WHICH SUCH INVESTOR INVESTS FOR (SEE **CONFLICTS OF INTEREST** IN THIS MEMORANDUM) OR WISHES FOR COMPANY TO PLACE UNDER PURCHASE CONTRACTS. COMPANY MAY REJECT ANY SUBSCRIPTION FOR ANY REASON.

THIS CONFIDENTIAL PRIVATE PLACEMENT **MEMORANDUM** AND THE EXHIBITS AND APPENDICES THERETO MAY CONTAIN REFERENCES TO OR SUMMARIES OF MATERIAL DOCUMENTS. ALTHOUGH SUCH SUMMARIES ARE BELIEVED TO BE ACCURATE, THEY DO NOT PURPORT TO BE A COMPLETE DESCRIPTION OF EVERY TERM AND CONDITION AND REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO. THE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE. ALL DOCUMENTS RELATING TO THIS INVESTMENT WILL BE MADE AVAILABLE FOR INSPECTION BY THE PROSPECTIVE INVESTOR OR HIS REPRESENTATIVES AND OTHER ADVISORS THROUGH COMPANY'S PRESIDENT AND UPON NOTICE TO PRESIDENT.

NO OFFERING LITERATURE OR ADVERTISING, IN WHATEVER FORM, MAY BE RELIED ON BY THE POTENTIAL INVESTOR IN EVALUATING THE OFFERING OF THESE PARTIAL BENEFICIAL INTERESTS OTHER THAN THIS CONFIDENTIAL PRIVATE OFFERING **MEMORANDUM** AND THE APPENDICES AND EXHIBITS THERETO. **NO PERSON** HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THIS OFFERING OR THE INVESTMENT THEREIN, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OTHER THAN THAT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY COMPANY OR ANY OF OUR AUTHORIZED OFFICER REPRESENTATIVES. ANY PREDICTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, WHICH DO NOT CONFORM TO THOSE CONTAINED IN THE **MEMORANDUM** SHOULD BE DISREGARDED AND THEIR USE IS A VIOLATION OF THE LAW. THE PRESIDENT AND ANY AFFILIATED PERSON SHALL NEVER SERVE AS A FINANCIAL OR INVESTMENT ADVISOR, WITH THE CONTENTS OF THIS MEMORANDUM BEING THE SOLE SOURCE OF INFORMATION FROM WHICH ANY INVESTOR MAY RELY ON. **THE LAW FIRM THAT DRAFTED THIS MEMORANDUM DISCLAIMS ALL LIABILITY FOR THE CONTENTS OF THIS MEMORANDUM AND DOES NOT SERVE TO VERIFY ANY CONTENT OF SAME OR THAT OF THE COMPANY'S OPERATIONS**.

THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT MAY CHANGE AFTER ISSUE AND THE COMPANY ACCEPTS NO FORMAL OBLIGATION TO UPDATE THE INFORMATION CONTAINED IN THIS OFFERING DOCUMENT EXCEPT TO CORRECT ANY MEMORANDUM MISSTATEMENT OR ANY INFORMATION THAT BECOMES UNTRUE.

THE CONTENT OF THIS OFFERING DOCUMENT AND ANY OTHER PRIOR OR SUBSEQUENT COMMUNICATIONS FROM OR WITH THE COMPANY OR ANY OF ITS REPRESENTATIVES, OR ANY PERSON, FIRM OR ENTITY ASSOCIATED WITH THE OFFERING **DOES NOT CONSTITUTE LEGAL, INVESTMENT, TAX OR ANY OTHER FORM OF PROFESSIONAL ADVICE NOR IMPLIES OR CREATES ANY RELATIONSHIP THEREWITH**.

YOU MUST CONSULT YOUR OWN COUNSEL, ACCOUNTANT, AND BUSINESS, FINANCIAL OR INVESTMENT ADVISOR AS TO LEGAL, TAX, AND OTHER MATTERS RELATING TO THE INVESTMENT IN THE PARTIAL BENEFICIAL INTEREST(S). PRIOR TO SIGNING THE SUBSCRIPTION AGREEMENT, ANY PROSPECTIVE INVESTOR MAY ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE PRESIDENT OF THE COMPANY CONCERNING (A) THE TERMS AND CONDITIONS OF THE OFFERING, AND (B) ANY ADDITIONAL RELEVANT INFORMATION IN THE COMPANY'S POSSESSION. YOU MUST RELY ONLY UPON WHAT IS CONTAINED IN THIS MEMORANDUM UNLESS ADDITIONAL INFORMATION IS PROVIDED TO YOU IN DOCUMENTED FORM RESULTING FROM CONVERSATIONS YOU MAY HAVE WITH THE AUTHORIZED REPRESENTATIVES OF THE COMPANY IN REGARD TO THIS OFFERING.

INVESTORS IN THIS OFFERING ARE BEING PROVIDED WITH A SPECULATIVE PROJECTION OR ESTIMATE OF PERFORMANCE. AS A NEW COMPANY, AUDITED FINANCIAL STATEMENTS OF THE COMPANY ARE NOT AVAILABLE. PROJECTIONS AND ASSUMPTIONS CONTAINED HEREIN ARE BASED UPON MANAGEMENT ESTIMATES AS OF THE DATE OF THIS **MEMORANDUM**. WE CAN PROVIDE NO ASSURANCES THAT MANAGEMENT ESTIMATES OF FINANCIAL PERFORMANCE, MARKETPLACE AVAILABILITY, AND ASSUMPTIONS GERMANE TO ANY PURCHASE CONTRACT OR THE AVAILIABILITY THEREOF WILL BE PROVEN CORRECT.

ACCORDINGLY, RELIANCE ON PROJECTIONS IS SPECULATIVE. SEE "RISK FACTORS AND OTHER DISCLOSURES." NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE PROJECTED ECONOMIC RETURN, I.E., THE INVESTMENT RETURN WHICH MAY ACCRUE TO INVESTORS. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL **MEMORANDUM** AS LEGAL, TAX OR INVESTMENT ADVICE. EACH INVESTOR SHOULD CONSULT THE INVESTOR'S OWN COUNSEL AND ACCOUNTANT AND FINANCIAL ADVISER AS TO LEGAL, FINANCIAL, TAX AND RELATED MATTERS CONCERNING THIS INVESTMENT.

# PRIVATE PLACEMENT MEMORANDUM
## TABLE OF CONTENTS

I.      SUMMARY OF THE OFFERING ................................................................................. 6

II.     REQUIREMENTS FOR INVESTORS ......................................................................... 13

      A.      General Suitability Standards .......................................................................... 13

      B.      Accredited Investors ......................................................................................... 13

      C.      Other Requirements .......................................................................................... 13

III.    FORWARD-LOOKING STATEMENTS ....................................................................... 14

IV.     THE BUSINESS - EXECUTIVE SUMMARY .............................................................. 15

V.      RISK FACTORS AND OTHER DISCLOSURES ........................................................ 16

      A.      Risks Related to the Company ......................................................................... 16

      B.      Legal - Regulation ............................................................................................ 19

      C.      Insurance ........................................................................................................... 20

      D.      Background of Company's President ................................................................ 20

      E.      Conflicts of Interests ........................................................................................ 20

      F.      Pro Forma Capitalization .................................................................................. 22

VI.     COMPANY STRUCTURE ........................................................................................... 23

VII.    TAX STATUS ............................................................................................................... 24

VIII.   USE OF PROCEEDS .................................................................................................. 25

IX.     FINANCIAL PROJECTIONS ....................................................................................... 26

X.      FEDERAL AND STATE INCOME TAX ASPECTS .................................................... 27

XI.     ADDITIONAL INFORMATION ..................................................................................... 28

| | | |
|---|---|---|
| **EXHIBIT A** | **ARTICLES OF ORGANIZATION – CORPORATE DOCUMENTATION** | |
| **EXHIBIT B** | **COMPANY OPERATING AGREEMENT** | |
| **EXHIBIT C** | **SAMPLE INSURANCE SETTLEMENT AGREEMENTS ($80,000.00 AND $ 100,000.00)** | |
| | **COMPANY'S CODE OF ETHICS AND BUSINESS CONDUCT** | |
| **EXHIBIT D** | **INVESTOR QUESTIONNAIRE** | |

# I.    SUMMARY OF THE OFFERING

THE FOLLOWING CONTAINS CERTAIN INFORMATION REGARDING THE OFFERING BUT DOES NOT CONTAIN ALL THE INFORMATION THAT MAY BE IMPORTANT TO POTENTIAL INVESTORS. POTENTIAL INVESTORS SHOULD READ THIS ENTIRE DOCUMENT AND EACH EXHIBIT CAREFULLY BEFORE THEY DECIDE TO INVEST UNDER THIS OFFERING FOR THE PLACEMENT OF THEIR INVESTMENT TO SECURE A PARTIAL BENEFICIAL INTEREST IN PURCHASE CONTRACTS TIED TO THE FUNDING OF THIRD-PARTY BENEFICIARY INSURANCE SETTLEMENT AGREEMENTS.

THE COMPANY'S LEGAL OR OTHER COUNSEL DISCLAIM ALL LIABILITY UNDER THIS OFFERING AND ARE NOT ADVISING THE PROSPECTIVE INVESTORS, NOTING THAT LEGAL OR OTHER COUNSEL HAS NOT PERFORMED ANY DUE DILIGENCE REGARDING ANY CONTENT IN THIS MEMORANDUM WITH ALL INFORMATION SOLELY PROVIDED BY COMPANY. ALL POTENTIAL INVESTORS SHOULD SEEK INDEPENDENT TAX, LEGAL, FINANCIAL, INVESTMENT, ACCOUNTING AND OTHER COUNSEL TO ADVISE THEM WITH RESPECT TO ANY INVESTMENT UNDER THIS OFFERING.

| | |
|---|---|
| **THE COMPANY AND THIS OFFERING GENERALLY** | **J and J Purchasing, LLC** (the "**Company**") is a new Florida limited liability company that has no operating history but will hereafter under this Offering: (1) receive, certify, and manage the Investments Proceeds from this Offering as transferred by Investor to the Company's Escrow Account in full compliance with all Subscription Documentation matters hereto and concomitant Due Diligence by Company thereon; (2) utilize the Investor's Investment Principal as consideration for a Third-Party Beneficiary (owner of claims settled through an existing/expected Insurance Settlement Agreement) to assign certain beneficial interests under such Insurance Settlement Agreement to the Company and through a "Purchase Contract" instrument that is funded by the Investment Principal, and whereby a part of such Third-Party Beneficiary-assigned beneficial interest is retained on behalf of the Investor and will be paid to the Investor as Investor's "Partial Beneficial Interest" and which sum is the "Investment Return;" (3) provide Investors a monthly statement germane to the activity of their relevant Partial Beneficial Interest(s) under one or more Purchase Contract(s) and pay to Investors their Partial Beneficial Interest (the "Investment Return") upon the expiration of the relevant "Placement Period;" and (4) comply with Investor's right to redeem their Investment Principal pursuant to Investor's retained "Right of Redemption" or act consistent with Investor's "Option to Reinvest" as further delimited below.

The opportunity to invest in Partial Beneficial Interests is offered by the Company with no commission or other remuneration paid to any person, directly or indirectly, for solicitation of Investors or otherwise for the offering and sale of Partial Beneficial Interests hereunder. Any "Finder" directly or indirectly affiliated with the Company may not serve or act in any way as a financial or investment advisor, any of which act would be prohibited under the Act or any other SEC limitations. |
| **PRESIDENT AND OPERATION OF THE COMPANY** | The Company, and all relationship permutations as between the Company, the Company's sole owner, or future owners and Managing Member/President (Mr. Jeffrey Judd, hereafter "President") and the Investors under this Offering is governed by the Company's Operating Agreement, attached hereto as Exhibit B (the "Operating Agreement").

Because the Investors **join the Operating Agreement only as Investors** in Partial Beneficial Interests under Company-negotiated and otherwise secured Purchase Contracts and **not as owners or members of the Company**, Investors do not, and will not, participate in the management of, nor control the, Company's business, nor transact any business for the Company, nor have any right to any Company Units, stock or other ownership or distribution interest in, or of, Company nor power to bind the Company and will not receive any profit or other distribution germane to any Company revenue or operations, including but not limited to, the beneficial interests that belong solely to the Company (and are strictly retained for the benefit of the Company) under all Purchase Contracts.

**The Investor's sole interest and expected potential investment profit under this Offering and provided for in the Operating Agreement is the "Investment Return"** (as defined in herein and the Operating Agreement) that is retained under a "Purchase Contract" as the Investor's specific "Partial Beneficial Interest." Separately, the Investor herein retains the Right of Redemption of the Investor's "Investment Principal."

The Company is Member Managed by Mr. Jeffrey Judd, President of the Company. The sole Company Member is Mr. Judd, owning 100% of the Units in the Company. Mr. Judd's management activities will include the Company's day-to-day operations and all matters described in this summary of the Offering and where otherwise described including the retention of services relevant to the negotiation and securing of Purchase Contracts. The Operating Agreement sets forth the obligation for President to act on behalf of the Investors germane to Investor's Partial Beneficial Interest, Investment Return lump sum payment, Right of Redemption, and if relevant, Option to Reinvest. The capitalization of the Company is set forth in the Operating Agreement (Exhibit B). The Company's principal place of business will be determined by the President but is currently 9 Sky Arc Court, Henderson, NV 89012. |

| | |
|---|---|
| **INSURANCE SETTLEMENT AGREEMENT INTERESTS** | President will apply the Investment Principal to fund a Purchase Contract germane to a Third-Party Beneficiary's interest in the proceeds from an Insurance Settlement Agreement. Redacted examples of such $ 80,000.000 and $100,000.00 Purchase Contracts are found in Exhibit C. Company states that the causes of action, claims, or liability circumstances implicated or relevant to any Insurance Settlement Agreement, and the beneficial interest that is secured therein by Company under a Purchase Contract, **do not involve pending lawsuits or other court proceedings** (such controversy is not being prosecuted or defended in pending court proceedings with the controversy being settled through the relevant Insurance Settlement Agreement by the Third-Party Beneficiary prior to the institution of court action).<br><br>President explicitly discloses that there may exist circumstances where Insurance Settlement Agreements that are the basis for a Purchase Contract are depleted in the marketplace or are preferentially secured on behalf of Company or any affiliated individual or Member of same, including the President (See Conflict of Interest and regarding "Conflicted Parties"). In such a case, and as a non-exclusive example, the Investor's Investment will not be applied/converted to any Partial Beneficial Interest, e.g., without limitation, when the Investor asks the Company to effectuate an Option to Reinvest or otherwise.<br><br>In the unlikely case where an Investor's Investment is unable to fund the consideration under a Purchase Contract or otherwise secure the Investor's Partial Beneficial Interest under a Purchase Contract, then President will return the Investment Principal to the Investor as soon as commercially practicable, generally **within five (5) business days**, and terminate Investor as a Company Investor, without further recourse by Investor. No Investment Return will be due to Investor under these types of circumstances noting that the Placement Period has not been met with the sole action by Company being to return to the Investor their Investment Principal and after such return, the Investor shall have no other recourse or right germane to any Investment Return or continued relationship with the Company in any way subject to the President's sole and unrestricted discretion. |
| **TERMS OF THE INVESTMENT OFFERING** | The Company offers pursuant to this Offering the potential to place Investor's Investment Principal as consideration for Purchase Contracts and the Investor's retained Partial Beneficial Interest therein of the profits from such Purchase Contract. The "Purchase Contract" is an instrument whereby the Company becomes the owner of a beneficial interest in the expected sums to be paid to Third Parties for their claims through and pursuant to an Insurance Settlement Agreement.<br><br>The Purchase Contract provides that the Third-Party Beneficiary is advanced the sum of $80,000.00 or $100,000.00 (the Investor's "Investment Principal") and such Third-Party Beneficiary assigns to Company a sum larger than the Investment Principal when their relevant Insurance Settlement Agreement is funded at some time during, or at the conclusion of, the Placement Period. The Company expects to receive all the Investment Principal under the Purchase Contract and additional profits and revenues expected consistent with the terms of the Purchase Contract. From these additional profits and revenues under the Purchase Contract, the Company will **only pay the Investor their retained Partial Beneficial Interest which sum is specifically the Investment Return**.<br><br>The Investor may invest at an Offering price of $100,000.00 or $80,000.00 per Partial Beneficial Interest/the Investment Return. The Minimum Investment Subscription is $ 80,000.00 which funds the potential placement of one Purchase Contract and the relevant Investment Return from the Investor's retained Partial Beneficial Interest in such $80,000.00 Purchase Contract. As to $100,000.00 Purchase Contracts, the Minimum Investment Subscription is $ 100,000.00 which funds the potential placement of one Purchase Contract and the relevant Investment Return from the Investor's retained Partial Beneficial Interest in such $100,000.00 Purchase Contract.<br><br>The Company reserves the right to offer Partial Beneficial Interests to Investors in whatever proportion the President, in the exercise of his unrestricted discretion so decides, except in relation to an Investment under this Offering that does not meet the Minimum Investment Subscription amount. **The President reserves the right, in President's sole discretion, to reject any subscription under this Offering.**<br><br>The Partial Beneficial Interests are only being offered to Investors who meet certain suitability requirements and are satisfactory to the Company under its Due Diligence standards and otherwise, in its sole discretion, for admission as Investor for a (specific to such Investor) Partial Beneficial Interest.<br><br>**Investors will not become Members of the Company** but only hold a beneficial interest as Investors in Company negotiated Partial Beneficial Interests, i.e., for a part of the proceeds from Purchase Contracts which sum is equal, and will never exceed, the "Investment Return." No fractional Partial Beneficial Interests may be subscribed for, except as the President may otherwise decide on a case-by-case basis and in President's sole discretion for such subscriptions meeting the Minimum Investment Subscription. Any Investment under this Offering will be made by ETF (wire transfer) upon subscription and acceptance of all Subscription Documents by President and which investment sums will be transferred to and deposited in the Company's Escrow Account at the following financial institution: **Well Fargo Bank NA (Nevada) Routing Number: 121000248, Account Name, Beasley Law Group IOLTA** (noting that, upon the Company's acceptance by Company of the Subscription Documents, an authorized Company officer will inform the prospective Investor of the Account Number). |

| | |
|---|---|
| **THE EXPECTED INVESTMENT RETURN –**<br><br>**INVESTMENT RETURN DEFINED** | Under this Offering, the Company offers Investors an expected **twelve and one half (12.5%) Investment Return** for each Purchase Contract/Partial Beneficial Interest funded by the Investor's Investment Principal. The Investment Principal, as used to fund the consideration of a Purchase Contract of either a $80,000.00 or $100,000.00 increment, and the Investment Return sum will be paid to the Investor in a lump sum after the expiration of the required **90-day Placement Period if no Event of Default occurs**. The Placement Period ends when the Purchase Contract Proceeds are received by the Company from the Third-Party Beneficiary's agent/representative.<br><br>When Investor submits their Subscription Documentation and funds their Investment, the President or his delegate is expected to execute the relevant Purchase Contract with the Third-Party Beneficiary to the Insurance Settlement Agreement ("Third-Party Beneficiary") and which Purchase Contract consideration on the part of the Company will be funded by the Investor's Investment Principal and transferred by wire to the relevant Third-party Beneficiary or their agent/representative. The execution of the Purchase Contract by Company and the relevant Third-Party Beneficiary is expected to occur generally within **three (3) business days** after receipt of the Investment Principal by Company into its Escrow Account. The wiring of the Investment Principal to the Third-Party Beneficiary will occur after the Purchase Contract is executed.<br><br>When the Investor relevant Purchase Contract is executed by the Company and the Third-Party Beneficiary and the wire of the relevant amount is wired to the Third-Party Beneficiary, the **ninety-day (90) "Placement Period" will begin**. During the Placement Period, no Investment Return will be due Investor or paid by the Company. At the conclusion of the Placement Period, if the Insurance Settlement Agreement funds the Purchase Contract beneficial interest (the "Proceeds of the Purchase Contract") and under its terms, and specifically when there is no Default Event as to either, the Investor can expect to receive the Investment Return in one lump sum and within five (5) business days after the expiration of the Placement Period/when the Company receives the Proceeds of the Purchase Contract.<br><br>Under the preceding circumstances, If the Investor-retained Partial Beneficial Interest and Principal Investment relate to: (1) an $80,000.00 Purchase Contract, then the lump sum payment of the Investment Return to the Investor **will equal only $10,000.00** of the Proceeds of the Purchase Contract; or (2) a $100,000.00 Purchase Contract, then the lump sum payment of the Investment Return to the Investor will **equal only $12,500.00** of the Proceeds of the Purchase Contract. Company will issue and forward to each Investor a yearly appropriate Tax reporting form setting out all Investment Return amounts paid to Investor under any Purchase Contract.<br><br>When the Company wires the Investment Return to the Investor after the expiration of the Placement Period, the Investor may inform the Company of the Investor's exercise of their Right of Redemption. If the Investor so notifies the Company, the Company will also wire to the Investor their Investment Principal, e.g., either $80,000.00 or $100,000.00 **and within five (5) business days** of Company's receipt of the Investor's notice to redeem. Each Investment Principal and Investment Return transfer may be subject to relevant wiring fees and which operating expense may be charged to the Investor and deducted from the Investment Principal/Investment Return, noting that Investor's financial organization may also charge the Investor a separate wiring fee.<br><br>The opportunity to invest in Partial Beneficial Interests are being offered by the Company with no commission or other remuneration paid to any person for solicitation of Investors or for the offering and sale of Partial Beneficial Interests. The only individual authorized to communicate with the Potential Investor/Subscriber regarding any aspect of this Offering or the Subscription Documents is a Company officer; currently, only Mr. Judd is an authorized Company officer and will be able to answer certain matters regarding the Offering.  Company notes that Mr. Judd, or any other person speaking on the Company's behalf are not financial or investment advisors, and may not act or communicate in any way that is reserved to licensed/professional investment or financial advisors.  In short, Mr. Judd and anyone authorized to speak on Company's behalf are not financial or investment advisors and will never act in such capacity. |
| **RIGHT OF REDEMPTION**<br><br>**OPTION TO REINVEST** | Investors may exercise an absolute Right of Redemption on the Investment Principal Invested under this Offering after (or concomitant to) Company's payment to the Investor of their Investment Return after the expiration of the Placement Period. The Right of Redemption is exercised by Investor notifying the Company's President in writing and President shall refund to Investors their Investment Principal within five (5) business days from the Investor's Right of Redemption notice. Subject to Investor's instruction to do so, and President's approval and concurrence, the Investor may benefit from the Option to Reinvest the Investment Principal invested under this Offering (after Company pays the Investor their Investment Return after the expiration of the Placement Period).<br><br>The Option to Reinvest exists, if at all, only after the Investment Principal is due to Investor and after the Investment Return is paid. Specifically, if the Investor requests that Company fund the purchase of an additional and subsequent Purchase Contract, and Company so concurs in its sole discretion, then the Company will act accordingly with the Company informing the Investor of when a new Purchase Contract is funded and the concomitant start of that Purchase Contract's Placement Period. |

| | |
|---|---|
| **CONFLICTS OF INTEREST**<br><br>**COMPANY CONFLICTED PARTIES** | Investors, by their signature to the Subscription Documents, certify their understanding and agreement that, except for their Investments applied to securing/placement/assignment of Partial Beneficial Interests, all profits or revenues realized under the relevant Purchase Contract beyond what is due Investors (under their beneficial interest right to receive the Investment Return) **SHALL BE RETAINED BY THE COMPANY AND IS, WITHOUT LIMITATION, OWNED BY COMPANY (OR ITS OWNERS OR PARTNERS) AND WHETHER AS BENEFICIARY INTEREST RECIPIENT OR OTHERWISE; NOTING THAT PORTIONS OF THE BENEFICIAL INTEREST RETAINED UNDER PURCHASE CONTRACTS ARE DUE TO COMPANY THIRD PARTY SERVICES PROVIDERS.**<br><br>In short, except for the right to receive the potential Investment Return (and their Investment Principal) Company **shall retain all and any other profit or revenue that may be associated with their activities under this Offering**, whether as profit beyond the due the Investment Return to Investors or as may be otherwise realized by Company, and whether as part of their services agreements, any Purchase Contract, or their, or their owners, managers or affiliated individuals' investments which may or will be treated as preferential to the placement of any Investment for Partial Beneficial Interests on behalf of the Investors any of which activities of Company, or its owner, or President may so choose.<br><br>An Investment under this Offering can only be understood to be for potential placement by Company, but not assured to be so placed. As Company is, and will be self-funded (i.e., separate from any Investment made under this Offering which are potentially designated to fund Investment in Partial Beneficial Interests on behalf of the Investor), Company, and its owner, President and/or partners (collectively, "Conflicted Parties") may invest on their own behalf and **preferentially** secure interests germane to Insurance Settlement Agreement interests available in the marketplace **with their own funds**, except that at no time will any Investment Principal or Investment Return hereunder be effectively comingled with or used by the Conflicted Parties to secure any such personally amenable interests in purchase contract beneficial interests.<br><br>In short, Company, its President, and certain other partners do not have to preferentially secure Partial Beneficiary Interests on behalf of Investors beyond any time other than the specific Placement Period that applies to their specific Investment Principal applied to their specific Purchase Contract. Company has no duty, without limitation, to accept any Investor requested Option to Reinvest. Other than payment of the Investment Return and refund of the Investment Principal, the Company and all affiliated individuals and entities have not duty to continue the Investor's Investment relationship to Company or as applicable to any additional Purchase Contract relationship or otherwise.<br><br>What the Investor can expect is that their Investment Principal will be utilized to secure the specific Partial Beneficial Interests at the discretion of President which does not guarantee that President will at any time preferentially place the Investor's Investment ahead of the Conflicted Parties' securing/placement/ assignment/purchase of the very Partial Beneficial Interest that could be secured on behalf of an Investor.<br><br>The Conflicted Parties are not restricted to fulfil their separate business or investment goals (except that the Conflicted Parties shall never utilize investment funds realized under this Offering to secure a beneficial interest under Purchase Contracts for themselves or on their own account).<br><br>President disclaims any fiduciary or other duty to place Investor's Investment Principal ahead of Company or President's or their owners' or partner's personal funds to securing/placement/assignment/purchase beneficial interests in Purchase Contracts for, as relevant, their individual benefit and **ahead** of Investors. Nonetheless, President certifies that at no time will any Investment under this Offering be applied to any such individual benefit in securing/placement/assignment of Purchase Contracts. |
| **TRUST ACCOUNT** | President has secured that all Investments received hereunder will be held in a trust account before any disbursement is made from such Trust Account to place/secure a Partial Beneficial Interest germane to any Investor. If no Purchase Contract/Partial Beneficial Interest is secured on behalf of the Invest, the Investment Principal will remain in the Trust Account until returned as otherwise described in this Offering. |
| **PERIOD OF THE PRIVATE OFFERING** | The subscription period begins on the effective date of this Memorandum and closes at 5:00 p.m. Central Standard Time on December 31, 2022 (the "Closing Date") unless completed or terminated sooner or extended in the sole discretion of the Company. The Closing Date may not be extended except by the terms in this Memorandum and applicable law. Subscribers may submit their Subscription Agreement at any time before the Closing Date. |
| **THE COMPANY'S RIGHT TO AMEND, ACCEPT, REJECT, AND/OR CLOSE** | The Company retains the right, in its sole discretion and for any reason whatsoever, to:<br><br>(1) modify, amend, and/or withdraw all or a portion of the Offering, (2) accept or reject, in whole or in part, any prospective investment in the Partial Beneficial Interests or to allot to any prospective investor less than the number of Investor Partial Beneficial Interests such investor desires to secure, and/or (3) to close the Offering regardless of the number of Investor Partial Beneficial Interests subscribed hereunder.<br><br>The Company will have no liability whatsoever to any offeree and/or subscriber if any of the foregoing |

| | |
|---|---|
| | occurs, noting that if no Investment has been placed and the Placement Period has not begun as to any such amounts, then no Investment Return will accrue or be due Investor with the Investment Principal being returned to Investor if any such transfer of funds has occurred. |
| **USE OF PROCEEDS**<br><br>**EVENT OF DEFAULT** | The proceeds from Investments under this Offering are to be solely allocated to the negotiated Purchase Contracts germane to Third-Party Beneficiary Insurance Settlement Agreement interests (that will yield the Investor's Partial Beneficial Interest's Investment Return) by the Company and not to any other Company expense.<br><br>COMPANY EXPLICITLY DISCLAIMS TO AND WARNS INVESTORS THAT THE INVESTOR'S PRINCIPAL INVESTMENT AND INVESTMENT RETURN ARE NOT INSURED IN ANY WAY. PURSUANT TO ANY EVENT WHEREBY THE RELEVANT PURCHASE CONTRACT DEFAULTS — AND WHETHER SUCH DEFAULT OF THE PURCHASE CONTRACT OBLIGATIONS IS DUE TO A CONCOMITANT DEFAULT OF THE APPLICABLE INSURANCE SETTLEMENT AGREEMENT OR OTHERWISE — THE INVESTOR'S INVESTMENT PRINCIPAL MAY BE LOST IN ITS ENTIRETY AS WELL AS THE EXPECTANCY AND RIGHT TO RECEIVE THE INVESTMENT RETURN.<br><br>The investment in Partial Beneficiary Interests in Purchase Contracts, which beneficial interest payout is tied to the payout of the source Third-Party Beneficiary Insurance Settlement Agreement at the end of the Placement Period, could fail and which circumstance will constitute an Event of Default. Investors must understand that, if the source Third-Party Beneficiary Insurance Settlement Agreement fails to fund for whatever reason, then this circumstance will generally present with a Default Event as to its relevant Purchase Contract. In such an Event of Default, then the entire Investment Principal will be lost in addition to the Investment Return. While not expected, any such Event of Default is not possible to predict, and its occurrence will result in the Investor losing the Investment Principal and Investment Return. If such Event of Default occurs, it may also lead to the Company not being able to continue to operate. |
| **SUBSCRIPTION** | All submitted Subscription Documentation (Subscription Agreement, Investor Questionnaire, etc.) and Investment Principal funds may, in the sole discretion of the President, be returned to the putative subscriber and without interest and deductions and within five (5) business days. Any subscriptions for Partial Beneficial Interests may not be withdrawn by subscribers once submitted. Each investor will be required to fill out and sign an Investor Questionnaire to affirm that subscriber meets the requirements of being an Accredited Investor and that they have such sufficient business and investment experience to evaluate the advantages and disadvantages of an investment in the Partial Beneficial Interests, and further, that the subscriber meets all Due Diligence matters for being included as an Investor under this offering and in all cases is otherwise financially able to bear the risk of loss of such Investment.<br><br>In order to subscribe for Partial Beneficial Interests, a prospective investor must provide the following to the Company at the address below at or before 5:00 p.m. Central Standard Time on December 31, 2022 (the "Closing Date"): (i) completed, signed and notarized (where applicable) Subscription Agreement, Investor Questionnaire, and Power of Attorney attached hereto as Exhibit D to this Memorandum; (ii) a joinder to the Company Operating Agreement in the form attached as Exhibit B to this Memorandum; and (iii) an ETF wire for the benefit of **J and J Purchasing, LLC** in the amount equal to the number of Partial Beneficial Interests being subscribed for multiplied by the applicable price ($80,000.00 or $100,000.00). The documents may be sent either as the President requests or in the alternative, foregoing items may be delivered to: **J and J Purchasing, LLC c/o Mr. Jeffrey Judd - 9 Sky Arc Court, Henderson, NV 89012**.<br><br>Subscribers may submit their subscriptions at any time before the Closing Date and the President may accept or reject such subscriptions prior to the Closing Date. The date or dates of the acceptance prior to the Closing Date of any such subscriptions is referred to herein as "Interim Closing Date." The Company retains the right, in its sole discretion and for any reason whatsoever to: (1) modify, amend, and/or withdraw all or a portion of the Offering; (2) accept or reject, in whole or in part, any prospective investment in the Partial Beneficial Interests or to allot to any prospective investor less than the number of Partial Beneficial Interests such investor desires to invest in; (3) to close the Offering with fewer than the potential number of Partial Beneficial Interests offered and whether same be consistent or inconsistent with the Aggregate Offering Amount; (4) extend the Offering period and the Closing Date; or (5) have multiple Interim Closing Dates. The Company will have no liability whatsoever to any offeree and/or subscriber if any of the foregoing occurs.<br><br>After the Closing of the Offering, or throughout Company's and Investor's relationship under this Offering, each Investor whose subscription has been accepted by the Company, may or will be required to execute any other documents as presented to the Investor by the Company in accordance with this Memorandum, noting that such documentation will generally relate to **Due Diligence** and **Compliance Certifications** matters. The opportunity to invest in Partial Beneficial Interests is being offered by the Company with no commission or other remuneration paid to any person for solicitation of investors or for the offering and sale of Partial Beneficial Interests.<br><br>No sales literature has been authorized for use in connection with the offering of Partial Beneficial Interests except this Memorandum. The Company is delivering this Memorandum to each individual who is, or is |

| | anticipated to be, a direct or indirect investor in the Company, and urges each individual to closely review this Memorandum and the attachments in their entirety so that each individual can decide whether he or she wishes to invest directly or indirectly in the Partial Beneficial Interests offered hereby. |
|---|---|
| **THE INVESTORS JOIN THE OPERATING AGREEMENT BUT NOT AS MEMBERS** | The Company's affairs will be conducted in the manner described in the Operating Agreement, a copy of which is attached as Exhibit B, hereto. Section 1 of the Operating Agreement contains definitions of some of the capitalized terms used in this Memorandum.<br><br>The Operating Agreement governs, restricts, and controls the President's actions on behalf of Investors under this Offering and any Member's ownership interest in the Company. It is important that prospective investors carefully read and understand its provisions as they are required to join the Company Agreement as Investors but not Members.<br><br>The distribution of available cash flow and proceeds and the allocation of taxable income or loss as germane to the Company's Members are governed by the Operating Agreement. Prospective Investors should read and become familiar with the Operating Agreement in its entirety, as they will be subject to the provisions set forth in the Operating Agreement if they invest in the Company pursuant to its Offering considering that **they will not become members in the Company, owners of Units, or otherwise will have no ownership or other voting power in any Company matter or any expectancy of Company profits or liabilities other than the Investor's Investment Return and Right of Redemption.**<br><br>The Investor's sole retained interest hereunder and thereunder will be that Investor's specific Partial Beneficial Interest/Investment Return in that Investor's specific Purchase Contract attributable to that Investor's specific Investment Principal so invested by Investor under this Offering. |
| **NO ADDITIONAL CAPITAL CONTRIBUTIONS FROM INVESTORS** | The Company does not require any or additional capital contributions from the Investors under this Offering. Only the Company's Members may be looked at for additional capital not the subject of Partial Beneficial Interest securing/placement/assignment/purchase. The Company's profits and losses are not matters inuring to Investors except as may be related to any Event of Default germane to any Purchase Contract or Insurance Settlement Agreement. |
| **NO VOTING RIGHTS OR COMPANY OWNERSHIP BY INVESTORS** | Explicitly, Investors understand that they are not owners/Members of the Company. For their part, each Member is entitled to one vote per share or a fraction of one vote per fraction of a share, as applicable. Investors do not have any voting rights. Nonetheless, Member Jeffrey Judd may be the Trustee in the future regarding a Voting Trust Agreement for some Members and, as such, Mr. Judd may have the discretion to vote more Units than his then existing holding — noting that the Operating Agreement defines Majority in Interest as the "Member who hold more than 50% of the aggregate Units held by all Members." |
| **PROFITS, LOSSES, AND INVESTMENT RETURN PER SHARE FOR MEMBERS** | In general, Investors understand that they are not, and will never be, owners/Members of the Company. The President, as sole Company Member, and any other further Company Member, will share in the Company's profits, losses and distributable cash pro rata based upon the number of Units owned by that Member and the percentage of total issued Units that those Units represent.<br><br>The allocation of Profits and Losses will be done subject to US Internal Revenue Code rules and regulations applicable to entities taxed as so designated, and as further outlined in the Company Operating Agreement. Prospective Investors are advised to read the Company Operating Agreement and discuss with their tax and legal advisors to determine all tax implications involved in their Investor Partial Beneficial Interest(s). |
| **RISK FACTORS** | The general economic, financial, and regulatory risks of securing Purchase Contracts germane to Insurance Settlement Agreement Third-Party Beneficiary Interests are (and are deemed to be considered) substantial and such risks could adversely affect the ability of the Company to ensure Investment Return or Investment Principal to Investors.<br><br>An investment for the potential securing/placement/assignment/purchase of Partial Beneficial Interests under a Purchase Contract involves a high degree of risk. Many of the factors which may affect the Company are subject to change or are not within the control of, without limitation, the Company, or its President. See "Risk Factors and Other Disclosures." |
| **TAX RULINGS** | The Company has not sought and will not seek a ruling from the Internal Revenue Service (the "IRS" or the "Service") with respect to its tax classification or other tax matters whether germane to the Company, or any Investor. |
| **DEFINITIONS** | Terms with capitalized first letters have the same definitions as set out in the Company Operating Agreement attached hereto as Exhibit B and/or the Company's Code of Ethics and Business Conduct |

## II.   REQUIREMENTS FOR INVESTORS

**PROSPECTIVE INVESTORS** FOR THE **INVESTMENT** AND INVESTMENT RETURN UNDER THIS OFFERING SHOULD GIVE CAREFUL CONSIDERATION TO VARIOUS RISK FACTORS DESCRIBED UNDER THE "**RISK FACTORS AND OTHER DISCLOSURES**" SECTION OF THIS **MEMORANDUM** AND ESPECIALLY TO THE SPECULATIVE NATURE OF THIS INVESTMENT AND THE LIMITATIONS DESCRIBED UNDER THAT CAPTION WITH RESPECT TO THE LACK OF A READILY AVAILABLE MARKET FOR THE INTEREST SECURING/PLACEMENT/ASSIGNMENT/PURCHASE HEREUNDER AND THE RESULTING **3 MONTH PLACEMENT PERIOD** TERM OF ANY INVESTMENT IN THE COMPANY, OR AS RESTRICTED BY COMPANY'S OR ITS PRESIDENT'S, PARTNER OR OWNER'S PREFERENTIAL INDEPENDENT INVESTMENT IN INSURANCE SETTLEMENT AGREEMENT INTERESTS AHEAD OF INVESTOR. **THIS OFFERING IS AVAILABLE ONLY TO SUITABLE ACCREDITED INVESTORS, HAVING ADEQUATE MEANS TO ASSUME SUCH RISKS AND OF OTHERWISE PROVIDING FOR THEIR CURRENT NEEDS AND CONTINGENCIES**. ACCREDITED INVESTORS SHOULD CONSIDER THEIR INVESTMENT THROUGH THIS OFFERING FOR THE PLACEMENT OF **PARTIAL BENEFICIAL INTEREST(S)** IN PURCHASE CONTRACT(S) TO REQUIRE THE FOLLOWING:

A.   GENERAL SUITABILITY STANDARDS. The investment in Partial Beneficial Interests will not be afforded to any prospective Investor unless the Subscriber or Subscriber's duly authorized representative represents in writing to the Company in a Subscription Agreement that:

(1)   The prospective purchaser has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in the investment, subject to their **Redemption Rights** under this Offering.

(2)   The prospective purchaser's overall commitment to investments which are not readily marketable is not disproportionate to Subscriber's net worth and the investment through this Offering will not cause such overall commitment to become excessive.

(3)   The prospective purchaser is an "**Accredited Investor**" (as defined below) suitable for investment under this Offering.

(4)   Each person acquiring a Partial Beneficial Interest in Partial Beneficial Interests hereunder will be required to represent that such person is investing for his, her, or its own account for investment purposes and not with a view to resale or transfer.

B.   ACCREDITED INVESTORS. The Company will conduct the Offering in such a manner that the Partial Beneficial Interest may be sold to "Accredited Investors as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act").

In summary, a prospective investor will qualify as an "Accredited Investor" if the prospective investor meets the following criteria as further described in the Subscription Documents:

(1)   Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of this purchase, exceeds $1,000,0000 excluding the value of the primary residence of such natural person;

(2)   Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who has a reasonable expectation of reaching the same income level in the current year; and

(3)   Any entity in which all the equity owners are Accredited Investors.

C.   OTHER REQUIREMENTS. No subscription for the Partial Beneficial Interests will be accepted from any investors unless the investor is acquiring the Partial Beneficial Interests for his/her own account (or accounts as too which he/she has sole investment discretion), for investment and without any view to sale, distribution, or disposition thereof. Each prospective investor in the Partial Beneficial Interests may be required to furnish such information as the Company may need to determine whether any person or entity so investing is an Accredited Investor and any other certifications required of the Investor under the Company's compliance program.

## III.    FORWARD-LOOKING STATEMENTS

This **Memorandum** contains certain forward-looking statements, as defined in the private Securities Litigation Reform Act of 1995, including or related to the Company's future results (including certain future projections), including but not limited to those pro forma projections, if any, set forth in Section IX hereto. (*See*, *"Financial Projections"*).

These and other statements are based largely on current expectations, beliefs, estimates, projections, and assumptions of the Company and are subject to a number of risks and uncertainties that could cause actual results to differ materially from those contemplated by such forward-looking statements. These risks and uncertainties include, among others, those described in Section III, "Risk Factors and other Disclosures."

Assumptions relating to forward-looking statements involve judgments with respect to future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and subject to the Conflict of Interest disclosures in this Memorandum. Although the Company believes that assumptions underlying any forward-looking statements are reasonable, any of the assumptions could prove to be inaccurate and there can therefore be no assurance that the results contemplated in the forward-looking information will be realized. In light of the significant uncertainties inherent in the forward-looking information herein, the inclusion of such information should not be regarded as the Company's representation that any business objectives will be achieved.

These along with other risks, which are described under "Risk Factors and Other Disclosures" may be described in future communications with Investor. The Company makes no representation and undertakes no obligation to update the forward looking statements to reflect actual results or changes in assumptions or other factors that could affect those statements.

# IV.   THE BUSINESS

*Executive Summary*

The Company operates as the Florida Limited Liability Company "*J and J Purchasing, LLC*." The Company's Management structure is set out in the Company's Operating Agreement, to which all Investors and separately the Company Members are bound.

The Company will engage in the business of: (1) receiving, certifying and managing the **Investments Proceeds** from this **Offering** for **Partial Beneficial Interests**; (2) effectuate the potential securing/placement/assignment/purchase of **Insurance settlement Agreement interests** from the **Investment Proceeds** of this **Offering**, (3) provide Investors a monthly statement germane to their relevant **Partial Beneficial Interests** and pay to **Investors** the **Investment Return** for placed Investments, **and** (4) Comply with Investor's right to redeem their Investment Principal pursuant to Investor's retained **Right of Redemption**.

The Company offers Investors a **12.5% Investment Return** for each **Partial Beneficial Interest** placed by their Investment in a Purchase Contract. When Investor submits their Investment Documentation and funds their Investment, the President will **place the Investment** to fund the securing/placement/assignment/purchase of potentially and at least one $80,000.00 or $100,000.00 **Purchase Contract from which the Investor retains a Partial Beneficial Interest which is equal to the Investment Return and their Investment Principal and no more**.  All other revenue, profit or realized revenue germane to any Purchased Purchase Contract will belong solely to the Company.

The time period between the receipt of the Investor's Investment and such assignment/purchase of a Purchase Contract germane to an Insurance Settlement Agreement is expected to range from 24 to 72 hours after the Investment Principal is transferred. On the expiration of the 90-Day **Placement Period** the Investor is expected to receive a lump sum payment of the Investment Return. In the unexpected case that the Investor's Investment is not placed pursuant to a Purchase Contract, such Investment Principal transferred to Company will be returned to the Investor. During the Placement Period, no interest will accrue or issue.

At the expiration of the Placement Period, each Partial Beneficial Interest will, if no Event of Default occurs, earn the Investment Return, which specifically means that each $80,000.00 Investment/each Partial Beneficial Interest is expected to secure $10,000.00 paid to Investor within five (5) business days after the expiration of the Placement Period or for each $100,000.00 Investment/each Partial Beneficial Interest is expected to secure $12,500.00 paid to Investor within five (5) business days after the expiration of the Placement Period. Company will issue and forward to each Investor a yearly 1099 Tax reporting form setting out amounts paid to Investor.

For purposes of establishing the exact date the Investor can expect to receive **Investment Return**, and for example, if an Investor's Investment is made on January 1, 2022, and such Investment is immediately placed, then the Investment Return will be due and paid on the expiration of five (5) business days after 90 days after January 1, 2022.

Similarly, and for example, if the same Investor exercises their **Right of Redemption** after the Placement Period and on April 1, 2022, and the President effectuates the Right of Redemption — pursuant to be determined procedures and consistent with the refunding, terminating or other terms germane to any Insurance Settlement Agreement/any Partial Beneficial Interest so funded, the Investment Return (along with the Investment **Principal**) will be paid to Investor within five (5) business days after the expiration of the Placement Period.

Investors may exercise an absolute **Right of Redemption** on the **Investment Principal** invested under this Offering but only after the expiration of the **Placement Period**. The Right of Redemption is exercised by Investor notifying President in writing and President shall refund to Investors their Investment Principal within five (5) business days from the Investor's Right of Redemption notice.

Subject to the disclosures in this Offering, Company's President or services provider will negotiate and secure a Purchase Contract tied to the Investment Principal in the form generally as is found in **Exhibit C**.

Company's President explicitly discloses that there may exist circumstances where Third-Party Beneficiary Insurance Settlement Agreements are depleted in the marketplace. In such a case: (a) Investor's Investment Principal may not be applied/converted to any Partial Beneficial Interest under a Purchase; in effect, the Placement Period will not begin. Accordingly, if Investor's Investment Principal is unable to be converted to a Partial Beneficial Interest, then President will return the Investment Principal to the Investor as soon as commercially practicable and terminate Investor as a Company Investor, without further recourse by Investor. No Investment Return will be due under this circumstance noting that the Placement Period has not been met; or (b) In cases where the one or more Investment Principal have been converted to Partial Beneficial Interests under this Offering, the President retains sole discretion to exercise the President's right to return part or all of Investor's Investment along with any partially earned Investment Return, as determined in the President's sole discretion and if any, and terminate Investor's Partial Beneficial Interest(s) without further recourse by Investor.  Without limitation, the preceding may relate to Company Due Diligence efforts at any time, which efforts may reveal information regarding Investor that establishes a violation of the Company's compliance program.

The Company's operations will be consistent with applicable State and Federal law and this Memorandum and the Company's Operating Agreement (*See*, this **Memorandum**, "Risk Factors and Related Disclosures). The Company expects to encounter competition in the form of similar businesses existing within the same market. The Company cannot forecast the level of competition the Company will have to manage or endure.

# V.    RISK FACTORS AND OTHER DISCLOSURES

**INVESTMENT IN A PARTIAL BENEFICIAL INTERESTS OFFERED UNDER THIS OFFERING INVOLVES SIGNIFICANT RISKS DESCRIBED BELOW. PROSPECTIVE INVESTORS SHOULD CONSIDER CAREFULLY THE FOLLOWING RISK FACTORS — TOGETHER WITH ALL OTHER INFORMATION SET FORTH IN THIS MEMORANDUM — PRIOR TO INVESTING FOR THE PARTIAL BENEFICIAL INTERESTS OFFERED HEREBY. THE COMPANY CAN MAKE NO ASSURANCE THAT ITS FINANCIAL CONDITION WILL NOT BE ADVERSELY AFFECTED IN THE FUTURE BY ONE OR MORE OF THE RISK FACTORS OR OTHER RISK FACTORS NOT ENUMERATED.**

A.   **RISKS RELATED TO THE COMPANY**.

1.   ***The Company Has No Operating History***. The Company can provide no assurances that the Company will be able to place the Investor's Investment Principal under the Offering. Generally, the President anticipates that the Company will initially generate cash deficits, which may or may not be overcome. For example, the Company may fail to: (i) generate sufficient business, (ii) meet contractual relationships with third party entities or individuals, and/or (iii) negotiate for the securing/placement/assignment/purchase of Purchase Contracts tied to Insurance Settlement Agreements and the associated Partial Beneficial Interest on behalf of the Investor.

2.   ***Events of Default***. The investment in Partial Beneficiary Interests in Purchase Contracts — which beneficial interest payout is tied to the payout of the source Third-Party Beneficiary Insurance Settlement Agreement at the end of the Placement Period — could fail and may constitute an Event of Default. In short, if the source Third-Party Beneficiary Insurance Settlement Agreement fails to fund, which in turn would cause a Default Event as to its relevant Purchase Contract, then the entire Investment Principal may be lost in addition to the Investment Return. While not expected, any such Event of Default is not possible to predict, and its occurrence will result in the Investor losing the Investment Principal and Investment Return. If such Event of Default occurs, it may also lead to the Company not being able to continue to operate. Additional Event of Default circumstances include Referral Source or Third Party Beneficiary of Insurance Settlement Agreement misrepresentation, and as to any, whether negligent, reckless, knowing or willful fraud. Additionally, any claim so settled in a Third party Beneficiary Insurance Settlement Agreement may be breached or withdrawn by such Third Parties for a variety of reasons, including but not limited to, fraud in the inducement of the Insurance Settlement Agreement, bankruptcy of the insurance payor, or other circumstances whereby an Insurance Settlement Agreement fails to fund, including recission by any Third Parties.

3.   ***No Assurance of Insurance Settlement Agreement Marketplace Availability***. The success of the Company's Investor operations will depend in part upon availability in the marketplace of Third-Party Beneficiary Insurance Settlement Agreements. Indeed, any Company Investment Return may be adversely affected by the market pressures in or regarding the geographic area the Company serves and furthermore, such cost and other factors over which the Company has or may have no control. Moreover, the Company's ability to pay Investment Returns will result from the number and kinds of Purchase Contracts it can negotiate and secure and the types and amounts of Third-Party Beneficiary Insurance Settlement Agreement interests it can identify. The identification and availability of Third-Party Beneficiary Insurance Settlement Agreements is not secured. Such identification and availability are subject to market pressures, Third Party relationships, marketing and sales activities, local laws and regulations, among others. If an Investor's Investment Principal is not placed with a Purchase Contract, the Investor will not be entitled to any Investment Return, only to the return of the Investment Principal.

4.   ***Present and Future Competitors***. There is no assurance that competitors will not, presently or in the future, provide similar investment opportunities in competition with the Company and which competition is explicitly disclosed to Investors separately and significantly by the Conflicted Parties as to their own and superior activities to secure for themselves any beneficial marketplace interest in Partial Beneficial Interests (i.e., ahead of Investors).

Nonetheless, any such future competition could lead to a decrease in Company profitability any of which, including Events of Default, could lead to Company not being able to continue operations. Moreover, there is no guarantee that the target market, whether as a source of Third-Party Beneficiary Insurance Settlement Agreements or otherwise, will not prefer Purchase Contract relationships with present or future competitors who may or do offer, whether to such Third-Party Beneficiaries or other Third Parties, more cost-effective investment opportunities or Purchase Contract terms and conditions than those to be potentially acceded to or negotiated or provided by the Company. Accordingly, some potential outcomes include that Third-Party Beneficiaries may prefer other Third Parties with which to execute Purchase Contracts or similar undertakings; in short, the Company could lose business to these competitors and/or the Conflicted Parties. Many of the Company's existing and potential competitors may have greater financial and other resources than the Company and there can be no assurance that the Company will be able to compete successfully against those competitors.

At all times, the Conflicted Parties are deemed in no way limited to invest on their own account and secure beneficial interests in Purchase Contracts ahead of Investors (the Conflicted Parties can invest their own funds to secure Purchase Contracts on their own account). Company, President, or their owners, partners or affiliated individuals have no fiduciary or other duty to Investors to preferentially place Investor's Investments ahead of their own investment activities.

5. ***The Company May Incur Losses and Negative Cash Flow***. The Company may incur negative cash flow. There can be no assurance that the Company will eventually operate profitably.  The marketplace cannot assure the provision of Investment Returns. Investors must remember that they are not and will never be Company Members or own any part of the Company and therefore have no Voting Rights in Company.

6. ***The Availability of Additional Working Capital Is Uncertain***. The Company believes that the proceeds from the Offering will allow the Company to implement its proposed business plan and to satisfy expected Investment Returns cash requirements. However, the Company's continued operations thereafter will be dependent on the availability of revenue from its operations. In the event there is insufficient cash flow from operations, the Company may be required to obtain additional financing. There can be no assurance that such financing will be available or, if available, that the financing will be on terms satisfactory to the Company. If financing is needed, but is not available, the Company may not be able to operate successfully and any investment made may be lost, for example, concomitant an Event of Default.

7. ***The Company May Undertake Leverage in Order to Fund its Operations***. With the approval of the Majority in Interest (as defined in the Company Operating Agreement), the Company may incur indebtedness. While the Company anticipates that cash generated from operations will enable the Company to repay any indebtedness in accordance with its terms, lower-than-anticipated revenues, greater-than-anticipated expenses, or delays in commencing operations could result in the Company failing to make payments of Investment Principal or Investment Return when due under indebtedness circumstances. In such events and/or concomitant an Event of Default, the Investor could lose their entire investment.

8. ***Competition - Projected Profits of the Company Are Based upon Assumptions that May Be Incorrect***. Section IX (Financial Projections), if any, sets out the potential financial status from the Company's operations. If any, such projections are based upon a great number of variables, estimates, and judgments on matters over which the Company will have no control including, without limitation: (i) the market for the Company's proposed business operations, (ii) economic conditions generally, (iii) insurance costs, (iv) the effects of competition, and (v) the legal and regulatory environment. Such projections are principally intended for use as objectives and are not intended, and should not be taken, as assurance that the Company will accomplish such projections. Nonetheless, the Company will encounter direct competition in the form of similar businesses existing within the same market. Indeed, some of these competitors may be well capitalized and may presently control a significant market share. Moreover, such competitors may enjoy long established and better market relationships. Accordingly, the Company cannot forecast the level of competition the Company will have to manage or endure. As a result of this competition, the Company cannot guarantee that it will achieve be able to grow, establish or maintain market share or become profitable. Concomitant any Event of Default, the Company may have to stop operations altogether.

9. ***Conflicts of Interest***. The activities of the Company will give rise to numerous immediate and potential conflicts of interest between the Company and certain of the Investors or their affiliates, some of which may be partially owned by such Investor or Member owners (*See*, Conflicts of Interests, Section F, below). As disclosed herein and as established in the Company Operating Agreement, President will have significant authority to manage the Company's business and decisions may be taken by President contrary to desires of Investor. Thus, the President may make decisions with which the other Investor may disagree.

10. ***Contract Negotiations***. As part of the Company's operations, it will be necessary for the Company to negotiate and maintain services contracts with Third Parties. The Company will not be able to guarantee the continuation or quality of such relationships. The Company's failure to maintain any such relationships means that the Company cannot guarantee that relationships may be even established. Accordingly, the potential inability of the Company to negotiate and maintain agreements on favorable terms could reduce its revenues and adversely affect its operations.

11. ***Lack of Diversification***. Because the Company may only provide, or may continue to provide, a limited number of investment opportunities, the Company may not be competitive in the target market. Moreover, due to a lack of diversification, the Company is or may be subject to a greater risk than would be the case with a more diversified business.

12. ***No Participation in Management***. The Company Operating Agreement provides that its President maintains unhindered and broad day-to-day and discretionary management over Company activities. Investors are not Members of the Company and retain solely the right to receive the Investment Return and maintain their Right of Redemption if no Event of Default occurs.

13. ***Participation in the Management of the Company by Investor Is Non Existent***. As set forth in the Company Operating Agreement, the powers of the Company will be exercised by — and under the authority and direction of — the President. Neither the President nor the Company's employees are required to devote their full time to the Company's affairs. The President intends to devote time and effort in organizing and operating other businesses or ventures throughout the United States that may be similar to the Company. Nonetheless, the President will devote such time to the Company's business and affairs as deemed necessary and appropriate in the exercise of reasonable judgment but unforeseen circumstances may require the President to devote more time to other activities to the detriment of the Company and may include President's activities as a Conflicted Party.

14. ***Member Liability***. Generally, because the Company is a Limited Liability Company, a Member is not individually liable for the Company's debts or negligence in the course of Company business arising from the acts or omissions of another Member of the Company (including agents or employees) who is not working under the supervision or direction of the President. A Member may be individually liable if the Member: (i) was directly involved in the specific activity in which the errors, omissions, negligence, incompetence, or malfeasance were committed by the other Member or representative; or (ii) had notice or knowledge of the errors, omissions, negligence, incompetence, or malfeasance by the other Member or representative at the time of occurrence and then failed to take reasonable steps to prevent or cure the errors, omissions, negligence, incompetence or malfeasance.

15. ***Business Sources***. The Company's operations will depend upon establishing and maintaining relationships with Third Parties including individuals and entities any of which may be Referral Sources. Such Third-Party business may depend on the Company being perceived as providing, among others, reasonable, convenient, cost effective or quality Third-Party Insurance Settlement Agreement benefits as secured under Purchase Contracts. The Company foresees that a significant amount of business will have to be sourced from Insurance Settlement Agreement germane professionals and industry ventures in the target market area. Should the Company's business sources decline or if the Company fails to manage such relationships, the Company could be significantly and adversely affected. The Company makes no guarantee that any federal or state laws or any regulatory, whether professional licensing or otherwise, may make or limit the availability of Settlement Insurance Agreements or Company's negotiation of same via Purchase Contracts.

16. ***The Company May Be Affected by Operating Risks Beyond its Control***. The costs of operating the Company may be affected by factors beyond the Company's control including Events of Default and other environmental problems, fire, strikes, energy shortages, inflation, adverse weather conditions (including Acts of God, such as tornadoes, hail, flooding, and other risks), and other unknown contingencies. Moreover, income may be adversely affected by various changing local factors such as an increase in local unemployment, a change in the characteristics or demographics of the target market, governmental regulations, various uninsurable risks, and unforeseen changes in the Insurance Settlement Agreement industry. Indeed, there can be no assurance that the Company will generate sufficient revenues whether tied directly to the revenues under Purchase Contracts or otherwise, for example, concomitant Events of Default. In addition, the Company will have normal business risks including disruptions from malfeasance or embezzlement by the Company's employees or contractors, malfeasance or embezzlements, or lawsuits brought by Third Parties against the Company and/or any agent, employee, contractor, or person acting on behalf of the Company. The Company will have general liability risks in that any of those types of disruptions could cause material change in the Company's ability to operate and any of which may place the Investor's Investment Principal and Investment Return in peril of complete loss.

17. ***The Company May Be Sold***. The Company and other affiliates companies may be sold in the future. There is no guarantee, however, that such an event will generate a net profit for the Company or its Members, but in any case, such event shall NOT result in any benefit germane to or for any existing Investor noting that Investors do not and shall not hold any ownership interest in the Company or its Units. In particular, Jeffrey Judd may sell any or all of his Units in the Company without prior consent or notice of Members or Investors (who have no voting rights or ownership rights in the Company) or any distribution of any profits from such sale to Members or Investors. Any future Members in addition to Mr. Judd may be compelled to sell some or all of their Units upon the occurrence of various events as described in the Company Operating Agreement.

18. ***The Company may be Subject to Leasehold Risks***. The Company may be subject to all of the risks inherent in being a tenant under a lease of real property, including risks of additional costs, delays, and possible complete loss of investment due to matters such as compliance with governmental laws and regulations, new or increased fees or charges imposed on leasehold improvements or ownership, termination of the leasehold interest following a casualty or condemnation, new or increased real estate taxes, restrictive governmental rules or actions, and outside forces, such as flood or earthquakes, which may result in irreparable damage or insured losses and termination of a lease. The occurrence of any such events could have a material adverse effect on the Company.

19. ***No Transferability and Illiquidity of Investments***. Transferability of the Partial Beneficial Interests is explicitly proscribed during the Placement Period by the Company Operating Agreement and the Subscription Agreement executed by the Subscriber. No public market for the Partial Beneficial Interests exists and none is expected to develop even if President so approves. The Company will be under no obligation to allow the transfer of Partial Beneficial Interests or otherwise take any action that would enable, without limitation, the assignment or transfer of any Partial Beneficial Interests. Thus, an Investor will not be able to liquidate an investment in the Partial Beneficial Interests during the Placement Period in the event of an emergency or otherwise and the Partial Beneficial Interests may not be pledged, without limitation, as collateral for loans or otherwise. Accordingly, the placement of Partial Beneficial Interests must be considered a term and illiquid investment during the Placement Period. Additionally, Investors may not pledge, hypothecate, assign, sell, or use their Partial Beneficial Interest/Investment Principal refund/or Investment Return and may not transfer any Partial Beneficial Interests except as permitted by the Company Operating Agreement.

20. ***There Is No Prior Public Market for Partial Beneficial Interests in the Company***. There has been no prior market for the any Partial Beneficial Interests **and no such transfer is allowed under the Operating Agreement**. The Company

does not expect that a trading market will develop in the foreseeable future and transfer, or resale of the Partial Beneficial Interests is severely restricted under the Company Operating Agreement. There can be no assurance that any such trading market will develop, or if such trading market develops, that it will be sustained or allowed to be accessed by the President.

21. ***The Failure to Retain Key Management Personnel Could Adversely Impact the Company***. The President may elect, appoint, or hire officers to manage the Company and perform certain operational duties on behalf of the Company. The Company may be largely dependent upon the resources and efforts of such individuals to provide governance of the Company. Such individuals may have limited experience in managing business such as that of the Company. The inability or failure of such individuals to adequately perform those duties could have a material effect on the Company and any investment in Partial Beneficial Interests.

Similarly, the President may contract with Third Party services providers to perform certain operational duties on behalf of the Company. The Company may be largely dependent upon the resources and efforts of such Third Party services providers to, without limitation, secure business opportunities on behalf of the Company. Such Third Party services providers may fail to secure business opportunities. The inability or failure of such Third Party services providers to adequately perform those duties could have a material effect on the Company or any investment in Partial Beneficial Interests.

22. ***The Company's Cash Flow and Operating Results Could Be Adversely Affected by Legal Actions***. Companies providing services germane to the Insurance Settlement Agreement marketplace/industry can be subject to legal actions. The Company may be named as a defendant in any cause of action arising from, *without limitation*, alleged, or actual tortuous interference, breach of contract, and fraud, which actions may be brought by competitors or other Third Parties or Governments. These actions may involve large monetary claims and significant defense costs. Additionally, there can be no assurance that insurance maintained by the Company, if any, will adequately cover any liabilities that may occur.

23. ***The Company Has Not Provided Advice Regarding Tax and Legal Risks Related to Investing in the Partial Beneficial Interests***. The Company and its legal or other advisors have not advised potential Investors with respect to any tax or legal risk or consequences of an investment in beneficial interests in Partial Beneficial Interests. The Company has not advised potential investors with respect to any legal risks or consequences of an investment in beneficial interests germane to Partial Beneficial Interests. Accordingly, potential Investors are encouraged and expected to consult with their own legal, tax, financial, investment, and other counsel regarding potential legal issues.

24. ***The Terms of this Offering May Be Amended or Withdrawn by the Company***. The Company reserves the right, in its sole discretion and for any reason whatsoever, to modify, amend, and/or withdraw all or a portion of the Offering and/or to accept or reject in whole or in part any prospective investment or to allot to any prospective Investor less than the number of investment that such Investor desires to purchase.

25. ***Conflicts of Interest by Investors and Cross-Ownership of Other Ventures***. Investors are expected to avoid conflicts of interest, to secure and maintain the integrity and confidentiality of Company operations, Investment Return, and management in full consideration and awareness of their respective beneficial interest and deemed accompanied duties of loyalty and care, under, without limitation, the Investor's and Company's non-disclosure obligations.

Accordingly, the Company Operating Agreement explicitly states that Investors, are barred from directly or indirectly, alone or with others, to develop, own, manage, operate, license, control, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest (in any manner including but not limited to equity, debt, or bond financing) that offers or provides any of the investment services offered by the Company (*See*, the Confidentiality Agreement and Company Operating Agreement). A breach by an Investor of the Company Operating Agreement will cause, at its discretion, to return such Investor's Investment Principal and institution of legal action against the Investor.

B. **LEGAL - REGULATION**.

(1) ***Introduction***. The matters set out in this Memorandum represents the President's and Company's current understanding of the legality of its business model. Nonetheless, in light of the complexity, unpredictability, and ever evolving nature of businesses and applicable rules, no statement herein may be construed as a representation or guarantee as to any present or future legal position(s) that the federal or a state Government, regulators or any other adjudicative, ethical, or other body might take in relation to the Company, its President, its business, Investors, if any, or the investments set out herein. All explanations herein are subject to and may be limited by future legislation, case law, and enforcement of either. Accordingly, the statements are limited to the matters stated herein, and no opinion is implied or may be inferred beyond the matters expressly stated.

(12) ***The Company Could Become Involved in a Proceeding***. At any time, the Company, its President or its officer or affiliates may be subject to litigation, regulatory or enforcement actions, or other proceedings (a "Proceeding") any of which may brought by varied individuals or entities including, but not limited to, federal, state, or local Governments, potential or actual competitors, or Investors. Any such Proceeding could delay the commencement of or suspend the operations of the Company temporarily or indefinitely regardless of the Proceeding's merit. If such a Proceeding is successful, the Company or its President, officers or affiliates could be permanently prevented from operating the business as described in this Memorandum or the Company Operating Agreement or lack the financial means to commence or continue operations.

Nonetheless, each Investor certifies — in their Subscription and Company Operating Agreement — their agreement to support the Company in such Proceeding, (i) either when holding a Partial Beneficial Interest or after termination of same, or (ii) during the existence, or after the dissolution, of the Company.

(13) *If the Company Fails to Comply with Applicable Laws and Regulations, the Company Could Suffer Sanctions and Be Required to Dissolve or Make Significant Changes to its Operations*. While Investors will not manage or otherwise be involved as owners/Member of the Company the Company nonetheless notes that Company's operations are subject to Government regulation. As such, the ability of the Company to operate legally and be profitable may be adversely affected by changes in governmental regulations on a federal, state, and municipal level. Any Government law or regulation may adversely affect the economic viability of the Company. These laws are broad in scope, and interpretations by courts have been limited, inconsistent, and tailored to specific facts that may vary from case to case. Implementation of these laws or regulations could subject the Company, its President, its officers, any affiliate and the Investor to Government scrutiny and/or prosecution and punishment.

C.   **INSURANCE.**

(1)   *Liability*. The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is or may be entitled to indemnification against any expense, liability, or loss, whether or not the Company would have the ability to indemnify such person.

(2)   *The Company's Liability Insurance May Not Be Sufficient to Cover All Potential Liability*. The Company may be liable for damages to persons or property for activities that occur in the Company's offices or on the Company's premises. Although the Company may attempt to obtain and maintain adequate insurance coverage for personal injury, property damage, general and professional liability, officer and director insurance, workers compensation insurance, the Company will not be able to obtain coverage in amounts sufficient to cover all potential liability. Since most insurance policies contain various exclusions, the Company will not be insured against all possible occurrences.

(3)   *No Insurance to Protect Investors from Events of Default of any Purchase Contract or otherwise*. A Purchase Contract may default and the Company and Investor will not receive any revenue for same. **THE COMPANY WILL NOT SECURE INSURANCE COVERAGE FOR ANY PURCHASE CONTRACT OR THIRD-PARTY BENEFICIARY INSURANCE SETTLEMENT AGREEMENT EVENT OF DEFAULT. THE POTENTIAL OF ANY EVENT OF DEFAULT WILL NOT BE INSURED BY THE COMPANY AND IF SUCH EVENT OF DEFAULT OCCURS, THE INVESTOR'S ENTIRE INVESTMENT PRINCIPAL AND INVESTMENT RETURN MAY BE LOST**

D.   **BACKGROUND OF COMPANY PRESIDENT** - **MR. JEFFREY JUDD**

Mr. Jeffrey Judd is the current Managing Member and President of J and J Purchasing, LLC.  Prior to serving as Company President, Jeffrey worked in various industries.  His first job out of college was with Bristol Myers as a Pharmaceutical Sales Representative.  Jeffrey held this same position with Schering Plough.  In the early 2000's the real estate sector was the place to be for someone like Jeffrey who excelled at sales, so he left the Pharmaceutical Industry and took a position with Countrywide Home Loans. When the bubble burst in 2009, Jeffrey took an ownership position in Partell Specialty Pharmacy serving as Vice - President of Sales and Marketing.

Jeffrey was born and raised in Las Vegas, Nevada. He received a Bachelor of Science from the University of Nevada Las Vegas in 1998, where he met his wife of 27 years, Jennifer Rowland Judd, also born and raised in Las Vegas.  Jeffrey and Jennifer have 4 children and one daughter in law — Parker an insurance agent, Preston a professional soccer player in LA Galaxy system, Rachel Utley Judd, Preston's wife, who is studying to be a nurse, Kennedy an esthetician and the baby of the family Khloe who is a fantastic singer and performer.

E.   **ACTUAL OR POTENTIAL CONFLICTS OF INTEREST.**

(1)   *Transactions with the Company*. In his discretion, the President may cause the Company to enter into agreements with companies and service entities that may be totally or partially controlled by Members of the Company or President of the Company (the "President or Member Affiliated Entity(ies)").  President or Member affiliated entities or Members and their owners, affiliates, or representatives may: (i) provide operational support to the Company and may engage its affiliates to perform certain services, (ii) be paid or reimbursed by the Company the out-of-pocket costs (including, but not limited to, legal or other professional expenses) incurred with respect to establishing the Company or its operations; (iii) have interests in other programs, organizations, or ventures that may compete with the Company, (iv) be involved in other operations of ventures, including entities that have the exact same or similar business operating plan and operate exactly or similarly as the Company, and may continue to develop additional beneficial interests offers germane to Insurance Settlement Agreements ventures in the future. When the Company or President enter such arrangements, the President is not required to assure they are consistent with arrangements that would be obtainable from unaffiliated Third Parties. Prospective Investors who have questions concerning the duties of the President should consult with their own counsel.

(2) ***Investors under this Offering Invest only for the potential Investment Return and Right of Redemption and will receive no other benefit.*** ALL PROFITS OR REVENUE BY COMPANY OR OTHERWISE REALIZED BEYOND WHAT IS DUE INVESTORS UNDER THEIR RIGHT TO RECEIVE THE POTENTIAL INVESTMENT RETURN, IS RESERVED TO AND OWNED BY COMPANY (AND ITS OWNERS OR PARTNERS) AND WHETHER AS BENEFICIARY INTEREST RECIPIENT UNDER A PURCHASE CONTRACT OR OTHERWISE. THIS MEANS THAT ANY PROFIT OR REVENUE REALIZED AT ANY TIME BEYOND WHAT IS DUE INVESTORS (THEIR INVESTMENT RETURN) SHALL NEVER BE DUE INVESTORS AND SHALL BE RETAINED FOR THE BENEFIT OF COMPANY AND THEIR MEMBERS OR PARTNERS.

Company retains all other profit or revenue that may be associated with a Purchase Contract funded by Investor under this Offering. Specifically, this means that any profit or revenue beyond the Investment Return and Right of Redemption due to Investors is owned by Company and Investor has no right to such profits or revenues. Moreover, any additional profits or revenues realized by Company (and whether as part of any services agreement, or the President's, Member's, or affiliated individuals' or entity's separate investments in Third-Party Beneficiary Insurance Settlement Agreements) will never be due to Investors. Any of the preceding-sentence-described activities or purchases or activities may or will be treated as preferential to the placement of any Partial Beneficial Interests so secured on behalf of Investor any of which activities of Company, or as to either their owners, partners or officers may so choose and are unrestricted to so pursue. In short, when an Investor's Partial Beneficiary Interest is negotiated and funded by the Investor's Investment Principal, the Investor retains no expectancy in the future as to any other Purchase Contract not funded by Investor, but nonetheless subject to any Event of Default.

An Investment under this Offering can only be understood to be potentially placed by Company, but not assured to be so placed. As Company is and remain be self-funded (i.e., separate from any Investment made under this Offering which are potentially designated to fund the potential Partial Beneficial Interest on behalf of the Investor) Company, and its owners, managers, and/or partners (collectively, "Conflicted Parties") may invest on their own behalf with their own funds and negotiate and secure beneficial interests in Third-Party Beneficiary Insurance Settlement Agreement on their own account and for their own benefit except that at no time will any Investment Principal hereunder be comingled with or used by the Conflicted Parties to secure any such personal beneficial interests.

What the Investor can expect is that their Investment Principal will be utilized to negotiate and secure one or more Partial Beneficial Interests in one or more Purchase Contracts in and at the discretion of President (and as may be consistent with the availability of same in the marketplace and the amount of the Investment Principal Subscribed under this Offering), which does not guarantee that President will at any time preferentially place the Investor's Investment ahead of the Conflicted Parties' interest in securing a beneficial interest under a Purchase Contract of the very Insurance Settlement Agreement interest that Investor may otherwise want to Invest in and that could be secured on behalf of an Investor.

The Conflicted Parties are not restricted to fulfil their individual and separate business or investment goals (except that the Conflicted Parties shall never utilize any Investor's Investment Principal or Investment Return realized under this Offering to secure Insurance Settlement Agreement beneficial interests for themselves or under their own account).

THE PRESIDENT DISCLAIMS ANY FIDUCIARY OR OTHER DUTY TO PLACE INVESTOR'S INVESTMENT PRINCIPAL AHEAD OF COMPANY, OR PRESIDENT'S OR THEIR OWNERS' PERSONAL FUNDS TO SECURING/PLACEMENT/ASSIGNMENT/PURCHASE OF PURCHASE CONTRACTS GERMANE TO INSURANCE SETTLEMENT AGREEMENT INTERESTS FOR, AS RELEVANT, THEIR INDIVIDUAL BENEFIT AND AHEAD OF INVESTORS. COMPANY AND PRESIDENT CERTIFY THAT AT NO TIME WILL ANY INVESTMENT PRINCIPAL UNDER THIS OFFERING BE APPLIED TO ANY SUCH INDIVIDUAL OR SEPARATE ACTIVITY.

(3) ***Competition With the Company.*** Company's President, Members, Investors, and owners of Members or Investors (whether directly or indirectly or individually or through entity held interests), officers, directors and affiliates of the Company or the Member or Investor, will provide or may provide services or products to, and intend in the future to continue to own or provide services or products to other businesses or operating entities, some of which may have the same or similar investment objectives or business activities as the Company or otherwise may compete with the Company and Investors' interest in having their Investment Principal placed. The Company Operating Agreement does not prohibit these activities and does not impose any duty or obligation on President or any entity Member or his its officers, directors, investor or affiliates or the President to disclose or offer to the Company or the Members or Investor any venture, opportunity, activity, or interest therein, including the acquisition, financing, operation, or sale of other competing businesses or Partial Beneficial Interests/Personal interests. The President, Jeffrey Judd and certain other Investors or other Third Parties may engage in activities of any nature or description. Accordingly, the Company may be in competition with other entities formed or managed by Jeffrey Judd or his affiliates.

F.   **PRO FORMA CAPITALIZATION TABLE**. The following capitalization table summarizes, on a pro forma basis as of November 1, 2021, the capitalization of the Company.

| NAME | UNITS | SHARING RATIO | CAPITAL CONTRIBUTION |
|---|---|---|---|
| **MEMBERS** | | | |
| **Jeffrey Judd** | 100 | 100.00% | $1,000 plus in-kind contributions |
| | | | |
| **Total** | 100 | 100.00% | |

# VI.    COMPANY STRUCTURE

*Capitalized terms not otherwise defined herein will have the same meaning that is set forth in the Company Operating Agreement or the Code of Ethics and Business Conduct.* The Company is a Florida limited liability company that is owned by its President with an ownership interest, in isolation or in the aggregate, of one hundred (100%) percent of all the outstanding Units of the Company.

A.   *Management*. The Company Operating Agreement sets forth the obligations, rights, and powers of the President as to the Company and, among other things, regarding the **Investment Return** to the Investors. **Jeffrey Judd** is the sole Member and is the President of the Company.

B.   *Determination of Offering Investment Amounts*. There is no public market for the Partial Beneficiary Interest investments made herein. The Partial Beneficial Interest is established arbitrarily by the President without any arms-length negotiations or appraisal. Further, any Investment through this Offering does not bear any relationship to the Company's assets (tangible or intangible), book value, net worth or expected or earnings. The Third-Party Beneficiary Insurance Settlement Agreement Partial Beneficiary Interest assigned with the Investment Principal under this Offering only entitles the Investor to the potential of **Investment Return** and a **Right of Redemption**, subject to any Event of Default.

C.   **The Partial Beneficial Interest affords Investors only a straight debt germane Partial Beneficiary Interest and its concomitant Investment Return and a Right of Redemption**. An Investor's Offering Investment of a minimum $80,000.00 is expected to fund **one (1) $80,000.00 Purchase Contract germane to an Insurance Settlement Agreement and Partial Beneficial Interest** or if the Investment Principal is $100,000.00 then it will fund **one (1) $100,000.00 Purchase Contract germane to an Insurance Settlement Agreement interest**. Once each $80,000.00 or $100,000 Investment Principal increment is placed with a Purchase Contract germane to an Insurance Settlement Agreement, then the Investment Return may be expected to be due at the expiration of the Placement Period on behalf of the Investor.

At the expiration of the Placement Period, Investors will be expected to receive from Company, as their **Investment Return**, a minimum of the distributed 12.5% ($12,500 per 100K contract or $10,000 per 80K contract) germane to the relevant Partial Beneficial Interest so invested.  Also, for each $100,000.00 or $80,000.00 tranche so invested that funds the relevant Purchase Contract as to a particular Insurance Settlement Agreement. Investors retain an absolute right to call back ("**Redeem**" through a "**Right of Redemption**") their Investment Principal in Partial Beneficial Interests any time after **the expiration of the 90-day Placement Period** through this Offering. Any redemption will be made and settled no later than five (5) **business days after** Investor informs Company in writing of their exercise of their **Right of Redemption**.

D.   **Capital Contributions-Contributed Assets** - The capital contributions/contributed assets made by Jeffrey Judd includes intellectual property contributions and expenses as incurred by such Member President on behalf of the Company. For example, such Member President has or may contribute, among others: (i) business management expertise in Company, Insurance Settlement Agreement placed/secured/assigned/purchased, manages and attendant operations; (ii) the formation and structural guidance for the Company's management operations; or (iii) an understanding of best practices.

THE PRECEDING CONSTITUTES A PARTIAL AND GENERAL DESCRIPTION OF THE COMPANY AND SOME OF THE TERMS OF THE COMPANY OPERATING AGREEMENT INVESTORS MUST CAREFULLY REVIEW THE COMPANY'S OPERATING AGREEMENT IN ITS ENTIRETY PRIOR TO SUBMITTING THEIR DECLARATIONS AND SUBSCRIPTION AGREEMENT TO INVEST AND IN CONJUCTION WITH THEIR LEGAL, FINANCIAL AND TAX ADVISOR.

## ACKNOWLEDGMENT OF LEGAL RISK

EACH POTENTIAL AND ACTUAL INVESTOR OF THE COMPANY PURSUANT TO THIS MEMORANDUM AND THROUGH THEIR EXECUTED DECLARATIONS AND SUBSCRIPTION AGREEMENT ACKNOWLEDGES AND CERTIFIES THAT HE OR SHE WILL RELIES SOLELY ON THEIR OWN LEGAL, FINANCIAL AND TAX ADVISORS TO ASSESS AND EVALUATE THE ALL RISKS AND LAWFULNESS ASSOCIATED WITH THE INVESTMENT AND ALL ASPECTS OF THE INVESTOR'S RELATIONSHIP TO THE COMPANY UNDER ALL APPLICABLE FEDERAL AND FLORIDA STATE OR ANY OTHER STATE'S LAWS (OR STATE LAW SERVING AS AN EQUIVALENT TO A FEDERAL LAW).

# VII.   TAX STATUS

An investor's basis is expected to be his or her Investment Principal and noting that the Partial Beneficial Interests will equal the amount paid for that Partial Beneficial Interest. Investors may or will recognize a taxable event on the revenue germane to the Investor Partial Beneficial Interests equal to the difference between the investor's basis in the Investor Partial Beneficial Interests and the amount the investor realizes on the revenue of those Investor Partial Beneficial Interests, if any. An investor is advised to seek tax counsel from either its attorney or certified public accountant before investing in the Investor Partial Beneficial Interests in order to fully understand the ramifications of investing in the Investor Partial Beneficial Interests. The Company is not providing any tax advice to any Investor as part of this Offering.

# VIII.   USE OF PROCEEDS

The following paragraph discloses the Company's proposed sources and uses of the capital **Investment** raised pursuant to this **Offering**. Varying circumstances may dictate other uses of the **Investment Proceeds** different from those set forth below. The President, in his sole discretion, may determine the use of the **Investment Proceeds**, which may be different than is set forth in the following paragraph.

The Company plans to use the proceeds from Investment to placed/secured/assigned/purchased **Insurance Settlement Agreement beneficial interests**. The Company will be self-funded to settle its other **Offering Expenses** and **Operational Expenses**. The portion of the **Investment** that has been allocated to settle Company's **Offering Expenses** and **Operational Expenses**: $ 0.

Any wiring fee germane to the delivery of any Investment Return or Investment Principal may be deducted from the Investment Return.

The purpose of this Offering is for capitalization and financial flexibility for the placement of Partial Beneficial Interests germane to Third-Party Beneficiary **Insurance Settlement Agreements**. As of the date of this **Memorandum**, the President cannot specify with certainty all particular uses it will have for the Investment Proceeds except that they are deposited in the Escrow Accounts and earmarked solely for the placement of Partial Beneficial Interests. Accordingly, the President does not retain broad discretion in the allocation and use of the proceeds from this Offering. The President will commence Company operations in his sole discretion and may cancel this Offering if an insufficient number of Subscriptions are achieved pursuant this Offering.

**Offering Expenses**, include, but are not limited to: (i) Legal Costs; (ii) Licensing Costs; (iii) Filing Expenses; (iv) Form Fees; (v) Accounting Fees; (vi) Equipment; (vii) Computers; (viii) Small Equipment;

**Operating Expenses**, include, but are not limited to: (i) Staff; (ii) Office leases; (iii) Office Supplies; (iv) Shipping Expenses; (v) Compliance Costs; (vi) Marketing Expenses; (vii) Banking Costs and Fees; (viii) Communications Costs such as Telephone and Internet; or (x) Taxes;

# IX.   NO FINANCIAL PROJECTIONS FOR COMPANY OR ANY INVESTMENT OPERATIONS

As an offering for Partial Beneficial Interests in Purchase Contracts and relevant to the operations of a newly formed Company, See Exhibit A, the Company does not provide for any audited or unaudited financial statements or financial projections. Company reiterates that it is a newly formed entity without any prior business operations. In all cases, there is no assurance that the placement of investments in this offering for Partial Beneficial Interests in Purchase Contracts will be achieved.

# X.   FEDERAL AND STATE INCOME TAX ASPECTS

A. **INTRODUCTION**.

The federal income or other tax aspects of limited liability companies are complex and this disclosure is set out germane to the tax considerations relating to the Company and its Members. Generally, any matter set out below summary is based upon the Code, the Regulations, current published administrative positions of the Internal Revenue Service (the "IRS") contained in Revenue Rulings, Revenue Procedures, Private Letter Rulings, Technical Advice Memorandums, and existing judicial decisions.

Assurance cannot be given that there will not be legislative or administrative changes or court decisions that would significantly modify the statements in this summary. Bills may have been introduced in past sessions and may be introduced in the future that, if enacted, could materially alter the tax consequences of any investment, which changes may or may not be retroactive. Furthermore, numerous provisions in the Code that were enacted during the last several years have not yet been the subject of significant administrative or judicial interpretation or clarification as of the date of this Memorandum.

Nonetheless, a prospective Investor should be advised that this discussion is necessarily general and the applicability or effect of the matters discussed may vary, depending on an Investor's individual circumstances and must be discussed with their own tax advisors. The following summary does not include any discussion of general principles of taxation or of the sections of the Code and the Regulations that implement those principles. In addition, the availability, timing, and amount of deductions taken by an Investor regarding any aspect of this Offering depends not only on the tax aspects generally set out below, but also upon various determinations relating to each Investor and the activities of the Company, all of which are subject to potential challenge by the IRS on factual or other grounds.

Therefore, there can be no assurance that the anticipated treatment of tax items with respect to an Investment may not be challenged or otherwise categorized by the IRS. Finally, this disclosure does not discuss any foreign, state, or local tax considerations related to an investment through the Company.

B. **TAX ASPECTS OF THE OFFERING**.

**THE TAX CONSIDERATIONS RELATING TO FOR INVESTORS ACQUIRING THE PARTIAL BENEFICIAL INTERESTS MAY BE SIGNIFICANT. IT IS IMPOSSIBLE FOR ANY MEMORANDUM SUCH AS THIS TO ADDRESS ALL OF THE TAX CONSIDERATIONS THAT MAY BE RELEVANT TO PARTIAL BENEFICIAL INTEREST HOLDERS IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES OR TO PARTIAL BENEFICIAL INTEREST HOLDERS SUBJECT TO SPECIAL RULES UNDER U.S. FEDERAL INCOME OR OTHER TAX LAWS.**

**THEREFORE, ALL PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR INDIVIDUAL TAX ADVISORS WITH RESPECT TO THE TAX RAMIFICATIONS OF ANY INVESTMENT IN, OR HOLDING OF, ANY INVESTMENT RETURN OR PARTIAL BENEFICIAL INTEREST OR OTHERWISE AS TO THIS OFFERING.**

**AS REQUIRED BY U.S. TREASURY REGULATIONS GOVERNING TAX PRACTICE, YOU ARE HEREBY ADVISED THAT ANY WRITTEN TAX MATTER CONTAINED HEREIN WAS NOT WRITTEN OR INTENDED TO BE USED (AND CANNOT BE USED) BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE INTERNAL REVENUE CODE OR U.S. FEDERAL, STATE, AND LOCAL INCOME TAX CONSEQUENCES IN THE PARTICULAR SITUATIONS OF THE PURCHASE, OWNERSHIP, AND DISPOSITION OF INTERESTS, AS WELL AS ANY CONSEQUENCES UNDER THE LAWS OF ANY OTHER TAXING JURISDICTION.**

THE FOREGOING INFORMATION OF CERTAIN OF THE FEDERAL INCOME TAX CONSIDERATIONS APPLICABLE TO AN INVESTMENT IS NOT INTENDED TO BE A SUBSTITUTE FOR FEDERAL OR STATE TAX PLANNING, WHICH FOR EVERY INVESTOR MUST BE SOUGHT OUT INDEPENDENTLY BY EACH INVESTOR. NOTHING IN THIS MEMORANDUM MAY BE CONSTRUED BY INVESTORS (OR ANYONE) TO CONSTITUTE INVESTMENT, FINANCIAL OR TAX ADVICE.
ANY PERSON OR ENTITY CONTEMPLATING AN INVESTMENT IN THIS OFFERING IS URGED AND REQUIRED TO CONSULT THEIR FINANCIAL, LEGAL AND TAX ADVISORS, PARTICULARLY WITH RESPECT TO THEIR OWN TAX SITUATIONS. NO STATEMENT IN THIS MEMORANDUM IS INTENDED TO BE, NOR SHOULD ANY STATEMENT BE CONSTRUED AS, "WRITTEN TAX ADVICE" WITHIN THE MEANING OF CIRCULAR 230 (ENTITLED "REGULATIONS GOVERNING THE PRACTICE OF ATTORNEYS, CERTIFIED PUBLIC ACCOUNTANTS, ENROLLED AGENTS, ENROLLED ACTUARIES, AND APPRAISERS BEFORE THE INTERNAL REVENUE SERVICE"), OF INVESTMENT OF FINANCIAL ADVICE.

# XI.   ADDITIONAL INFORMATION

Attached hereto for review by Prospective Investors and their representatives are the Exhibits containing the Company's Articles of Organization, Company Operating Agreement, its Code of Ethics and Business Conduct, Sample Purchase Contracts germane to Insurance Settlement Agreements, and Subscription Documents. The information in the Exhibits, as well as the information in this Memorandum, and any supplements or addenda thereto or to the Exhibit — is strictly CONFIDENTIAL and subject to Subscriber's and Company's prior executed Non-Disclosure Agreement.

Prospective investors may not rely on any representations or statements relating to the offering other than the information set forth in this Memorandum.

LEGAL COUNSEL HAS PARTICIPATED IN THE PREPARATION OF THE COMPANY OPERATING AGREEMENT AND CERTAIN OTHER AGREEMENTS THAT ARE EXHIBITS TO THIS MEMORANDUM. SUCH COUNSEL **DOES NOT CREATE** AN ATTORNEY-CLIENT RELATIONSHIP BETWEEN ANY POTENTIAL INVESTOR, SUBSCRIBER OR MEMBER AND SUCH COUNSEL. SUCH COUNSEL DOES NOT PURPORT TO HAVE MADE ANY INVESTIGATION OR TO HAVE ACTED INDEPENDENTLY ON BEHALF OF THE INVESTORS OR ANY MEMBER. EACH INVESTOR MUST LOOK TO HIS OR HER OWN LEGAL AND TAX COUNSEL IN CONNECTION WITH AN INVESTMENT IN THE COMPANY.

# EXHIBIT A
# CORPORATE DOCUMENTS
# J AND J PURCHASING, LLC

# EXHIBIT B
# OPERATING AGREEMENT
# J AND J PURCHASING, LLC

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**J AND J PURCHASING, LLC**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF J AND J PURCHASING, LLC (the "Operating Agreement" or "Agreement") made effective as of November 1, 2021, is adopted, executed, and agreed to, for good and valuable consideration, by the Members (as defined below).

ARTICLE 1
DEFINITIONS

Capitalized words and phrases used and not otherwise defined elsewhere in this Agreement will have the following meanings:

1.1.    "Act" means the Florida Revised Limited Liability Company Act or, from and after the date any successor statute becomes, by its terms, applicable to the Company, such successor statute, in each case as amended at such time by amendments that are then applicable to the Company (to the extent the provisions of the Act are not modified by the Articles of Organization or this Agreement "Certificate").  All references to sections of the Act include any corresponding provision(s)of any such successor statute.

1.2.    "Additional Capital Contributions" means any Capital Contributions required by the Company other than the Initial Capital Contributions described in this Agreement.

1.3.    "Adjusted Capital Account" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after:  (a) adding to such Capital Account the amount that such Member is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (b) subtracting from such Capital Account such Member's share of the items described in Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

1.4.    "Affiliate" means, with reference to a specified Person: A Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under common Control with, the specified Person.

1.5.    "Agreement" means this Operating Agreement.

1.6.    "Applicable Law" or "Applicable Laws" means all laws and regulations applicable to the Members and/or the Company.

1.7.    "Board of Members" "Members" or "Shareholders" means every Member of the Company acting collectively as a whole.

1.8.     "Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Florida are closed.

1.9.    "Capital Account" means a  capital account established and maintained for each Member with respect to the Company in which the Member has an interest in accordance with the following provisions: (1) To the Member's Capital Account there will be added (i) such Member's Capital Contributions to the Company and (ii) such Member's allocable share of Net Profits and any items in the nature of income or gain to the Company that are allocated to such Member; (2) From each Member's Capital Account there will be subtracted by the Company (i) the amount of (1) cash and (2) the Gross Asset Value of any assets distributed from the Company to such Member pursuant to any provision of this Agreement (net of liabilities encumbering the distributed assets that such Member is considered to assume or take subject to under Code Section 752), (ii) such Member's allocable share of Net Losses and any other items in the nature of expenses or losses that are allocated from or with respect to the Company to such Member and (iii) liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company, calculated by reference to Code Section 752.  With respect to distributions of assets from the Company, the Capital Accounts of the Members of the Company will first be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not been previously reflected in Capital Accounts) would be allocated to the Members of the Company if there were a taxable disposition of such property for its fair market value (taking Code Section 7701(g) into account) on the date of distribution; (3) The Managing Member may cause an increase or decrease to the Capital Accounts of the Members to reflect a revaluation of assets on the books and records of the Company.  Any such adjustments will be made in accordance with Regulations Section 1.704-1(b)(2)(iv)(g); (4) Additional adjustments will be made to the Members' Capital Accounts as required by Regulations Sections 1.704-1(b) and 1.704-2 or, as permitted but not required, in the reasonable discretion of the Managing Member; (5) Adjustments to Capital Accounts in respect to the Company income, gain, loss, deduction and non-deductible expenditures (or any item thereof) will be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to federal tax treatment of the corresponding tax items) at the Company level, without regard to any requisite or elective tax treatment of such items at the Member level; (6) The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-

2 and will be interpreted and applied in a manner consistent with such Regulations, as reasonably determined by the Managing Member.

1.10.   "Capital Contributions" means, with respect to any Member, the total amount of money and the fair market value of property (other than money) contributed to the capital of the Company by such Member, whether as an Initial Capital Contribution or as an Additional Capital Contribution.

1.11.   "Cash Available for Distribution" means, all the Company cash receipts (excluding the proceeds from any Terminating Capital Transaction), after deducting payments for Operating Cash Expenses and payments required to be made in connection with any loan to the Company or any other loan secured by a lien on any Company Assets, capital expenditures, and any other amounts set aside for the restoration, increase, or creation of reasonable Reserves.

1.12.   "Certificate" means the relevant incorporation document(s) and supplements and amendments thereto of the Company filed in the Office of the Secretary of the State of Florida for the purpose of forming the Company as a Florida limited liability company, and any duly authorized, executed and filed amendments or restatements thereof.

1.13.   "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

1.14.   "Company" or "J&J" means J and J Purchasing, LLC.

1.15.   "Company Assets" means all direct and indirect interests in real and personal property owned by the Company from time to time and will include both tangible and intangible property (including cash).

1.16.   "Control," "Controlled," or "Controlling" means (a) with respect to any corporation or other entity having, whether directly or through another corporation or entity, voting shares or the equivalent, the ownership or power to vote equal to or greater than fifty-one percent (51%) of the outstanding shares or the equivalent; or, (b) with respect to any partnership, limited liability company, professional association, non-profit corporation, joint venture or other entity, directly or through another entity, the power to elect, appoint, or approve of fifty-one percent (51%) or more of the directors, Members, or Persons performing similar functions or the ability to direct its business and affairs.

1.17.   "Delinquent Member" means a Member who does not contribute by the required date all of a Capital Contribution that the Member is required to make as provided in this Agreement.

1.18.   "Economic Interest" means a Person's: (i) right to share in the Net Profits, Net Losses, or similar items of, and to receive distributions from, the Company in proportion to the Member's Percentage Interest, and (ii) obligation to make any required Additional Capital Contributions, but does not include any other rights of a Member including, without limitation, the right to vote or to participate in the management of the Company or, except as specifically provided in this Agreement or required under applicable state law, any right to information concerning the business and affairs of the Company.

1.19.   "Economic Interest Holder" means any Person (a) to whom a Member Transfers all or any part of its interest in the Company, and (b) which has not been admitted to the Company as a Substitute Member pursuant to this Agreement.  An Economic Interest Holder only has an Economic Interest in the Company.

1.20.   "General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate, as quoted in the money rates section of The Wall Street Journal, plus one percent or (b) the maximum rate permitted by applicable law.

1.21.   "Gross Asset Value" means, with respect to any Company Asset, Company Asset's adjusted basis for federal income tax purposes, except as follows:

    1.21.1 The initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as provided herein.

    1.21.2 Except as otherwise provided in this Agreement, the Gross Asset Values of all assets immediately prior to the occurrence of any event described in subsections (a), (b), (c), or (d) of this Section 1.21.2 will be adjusted to equal their respective gross fair market values, as of the following times: (a) the acquisition of an additional interest in the Company; (b) the distribution by the Company to a Member of more than a de minimis amount of assets as consideration for an Interest in the Company; (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (d) at such times as the Company may determine as necessary or advisable in order to comply with Regulations Sections 1.704-1(b) and 1.704-2.

    1.21.3 The Gross Asset Value of any Company Asset distributed to a Member will be the gross fair market value of such Company Asset on the date of distribution.

    1.21.4 The Gross Asset Values of the assets of the Company will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are considered in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m). If the Gross Asset Value of a Company Asset has been determined or adjusted pursuant to Section 1.21.1, 1.21.2 or 1.21.4 above, such Gross Asset Value will thereafter be adjusted by the depreciation taken into account with respect to such Company Asset for purposes of computing Net Profits and Net Losses.

1.22.  "Interest" means a Member's Membership Interest and/or a Person's Economic Interest.

1.23.  "Investor" means an Investor pursuant to Company's Private Placement Memorandum which investment is managed by Company.  An Investor is not a Member of and owns no Units in Company. An Investor is not a Person and is such individual Investor in Company negotiated Purchase Contracts and which Investor does not have any form or ownership or other right or expectancy in or otherwise relevant to Company, nor its profits or revenues, except that such Investor has a right to the Investment Return which is their retained Partial Beneficial Interest in Purchase Contracts and retained Right of Redemption, subject to any Event of Default.  Investors have no voting right or ownership in or related to this Operating Agreement or otherwise.

1.24.  "Investment Return" means and encompasses the following: pursuant to the Company's Private Placement Memorandum and investment Offering for the investment in Purchase Contract(s), the Company has offered Investors an expected 12.5% or $12,500 for a $100,000 Purchase Contract's Return or 12.5% or $10,000 for an $80,000 Purchase Contract's Investment Return (i.e., the specific sum constituting the Investor's Partial Beneficial Interest in the relevant Purchase Contract due to be paid in a lump sum subsequent the expiration of the Placement Period in addition to the refundable Investment Principal pursuant to the Investor's retained Right of Redemption). The $100,000.00 or $ 80,000.00 consideration/price for the Purchase Contract is funded by the Investor's Investment Principal under the Offering and as so attributed/placed by Company. When Investor submits their Investment Documentation and funds their Investment Principal, the President will place the Investment Principal to fund the assignment/purchase of the relevant $100,000.00 or $80,000.00 Purchase Contract. The time period between the receipt of the Investor's Investment by Company and such assignment/purchase may vary, but generally will be less than three business days. The ninety-day "Placement Period" begins on the day the Purchase Contract is signed. At the end of the Placement Period, the Investor is expected to receive a lump sum payment of the relevant Investment Return (i.e., depending on whether the Purchase Contract is for $100,000 or $ 80,0000), subject to any Event of Default and described or defined in the Private Placement Memorandum. Manager will issue and forward to each Investor a yearly 1099 Tax reporting form setting out amounts paid to Investor.

1.25.  "Majority of Interest" means 51% or more of the Membership Interests in Company and a "Super Majority Vote" means 70% or more of the Membership Interests in Company.

1.26.  "Managing Member" means each Person elected as the Managing Member of the Company in accordance with this Agreement, but only for so long as each such Person remains a Managing Member of the Company in accordance with this Agreement.  References to Manager/President in this Agreement means Managing Member.

1.27.  "Member" or "Shareholder" means any Person named in the relevant Certificate as an initial Member of the Company and any Person hereafter elected or appointed as a Member of the Company as provided in this Agreement but does not include any Person who has ceased to be a Member of the Company.

1.28.  "Membership Interest" means the entire ownership interest of a Member in the Company at any particular time and any and all rights hereunder.

1.29.   "Net Profits" or "Net Losses" means, with respect to the Company, for each fiscal year or other period, an amount equal to the taxable income or loss of the Company for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments: (a) any income that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section 1.27 will be added to such taxable income or loss; (b) Any expenditure described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this Section, will be subtracted from such taxable income or loss; (c) Gain or loss resulting from any disposition of assets where such gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the assets disposed of, notwithstanding that the adjusted tax basis of such assets differs from its Gross Asset Value; (d) To the extent an adjustment to the adjusted tax basis of any Company Asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of Company Asset) or loss (if the adjustment decreases the basis of Company Asset) from the disposition of Company Asset and will be taken into account for the purposes of computing Net Profits and Net Losses; (e) If the Gross Asset Value of any Company Asset is adjusted in accordance with the terms of this Agreement, the amount of such adjustment will be taken into account in the taxable year of such adjustment as gain or loss from the disposition of such Company Asset for purposes of computing Net Profits or Net Losses.

1.30.  "Operating Cash Expenses" means, with respect to any fiscal period, the amount of cash disbursed in the ordinary course of business during the period to pay the expenses of the Company including, without limitation, all cash expenses, such as advertising, promotion, property management, insurance premiums, taxes, utilities, repair, maintenance, legal, accounting, bookkeeping, computing, equipment use, travel on the Company business, telephone expenses, and salaries, and direct expenses of the Company employees and agents while engaged in the Company business. Operating

Cash Expenses will include the actual cost of goods, materials and administrative services used for or by the Company in performing functions set forth in this Agreement reasonably requiring the use of such goods, materials, or administrative services.  Operating Cash Expenses will not include expenditures paid from Reserves (as defined below).  Operating Cash Expenses will be calculated in accordance with generally accepted accounting principles.

1.31.  Partial Beneficial Interest" means an Investor's Partial Beneficial Interest that through their investment pursuant to Company's Private Placement Memorandum subscription gives rise to their interest in Investment Return under a Purchase Contract and subject to any Event of Default as defined or described in the Company's Private Placement Memorandum.

1.32.  Person" means and includes an individual, a corporation, a company, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or any entity similar to any of the foregoing that holds or is owner of Units in Company, but not Investor.

1.33.  "Regulations" means proposed, temporary, and final Treasury Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding Treasury Regulations).

1.34.  "Reserves" means funds set aside or amounts allocated to reserves that will be maintained in amounts deemed sufficient by the Managing Member for working capital, to pay taxes, insurance, debt service, and other costs or expenses incident to the conduct of business by the Company as contemplated hereunder

1.35.  "Terminating Capital Transaction" means any sale or other disposition of all or substantially all of the assets of the Company or a related series of transactions that, taken together, result in the sale or other disposition of all or substantially all of the assets of the Company.

1.36.  "Transfer" means, with respect to any interest in the Company, a sale, conveyance, exchange, assignment, pledge, encumbrance, gift, bequest, hypothecation, or other transfer or disposition by any other means, whether for value or no value and whether voluntary or involuntary or directly or indirectly (including, without limitation, by operation of law), or an agreement to do any of the foregoing; provided however, (i) the pledge of Membership Interests or assets of the Company to a third party as collateral for the financing of the purchase of real estate or other property owned by the Company, and (ii) the assignment by a Member to (a) an entity that is wholly-owned by such Member, or (b) a trust for which such Member is a beneficiary (provided that Control of such trust remains with such Member), will not be construed as a "transfer" as that term is used herein.  Used as a verb, the term will mean effecting any of the foregoing.

1.37.  "Units" means Membership Units.

ARTICLE 2
ORGANIZATIONAL MATTERS

2.1    FORMATION.  The Company was formed under Florida law and will be governed by such law for the purposes and upon the terms and conditions set forth in this Agreement.  The rights, duties, powers and liabilities of the Members will be as provided in the relevant Florida State statutes, except as otherwise expressly provided in this Agreement.  In the event of any inconsistency between any provision contained in this Agreement and any non-mandatory provision of Florida State law, the provision contained in this Agreement will govern.

2.2    NAME.  The name of the Company is "**J and J Purchasing, LLC**".

2.3    PRINCIPAL PLACE OF BUSINESS; OTHER PLACES OF BUSINESS. The principal place of business of the Company is located at 9 Sky Arc Court, Henderson, NV 89012, or such other place within or outside the State of Florida as the Manager may from time to time designate.

2.4    BUSINESS PURPOSE.  The Company is formed to conduct lawful business.

2.5    FILINGS.  The Managing Member may execute and file any duly authorized amendments to the Certificate of Formation of the Company (the "Certificate") from time to time in a form prescribed by Florida State law.  The Managing Member will also cause to be made, on behalf of the Company, such additional filings as the Managing Member will deem necessary or advisable.

2.6    DESIGNATED AGENT FOR SERVICE OF PROCESS.  The Company will continuously maintain a registered office in the State of Florida at its principal place of business.  Until the Managing Member decides otherwise, the designated and duly qualified agent for service of process on the Company in Florida will be the Managing Member of the Company.

2.7    COMPANY PROPERTY. All Company assets will be held and owned, and conveyance made, in the Company's name.  Instruments and documents providing for the acquisition, mortgage, or disposition of any Company asset will be valid and binding upon the Company if executed by the Person authorized by the Managing Member.

2.8    BANK ACCOUNT.  All funds of the Company will be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company at such locations as determined by the Managing Member

from time to time.  Withdrawal from such accounts will require the approval/signature of the Managing Member or the Person designated by the Managing Member.

2.9     TERM.  The Company commenced upon the filing of the Certificate with the Secretary of State of the State of Florida and will continue perpetually until duly terminated.

2.10   WARRANTIES.  The Company and current Members represent and warrant as part of Member's Unit purchase the following: (a) Company and all subsidiaries are duly and legally formed and in good standing in their state of incorporation or will be within five (5) business days from executing this Agreement; (b) There are no liabilities other than those disclosed in the balance sheet at closing; (c) All related party transactions shall be scheduled at closing; (d) There are no threatened or filed legal actions against the Company by governmental agencies or other plaintiffs.

ARTICLE 3
MANAGING MEMBER AND BOARD OF MEMBERS

3.1     MANAGING MEMBER.  Broadly, Company's daily operations shall be managed solely by its Manager/President and not by its Members. The Manager/President is **Mr. Jeffrey Judd**. Daily operations include all services and affairs that do not require approval by the Board of Members as outlined in this Agreement. Unless the action of the Members is otherwise required by this Agreement, the Company's Certificate or the Act, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be solely managed under the direction, supervision, and responsibility of the Manager/President. Subject to the limitations contained in Section 3.2, the Manager shall make all decisions and may take all actions for, or on behalf of, the Company in furtherance of its business and affairs as he may deem necessary or appropriate. The Members approve the appointment of **Mr. Judd** as President, the Manager and Attorney-in-Fact of the Company.

Mr. Judd's authority shall include but is not limited to: (i) entering into and performing contracts, agreements, and other undertakings binding the Company that may be necessary to further the Company's purposes in the sole discretion of Manager; (ii) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders of the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements; (iii) maintaining the Company's Assets; (iv) collecting sums due the Company; (v) paying the Company's debts and obligations; (vi) borrowing money or opening a line of credit either in an amount deemed necessary by Manager and voluntary prepayment or debt extensions of same for Company purposes and to secure the repayment by pledging Company Assets; (vii) selecting removing and changing the authority and responsibility of lawyers, accountants and other advisers and consultants; (viii) obtaining insurance for the Company and as germane to its operations; (ix) determining method(s) for and amounts regarding the distribution of Company cash; (x) hiring of personnel, staff or professionals and leasing, purchasing or otherwise retaining the use or title for equipment, furniture and other property; (xi) establishing, amending or extending credit relationships in amounts and with terms in the sole discretion Manager, (xii) setting of the date and time for the annual, quarterly, or other meeting of Members; (xiii) managing the negotiation of Purchase Contracts tied to Third-Party Beneficiary Insurance Settlement Agreements matters germane to the private investment of relevant Investors, issuing monthly statements and Investment Returns pursuant to the Offering; (xiv) waiving of requirements regarding waivable matters set forth in this Agreement; (xiv) approving of annual, quarterly or monthly budgets; (xv) commencing, amending or terminating relationships with insurance providers or other products or services provider in Manager's sole discretion; (xvi) terminating any employment, independent contractor, or other agreement and secure that all taxes, payments, compensation to any is compliant with all laws and regulations; (xvii) distributing Assets; (xviii) determining and implementing a formula or methodology to determine distributions of Investment Returns germane to Partial Beneficial Interests to Investors or compensation to Members; (xx) approving the commencement of any lawsuit or legal proceeding that Manager considers necessary and in the best interest of Company; (xxi) determining method(s) for and regarding dilution of Units; (xxii) settle or resolve of any dispute of any claim made against the Company; (xxiii) create or propose amendments to this Agreement; (xxiv) cause Company to engage in additional business activities or streams; (xxv) instituting, managing, auditing and ensuring ongoing adherence to a Company compliance program regarding Applicable Laws (and further, all industry laws regulations) governing or relevant to the Company's operations and all Company policies and procedures; and, (xxvi) delegating an authorized agent of the Company to take any of the actions referred to in the foregoing clauses. In general, Mr. Judd shall have a broad right to manage the day-to-day operations of the Company.

3.3.    BOARD OF MEMBERS.  The Board of Members consists of all Shareholders of Company.  By Majority of Interest, the Board of Members retain the right to decide on fundamental and structural changes to Company, specifically, (1) amendments to this Agreement, (2) the sale/liquidation of Company, and (3) appointment of a Managing Member.  In the event a deadlock on a matter requiring a Majority of Interest vote occurs and is not resolved within thirty (30) days from the date of the initial vote, then the vote of Managing Member shall decide, with binding force, over the affair/matter.

3.3.1  PLACE AND MANNER OF MEETING.  All Member meetings will be held at the time and place stated in the meeting notice or in an executed waiver of the meeting notice.  Participation in a meeting will constitute a Member's presence at the meeting, except when the Member attends the meeting for the express purpose of stating that the meeting is not lawfully called or convened.  The Members may participate in a meeting by means of telephone, video conference, electronic (for example, GoToMeeting) or similar communications equipment by means of which all persons participating

in the meeting can hear each other. Such participation in a meeting will constitute presence in person at the meeting. If all Members are participating by conference telephone or similar communications equipment, the meeting will be deemed to be held at the principal place of business of the Company.

3.3.2  CONDUCT OF MEETINGS.  All Member meetings will be presided over by the President. The President, in the President's discretion, may determine the order of business and procedure at the meeting, including regulating of the voting manner and the discussion conduct. If the President is unavailable for a meeting, the President's designee will preside over the Member meeting.

3.3.3  ANNUAL MEETING.  The Members shall meet at least once a year at a time and place to be determined by the Managing Member. Failure to hold the annual meeting at the designated time will not result in a dissolution of the Company.

3.3.4  SPECIAL MEETINGS.  Special meetings may be called at any time by the President, Managing Member, or by the written request of holders of at least twenty-five percent (25%) of the Membership Units. The request must state the meeting purposes and the matters proposed to be acted on at the meeting.

3.3.5  NOTICE.  Notice of the meeting must be in writing and state the meeting's place, day and hour, and, in case of a special meeting, the purposes for which the meeting is called. The notice must be delivered not less than ten (10) or more than sixty (60) days before the meeting date either personally, by first class mail, by facsimile, or by electronic mail to each Member. Notice may be waived as provided in this Agreement. If mailed, the notice will be deemed to be delivered when deposited, postage prepaid, in the United States mail addressed to the Member at the Member's address as it appears on the Company's records.

3.3.6  QUORUM OF MEMBERS.  Unless otherwise provided in the Certificate, the holders of at least fifty-one percent (51%) of the Membership Units represented in person or by conference telephone or similar communications as described above will constitute a quorum at a Members meeting.

3.3.7  MAJORITY VOTE; WITHDRAWAL OF QUORUM.  When there is a quorum, the holders of a majority of all of the Membership Units present at the meeting or participating in the meeting will decide the matters brought before the meeting unless a different vote is required by the Certificate, this Agreement, or Florida law. The Members present at a meeting may not continue to transact business if a quorum is not present or is no longer present.

3.3.8  VOTING OF MEMBERSHIP UNITS.  Each Member entitled to vote is entitled to one (1) vote per Membership Unit or a fraction of one (1) vote per fraction of a Membership Unit on each matter submitted to a vote at a Member meeting on which that Member is entitled to vote. A Member may vote in person, by electronic mail, by facsimile, or other written means. A Member may not vote by proxy.

3.3.9  CONSENT FOR ACTION WITHOUT MEETING.  Any action required to be taken or that may be taken at a Member meeting, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, has been signed by not fewer than the minimum number of holders of Membership Units that would be necessary to take the action at a meeting at which the holders of all Membership Units entitled to vote with respect to that action were present and voted. Within ten (10) days after such authorization, notice of the taking of any action by the Members without a meeting by less than unanimous consent will be given to the Company and those Members who did not consent in writing to the action or who are not entitled to vote on the action.

3.3.10 REQUIREMENTS FOR WRITTEN CONSENT.  Each written consent must be signed, dated and delivered by the Member. The consent will become effective at the time and remain effective for the period specified in the consent. A telegram, telex, cablegram, or similar transmission by a Member, or a photographic, electronic, facsimile, or similar reproduction of a writing signed by a Member, will be regarded as signed by the Member.

3.4  WARRANTIES. Each Member agrees to the following clauses:  (a) Only one class of stock (Units) is authorized; (b) Each Shareholder of Company is guaranteed a right to participate in future equity offerings pro-rated to their Membership Interest at the time of the offering; (c) Distributions and dividends will be pro-rata to stock ownership and subject to Managing Member's approval; (d) Each Shareholder agrees to accept and follow any transaction approved by a Majority of Interest. Each Shareholder's right to sell Units shall be pursuant Article 7; (e) In the event a Shareholder desires to sell Units in the Company or transfer Units as part of a divorce proceeding, each Shareholder and their spouses who join this Agreement agrees to a right of first refusal for the Company or existing Shareholders to repurchase the Units at Book Value. Such purchase may be funded by the Company over time rather than through an immediate cash payment. Nonetheless, by their execution of a joinder to this Agreement, each Shareholder spouse acknowledges and accepts the Company's or existing Shareholders' right of first refusal described herein in favor of the relevant Shareholder. Each Shareholder spouse agrees and recognizes that should any provision of this Agreement or joinder to this Agreement by a Member spouse for any reason be held to be invalid, unenforceable, or contrary to public policy or law, the right of first refusal set out herein shall remain inviolate; (f) A Majority In Interest may decide to dilute the Units of Shareholders provided that (i) such dilution was made in good faith and in the best interest of Company, (ii) Company had no intent to harm minority Shareholders, (iii) is justified by a viable business reason, (iv) Company received a fair market value for the

stock, and (v) the dilution does not violate a preemptive right.  An increase of distribution in the aftermath of six months from the time of the dilution may serve as a non-rebuttable justification for the decision in favor of dilution.

3.5     RECORDS AND REPORTS.  Managing Member will cause to be kept at the principal place of business of the Company, or at such other location as the Managing Member will reasonably deem appropriate, full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities, and the internal affairs of the Company for at least the current and past four (4) fiscal years.  All Members will be granted access to the books and records of the Company at reasonable times. Managing Member will cause to be sent to each Member the following:  (a) following the end of each fiscal year of the Company, a report that will include all necessary information required by the Members for preparation of their federal, state, and local income or franchise tax or information returns, including each Member's pro rata share of Net Profits, Net Losses, and any other items of income, gain, loss, and deduction for such fiscal year; and (b) a copy of the Company's federal, state, and local income tax or information returns for each fiscal year, concurrent with the filing of such returns, and (c) an annual unaudited financial report for the activities of the Company.

3.6     REIMBURSEMENTS; COMPENSATION.  If any, the Company will reimburse the Members, and their duly authorized representatives, for all ordinary and necessary out-of-pocket expenses incurred by them on behalf of the Company, in accordance with policies established by the Managing Member.  Such reimbursement will be treated as an expense of the Company that will be deducted in computing the Operating Cash Expenses and will not be deemed to constitute a distributive share of Profits or a distribution or return of capital to any Member.  Each Board of Members (the Members) that provide services to the Company, if any, may be reasonably compensated for services rendered to the Company upon approval of the Members and the Managing Member.  This compensation will be a guaranteed payment pursuant to Code Section 707(c).  The Members may adjust the compensation based upon performance and dedication of time to the Company's business.  Reasonable compensation must comply with Code Section 704(e), if applicable, and will be measured by (i) the time required in the Company's administration; (ii) the value of property under administration; and (iii) the responsibilities assumed in the discharge of duties of office.

3.7     COMPLIANCE.  The Company will be managed and operated in a manner that complies with all laws and regulations all germane to which the Members rely on the Managing Member as consistent with Section 3.1 and otherwise.

ARTICLE 4
MEMBER CAPITAL, LOANS, AND LIABILITY

4.1     CAPITALIZATION AND INITIAL CAPITAL CONTRIBUTIONS OF MEMBERS.  The name and address of the Capital Contributions made by, and the Percentage Interest of each Member are set forth on Exhibit 4.1 attached hereto and made a part hereof. All Members acknowledge and agree that "Initial Capital Contributions" represents the amount of cash initially contributed by the Members.

4.2     ADDITIONAL CAPITAL CONTRIBUTIONS BY MEMBERS.  Except as otherwise provided in this Agreement, no Member will be required to make any Additional Capital Contributions to the Company.  Nonetheless, equity offerings shall be offered to all Members according to their pro-rated interest in Company as approved by the Managing Member.

4.3     CAPITAL ACCOUNTS.  A Capital Account will be established and maintained for each Member in accordance with the terms of this Agreement.

4.4     MEMBER CAPITAL AND PERCENTAGE INTERESTS.  Except as otherwise provided in this Agreement or except as approved in writing by the Managing Member: (a) no Member will be entitled to receive a return of, or interest on, the Member's Capital Contributions or Capital Account; (b) no Member will withdraw any portion of the Member's Capital Contributions or receive any distributions from the Company as a return of capital on account of such Capital Contributions; and (c) the Company will not redeem or repurchase the Interest of any Member without first offering the interest to other Members pro-rata.  Upon any withdrawal of capital by a Member, the Percentage Interests of all Members will be adjusted so that each remaining Member has a Percentage Interest proportionate to the remaining Member's total Capital Contributions (minus any capital withdrawals) relative to the total of all Capital Contributions (minus capital withdrawals) made to the Company.

4.5     MEMBER LOANS.  No Member will be required or permitted to make any loans or otherwise lend any funds to the Company, without first obtaining the prior written consent of the Managing Member.  In addition, any Member will be permitted (but not required) to make loans to the Company only to the extent the Managing Member reasonably determines that such loans are necessary or advisable for the business of the Company, pursuant to terms that are consistent with fair market value, and subject to interest accruing at the General Interest Rate from the loan date until the date on which such loan is repaid.  No loans made by any Member to the Company will have any effect on such Member's Percentage Interest.  Such loans will represent a debt of the Company payable or collectible solely from the assets of the Company in accordance with the terms and conditions upon which such loans were made.

4.6     LIABILITY OF MEMBERS.  Except as otherwise required by any non-waivable provision of Florida state law or other Applicable Law: (a) no Member will be personally liable in any manner whatsoever for any debt, liability, or other obligation of the Company, whether such debt, liability, or other obligation arises in contract, tort, or otherwise; and (b) no

Member will in any event have any liability whatsoever in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed profits of the Company, (iii) the amount of any unconditional obligation of such Member to make additional Capital Contributions to the Company pursuant to this Agreement, and (iv) the amount of any wrongful distribution to such Member, unless, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of Florida state law.

ARTICLE 5
DISTRIBUTIONS

5.1    DISTRIBUTIONS OF CASH AVAILABLE FOR DISTRIBUTION.  The income, gains, losses, deductions and credits of the Company (the "Net Profits" and "Net Losses") shall be determined for each Fiscal Year in accordance with generally accepted accounting principles as promulgated in the United States pursuant to the accounting method followed by the Company, regardless of the accounting method used for federal income tax purposes.

5.2    DISTRIBUTIONS.  Cash will be distributed according to the Membership Interest based on cash available for distribution allowing the Company to keep necessary reserves for future expenses and liabilities.  Cash distribution will not be equal to net income and in fact could vary substantially from net income.  It is anticipated that Company will strive to make cash distributions that at a minimum are adequate to fund Shareholder tax liability arising from the taxable earnings of the Company.  Distributions made in conjunction with the final liquidation of the Company, including, without limitation, the net proceeds of a Terminating Capital Transaction, will be applied or distributed as provided in this Agreement.

5.3    WITHHOLDING.  The Managing Member may withhold distributions or portions thereof if the Company is required to do so by any applicable rule, regulation, or law, and each Member hereby authorizes the Managing Member to withhold from or pay on behalf of or with respect to such Member any amount of federal, state, local, or foreign taxes that the Managing Member determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  Any amount paid or withheld on behalf of or with respect to a Member pursuant to this Section will be treated as having been distributed to the Member.

5.4    DISTRIBUTIONS IN KIND.  No right is given to any Member to demand or receive property other than cash as provided in this Agreement.  The Managing Member may determine in his sole discretion to make a distribution in kind of Company Assets to a Member or the Members, which the Members will accept, and such Company Assets will be distributed in such a fashion as to ensure that the fair market value thereof is distributed and allocated in accordance with this Agreement.

5.5    LIMITATIONS ON DISTRIBUTIONS.  Notwithstanding any provision to the contrary contained in this Agreement, the Company will not knowingly make a distribution to any Member on account of its Membership Interest in the Company (as applicable) in violation of Florida state laws.

5.6    INVESTMENT RETURN AS TO INVESTORS. As to Investors, the Manager will effectuate the Investment Return as consistent with the Investor's Subscription Agreement and relevant Investment Principal and consistent with the conclusion of the Placement Period subject to any Event of Default.

ARTICLE 6
ALLOCATIONS OF NET PROFITS AND NET LOSSES

6.1    GENERAL ALLOCATION OF NET PROFITS AND LOSSES.  Subject to this Agreement, Net Profits, Net Losses and any other items of income, gain, loss and deduction of the Company for any fiscal year will be allocated, for purposes of adjusting the Capital Accounts of the Members, as follows:

6.1.1    The Net Losses of the Company will be allocated as follows: (i) First, to the Members with positive Adjusted Capital Account Balances, in proportion to and to the extent thereof; (ii) Second, to the Members who are allocated a share of the Company's indebtedness pursuant to Code Section 752, in proportion to and to the extent of each such Member's share of the indebtedness that funded the Net Losses being allocated pursuant to this Agreement (determined by assuming that, once no Member's Adjusted Capital Account is positive, the Net Losses of the Company are funded in inverse order of, and to the extent of, the Company's creditors' claims to the assets of the Company); and (iii) Thereafter, to the Members in proportion to their Percentage Interests in the Company.

6.1.2    The Net Profits will be allocated as follows: (i) First, to the Members in proportion to and to the extent of the Net Losses as outlined in this Agreement; (ii) Then, to the Members in the proportion and to the extent of the Net Losses as outlined in this Agreement; (iii) Then, to the Members in proportion to their respective Percentage Interest in the Company.

6.2    SPECIAL ALLOCATIONS.

6.2.1    Tax items with respect to an asset contributed to the Company with a Gross Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution will be allocated among the Members for income tax purposes pursuant to Regulations promulgated under Code Section 704(c) so as to consider such variation.  The Company will account for such variation under any method approved under Code Section 704(c) and

the applicable Regulations, including the so-called "remedial method," as selected by the Managing Member, in its sole discretion. If the Gross Asset Value of any Company Asset is adjusted pursuant to Section 1.21.2 hereof or a similar adjustment is made pursuant to Section 1.21.2 hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder. Allocations pursuant to this Agreement are solely for purposes of federal, state, and local taxes and will not affect, or in any way be considered in computing, any Member's Capital Account or share of Net Profits, Net Losses, and any other items or distributions pursuant to any provision of this Agreement.

6.2.2    If any Member unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases a deficit Adjusted Capital Account (for this purpose, combining all Capital Accounts of such Member), items of income and gain will be allocated to all such Members (in proportion to the amounts of such deficit Adjusted Capital Accounts) in an amount and manner sufficient to eliminate the deficit balances in such Members' Adjusted Capital Accounts as quickly as possible as of the end of the Company's taxable year to which adjustment, allocation or distribution relates. It is intended that this Section 6.2.2 qualify and be construed as a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d).

6.2.3    To the extent that an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of Company Asset) or loss (if the adjustment decreases such basis), and such gain or loss will be specially allocated to the Members in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

6.2.4    The allocations set forth in Section 6.2.2 and Section 6.2.3 (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2(i). The Regulatory Allocations may not be consistent with the manner in which the Members intend to distribute the assets of the Company or allocate income or loss from the Company. Accordingly, the Managing Member is hereby authorized to cause the allocation of Net Profits, Net Losses and other items of income, gains, loss and deductions of the Company not to distort the manner in which distributions will be divided among the Members and, further, to ensure that the allocations set forth herein meet the requirements of the Code and the Regulations.

6.2.5    For any fiscal year during which any part of a Membership Interest is Transferred between the Members, the portion of the Net Profits, Net Losses, and other tax items that are allocable with respect to such part of a Membership Interest will be apportioned between the transferor and the transferee under any method allowed pursuant to Code Section 706 as determined by the Managing Member.

6.2.6    In the event that the Code requires allocations of tax items different from those set forth in this Agreement, the Managing Member is hereby authorized to make new allocations in reliance on the Code. Specifically, the Managing Member is authorized to take such steps as the Managing Member deems necessary or advisable in order to comply with the rules under Regulations §§1.704-1 and 1.704-2 dealing with "substantial economic effect" as it affects the allocation of income and loss. No such new allocation will be grounds for any claim or cause of action by any Member. The Members will be bound by the provisions of this Agreement in reporting their Units of Net Profits, Net Losses, and other tax items for federal, state, and local income tax purposes.

6.2.7    The Members acknowledge and are aware of the income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their Units of Net Profits, Net Losses, and other items of income, gain, loss, deduction, and credit for federal, state, and local income tax purposes.

ARTICLE 7

PRICE & TRANSFER OF UNITS, RIGHT OF FIRST REFUSAL

7.1    PURCHASE PRICE AND TERMS OF PURCHASE. (i) In case of any divorce or bankruptcy that may be in any way related to or affect the Membership Units, the Company retains its right of first refusal to buy back the relevant Units at Book Value; (ii) In case of death or judicially determined incapacity of a Member, the Company retains its right of first refusal but not an obligation to buy back the relevant Units at Fair Market Value. The Company and Shareholder shall endeavor to designate a mutually acceptable appraiser to determine such value. If the parties have not agreed on an appraiser within forty days after the Company's exercise of the option, each party shall appoint its own appraiser within thirty days thereafter. The two appraisers shall determine the value of the Units within sixty days after their appointment. If the higher of the two appraisals is less than 110% of the lower appraisal, the value of the Units shall be the average of such values. If the higher of the two appraisals is 110% or more of the lower appraisal, the appraisers shall within twenty days appoint a third appraiser. If the two appraisers fail to appoint or agree upon a third appraiser within such period, a third appraiser shall be appointed by the parties if they so agree within further period of twenty days. If an appraiser is not

appointed or agreed upon with the time herein provided, either party may apply to an appropriate court of competent jurisdiction for the appointment of such appraiser. The third appraiser shall determine the value of the Units pursuant to the provisions of this Article within thirty days after such appraiser's appointment and the value so determined shall be determinative as to the value of the Units unless it is higher than the higher, or lower than the lower, of the two original appraisals, in which case such previous high and previous low determination shall be averaged and shall establish the value.

7.2  If a person appointed as an appraiser by or on behalf of either party fails or ceases to act for any reason, and the party by or on behalf of whom such appraiser was appointed fails to appoint a substitute or successor appraiser within ten days after being requested to do so by the other party, the appraiser in question shall be appointed by an appropriate court of competent jurisdiction upon application of either party.

7.3  Each appraiser shall execute such agreements as the Company reasonably requests whereby the appraiser agrees to treat as confidential any proprietary information of the Company obtained by the appraiser in connection with the appraisal. The Company will fully cooperate to effectuate the appraisal.  For purposes of the preceding sentence, the Company shall be deemed to be a Florida corporation and Shareholder shall be deemed to own such number of Units of the Company's stock as to the enable Shareholder to inspect and review the Company's books and records under Florida law. Each party shall bear one-half of the cost of a mutually appointed appraiser. If there is no mutual agreement, each party shall bear and pay the cost of the appraiser appointed by (or for) such party, and the cost of any third appraiser shall be borne equally by the parties. Both parties shall be given reasonable advance notice of the time and place of any appraisal proceedings and shall have the right to be present, heard, and represented by counsel.

7.4  Shareholder shall retain and the Company grants a security interest in the Units purchased by the Company to secure the Company's obligation to pay the purchase price for the Units. In such regard, Shareholder shall have all the rights and remedies of a secured party now or hereafter under Florida and any other applicable laws for the collection of the Company's obligation and the enforcement of the security interest. Unless and until Shareholder disposes of the Units pursuant to Shareholder's enforcement of the security interest after the Company's default in the payment of the purchase price, the Units shall be treasury Units of the Company.  Upon Shareholder's disposition of the Units pursuant to Shareholder's enforcement of the security interest, the Units shall be deemed to be validly issued and outstanding and fully paid and non-assessable. At the closing, the Company shall deliver possession of the certificate evidencing the Units, shall execute such financing statements relating to the Units and shall perform such other acts as Shareholder requests so that Shareholder's security interest in the Units is perfected as a first lien on the Units. Shareholder's resort as a secured party to any remedy provided by law shall not prevent the concurrent or subsequent employment of any other appropriate remedy.

7.5  The closing of the sale and purchase of Units pursuant to the exercise of the Company's option shall occur within thirty days after the value of the Units is determined. The closing shall occur at the Company's principal office in Florida. At the closing, Shareholder shall convey ownership of the Units to the Company free of any lien, claim or encumbrance, except for Shareholder's retained security interest.  If Shareholder fails to convey the Units to the Company at the closing, the Company may obtain ownership thereof by tendering the purchase price to Shareholder whereupon the Units shall be registered in the Company's name on the Company's books.  All obligations of each party under this Agreement shall survive the closing.

7.6  Each Shareholder in the Company agrees to this Agreement's following clauses: (a) Only one class of stock is authorized; (b) Each Shareholder of Company is guaranteed a right to participate in future equity offerings and will not be diluted; (c) Distributions and dividends will be pro rata to stock ownership and subject to Board of Director's approval; (d) Each Shareholder agrees to accept and follow any transaction approved by a Majority of Interest; (e) Each Shareholder will agree to a right of first refusal for the Company or existing Shareholders to repurchase stock at fair market value as determined by a formula and the terms of this Agreement.  Such purchase may be funded by the Company or Shareholders over time rather than through an immediate cash payment.  By their execution of a joinder herein, each Shareholder's spouse acknowledges and agrees that the expected shareholder agreement will contain the Company's or existing Shareholder's right of first refusal described herein and the Shareholder's spouse shall further execute such agreement.  Each Shareholder spouse further agrees and recognizes that should any provision of the shareholder agreement or any Joinder by a spouse of a Member for any reason be held to be invalid, unenforceable, or contrary to public policy or law, the right of first refusal set out herein shall remain inviolate.

7.7  Any attempted assignment or other transfer of Units in breach of this Agreement shall be void and of no effect.  This Agreement shall be specifically enforceable and upon the breach or attempted breach of this Agreement by a party, the other party shall be entitled to injunctive relief against such breach or attempted breach in addition to any other remedy at law or in equity, including the recovery of damages.  In addition, the prevailing party in any suit brought to enforce or interpret this Agreement shall be entitled to recover reasonable attorneys' fees and necessary disbursements in addition to all other relief awarded.

7.8  Except as permitted under this Agreement, neither the Units nor any interest therein may be transferred, whether voluntarily or involuntarily, by operation of law or otherwise, whether through a sale, gift, partition, pledge, or otherwise, without the advance written consent of the Company.  The Company may grant or withhold its consent to a transfer as to which its consent is required in its sole and uncontrolled discretion.

7.9  Units held by Shareholders may be transferred without the consent of the Company: (a) to the personal representatives, heirs and distributees of the estate of Shareholder following the death of Shareholder; (b) to the guardian of the estate of Shareholder following the judicially- determined incapacity of Shareholder; or (c) in or by virtue of an involuntary proceeding involving Shareholder (An involuntary proceeding means a proceeding or event by which Units or an interest therein are transferred by or subject to a charging order, attachment, execution, bankruptcy, receivership, foreclosure or other proceeding similar to the foregoing).

Provided, however that this Clause 7.9 shall not affect or diminish the Company's right of first refusal and option to purchase the Units from the transferee as provided for in this Agreement. Upon a permitted transfer of Units, the transferee shall be included within the term "Shareholder" for all purposes of this Agreement and the transferred Share shall continue to be subject to this Agreement.

7.10    No purported transfer of Units shall be permitted or effective, and any purported transfer of Units shall be void: (a) if the transferee's ownership of the Units would disrupt the status of the Company as an S corporation if the Company is an S corporation at the time of the proposed transfer; or (b) if Shareholder or the transferee of the Units (or any spouse of transferee fails to execute such documents as the Company designates (and in the form and substance designated by the Company) to further evidence the applicability of this Agreement to the transferee (and the transferee's spouse) and to the Units transferred to the transferee, including the applicability of the Company's option to purchase the Units as provided in this Agreement.

7.11    This Agreement shall apply to the interest, if any, which the spouse of Shareholder owns or may acquire in the Units held by Shareholder, including any interest of the spouse arising by the virtue of community property laws in the case that the Partition Agreement evidenced by a Joinder or otherwise to this Agreement is held to be unenforceable by a Court of competent jurisdiction. If pursuant to the terms of this Agreement, Shareholder is obligated to sell any Units held by Shareholder, all interest held or claimed in such Units by the spouse of Shareholder shall be included therewith and acquired by the purchaser of such Units; provided, however, that such spouse's interest shall continue in the proceeds of the sale of the Units.

7.12    The restrictions imposed by this Article shall terminate upon a Public Offering. A "Public Offering" means the first date, if any, that Units of the Company's capital stock are publicly traded on an established securities market or are admitted to quotation on the National Association of Securities Dealers Automated Quotation System.

7.13    This Agreement shall be binding upon the personal representatives, heirs, successors and permitted assigns of a Shareholder and shall inure to the benefit of the Company's successors and assigns.  Upon the death or the judicially- determined incapacity of a Shareholder, the surviving spouse or any other person the deceased has declared to be his successor-in-law shall receive and continue to represent the interests and the ownership interest of the deceased or incapacitated Shareholder.  This personal representative of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is incapacitated) shall have no voting rights and shall have no veto rights in Company.   Company shall have the option to purchase all, but not less than all, of the Units held by the personal representative of the decreased or incapacitated Shareholder. The option shall be exercisable by notice to the personal representative of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is decreased) or to the guardian of the estate of Shareholder (if Shareholder is incapacitated) during the period beginning on the date of Shareholder's death or date of determination of incapacity, as applicable and ending one hundred twenty days after the Company receives a request to transfer the Units as the result of the death or determination of incapacity of Shareholder.

7.15    Upon the transfer of any Units in or by virtue of an involuntary proceeding involving Shareholder, the Company shall have the option to purchase all or any portion of the transferred Units at any time thereafter. The option shall be exercisable by notice to the transferee at any time after the Company receives a request to transfer the Units as the result of the involuntary proceedings.

7.16    If Shareholder receives a bona fide offer for all or a portion of the Units held by Shareholder and Shareholder desires to sell pursuant to such offer, Shareholder shall notify the Company of the identity of the offeror (the "offeror"), the amount and method of payment of the purchase price and all other terms and conditions of the offer (the "Third Party Offer"). The Company shall thereupon have the option, exercisable for period of thirty days after the date the notice is given, to purchase the Units covered by the Third Party Offer at the price and on the terms set forth therein, except that the Company shall have not less than ninety days after the date the notice is given to close the purchase of the Units after the Company's exercise of the option and the closing shall occur at the Company's principal office in Florida.

7.17    If the Company does not exercise such option, Shareholder shall be free to sell the Units covered by the Third Party Offer if such sale is made to the Offeror and at the price and in accordance with all other terms of the Third Party

Offer, except that in all events the sale must be closed not later than ninety days of the notice of the Third Party Offer is given by Shareholder.

7.18    **Notwithstanding the restrictions set out in this Article,** in the event that a Majority of Interest approves a sale transaction regarding Company Units (to a "Drag-Along Right Holder"), whether such sale is in one transaction or a series of related transactions, to an third party purchaser (or group of related purchasers) or whether directly or indirectly or by way of sale, merger, statutory share exchange, recapitalization, reclassification, consolidation, or other business combination transaction or purchase of beneficial ownership (a "Sale Transaction"), the Drag-Along Right Holder may send written notice (the "Drag-Along Notice") to the Company and the remaining Members (the "Drag-Along Sellers") notifying them of such proposed Sale Transaction and of their obligations pursuant to the Sale Transaction.  In a case of a Drag-Along Right Holder's entering into a Sale Transaction, such Sale Transaction's monetary terms and conditions will be the same for both the Drag-Along Sellers and for the Drag-Along Right Holder.

(a)   The Drag-Along Sellers shall have the right to receive from the Drag-Along Right Holder either (i) the most recent purchase agreement, and related documents, pursuant to which the Sale Transaction will occur or (ii) a brief summary of the material terms and conditions of such purchase agreement and related documents.  Upon receipt of a Drag-Along Notice, each Drag-Along Seller receiving such notice shall be obligated to (i) sell their Units through the Sale Transaction (including a sale or merger) contemplated by the Drag-Along Notice on the terms and conditions of such notice, and (ii) otherwise take all necessary action to cause the consummation of such transaction, including voting all of its Units in favor of such Sale Transaction and not exercising any appraisal or dissenters rights in connection therewith all of which rights the Members hereby explicitly waive.  Each Drag-Along Seller further agrees to (A) take all actions (including executing documents) in connection with the consummation of the proposed Sale Transaction as may reasonably be requested of him, her or it by the Drag-Along Right Holder and (B) appoint the Drag-Along Right Holder, as its attorney-in-fact to do the same on its behalf.  In connection with any Sale Transaction, no Drag-Along Seller shall be required to (1) make any representations or warranties (except as they relate to such Drag-Along Seller's ownership of and authority to sell its Units), (2) agree to any noncompetition or non-solicitation covenants beyond such already entered into, or (3) provide any indemnity.

(b)   Each Member covenants and agrees to this Section and that the Member shall not raise any objections against any Sale Transaction that has been approved by a Majority of Interest.  Moreover, all Members shall fully cooperate with and take all necessary and desirable actions in connection with the consummation of such Sale Transaction, without limitation, executing and delivering any document consenting to the sale or for exchange of Units, as applicable.  As such, the Members acknowledge and agree that no dissenter's rights of any kind are granted to the Members and that no part of this Agreement shall be deemed to establish any right under the Act regarding dissenter's rights or as a dissenting shareholder or owner or regarding any fundamental business transaction.

ARTICLE 8
DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

8.1    LIMITATIONS.  The Company may be dissolved, liquidated, and/or terminated only pursuant to the provisions of this Agreement, and the Members do hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company's assets.

8.2    EXCLUSIVE CAUSES.  Notwithstanding Florida state law, the following and only the following events singly or in concert will cause the Company to be dissolved, liquidated, and/or terminated: (i) The occurrence of a Terminating Capital Transaction; (ii) By the vote of at least a Majority in Interest pursuant to this Agreement; (iii) Applicable Law dissolution as provided in Section 8.6; or, (iv) Judicial dissolution.

8.3    EFFECT OF DISSOLUTION.  The dissolution of the Company will be effective on the day on which the event occurs giving rise to the dissolution, but the Company will not terminate until it has been wound up and its assets have been distributed as provided in Section 8.5 of this Agreement.  During the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members, as such, will continue to be governed by this Agreement.

8.4    NO CAPITAL CONTRIBUTION UPON DISSOLUTION.  Each Member will look solely to the assets of the Company for all distributions with respect to the Company, its Capital Contribution thereto, its Capital Account and its share of Net Profits or Net Losses and will have no recourse therefore (upon dissolution or otherwise) against any other Member.  Accordingly, if any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which the liquidation occurs), then such Member will have no obligation to make any Capital Contribution with respect to such deficit, and such deficit will not be considered a debt owed to the Company or to any other person for any purpose whatsoever.

8.5 LIQUIDATION.

8.5.1  Upon dissolution of the Company, the Board of Members will liquidate the assets of the Company, and after allocating all income, gain, loss and deductions resulting therefrom, will apply and distribute the proceeds thereof as

follows: First, to the payment of the obligations of the Company, to the expenses of liquidation, and to the setting up of any Reserves for contingencies which the Board of Members may consider necessary. Thereafter, to the Members in proportion to the positive balances in the Members' respective Capital Accounts, determined after considering all Capital Account adjustments for the Company taxable year during which such liquidation occurs by the end of the taxable year in which such liquidation occurs or, if later, within ninety (90) days after the date of the liquidation.

8.5.2  Notwithstanding Section 8.5.1, in the event that the Board of Members determines that an immediate sale of all or any portion of Company Assets would cause undue loss to the Members, the Board of Members, in order to avoid such loss to the extent not then prohibited by Florida state law, may either defer liquidation of and withhold from distribution for a reasonable time any Company Assets except those necessary to satisfy the Company's debts and obligations, or distribute Company Assets to the Members in kind.

8.6    MODIFICATION OR DISSOLUTION TO COMPLY WITH APPLICABLE LAWS.  The Managing Member is authorized and required by this Agreement to undertake all acts or amendment without consulting any Member in order to ensure that the Company operates at all times in a manner consistent with Applicable Laws.  Written notice of such act or amendment will promptly be given to the Members.  If the Managing Member determines in good faith that compliance with Applicable Laws is impossible or infeasible, the Managing Member must delegate the authority to the Board of Members and the Board of Members may cause the Company to dissolve and liquidate pursuant to this Section 8.6.

ARTICLE 9
LIABILITY; INDEMNIFICATION

9.1    LIABILITY OF MEMBERS.  Except as otherwise required by any non-waivable provision of Florida state law or other Applicable Law: (a) no Member or Managing Member will be personally liable in any manner whatsoever for any debt, liability or other obligation of the Company, whether such debt, liability or other obligation arises in contract, tort, or otherwise; and (b) no Member will in any event have any liability whatsoever in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed profits of the Company, (iii) the amount of any unconditional obligation of such Member to make Additional Capital Contributions to the Company pursuant to this Agreement, and (iv) the amount of any wrongful distribution to such Member, if, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of Florida state law.  The debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely the debts, obligations and liabilities of the Company.

9.2    INDEMNIFICATION.  Except and otherwise resolved by the members, the Company will indemnify and hold harmless each member that is a Managing Member, and each Member of the Board of Members all other officers of the Company, if any, (each, a "Covered Person"), to the full extent permitted by law from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, relating to the performance or nonperformance of any act concerning the activities of the Company, if (i) the Covered Person's conduct did not constitute bad faith, willful or intentional misconduct, or a knowing violation of the law; (ii) the relevant transaction was not one from which the Covered Person derived an improper personal benefit; (iii) no improper distribution circumstances are germane to the Covered Person; and, (iv) the Covered Person has not breached duties or obligations under the standard of conduct for the Covered Person as Member or Managing Member under state law.  The termination of an action, suit or proceeding by judgment, order, settlement, or upon a plea of nolo contendere or its equivalent, will not, in and of itself, create a presumption or otherwise constitute evidence that the Covered Person acted in a manner contrary to that specified in clauses (i) - (iv) above.  This Section will not be deemed to create any rights for the benefit of any other Person.

9.3    EXPENSES.  To the fullest extent permitted by Applicable Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding will, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay such amount if it will be determined that the Covered Person is not entitled to be indemnified as authorized in Section 9.3.

ARTICLE 10
CONFIDENTIALITY

10.1   The Members acknowledge that they will have access to confidential information relating to the Company including this Agreement, business plans, financial information, patient treatment information, trade secrets, statistical data, diagrams, drawings, specifications or other proprietary information relating thereto, together with all analyses, compilations, studies or other documents, records or data prepared by the Managing Member or his duly authorized representatives which contain or otherwise reflect or are generated from such information ("Confidential Information"). The term "Confidential Information" includes the business plans and financial information relating to the Company provided by the Members.  The term "Confidential Information" does not include information received by Members in connection

with the transactions contemplated by this Agreement which (i) is or becomes generally available to the public other than as a result of a disclosure by such Member or its duly authorized representatives, (ii) was within such Member's possession prior to its being furnished to such Member in connection with the transactions contemplated by this Agreement or (iii) becomes available to such Member on a non-confidential basis from a source other than the other Members or any of their respective duly authorized representatives.  For purposes of this Agreement, Confidential Information will not include, and no Member's obligations under this Agreement will extend to, (i) information that is generally available to the public or within the industry, and (ii) information obtained by such Member from Persons not under agreement to maintain the confidentiality of the same.

10.2    The Members will treat all Confidential Information as confidential, preserve the confidentiality of such Confidential Information and not disclose any Confidential Information to any person or entity, except to their respective duly authorized representatives who need to know such Confidential Information in connection with the transactions contemplated by this Agreement or in connection with the Member's exercise of rights under this Agreement.  The Members will use all reasonable efforts to cause their respective duly authorized representatives to treat all Confidential Information as confidential, preserve the confidentiality of such Confidential Information and not disclose any Confidential Information.  Each Member will be responsible for any breach of this Agreement by any of their respective duly authorized representatives.  If Confidential Information is disclosed, the Member responsible for such disclosure will immediately notify the Managing Member in writing and take all reasonable steps required to prevent further disclosure.

10.3    Following the date upon which any Member no longer owns any Membership Interests in the Company, and as soon as possible after the Company's written request, such Member will return to the Company all written Confidential Information of the Company that has been provided to such Member, and such Member will destroy all copies of any analyses, compilations studies or other documents containing or reflecting any Confidential Information of the Company.  Each Member will, upon written request of the Company and within five (5) Business Days of the receipt of such request, deliver to the Company a notarized document certifying that such written Confidential Information of the Company have been returned or destroyed in accordance with this Agreement.

10.4    If a Member or any of its respective duly authorized representatives are requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) or are required by operation of law to disclose any Confidential Information, the Member requested or required to disclose such Confidential Information will provide the Managing Member with prompt written notice of such request or requirement, which notice will, if practicable, be at least forty-eight (48) hours prior to making such disclosure, so that the Managing Member may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement.  If, in the absence of a protective order or other remedy or the receipt of such a waiver, the Member requested or required to disclose Confidential Information or any of its duly authorized representatives are nonetheless, in the opinion of counsel, legally compelled to disclose Confidential Information, then the Member requested or required to disclose Confidential Information may disclose that portion of the Confidential Information which such counsel advises is legally required to be disclosed, provided that the Member requested or required to disclose Confidential Information use their reasonable efforts to preserve the confidentiality of the Confidential Information, whereupon such disclosure will not constitute a breach of this Agreement.

ARTICLE 11
RESTRICTIVE COVENANT

11.1    COVENANT NOT TO COMPETE.  In consideration of the mutual promises contained herein and the Company's obligation to provide access to information and Confidential Information herein, the Members agree that, for as long as the Members own, directly or indirectly, any Membership Interest in the Company and for a period of two (2) years after the date of termination of a Member's ownership of Membership Units, a Member will not, either directly or indirectly, own a beneficial interest in a Company competitive with PTLT as of the effective date of termination: (A) provide competitive services (as defined below), nor (B) Control, have any beneficial or ownership interest in (excluding ownership of less than five percent (5%) of the equity of any publicly-traded entity), develop, manage, operate, or be employed by, or provide any administrative services to any company competitive to PTLT.  The Members and the Company agree that a reasonable price for a Member to buy-out of this restrictive covenant is Five Hundred Thousand Dollars ($500,000) ("Buy-Out Amount") payable in cash or by cashier's check to the Company.  Upon full payment of the Buy-Out Amount by the Member to the Company, the foregoing restrictive covenant will no longer be applicable.

11.2    INJUNCTIVE RELIEF.  The Members acknowledge and agree that (i) the covenants and restrictions contained in this Agreement are necessary, fundamental, and required for the protection of legitimate business interests of the Company; (ii) such covenants and restrictions relate to matters that are of a special, unique, and extraordinary character; and, (iii) a breach of any such covenants or restrictions will result in irreparable harm and damages to the Company that cannot be adequately compensated by a monetary award. Accordingly, the Members expressly agree that in the event of an actual or threatened breach by a Member of the covenants contained this Agreement, the Company will be entitled to a temporary restraining order or an injunction (or both) to specifically enforce the provisions of this Agreement.  Further, nothing herein will be construed as prohibiting compensation to the Company for such breach or threatened breach,

including (but not necessarily limited to) recovery of damages from the Member and for reasonable attorney's fees. The provisions of this Section 11.2 will survive termination of this Agreement.

11.3    CHANGE IN LAW.  In the event that, subsequent to the Effective Date of this Agreement, there is a change in Florida law governing covenants not to compete that renders all or a portion of the provisions of Sections 11.1 or 11.2 hereof unenforceable or if such provisions are deemed by a court of competent jurisdiction to be unenforceable, then the provisions of this Agreement will be modified by the parties within thirty (30) days or, if the parties are unable to agree to such modification within such thirty-day period, by a court of competent jurisdiction, to the extent necessary to bring the provisions of Sections 11.1 or 11.2 within the scope of such applicable law and such modification will be in a manner that, as closely as possible, enforces the intent of Sections 11.1 or 11.2 as set forth herein and the parties hereto will comply with such provisions as modified.  The provisions of this Section 11.3 will survive termination of this Agreement.

11.4    SECURITIES LAWS.  The term "Securities Laws" means that the Securities Act of 1933, as amended (the "Act") and applicable state securities laws.  Shareholder acknowledges that (a) the Units have not been registered under the Securities Laws and that the Units have been issued pursuant to exemptions from such laws; (b) the Units have not been filed with or reviewed by any federal or state securities administrators. Shareholder represents that Shareholder acquired the Units for Shareholder's own account and for investment purposes only, and without the intention of reselling or redistributing the Units.  If any person holding or claiming an interest in the Units desires to have the Company recognize a transfer of the Units, the Units will not be transferred unless and until the Company determines that the proposed transfer is exempt from the registration provisions of the Securities Laws. If requested by the Company, Shareholder shall furnish the Company with a written opinion of legal counsel satisfactory to the Company, which opinion shall be satisfactory in form and substance to the Company's counsel, that the proposed transfer is exempt from the registration provisions of the Securities Laws.

ARTICLE 12
MISCELLANEOUS

12.1    ACCOUNTING AND FISCAL YEAR.  Subject to Code Section 448, the books of the Company will be kept on such method of accounting for tax and financial reporting purposes as may be determined by the Managing Member.  The fiscal year of the Company will end on December 31st of each year, or on such other date permitted under the Code as the Managing Member will determine.

12.2    AMENDMENTS.  Subject to the right of the Managing Member pursuant to Section 8.6 hereof to unilaterally amend this Agreement to comply with Applicable Law, this Agreement may be altered, amended, or repealed only with approval of a Majority in Interest.

12.3    JOINDER OF SPOUSES.  When Membership Interests or Units are owned by individual Persons, such Members' spouses will join in the execution and delivery of this Agreement for the express purpose of recognizing the Company's or Shareholders' right of first refusal described in this Agreement.  By their signature of to a Joinder to this Agreement the relevant Members' spouses acknowledge that they are fully aware of, understand, and fully consent and agree to the provisions of this Agreement and its effect upon any property interest they may now or hereafter own.  Nonetheless, per each Member spouse's joinder and partition germane to the Units, the Members' spouses release, assign and partition any property interest that they now or may ever have in a Membership Interest or Unit in favor of their spouse and which release, assignment and partition further evidences the Member's spouse's acknowledgement that the Company's or Shareholder's right of first refusal to repurchase stock shall remain inviolate.

12.4    CAPTIONS; PRONOUNS.  Any titles or captions contained in this Agreement are for convenience only and will not be deemed part of the text of this Agreement.  All pronouns and any variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as appropriate.

12.5    CONSTRUCTION.  This Agreement will be construed as if all Members prepared this Agreement.

12.6    COUNTERPARTS.  This Agreement may be executed in any number of multiple counterparts, each of which will be deemed to be an original copy and all of which will constitute one agreement, binding on all Members hereto.

12.7    NOTICE TO MEMBERS OF PROVISIONS OF THIS AGREEMENT.  By executing this Agreement, each Member acknowledges that the Member has actual notice of all of the provisions of this Agreement and all provisions of the Certificate.

12.8    DISPUTE RESOLUTION.   Except for material deadlocks as specifically addressed in this Agreement any controversy or dispute related to or arising out of this Agreement, the management and operations of the Company, or the management and operations of an Affiliate of the Company, the Members agree to meet and confer in good faith to attempt to resolve the controversy or dispute without an adversary proceeding.  If the controversy or dispute is not resolved to the mutual satisfaction of the Members within ten (10) Business Days of notice of the controversy or dispute, then such dispute will be resolved in accordance with the following dispute resolution procedures:

1.    DISPUTES.  This Policy is intended to be applied to disputes or claims between or among the Members and Members that arise out of or relate to their relationship as Members of the Company Any dispute to which this Policy applies is called a "Dispute" and any person, corporation, or entity that is subject to this Policy is called a "Party."

2.    MEDIATION.  Disputes will be subject to mediation conducted as follows: (a) Any Party wishing to commence mediation will send a written notice of intent to mediate to the other Party, specifying in detail the nature of the Dispute and proposing a resolution thereof.  Within fifteen (15) calendar days after such notice is received by the other Party, if the parties cannot agree on a proposed mediator, one will be appointed by the executive director or functional equivalent of the American Arbitration Association (AAA) or its successor from a list provided by AAA.  Each Party will designate no more than three (3) representatives who will meet with the mediator to mediate the dispute.  Mediation will be commenced as soon as the mediator can be scheduled after the other Party receives such notice.  The mediator will be a person having no conflict of interest relationship with a Party; (b) The mediation will be non-binding.  Any non-binding mediation conducted under the terms of this Section will be confidential.  The cost of the mediation will be borne equally by the Parties; (c) Should a Party disagree with the decision rendered by the mediators; the Parties will have the right to proceed with arbitration proceedings as set forth below.

3.    ARBITRATION.  Mediation will be a prerequisite to invoking arbitration.  If unsuccessful in resolving an issue submitted to mediation as outlined above, such Dispute must be resolved by binding arbitration be conducted in Florida.  The Party wishing to commence arbitration will send a written notice of intent to arbitrate to the other Parties.  Arbitration will be commenced as soon as the arbitrators can be scheduled after such notice is received by the other Party, using a single arbitrator if the Parties can agree upon one within such thirty (30) day period.  Otherwise, each Party will appoint one neutral arbitrator within the thirty (30) day period and the arbitrators so appointed will together appoint a third-party arbitrator for the arbitration between the parties.

4.    It is expressly understood by each signatory to this Agreement that during the term of this Agreement, in case of any dispute under this Agreement, and after the term of this Agreement, Company's counsel, by virtue of his or her professional responsibilities, is barred from advising individual Members/shareholders and may only represent Company's interests.  In particular, all shareholders understand that the attorney-client privilege does not extend to individual shareholders, officers, directors, or employees of Company, but only covers the Company as one separate, independent entity.

12.9   ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement between the Members hereto pertaining to the subject matter hereof and fully supersedes any and all prior or contemporaneous agreements or understandings between the Members hereto pertaining to the subject matter hereof.

12.10  EFFECT OF WAIVER OR CONSENT.  The Managing Member may give an express or implied waiver or consent to a specific breach or default by a Person of that Person's obligation to the Company.  Any specific waiver or consent is not; however, a consent or waiver to any other breach or default in the Person's performance of the Person's same or other obligations to the Company.  A Person's failure to complain of any Person's acts or to declare any Person in default with respect to the Company does not waive that Person's rights with respect to that default until the applicable statute-of-limitations period has run.

12.11  GENERAL COMPLIANCE.  The Members enter into this Agreement with the intent of conducting the relationship in full compliance with Applicable Laws.  Notwithstanding any unanticipated effect of any of the provisions of this Agreement, no Member or any Managing Member or other Person acting on behalf of the Company will intentionally conduct himself or itself under the terms of this Agreement in a manner that would constitute a violation of Applicable Laws.  The Members will perform their obligations under this Agreement in accordance with the terms hereof.  Any agreements between the Company and any Member or direct or indirect owner of a Member will be in writing, and the parties to any such agreement will perform their obligations under such agreement only in accordance with the terms thereof.

12.12  FURTHER ASSURANCES.  Each of the Members hereto does hereby covenant and agree on behalf of itself, its successors, and its assigns, without further consideration, to prepare, execute, acknowledge, file, record, publish, and deliver such other instruments, documents and statements, and to take such other action as may be required by law or reasonably necessary to effectively carry out the purposes of this Agreement.

12.13  GOVERNING LAW; CERTAIN WAIVERS.  This Agreement, including its existence, validity, construction, and operating effect, and the rights of each of the parties hereto, will be governed by and construed in accordance with the laws of the State of Florida without regard to otherwise governing principles of conflicts of law.  The Members waive any and all rights they may have to punitive, special, exemplary, or consequential damages, in respect of any dispute based on this Agreement.

12.14  SEVERABILITY.  In the event that any provision of this Agreement as applied to any party or to any circumstance, will be adjudged by a court to be void, unenforceable, or inoperative as a matter of law, then the same will in no way affect any other provision in this Agreement, the application of such provision in any other circumstance or with respect to any other party, or the validity or enforceability of the Agreement as a whole.

12.15 NO REGISTRATION STATEMENT.  Each Member represents, warrants, acknowledges, and agrees that: (a) No Registration.  No registration statement is currently on file with the Securities and Exchange Commission with respect to any Membership Units and the Company has no obligation or current intention to register any Membership Units under the Federal Securities Act of 1933 or Florida securities law; (b) Company Reliance upon Exception.  The Membership Units have not been registered under the Federal Securities Act of 1933 as the Company has issued such Membership Units in reliance upon the exceptions and/or exemptions from registration requirements of the Federal Securities Act of 1933 providing for issuance of securities not involving a public offering, together with any corresponding exemptions from state securities regulations; (c) Held Solely for Investment.  The Company has relied upon the Members' representations that the Membership Units are to be held by the Members solely for investment purposes and not with a view toward distribution; (d) View Toward Distribution.  The exceptions and/or exemptions from registration under the Federal Securities Act of 1933 would be unavailable if the Membership Units were acquired by a Member with a view toward distribution; and (e) Sophisticated Investor.  The Member acquired Membership Units in the Company based upon a diligent review and investigation by the Member of material information from the Company and the Member's determination that such acquisition is a suitable investment for the Member based upon such information as well as the Member's investment background and history.  The Member is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with entities that are similar to the Company.

12.16 TAX MATTERS PARTNER.  The Managing Member of the Company will be the "Tax Matters Partner" of the Company in accordance with Code Section 6231(a)(7) (referring to the "tax matters partner").  The Tax Matters Partner must take the action necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223.  The Tax Matters Partner must give prompt notice to all Members of significant matters or communications the Tax Matters Partner may receive.  The Tax Matters Partner may not take any action contemplated by Code Sections 6222 through 6232 without the consent of the holders of at least sixty percent (60%) of the Membership Units.

IN WITNESS WHEREOF, the Members have caused this Agreement to be executed as of the date set forth below their respective signatures.

**MEMBER(S):**

| |
|---|
| **PRINTED NAME OF MANAGING MEMBER, PRESIDENT AND MEMBER: JEFFREY JUDDD** <br><br><br> SIGNATURE: _____ <br> **BY: JEFFREY JUDD** <br> DATE: _____ |

# EXHIBIT A

# NAMES OF COMPANY MEMBERS AND PERCENTAGE INTERESTS

|  | UNITS | SHARING RATIO | CAPITAL CONTRIBUTION |
|---|---|---|---|
| **MEMBERS** |  |  |  |
| **JEFFREY JUDD** | 100 | 100.00% | $1000.00 plus In-Kind/Contributed Assets |
|  |  |  |  |
| **Total** | **100** | **100.00%** |  |

# EXHIBIT B

## JOINDER OF INVESTOR TO THE OPERATING AGREEMENT

BY HIS OR HER SIGNATURE BELOW [NAME OF THE INVESTOR: _____ ] ACKNOWLEDGES THAT HE OR SHE HAS FULLY READ, UNDERSTANDS, AND HAS NO QUESTIONS ABOUT THE COMPANY'S OPERATING AGREEMENT AND AGREES TO AND JOINS THE EXECUTION AND DELIVERY OF THE AGREEMENT IN THE CAPACITY OF INVESTOR AND BENEFICIARY OF THE INVESTMENT RETURN IN PARTIAL BENEFICIARY INTERESTS AND NOT AS A MEMBER, OWNER, OR OTHER CAPACITY GERMANE TO THE COMPANY, FINANCIAL OR OTHERWISE, AND AGREES TO BE BOUND BY THE OPERATING AGREEMENT'S TERMS.

PRINTED NAME:

SIGNATURE: _____

DATE: _____

## JOINDER OF SPOUSES TO THE OPERATING AGREEMENT

BY HIS OR HER SIGNATURE BELOW, [NAME OF THE SPOUSE: _____ ] ACKNOWLEDGES THAT HE OR SHE HAS FULLY READ, UNDERSTANDS, AND HAS NO QUESTIONS ABOUT THE COMPANY'S OPERATING AGREEMENT AND AGREES TO AND JOINS THE EXECUTION AND DELIVERY OF THE AGREEMENT. NONETHELESS, MR. OR MRS. _____ VOLUNTARILY AND EXPRESSLY WAIVES ANY RIGHT TO DISCLOSURE OF HIS OR HER SPOUSE'S PROPERTY OR FINANCIAL OBLIGATIONS BEYOND ANY DISCLOSURE PROVIDED TO DATE REGARDING THE AGREEMENT, OR UNITS, OR OTHERWISE.

PRINTED NAME:

SPOUSE OF _____

PRINTED NAME:

MEMBER SPOUSE

# EXHIBIT C

# SAMPLE PURCHASE CONTRACTS 100K AND 80K (REDACTED)

# COMPANY'S CODE OF ETHICS AND BUSINESS CONDUCT

# <u>PURCHASE AGREEMENT</u>

This is a Purchase Agreement ("Agreement") dated the 3rd day of December, 2021. This Agreement is by and between ███████████ ("Seller") who is represented by ███████████ whose address is ███████████ ("Attorney") and ███████████, an ███████ corporation ("Buyer") who is represented by ███████████, Esq. of the ███████████ ("Buyer's Attorney") whose address is ███████████, ███████████.

A.      Seller has a claim arising from a slip and fall incident which occurred on February 8, 2020 ("Claim") at ███████████████████████ which is owned and operated by ███████████. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $███████ ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

B.      Seller desires to sell and assign to Buyer an interest in the Proceeds. Buyer desires to purchase the interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

BUYER AND SELLER AGREE AS FOLLOWS:

1.      PURCHASE OF INTEREST

a.      Seller hereby sells, transfers, conveys and assigns to Buyer a $100,000.00 interest ("Interest") in the Proceeds for a purchase price of $80,000.00 ("Purchase Price"). Seller acknowledges receipt of the Purchase Price. Seller understands that the amount of Buyer's Interest, or, in other words, the amount to be paid to Buyer, will increase to reflect the date the Buyer is paid its Interest in the Proceeds as set forth in the following Disclosure Table ("Disclosure Table"):

[Intentionally Left Blank]

<u>DISCLOSURE TABLE</u>

Purchase Price:               $80,000.00
Administration Fee:          $5,000.00

| **Date of Payment to Buyer** | **Amount due to Buyer** |
|---|---|
| On or before March 3, 2022 | $105,000.00 |
| After March 3, 2022 but on or before April 2, 2022 | $115,000.00 |

*Should Seller not pay Buyer from the Proceeds by April 2, 2022 the Buyer's Interest will increase by **$10,000.00 every thirty (30) days thereafter.**

b.      Buyer's Interest will be paid by Attorney out of the Proceeds of the Claim and will be deducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller with respect to the Claim.  If the Proceeds of the Claim Amount are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim.  Seller has directed Attorney to, among other things,(i) place an assignment, consensual lien and security interest in favor of Buyer against any and all Proceeds due Seller from the Claim (after payment of any and all legal fees and reimbursable costs) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) notify Buyer of receipt of Settlement Amount, (iii) pay Buyer from the Proceeds the proper amount due to Seller representing Seller's Interest  in the Proceeds at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iv) respond to requests for information from Buyer and (v) notify Buyer prior to any disbursements of funds to verify the amount due Buyer.  Seller has provided Buyer with an executed Authorization for Attorney to Pay Buyer from Proceeds of Claim/Acknowledgement of Authorization by Seller and Attorney in the form attached as Exhibit "A" ("Authorization and Acknowledgement ").

c.      The amount Buyer is entitled to may be more than is listed in the Disclosure Table above if Seller does not honor the obligations in this Agreement.  Seller will also be liable to pay Buyer's Interest, even if there are no Proceeds, if Seller has mislead Buyer or Attorney concerning Seller's Claim and will also be liable for Buyer's attorney' s fees or collection costs, as permitted by law.

d.      If Seller wants to sell an additional Interest, and if Buyer agrees to purchase an additional Interest, Buyer and Seller will sign an amended Disclosure Table. Seller understands that Buyer is not required to purchase any additional Interest.

e.      In the event that the Claim is the subject of more than one lawsuit, claim or cause arising out of more than one incident/accident/transaction, or against one or more defendants, then the amount due Buyer pursuant to this Agreement shall be paid from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, including insurance companies and malpractice claims arising out of the Claim, which results in a monetary recovery.  If insufficient funds are available from the first lawsuit, claim and/or case resulting in a monetary recovery to pay the full amount due Buyer pursuant to this Agreement, then the balance due Buyer shall be paid from the Proceeds of the next lawsuit, claim and/or cause, if any.

f.      The amount due Buyer shall be withheld from any money collected as a result of the Claim and shall immediately be paid to Buyer (after first deducting Attorney's fees and costs, and any prior liens which exist on the date of this Agreement).  Seller agrees and hereby directs that all Proceeds received in connection with the Claim, are held in Trust for Buyer until Buyer has been fully paid its Interest.  Seller understands that Seller will not receive any money or payment from the Proceeds of Seller's Claim until Buyer has been paid Buyer's Interest in full. This shall also apply to any structured settlements.  If Seller receives payments from several sources, Seller will pay Buyer all monies received from each source until Buyer is paid in full its Interest in the Proceeds of the Claim.  Seller acknowledge that receipt or use of any Proceeds of the Claim prior to the full payment to Buyer of Buyer's Interest in the Proceeds of the Claim may constitute an illegal conversion and may be a crime.

2.      GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral").  Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

3.      NO TRANSFER OF CLAIM

Seller is not assigning any portion of the Claim to Buyer, and Buyer is not buying any portion of the Claim under this Agreement.  Buyer has no right or obligation to take any legal action for Seller in connection with the Claim. Buyer has no right or obligation to advise, direct or instruct Seller or Attorney in how to go forward with Seller's Claim. Buyer will not be involved in the negotiation of any settlement of Seller's Claim.  Buyer has no obligations or duties concerning the Claim, or the collection of any settlement, award or verdict from the Claim.

4.      SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that:

a.      Seller is using the funds received from the Purchase Price for Seller's immediate economic necessities.  Seller has been advised that Seller should not sell any portion of the Proceeds of the Claim if Seller has any other alternative to meet my immediate economic necessities.  Seller understands that due to the various factors involved that Buyer may make a large profit.

b.      Seller acknowledges that Seller has been advised to seek the services of legal, tax, accounting and/or financial advisors in the negotiation and signing of this Agreement. Seller has either received such counsel prior to signing this Agreement or expressly waived such counsel.  Seller understands from speaking to Attorney and/or other advisors that the amount of Buyer's Interest as set forth in the Disclosure Table is greater than the Purchase Price Seller is receiving, and that there is a cost to Seller selling Buyer the Interest.  Seller understands that Buyer is relying upon Seller's representations in deciding to purchase this Interest and Seller represents and warrants that all statements made by Seller are true and correct as of the date hereof.  Seller understands that if any information provided by Seller changes that Seller has an obligation to immediately notify Buyer.

c.      Seller is not currently in bankruptcy, there are no pending tax claims or criminal allegations against Seller, and Seller has complied with all laws in connection with the Claim.  Seller further represent that Seller is not in violation of any obligations concerning childcare, alimony or support, and Seller has not been convicted of a felony or other crime involving dishonesty.  Other than the Claim itself, there is no claim, legal action, lien or any proceeding or order pending or in effect or threatened, against Seller, or which would in any manner affect or impair Buyer's Interest or Buyer's rights under this Agreement.  Seller has been truthful in all aspects of the Claim and has provided all information to Attorney in a complete and honest fashion. Seller also confirms that all documents submitted in connection with the investigation and Buyer's evaluation of the Claim are true, whether submitted by Attorney or Seller.  Seller understands that Buyer is relying upon these statements in determining whether to enter into this Agreement.

d.      Seller agrees to not change the fee agreement between Seller and Attorney in any way that would reduce the amount of Buyer's Interest in the Proceeds of the Claim. Seller further promises to notify Buyer in writing within 72 hours if Seller terminates the services of Attorney, or if Attorney determines not to proceed with the Claim.  If new attorneys are retained to represent Seller in the Claim, Seller will notify Buyer within 72 hours of the new attorneys being retained, and will direct the new attorneys to comply with the terms of this Agreement by Seller and the new attorney executing a

new Authorization and Acknowledgement within 14 days after accepting Seller's representation .  Seller will also notify Buyer in writing within 72 hours if Seller moves from the address listed above.

e.      Seller will not knowingly create or permit any additional liens, charges, security interests, encumbrances, agreements of any kind or other rights of third parties against the Proceeds of the Claim without the prior written consent of Buyer.  Seller specifically promises not to sell any additional portion of the Proceeds of the Claim after the date of this Agreement, unless Buyer has given prior written permission.  Seller also confirms that neither the Claim nor the Proceeds are subject to any liens, charges, security interests, encumbrances, agreements of any kind or nature (other than this Agreement) or other rights of third parties except for liens previously provided to Seller's medical providers.  Seller understands that if these statements are not true, it may be considered as a fraud, as Buyer is relying upon these statements in going forward with this Agreement.

5.      EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

a.      The failure by Seller or Attorney to pay Buyer's Interest in the Proceeds within thirty (30) days after the Settlement Amount is received by Seller or Attorney; or

b.      Seller's failure to perform or comply with any of the agreements, conditions, provisions or promises contained in this Agreement, including but not limited to if Buyer does not receive a timely response to a request for information from Seller or Attorney or if Buyer does not receive a new Authorization and Acknowledgement by Seller and new attorney within fourteen (14) days after accepting representation, and such failure to perform or comply continues unremedied for a period of ten (10) days after written notice from Buyer to Seller, unless such default, in Buyer's reasonable discretion, is not curable, in which event there shall be no grace period; or

c.      If Buyer discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to Buyer in this Agreement.

Upon an Event of Default by Seller under this Agreement, Seller agrees that Buyer may contact any insurance company, claims adjuster or attorney then handling the Claim on behalf of any responsible party and advise such insurance company, claims adjuster or attorney about Buyer's Interest in Seller's Claim and to direct that Buyer be included as a payee on settlement checks provided further that nothing herein shall prevent Buyer from exercising any other right or remedy provided under law or equity.  If Buyer does

anything stated in this paragraph, Buyer shall not be liable to Seller for any damages which Seller may suffer resulting from Buyer's actions described above.

6.    APPLICABLE LAW

This Agreement shall be governed, construed and enforced in accordance with, and all disputes arising out of or in connection with this Agreement shall be governed by, the internal laws of the State of Nevada, without regard to the conflict of law rules of Nevada or any other jurisdiction.

7.    ARBITRATION

BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT ALL DISPUTES, CLAIMS, DEFENSES OR CONTROVERSIES (WHETHER IN LAW OR IN EQUITY) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIPS THAT RESULT FROM THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY DISPUTES, CLAIMS OR  CONTROVERSIES  INVOLVING FEDERAL OR STATE STATUTORY CAUSES OF ACTION  OR INJUNCTIVE RELIEF, ANY INVOLVING FEDERAL OR STATE ADMINISTRATIVE  REMEDIES, ANY INVOLVING CONSUMER FRAUD AND ANY INVOLVING A CHALLENGE TO THE LEGALITY OF ANY PART OR ALL OF TH IS AGREEMENT ("DISPUTES") SHALL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES  ("RULES") OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA").  THE ARBITRATION SHALL TAKE PLACE BEFORE A SINGLE ARBITRATOR TO BE CHOSEN BY AGREEMENT OF THE PARTIES, OR FAILING SUCH, IN ACCORDANCE WITH AAA RULES.  THE ARBITRATION SHALL TAKE PLACE IN THE STATE OF NEVADA, COUNTY OF CLARK UNLESS THE PARTIES AGREE TO A DIFFERENT LOCATION.  THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SHALL BE GOVERN ED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1 AND THE SUBSTANTIVE LAWS OF THE STATE OF NEVADA SHALL BE APPLIED IN ALL EVENTS.  JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.  THE PARTIES ALSO AGREE THAT THE AAA OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION SHALL APPLY TO THE PROCEEDINGS.

8.    WAIVER OF JURY TRIAL

BUYER AND SELLER, AFTER CONSULTATION WITH THEIR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A JURY TRIAL, INCLUDING ANY RIGHT VESTED BY FEDERAL, STATE OR LOCAL STATUTE, IN CONNECTION WITH ANY DISPUTES OR LEGAL PROCEEDING

INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER COMMENCED BY OR
AGAINST EITHER PARTY IN ANY WAY ARISING OUT OF OR RELATED TO THIS
AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH
THIS AGREEMENT.

9.      WAIVER OF CLASS ACTION CLAIMS

SELLER HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS TO (i) ANY DISPUTE
WITH BUYER BEING HANDLED AS A CLASS ACTION AND (ii) JOINING AS A
PLAINTIFF, CLAIMANT, MEMBER OR PARTICIPANT IN ANY CLASS ACTION
AGAINST BUYER.  IT IS AGREED THAT ANY ARBITRATION WILL BE LIMITED TO
THE DISPUTE BETWEEN BUYER AND SELLER, AND BUYER AND SELLER WAIVE
ANY RIGHT TO CONSOLIDATE OR TO HAVE HANDLED AS A CLASS ACTION
ANY PROCEEDING ON ANY DISPUTES WITH ANY PROCEEDING ON DISPUTES,
CLAIMS, OR CONTROVERSIES INVOLVING ANY PERSON OR ENTITY NOT A
PARTY TO THIS AGREEMENT.

10.     RECLASSIFICATION OF TRANSACTION

This Agreement represents an investment by Buyer, and not a loan to Seller. However,
should a court of law determine that the transaction set out in this Agreement is a loan
of money, Seller agrees that interest shall accrue at the maxim um rate permitted by
law.  Seller agrees that any fees or expenses paid by Buyer in connection with the Claim
will not be included as interest. This includes any attorney's fees and costs Buyer has
expended to enforce its rights under this Agreement.  Seller agrees that these will be
considered as a reimbursement to Buyer, rather than as interest.

11.     MISCELLANEOUS

a.      If any part of this Agreement is deemed invalid or unenforceable, it shall not
affect the validity or enforceability of (i) any other part of this Agreement, and the
Agreement shall be modified to the extent legally possible to legally carry out the intent
of this Agreement and (ii) any agreement between Buyer and any other party. This
Agreement and its exhibit make up the entire and only agreement or understanding
between Buyer and Seller.  It may not be changed unless signed in writing by Buyer and
Seller.  This Agreement takes precedence over all prior agreements, brochures,
negotiations, commitments and representations, whether oral or written, about Seller's
Claim and Buyer's purchase of its Interest.

b.      Should Buyer retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing Buyer's rights under this Agreement and the amount of Buyer's Interest shall be increased in an amount equal to Buyer's costs and expenses.

c.      This Agreement will be binding upon Buyer and Seller, and each of their heirs, executors, administrators, successors and assigns. Seller understands and agrees that Seller has no right to assign Seller's rights and obligations under this Agreement.  Seller further understands and agrees that Buyer may assign its rights and obligations under this Agreement (and Buyer's Interest) to any party without Seller's prior approval, provided that any such party agrees to be bound by the terms and conditions of this Agreement.  It is agreed that if Buyer assigns this Agreement as provided in the prior sentence, Buyer shall have no further obligations under this Agreement and Seller must look solely to the party Buyer assigned the Agreement to for performance under this Agreement.  When requested by Buyer or any assignee, Seller will sign and deliver any and all reasonably requested documents as Buyer or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.  This Agreement may be signed in separate counterparts.  A facsimile signature shall be deemed to be an original signature.

12.     RIGHT TO CANCEL

SELLER HAS THE RIGHT TO CANCEL THIS AGREEMENT WITHOUT PENALTY OR FURTHER OBLIGATION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH (5TH) BUSINESS DAY FROM THE DATE SELLER RECEIVES FUNDING HEREUNDER FROM BUYER.

In order for the cancellation to be effective, Seller must return the full amount of disbursed funds to Attorney within five (5) business day of the disbursement of funds who will then return the amount to Buyer's Attorney upon the clearance of the funds in Attorney's Trust Account.

DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE YOU SIGN THIS AGREEMENT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY.  YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT.

SELLER:                                          BUYER:

## EXHIBIT A

AUTHORIZATION FOR ATTORNEY TO PAY ███████████████████████
     FROM PROCEEDS OF CLAIM/ACKNOWLEDGEMENT OF AUTHORIZATION

Pursuant to that certain Purchase Agreement dated December 3, 2021 between ████
████ ("Seller") and █████████████████████ ("Buyer") (the "Agreement"), I
█████████████ hereby irrevocably authorize and direct my attorney, █████████████,
Esq. ("Attorney"), (and any future Attorney representing me in connection with my
Claim to, among other things, (i) place an assignment, consensual lien and security
interest in favor of Buyer against any and all of the Proceeds due Seller from the Claim
(after payment of any and all legal fees, reimbursable costs, statutory liens and liens)
and to protect and satisfy the assignment, consensual lien and security interest in favor
of Buyer up to the full amount of Buyer's Interest, (ii) pay Buyer's Attorney from the
Proceeds the amount due to Buyer representing Buyer's Interest in the Proceeds of the
Claim at the time of distribution of the Proceeds prior to any payment to Seller with
respect to the Claim, (iii) in the event that the Claim is the subject of more than one
lawsuit, claim or cause of action arising out of more than one
incident/accident/transaction, or against one or more defendants, pay Buyer's Interest
from the Proceeds of the first lawsuit, claim and/or case against any of the defendants,
(iv) notify Buyer's Attorney of discontinuance or ending with respect to Attorney's
representation, (v) respond to requests for information from Buyer's Attorney and (vi)
call Buyer's Attorney prior to any disbursements of funds to verify the amount of
Buyer's Interest.  Such amounts shall be paid directly to Buyer's Attorney to satisfy
Seller's obligations to Buyer under the Purchase Agreement prior to any distribution of
Proceeds to Seller. The amount of Buyer's Interest will increase to reflect the date Buyer
is paid its Interest in the Proceeds as set forth in the Disclosure Table to the Agreement,
as such may be amended from time to time.  This Authorization is irrevocable and
binding and may only be amended by the mutual written agreement of Seller and
Buyer.

Dated this 3rd day of December, 2021.


_____
██████████████, Seller

## ACKNOWLEDGEMENT OF AUTHORIZATION

I, ████████████, Esq. hereby acknowledge that ████████████████ represents ████████████, as his attorney, in connection with the Claim described in the Agreement.  I acknowledge that ████████████ has irrevocably instructed me to comply with the Agreement's terms pursuant to the Authorization set forth above (the "Authorization").  I will honor ████████████ Authorization.  I agree to pay Buyer's Attorney Buyer's Interest from ████████████ Proceeds of the Claim in accordance with the Disclosure Table set forth in the Agreement, as such may be amended from time to time.  I agree not to distribute any Proceeds of the Claim to ████████████ until Buyer's Interest has been paid in full.  In the event of a dispute, I agree that only disbursements for attorney's fees, reimbursable costs, statutory liens and medical liens that are in existence prior to the date of the Agreement will be made.  All other funds due ████████████ shall be held in my Trust Account until such dispute is resolved.  In the event that I am terminated as ████████████ attorney with respect to the Claim, I shall give Buyer's Attorney immediate written notice thereof by certified mail, and state the name, address and telephone number of ████████████ new attorney.

All disbursements of funds, including ████████████ share of the Proceeds, will be through my Trust Account, and ████████████ will not receive a settlement check directly from any defendant or insurance company.  I agree to verify the amount of Buyer's Interest prior to any disbursement of funds.  I have no knowledge of ████████████ having previously sold, transferred or assigned any interest in the Claim or in the Proceeds of the Claim, and understand that ████████████ may not further sell, transfer or assign any additional Interest to any party other than Buyer without Buyer's written permission.  I warrant and covenant that I am authorized to execute this document on behalf of ████████████.

DATED this 3rd day of December, 2021.

████████████████

_____
By: ████████████, ESQ.

# **PURCHASE AGREEMENT**

This is a Purchase Agreement ("Agreement") dated the 3rd day of December, 2021.  This Agreement is by and between ███████ ("Seller") who is represented by ███, Esq. of the ███████ whose address is ███████ ("Attorney") and ███████, an corporation ("Buyer") who is represented by ███████, Esq. of the ███████ ("Buyer's Attorney") whose address is ███████.

A.      Seller has a claim arising from a slip and fall incident which occurred on December 21, 2019 ("Claim") at ███████ which is owned by ███ ███████ and operated by ███████.  Seller has hired Attorney to represent Seller in this Claim.  Seller has settled the Claim.  The entire amount of the settlement is $███ ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

B.      Seller desires to sell and assign to Buyer an interest in the Proceeds.  Buyer desires to purchase the interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

BUYER AND SELLER AGREE AS FOLLOWS:

1.      PURCHASE OF INTEREST

a.      Seller hereby sells, transfers, conveys and assigns to Buyer a $125,000.00 interest ("Interest") in the Proceeds for a purchase price of $100,000.00 ("Purchase Price").  Seller acknowledges receipt of the Purchase Price.  Seller understands that the amount of Buyer's Interest, or, in other words, the amount to be paid to Buyer, will increase to reflect the date the Buyer is paid its Interest in the Proceeds as set forth in the following Disclosure Table ("Disclosure Table"):

[Intentionally Left Blank]

<u>DISCLOSURE TABLE</u>

Purchase Price:          $100,000.00
Administration Fee:      $5,000.00

| **Date of Payment to Buyer** | **Amount due to Buyer** |
| --- | --- |
| On or before March 3, 2022 | $130,000.00 |
| After March 3, 2022 but on or before April 2, 2022 | $142,500.00 |

*Should Seller not pay Buyer from the Proceeds by April 2, 2022 the Buyer's Interest will increase by **$12,500.00 every thirty (30) days thereafter.**

b.      Buyer's Interest will be paid by Attorney out of the Proceeds of the Claim and will be deducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller with respect to the Claim.  If the Proceeds of the Claim Amount are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim.  Seller has directed Attorney to, among other things,(i) place an assignment, consensual lien and security interest in favor of Buyer against any and all Proceeds due Seller from the Claim (after payment of any and all legal fees and reimbursable costs) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) notify Buyer of receipt of Settlement Amount, (iii) pay Buyer from the Proceeds the proper amount due to Buyer representing Buyer's Interest  in the Proceeds at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iv) respond to requests for information from Buyer and (v) notify Buyer prior to any disbursements of funds to verify the amount due Buyer.  Seller has provided Buyer with an executed Authorization for Attorney to Pay Buyer from Proceeds of Claim/Acknowledgement of Authorization by Seller and Attorney in the form attached as Exhibit "A" ("Authorization and Acknowledgement ").

c.      The amount Buyer is entitled to may be more than is listed in the Disclosure Table above if Seller does not honor the obligations in this Agreement.  Seller will also be liable to pay Buyer's Interest, even if there are no Proceeds, if Seller has mislead Buyer or Attorney concerning Seller's Claim and will also be liable for Buyer's attorney's fees or collection costs, as permitted by law.

d.      If Seller wants to sell an additional Interest, and if Buyer agrees to purchase an additional Interest, Buyer and Seller will sign an amended Disclosure Table. Seller understands that Buyer is not required to purchase any additional Interest.

e.      In the event that the Claim is the subject of more than one lawsuit, claim or cause arising out of more than one incident/accident/transaction, or against one or more defendants, then the amount due Buyer pursuant to this Agreement shall be paid from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, including insurance companies and malpractice claims arising out of the Claim, which results in a monetary recovery.  If insufficient funds are available from the first lawsuit, claim and/or case resulting in a monetary recovery to pay the full amount due Buyer pursuant to this Agreement, then the balance due Buyer shall be paid from the Proceeds of the next lawsuit, claim and/or cause, if any.

f.      The amount due Buyer shall be withheld from any money collected as a result of the Claim and shall immediately be paid to Buyer (after first deducting Attorney's fees and costs, and any prior liens which exist on the date of this Agreement).  Seller agrees and hereby directs that all Proceeds received in connection with the Claim, are held in Trust for Buyer until Buyer has been fully paid its Interest.  Seller understands that Seller will not receive any money or payment from the Proceeds of Seller's Claim until Buyer has been paid Buyer's Interest in full. This shall also apply to any structured settlements.  If Seller receives payments from several sources, Seller will pay Buyer all monies received from each source until Buyer is paid in full its Interest in the Proceeds of the Claim.  Seller acknowledge that receipt or use of any Proceeds of the Claim prior to the full payment to Buyer of Buyer's Interest in the Proceeds of the Claim may constitute an illegal conversion and may be a crime.

2.      GRANT OF SECURITY INTEREST

By signing this Agreement, Seller grants to Buyer a security interest and a lien in the Settlement Amount and all Proceeds of the Claim ("Collateral").  Buyer shall have all rights and remedies of a secured party under the Nevada Uniform Commercial Code. Seller authorizes Buyer to file one or more UCC financing statements regarding Buyer's security interest and lien in the Collateral and Seller agrees to take all other steps reasonably required by Buyer to perfect and maintain the perfection of Buyer's security interest.

3.      NO TRANSFER OF CLAIM

Seller is not assigning any portion of the Claim to Buyer, and Buyer is not buying any portion of the Claim under this Agreement.  Buyer has no right or obligation to take any legal action for Seller in connection with the Claim. Buyer has no right or obligation to advise, direct or instruct Seller or Attorney in how to go forward with Seller's Claim. Buyer will not be involved in the negotiation of any settlement of Seller's Claim.  Buyer has no obligations or duties concerning the Claim, or the collection of any settlement, award or verdict from the Claim.

4.      SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that:

a.      Seller is using the funds received from the Purchase Price for Seller's immediate economic necessities.  Seller has been advised that Seller should not sell any portion of the Proceeds of the Claim if Seller has any other alternative to meet my immediate economic necessities.  Seller understands that due to the various factors involved that Buyer may make a large profit.

b.      Seller acknowledges that Seller has been advised to seek the services of legal, tax, accounting and/or financial advisors in the negotiation and signing of this Agreement. Seller has either received such counsel prior to signing this Agreement or expressly waived such counsel.  Seller understands from speaking to Attorney and/or other advisors that the amount of Buyer's Interest as set forth in the Disclosure Table is greater than the Purchase Price Seller is receiving, and that there is a cost to Seller selling Buyer the Interest.  Seller understands that Buyer is relying upon Seller's representations in deciding to purchase this Interest and Seller represents and warrants that all statements made by Seller are true and correct as of the date hereof.  Seller understands that if any information provided by Seller changes that Seller has an obligation to immediately notify Buyer.

c.      Seller is not currently in bankruptcy, there are no pending tax claims or criminal allegations against Seller, and Seller has complied with all laws in connection with the Claim.  Seller further represent that Seller is not in violation of any obligations concerning childcare, alimony or support, and Seller has not been convicted of a felony or other crime involving dishonesty.  Other than the Claim itself, there is no claim, legal action, lien or any proceeding or order pending or in effect or threatened, against Seller, or which would in any manner affect or impair Buyer's Interest or Buyer's rights under this Agreement.  Seller has been truthful in all aspects of the Claim and has provided all information to Attorney in a complete and honest fashion. Seller also confirms that all documents submitted in connection with the investigation and Buyer's evaluation of the Claim are true, whether submitted by Attorney or Seller.  Seller understands that Buyer is relying upon these statements in determining whether to enter into this Agreement.

d.      Seller agrees to not change the fee agreement between Seller and Attorney in any way that would reduce the amount of Buyer's Interest in the Proceeds of the Claim. Seller further promises to notify Buyer in writing within 72 hours if Seller terminates the services of Attorney, or if Attorney determines not to proceed with the Claim.  If new attorneys are retained to represent Seller in the Claim, Seller will notify Buyer within 72 hours of the new attorneys being retained, and will direct the new attorneys to comply with the terms of this Agreement by Seller and the new attorney executing a

new Authorization and Acknowledgement within 14 days after accepting Seller's representation .  Seller will also notify Buyer in writing within 72 hours if Seller moves from the address listed above.

e.      Seller will not knowingly create or permit any additional liens, charges, security interests, encumbrances, agreements of any kind or other rights of third parties against the Proceeds of the Claim without the prior written consent of Buyer.  Seller specifically promises not to sell any additional portion of the Proceeds of the Claim after the date of this Agreement, unless Buyer has given prior written permission.  Seller also confirms that neither the Claim nor the Proceeds are subject to any liens, charges, security interests, encumbrances, agreements of any kind or nature (other than this Agreement) or other rights of third parties except for liens previously provided to Seller's medical providers.  Seller understands that if these statements are not true, it may be considered as a fraud, as Buyer is relying upon these statements in going forward with this Agreement.

5.      EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall be an event of default by Seller under this Agreement (each, an "Event of Default"):

a.      The failure by Seller or Attorney to pay Buyer's Interest in the Proceeds within thirty (30) days after the Settlement Amount is received by Seller or Attorney; or

b.      Seller's failure to perform or comply with any of the agreements, conditions, provisions or promises contained in this Agreement, including but not limited to if Buyer does not receive a timely response to a request for information from Seller or Attorney or if Buyer does not receive a new Authorization and Acknowledgement by Seller and new attorney within fourteen (14) days after accepting representation, and such failure to perform or comply continues unremedied for a period of ten (10) days after written notice from Buyer to Seller, unless such default, in Buyer's reasonable discretion, is not curable, in which event there shall be no grace period; or

c.      If Buyer discovers any material misrepresentation or inaccuracy in any representation or warranty made by Seller to Buyer in this Agreement.

Upon an Event of Default by Seller under this Agreement, Seller agrees that Buyer may contact any insurance company, claims adjuster or attorney then handling the Claim on behalf of any responsible party and advise such insurance company, claims adjuster or attorney about Buyer's Interest in Seller's Claim and to direct that Buyer be included as a payee on settlement checks provided further that nothing herein shall prevent Buyer from exercising any other right or remedy provided under law or equity.  If Buyer does

anything stated in this paragraph, Buyer shall not be liable to Seller for any damages which Seller may suffer resulting from Buyer's actions described above.

6.    APPLICABLE LAW

This Agreement shall be governed, construed and enforced in accordance with, and all disputes arising out of or in connection with this Agreement shall be governed by, the internal laws of the State of Nevada, without regard to the conflict of law rules of Nevada or any other jurisdiction.

7.    ARBITRATION

BUYER AND SELLER ACKNOWLEDGE AND AGREE THAT ALL DISPUTES, CLAIMS, DEFENSES OR CONTROVERSIES (WHETHER IN LAW OR IN EQUITY) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIPS THAT RESULT FROM THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY DISPUTES, CLAIMS OR  CONTROVERSIES  INVOLVING FEDERAL OR STATE STATUTORY CAUSES OF ACTION  OR INJUNCTIVE RELIEF, ANY INVOLVING FEDERAL OR STATE ADMINISTRATIVE REMEDIES, ANY INVOLVING CONSUMER FRAUD AND ANY INVOLVING A CHALLENGE TO THE LEGALITY OF ANY PART OR ALL OF TH IS AGREEMENT ("DISPUTES") SHALL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES  ("RULES") OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA").  THE ARBITRATION SHALL TAKE PLACE BEFORE A SINGLE ARBITRATOR TO BE CHOSEN BY AGREEMENT OF THE PARTIES, OR FAILING SUCH, IN ACCORDANCE WITH AAA RULES.  THE ARBITRATION SHALL TAKE PLACE IN THE STATE OF NEVADA, COUNTY OF CLARK UNLESS THE PARTIES AGREE TO A DIFFERENT LOCATION.  THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SHALL BE GOVERN ED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1 AND THE SUBSTANTIVE LAWS OF THE STATE OF NEVADA SHALL BE APPLIED IN ALL EVENTS.  JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.  THE PARTIES ALSO AGREE THAT THE AAA OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION SHALL APPLY TO THE PROCEEDINGS.

8.    WAIVER OF JURY TRIAL

BUYER AND SELLER, AFTER CONSULTATION WITH THEIR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT WHICH THEY MAY HAVE TO A JURY TRIAL, INCLUDING ANY RIGHT VESTED BY FEDERAL, STATE OR LOCAL STATUTE, IN CONNECTION WITH ANY DISPUTES OR LEGAL PROCEEDING

INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER COMMENCED BY OR AGAINST EITHER PARTY IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT.

9.     WAIVER OF CLASS ACTION CLAIMS

SELLER HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS TO (i) ANY DISPUTE WITH BUYER BEING HANDLED AS A CLASS ACTION AND (ii) JOINING AS A PLAINTIFF, CLAIMANT, MEMBER OR PARTICIPANT IN ANY CLASS ACTION AGAINST BUYER.  IT IS AGREED THAT ANY ARBITRATION WILL BE LIMITED TO THE DISPUTE BETWEEN BUYER AND SELLER, AND BUYER AND SELLER WAIVE ANY RIGHT TO CONSOLIDATE OR TO HAVE HANDLED AS A CLASS ACTION ANY PROCEEDING ON ANY DISPUTES WITH ANY PROCEEDING ON DISPUTES, CLAIMS, OR CONTROVERSIES INVOLVING ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT.

10.    RECLASSIFICATION OF TRANSACTION

This Agreement represents an investment by Buyer, and not a loan to Seller. However, should a court of law determine that the transaction set out in this Agreement is a loan of money, Seller agrees that interest shall accrue at the maxim um rate permitted by law.  Seller agrees that any fees or expenses paid by Buyer in connection with the Claim will not be included as interest. This includes any attorney's fees and costs Buyer has expended to enforce its rights under this Agreement.  Seller agrees that these will be considered as a reimbursement to Buyer, rather than as interest.

11.    MISCELLANEOUS

a.     If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of (i) any other part of this Agreement, and the Agreement shall be modified to the extent legally possible to legally carry out the intent of this Agreement and (ii) any agreement between Buyer and any other party. This Agreement and its exhibit make up the entire and only agreement or understanding between Buyer and Seller.  It may not be changed unless signed in writing by Buyer and Seller.  This Agreement takes precedence over all prior agreements, brochures, negotiations, commitments and representations, whether oral or written, about Seller's Claim and Buyer's purchase of its Interest.

b.      Should Buyer retain the services of an attorney to enforce the terms of this Agreement, Seller will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing Buyer's rights under this Agreement and the amount of Buyer's Interest shall be increased in an amount equal to Buyer's costs and expenses.

c.      This Agreement will be binding upon Buyer and Seller, and each of their heirs, executors, administrators, successors and assigns. Seller understands and agrees that Seller has no right to assign Seller's rights and obligations under this Agreement.  Seller further understands and agrees that Buyer may assign its rights and obligations under this Agreement (and Buyer's Interest) to any party without Seller's prior approval, provided that any such party agrees to be bound by the terms and conditions of this Agreement.  It is agreed that if Buyer assigns this Agreement as provided in the prior sentence, Buyer shall have no further obligations under this Agreement and Seller must look solely to the party Buyer assigned the Agreement to for performance under this Agreement.  When requested by Buyer or any assignee, Seller will sign and deliver any and all reasonably requested documents as Buyer or such assignee may require to confirm the various rights and obligations of the parties under this Agreement.  This Agreement may be signed in separate counterparts.  A facsimile signature shall be deemed to be an original signature.

12.     RIGHT TO CANCEL

SELLER HAS THE RIGHT TO CANCEL THIS AGREEMENT WITHOUT PENALTY OR FURTHER OBLIGATION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH (5TH) BUSINESS DAY FROM THE DATE SELLER RECEIVES FUNDING HEREUNDER FROM BUYER.

In order for the cancellation to be effective, Seller must return the full amount of disbursed funds to Attorney within five (5) business day of the disbursement of funds who will then return the amount to Buyer's Attorney upon the clearance of the funds in Attorney's Trust Account.

DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE YOU SIGN THIS AGREEMENT YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY.  YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT.

SELLER:                                         BUYER:

## EXHIBIT A

AUTHORIZATION FOR ATTORNEY TO PAY ███████████████
FROM PROCEEDS OF CLAIM/ACKNOWLEDGEMENT OF AUTHORIZATION

Pursuant to that certain Purchase Agreement dated December 3, 2021 between ██████ ███ ("Seller") and █████████████████ ("Buyer") (the "Agreement"), I, ████████████ hereby irrevocably authorize and direct my attorney, ███████████ ███, Esq. ("Attorney"), (and any future Attorney representing me in connection with my Claim to, among other things, (i) place an assignment, consensual lien and security interest in favor of Buyer against any and all of the Proceeds due Seller from the Claim (after payment of any and all legal fees, reimbursable costs, statutory liens and liens) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) pay Buyer's Attorney from the Proceeds the amount due to Buyer representing Buyer's Interest in the Proceeds of the Claim at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iii) in the event that the Claim is the subject of more than one lawsuit, claim or cause of action arising out of more than one incident/accident/transaction, or against one or more defendants, pay Buyer's Interest from the Proceeds of the first lawsuit, claim and/or case against any of the defendants, (iv) notify Buyer's Attorney of discontinuance or ending with respect to Attorney's representation, (v) respond to requests for information from Buyer's Attorney and (vi) call Buyer's Attorney prior to any disbursements of funds to verify the amount of Buyer's Interest.  Such amounts shall be paid directly to Buyer's Attorney to satisfy Seller's obligations to Buyer under the Purchase Agreement prior to any distribution of Proceeds to Seller. The amount of Buyer's Interest will increase to reflect the date Buyer is paid its Interest in the Proceeds as set forth in the Disclosure Table to the Agreement, as such may be amended from time to time.  This Authorization is irrevocable and binding and may only be amended by the mutual written agreement of Seller and Buyer.

Dated this 3rd day of December, 2021.

_____

███████████████, Seller

## ACKNOWLEDGEMENT OF AUTHORIZATION

I, ███████████, Esq., hereby acknowledge that ███████████ represents ███████████, as her attorney, in connection with the Claim described in the Agreement.  I acknowledge that ███████ has irrevocably instructed me to comply with the Agreement's terms pursuant to the Authorization set forth above (the "Authorization").  I will honor ███████████ Authorization.  I agree to pay Buyer's Attorney Buyer's Interest from ███████ Proceeds of the Claim in accordance with the Disclosure Table set forth in the Agreement, as such may be amended from time to time.  I agree not to distribute any Proceeds of the Claim to ███████████ until Buyer's Interest has been paid in full.  In the event of a dispute, I agree that only disbursements for attorney's fees, reimbursable costs, statutory liens and medical liens that are in existence prior to the date of the Agreement will be made.  All other funds due ███████ shall be held in my Trust Account until such dispute is resolved.  In the event that I am terminated as ███████████ attorney with respect to the Claim, I shall give Buyer's Attorney immediate written notice thereof by certified mail, and state the name, address and telephone number of ███████████ new attorney.

All disbursements of funds, including ███████████ share of the Proceeds, will be through my Trust Account, and ███████ will not receive a settlement check directly from any defendant or insurance company.  I agree to verify the amount of Buyer's Interest prior to any disbursement of funds.  I have no knowledge of ███████ having previously sold, transferred or assigned any interest in the Claim or in the Proceeds of the Claim, and understand that ███████ may not further sell, transfer or assign any additional Interest to any party other than Buyer without Buyer's written permission.  I warrant and covenant that I am authorized to execute this document on behalf of the ███████████.

DATED this 3rd day of December, 2021.

███████████

_____

By: ███████████, ESQ.

# J AND J PURCHASING, LLC
# CODE OF ETHICS AND BUSINESS CONDUCT

October 15, 2021

## DEAR COLLEAGUES:

At J and J Purchasing, LLC ("J&J" or "Company"), our mission is to operate consistent with the highest ethical business conduct both as to our relationships amongst each other, and as it relates to our Investors and all Third Parties. This is our commitment to our Investors and ultimately the marketplace.

To meet our commitment to each other and the Company, we must also safeguard our reputation.  As the Laws that govern our operations become increasingly complex, discerning right from wrong is not always evident. In many cases, failing to do the "right thing" can also be a violation of Laws.

While ethical missteps may have significant implication under Laws, any Misconduct only serves to knock down our reputation. Misconduct keeps us from meeting our commitment to our Investors and the marketplace. Because our success is inextricably tied to our reputation, it is up to all of us to bolster and protect it, act with the upmost of care, and always do the right thing.

At J&J, we conduct all aspects of our business according to our Code, its Core Values, Laws, and our Policies - our "Compliance Mandate." We hope that you are inspired to join us in always using sound judgment when deciding the proper course of action. If we always act in compliance with our Compliance Mandate, we succeed in the marketplace, we meet our commitments, and we safeguard our reputation.

This Code is intended to help you address compliance, ethics, integrity, and Laws issues by providing information, tools, and resources necessary to make good decisions. Our Management fully supports the Code and its Core Values — they constitute crucial components of our Corporate Compliance Program and our ongoing effort to ensure that our people fully commit to our Core Values, comply with all Laws, and in all things act with integrity and ethically.

Through our Code, and by leading by example, we want to make our Core Values understood and followed by everyone of our employees, agents, and contractors. Since no Code or Policy can anticipate every situation that may arise, everyone that works with us is encouraged to bring questions or concerns that may implicate Laws, the Code, or our Policies to our HR or Compliance Function, or myself.

The Code is incorporated into and complements our employee policies ("HR Policies") and Compliance Program and its Policies. Our Compliance Program is designed to assist our Company and our employees, agents and contractors in developing effective internal controls that promote adherence to Laws and ethics throughout our operations. For example, we always promote open communication and strive to inspire in everyone the importance speaking up. Whether it is about a question, concern, complaint, or Misconduct.

After carefully reading the Code, if you have any questions or concerns, please consult with your Manager or our HR or Compliance Function. Please remember that Capitalized Terms (sometimes in bold font) have a specific meaning and may be more expansively defined in the Code's Glossary or our HR Policies or another Company Official Record.

With your help, we are confident that J&J will exceed our commitment to the marketplace, we will continue to deserve the trust that our Investors have in us, and our reputation for integrity and our success will endure. Thank you for your continued dedication to J&J, for joining us in this effort, and for incorporating this Code and its Core Values into all aspects of your work.

JEFFREY JUDD

FOUNDER

PRESIDENT/MANAGER

# CODE OF ETHICS AND BUSINESS CONDUCT

## I.  CORE VALUE – WE SEEK COMPLIANCE AND QUALITY IN EVERYTHING WE DO:

We are a dedicated team committed to our operations and Investors. In so doing, our focus is to find Third-Party Beneficiary Insurance Settlement Agreement opportunities and compliant results through the innovation we bring to the marketplace. To achieve our mission to improve our operations, we implement organization-wide solutions based on a variety of qualitative and quantitative measures. We are proud of our work and we take this great responsibility as a privilege. For these reasons and more, we endeavor to maintain only the highest level of compliancy throughout our business and all our activities. We always do the right thing.  We commit to compliancy by competing ethically and all as consistent with Laws, our Code, and our Policies (our "Compliance Mandate").

To be "compliant" means that our behavior and business operations are consistent with Laws, our Code, and our Policies — all of which we expect our Personnel, agents, contractors to strictly honor. Indeed, this is a fundamental expectation and condition of employment by, or association with, our Company. Moreover, our Company supports the establishment of a Corporate Compliance Program. Our Compliance Program is implemented to meet regulatory requirements that our business and operations should meet.

To promote our Compliance Mandate, we expect to develop and update Policies that provide guidance for complying with the number of Laws governing our business and operations. Our Policies enable us to detect, correct and prevent non-compliant activities, operations, and Misconduct. Among others, Policies have been or will be implemented in the areas of Investment documentation, financial due diligence, Third-Party relationships, Official Records, among other regulatory areas, and Company Information (including, Trade Secrets, Confidential Information, Intellectual Property, Know-How, and Proprietary Information).

Moreover, to promote our Compliance Mandate, J&J will institute training, education, and awareness programs for our Personnel, agents and contractors. These programs may take the form of online learning modules, live training sessions, and periodic communications; for example, required compliance training (general, newly hired, and annual courses) for J&J Personnel, agents and contractors and specialized training for high-risk compliance topics for certain Personnel. "Independent Contractors" are required to complete specified compliance training.

Generally, our Compliance Program is supported by our Compliance Function which is committed to ensuring that the Compliance Program's key components are consistently made available to everyone and followed throughout our operations. Our Compliance Function serves as a contact for our Personnel and all Third Parties (including Investors, Vendors, Governments, and the public) on issues relating to the implementation, management and oversight of the Compliance Program and its key components. Generally, our Compliance Function supports our workforce and business partners to promote the integrity of the Company's operations. This ultimately supports Company-wide compliance with Laws and our Policies. Nevertheless, it is our Compliance Function that is ultimately responsible for the Compliance Program and our Compliance Mandate.

By following our Compliance Mandate, we also promote consistent satisfaction on the part of Investors and Third Parties. Our Compliance Mandate means that we do not just react, but we are proactive in our compliancy. Nonetheless, to foster our business relationships, we all must ensure that we operate consistent with our contractual requirements and also our Company's Policies and Laws. If you have a concern about any business or Third Party relationship or satisfaction issue, make sure to discuss the situation with your Manager right away.

NOTE: Our Code is an important (but not the only) component of our Company's Compliance Program. Our Program's other key components include the HR Policies, Policies, Compliance Training and Education, Personnel and Operations Communications, and Compliance Monitoring, Auditing, Risk Analysis, Risk Assessments, Periodic Compliance Bulletins, Compliance Certifications, and Contingency Planning. Each of the preceding address, oversee, and support J&J's Compliance Mandate in its vigilance of, among others: (A) Documentation and Official Records, (B) Accounting and Financial practices; (C) Marketing practices; and (D) Relationships with Investors and Referral Sources.

## II.  CORE VALUE – WE CONDUCT OUR BUSINESS ETHICALLY:

The Code reflects our belief that long-term, trusting business relationships are built by honesty, openness, and fairness. It is a resource you can rely on in many circumstances to determine whether something is appropriate or compliant. In short, our Core Values direct you to act with integrity in the workplace and everywhere you represent the Company.

OUR CODE PROMOTES:




(1) HONEST, ETHICAL AND LAWFUL CONDUCT AND BUSINESS PRACTICES BY ALL OF US; (2) COMPLIANCE WITH LAWS; (3) PROMPT REPORTING, ACCOUNTABILITY, AND CORRECTIVE ACTION FOR LAWS, CODE, OR POLICY VIOLATIONS OR MISCONDUCT; (4) CLEAR, ACCURATE, COMPLETE, AND TIMELY THIRD-PARTY COMMUNICATIONS (E.G., INVESTORS, VENDORS, AND GOVERNMENTS); AND (5) STRICT SECURITY OF COMPANY AND THIRD-PARTY PRIVATE OR CONFIDENTIAL INFORMATION.

As a J&J employee, agent or contractor, you are required to read, understand, and abide by the Code. No one has the authority to make you violate the Code and any attempt to do so is unacceptable. You also have the responsibility to watch for potential Code violations and to report them — whether they occur inside our Company or through external dealings with, but not limited to, Investors, Third Parties, or any Government.

Moreover, if you are a Manager, you have a leadership role at our Company. This means that you are responsible for setting a good example for your Personnel and for any contractor that you oversee. In addition, it means that you must encourage open and honest communication and act when Misconduct, ethical issues, questions, concerns, or complaints are brought to your attention.

Nonetheless, as a Manager, you must work to ensure that anyone who reports to you understands the Code's requirements and support any Personnel or contractor who, in good faith, raises questions or concerns. You are responsible for acting to address conduct that violates the Code and to seek help from corporate Management if the proper course of action is not clear. The Code is intended for use as a guideline. It does not address every situation you may possibly face during your workday.  In any case, our Personnel and every agent and contractor must exercise good judgment in decision-making and seek help with questions or concerns that are not addressed in the Code.

We are all tasked with strictly avoiding any activity that may diminish or appear to diminish confidence in the compliancy of the Company or its competence, impartiality, judgment, or operational integrity.

COMPLIANCE CERTIFICATIONS?: The Code applies to all Personnel, contractors and business operations. It is monitored by our Compliance Function and is affirmed by everyone through our Compliance Certification procedure under our Performance Management Program. Our HR Function and Compliance Function will instruct you on the various Compliance Certifications that apply to your job and Duties and Responsibilities and that you will be expected to acknowledge and fulfill.

Q: I BELIEVE THAT I CANNOT SIGN MY COMPLIANCE CERTIFICATION TO THE CODE OR ANOTHER POLICY OR OFFICIAL RECORD? (e.g., as a new hire or during annual certification)? A: Even if you do not sign a Compliance Certification, you are still obligated to follow our Compliance Mandate. If you are uncertain as to how this expectation works or have any issues with affirming that you will follow the Code or any other standard, you should discuss your concerns with Management.

Q: IF I COMPLY WITH LOCAL LAWS, IS THIS ENOUGH TO ENSURE MY COMPLIANCE WITH THE CODE OF ETHICS? A: Our Code of Ethics may impose standards more rigorous than those imposed under local Laws. Under such circumstances, and provided that the Code of Ethics does not conflict with local Laws, comply with Code of Ethics and discuss your concerns with Management.

Our Company's Compliance Function and Management will monitor Laws as they apply to our operations. Nonetheless, we trust our Personnel, agents, and contractors to follow the letter and spirit of all Laws and act ethically even when Laws may not be specific. When in doubt ask for guidance.

## III.  CORE VALUE – WE COMMUNICATE WITH INTEGRITY AND CONSISTENT WITH LAWS:

Our Company's Personnel, agents, and contractors must always — through their words and their actions — accurately represent our Company and its operations. Accordingly, Company statements made in, without limitation, marketing and advertising materials (and in whatever medium) will not be deceptive or unfair, must be evidence-based, and contain appropriate Disclosures.

Moreover, only the officers of the Company may communicate with Investors germane to matters set out in our Investment documentation.  No one at our Company, including our officers, is a licensed investment or financial advisors; accordingly, no Company Personnel may ever act, or in any way communicate with anyone, in a manner reserved solely to licensed professional investment or financial counselors.  As to the preceding and also, no one at our Company may ever instruct or allow any Third Party to act in such a manner. Any direct or indirect act or communication which violates the preceding compliance standard is considered Misconduct and will lead to corrective action including up to termination of employment or association.

Nonetheless, and whether online or otherwise, our Personnel, agents, and contractors are expected to act consistent with all advertising and consumer protection Laws. This means that we compete in the marketplace free of deception and unfair practices. In short, we do not communicate in a manner that confuses Third Parties, including Investors. Everyone that works with us may only publish truthful communications and incorporate Clearly and Conspicuously such Disclosures, including qualifiers and limitations, that may be required or advisable.

NOTE: Our verbal and written communications: (A) are truthful, complete, fair and not misleading, and (B) substantiate "express" or "implied" claims. Moreover, if a "Disclosure" is ever necessary to make a Company communication accurate, it will be portrayed "Clearly and Conspicuously."

All public statements made by J&J, or by anyone on its behalf, including in connection with advertising, promotional materials, warranties or guarantees, must always be truthful and have a reasonable basis in fact and in no way deviate from the contents of J&J's, without limitation, Investment documentation and Official Records. No one may disseminate any written or verbal communication or material, whether relevant to our Company or our operations or otherwise, which is false, misleading or deceptive or not in compliance with applicable Laws or our Policies.

## IV.  CORE VALUE – WE SPEAK UP AND SEEK HELP:

It is important to be competent about compliance. Being consciously competent allows you to recognize when you should seek advice from Management, our HR Function or our Compliance Function. As part of your Duties and Responsibilities, you are expected to earnestly study our Core Values and Policies so that you become competent about compliance.

When the best path forward is not obvious to you, take the Integrity Quick Test and answer its questions to help guide your decision-making process and your responses to uncertain circumstances. Remember that in all matters, you are expected to understand the Code and Laws, use good judgment, and avoid even the appearance of Misconduct.

INTEGRITY QUICK TEST:

If you ever have doubt about a course of action or are unfamiliar with the effect of a particular circumstance, ask yourself the following questions: (1) Is it consistent with the Code? Is it ethical or legal? (2) Is it consistent with all other Company Policies? (3) Will the conduct reflect well on me and the Company? (4) Will the course of action give the appearance of being unethical or illegal? (5) If publicly disclosed, will the course of action discredit me or the Company? (6) If someone treated me the same way, would I be comfortable with such act? (7) Am I properly protecting Confidential Information? (8) Would I be comfortable if the conduct appeared in the media? (9) Am I properly protecting the Company's or any Third Party's Confidential Information from disclosure to improper external or internal parties? If you answered "NO" to any of these questions, then don't do it. You should utilize one of our Reporting Channels and report the circumstances.

NONETHELESS, IF YOU FIND YOURSELF SAYING OR HEARING THE FOLLOWING WORDS:



"Well, maybe just this once"/"Nobody will ever know"/"It doesn't matter how it gets done, as long as it gets done"/"Everyone does it"/"What's in it for me?"/"We always did it this way"/"Don't contact the Compliance Email"/"Remember, we didn't have this conversation,"

YOU SHOULD TAKE A STEP BACK AND CAREFULLY CONSIDER THE SITUATION BECAUSE OFTENTIMES THE CIRCUMSTANCES THAT ELICIT THESE WORDS CONSTITUTE MISCONDUCT, VIOLATE THIS CODE, LAWS, OR OUR POLICIES.

**Q:** AFTER COMPLIANCE TRAINNING, I WAS CONCERNED THAT AN INVESTOR PROTOCOL MAY BE INCORRECT. I TOLD MY MANAGER ABOUT MY CONCERNS AND SHE TOLD ME THAT "THIS IS HOW WE DO THINGS HERE" AND WALKED AWAY; WHAT SHOULD I DO? **A:** Use one of our Reporting Channels that don't involve your direct Manager and voice your concern.

**Q:** MY MANAGER ASKED ME TO WORK OFF THE CLOCK BECAUSE HE WAS NOT MEETING OUR HR BUDGET FOR THIS QUARTER; HE TOLD ME HE WOULD MAKE IT UP TO ME NEXT QUARTER; WHAT SHOULD I DO? **A:** This is both a Policy violation and a Laws violation. Your Manager is expected to exemplify our Compliance Mandate, not violate it. In essence you are being asked to work for free. In the future, you could bring a complaint against the Company for wage Laws violations; these circumstances amount to Misconduct on the part of your Manager. Use one of our Reporting Channels to speak up.

## V. CORE VALUE – WE PROMOTE A SAFE WORK ENVIRONMENT:

We promote a safe work environment for our Personnel. Our safety Policies have been developed to safeguard everyone from potential workplace hazards. We must all become familiar with and understand how these Policies apply, for example, to your specific Duties and Responsibilities. Our Personnel should be familiar with, and follow, all our safe workplace guidelines and seek advice if they have any safety question or concern and in all cases promptly report any accident or unsafe condition to Management. For additional guidance, see our HR Policies.

We foster the kind of environment where (at all times) people should feel safe and are treated with courtesy and professionalism. Accordingly, we promote a workplace that is positive, creative, and rewarding. An environment that promotes individual expression, innovation, and achievement. As part of our commitment to safety in the workplace, our Personnel — and any person who works with us — is not permitted to use, possess, or be under the influence of alcohol or illegal drugs during work hours or on Company property.

## VI. CORE VALUE – WE TREAT EVERYONE RESPECTFULLY:

Everyone working at our Company should feel welcomed, supported, and inspired to succeed. We care about, and are concerned for, the health and well-being of our Personnel. Indeed, every one of us should rightfully expect to experience a professional environment free from intimidation and harassment. To promote such an environment, we define harassment broadly and prohibit its many forms. Without limitation, harassment includes offensive remarks, unwelcome advances, requests for sexual favors, inappropriate jokes, or ethnic, racist, or sexual slurs.

We treat everyone with respect and dignity — and we encourage input from everyone on ways to enhance the inclusive and diverse atmosphere of our workplace. Moreover, we promote a workplace that is free from disruptive conduct by anyone. Our respect for people is demonstrated in what we do and how we act towards everyone we encounter in our work. To meet our commitments to one another and to meet our commitments in the marketplace — and to attract, cultivate and retain talented individuals — it is vital to have a work environment built on mutual trust, respect, and the principles embodied in this Code. We must treat everyone well and equitably and we never take advantage of others through manipulation, misrepresentation, or concealment.

**Q:** I RECEIVED AN EMAIL WITH AN OFFENSIVE JOKE, IS THAT HARASSMENT? **A:** Offensive material sent through Company Data and Information Systems ("CDIS") have no place in our workplace (regardless of intended recipient). You should contact our HR or Compliance Function to discuss this matter. Even if your coworker did not intend to be offensive, our Core Value is that we are always respectful and considerate of others.

**NOTE:** Our HR Policies contain further guidance on Sexual Harassment, Harassment, Reporting Channels, and Dispute Resolution. Nonetheless, respectively in the preceding circumstances you also (a) may respond directly to the co-worker, notifying him/her that you found the matter offensive/inappropriate, to stop the behavior in the future, and advise that you will escalate the matter if it continues; and (b) are always free to immediately and clearly communicate to the individual your disinterest in, or offense taken, with regard to any such conduct.

## VII. CORE VALUE – WE PROMOTE EQUAL OPPORTUNITY:

Under our Compliance Mandate, we promote and provide an equal opportunity environment for all Personnel. We prohibit discrimination based on race, color, religion, creed, age, sex, national origin, gender identity or expression, sexual orientation, disability, marital status, veteran or military status, genetics or citizenship status, and any other legally protected status. Accordingly, we base employment decisions only on business needs, skills, experience and relative work performance.

**Q:** WHAT SHOULD I DO IF I BELIEVE I WAS PASSED UP FOR A PROMOTION BECAUSE OF MY AGE? **A:** Our Policies require that employment decisions be made without regard to a candidate's age. If you conclude in good faith that you were treated unfairly, contact the HR or Compliance Function for assistance. Our standard is straightforward, all HR Function related decisions and practices, including recruitment, hiring, placement, promotion, demotion, transfer, training and discipline will be made and administered solely on the basis of the attendant facts; for example, individual experience, merit, performance and other legitimate job-related qualifications. We are proud of our commitment to maintaining a diverse workforce and will not take adverse action or retaliate based on any protected status. Our HR Policies contain further guidance on Equal Employment Opportunity, Diversity, Reporting Channels, and Dispute Resolution.

## VIII. CORE VALUE – WE REPORT QUESTIONS, CONCERNS, AND MISCONDUCT:

It is up to each of us to report questions and concerns, for example, if we believe that any operations or business action or omission or result is unclear. Even more so, it is up to each of us to challenge and report any suspected violation of Laws or the Code, HR Policies, or our Policies; in short, any kind of Misconduct. We expect that everyone will comply with our Affirmative Duty to Report Misconduct Policy.

We must all respect the fact that asking questions and reporting concerns, complaints and Misconduct means that we actively pursue clarity about our choices and actions and promote our Compliance Mandate. This helps everyone to identify problems and gives us all the opportunity to address, investigate and correct not just Compliance Mandate matters. When in doubt about the right choice or potential violation, you are always encouraged to seek out advice or make a report. But, in cases of Misconduct, you are required to do so.

If you become aware of a situation that violates or may violate Laws or the Code, HR Policies, or our Policies, there are two options for making a report ("Reporting Channels"). Depending on your level of comfort, the following Reporting Channels are at your disposal:

**Discuss** the issue with your Manager, Management, or HR or Compliance Function representative.

**Send** an email to our Compliance Email.

For additional guidance, see the HR Policies', among others, Dispute Resolution Policy, Affirmative Duty to Report Misconduct, and Non-Retaliation/Whistle Blower Policy.

We take Code, Laws, and Policy violation (and any kind of Misconduct) reports seriously and we respond to them through follow-up steps including investigation, remediation, and when warranted, corrective action. These steps are designed to address compliance issues, learn from mistakes, and avoid recurrence of problems. Raising a concern regarding any noncompliance reinforces the Company's commitment to act ethically in all aspects of our business and supports our culture of compliance. Your actions do make a difference!

**NOTE:** The Compliance Function oversees and investigates Code, Laws, and Policy violations and most types of Misconduct. The Company's Managers may not conduct any independent investigation regarding any

alleged violation or Misconduct. Nonetheless, everyone involved in an investigation may be asked (and in some cases are required) to cooperate. In all cases, everyone involved will maintain the investigation's confidentiality. Raising a concern regarding any noncompliance reinforces the Company's commitment to act ethically in all aspects of our business and fosters a culture of compliance. Your actions do make a difference!

**Q:** WHAT IF I REPORT A CONCERN BUT NEVER HEARD ANYTHING FURTHER? **A:** Contact the Compliance Function to confirm that the report was received and the issues addressed. Some matters may take longer to investigate and resolve, but generally, you can expect to receive some form of update and final resolution. While all reports will be reviewed and acted upon, some aspects of the investigation or relevant information (e.g., due to privacy, confidentiality, or severity) may not be appropriate to share with the person who reported the Misconduct.

**Q:** WHAT HAPPENS IF I AM UNSATISFIED WITH THE RESOLUTION REGARDING A COMPLAINT I REPORTED? **A:** There may be circumstances when the Compliance Function has investigated and addressed a situation which does not result in a resolution you would have preferred, or where J&J has determined the concern is not contrary to the Code, Policy or Laws. If you continue to have concerns after a resolution has been instituted, please report your concerns back to the Compliance Email or Compliance Function for additional review and response.

**Q:** WHAT IF SOMEONE DELIBERATELY MAKES A FALSE REPORT AGAINST ME? **A:** All investigations are handled confidentially, professionally and objectively. Making an intentional false accusation is a serious matter that may lead to disciplinary action, up to and including, termination of employment.

**Q:** MY MANAGER INSTRUCTED ME TO DO SOMETHING THAT I BELIEVE MAY BE ILLEGAL OR MISCONDUCT BUT I AM AFRAID SHE WILL MAKE MY JOB HARDER IF I REFUSE, SHOULD I STILL REPORT MY CONCERN? **A:** While your Manager is generally the person with whom you will discuss compliance questions and concerns, if their instruction worries you, then contacting the Compliance Function is one option; remember, our Compliance Function retains independent objectivity to investigate and remediate these types of matters. Another option is the Compliance Email. When reporting through the Compliance Email, you will have the assurance of knowing that our Compliance Function is looking into the situation and that, in all cases, any retaliation by your Manager (or anyone else) will not be tolerated.

**NOTE:** We note that the Compliance Email may not be the best Reporting Channel for certain matters, including: (1) wages or benefits questions; (2) general questions, like parking or Facility issues; (4) computer or phone problems; or (5) general personal issues, like calling in sick. For these types of matters, contact the Company's HR Function or the IT Function.

**NOTE:** In some cases (and to assist in the Compliance Function's review) the Reporting Person is encouraged to identify themselves. However, anonymous reports will also be accepted and investigated to the extent possible. Remember that every reasonable effort will be made to treat the identity of anyone reporting a potential violation as confidential (noting that to the extent possible, this is subject to and consistent with the circumstances which may include our business practices).

## IX.  CORE VALUE – WE DO NOT RETALIATE:

We have a zero-tolerance policy against any form of retaliation. No one at our Company may retaliate against anyone who has raised any kind of operational, legal, or ethical concern or that cooperates with any investigation or remediation. Everyone must understand that retaliation is itself Misconduct and is deemed to be a violation of Laws. Nonetheless, retaliation that may result in liability and penalties.

We respect Laws and our Code and therefore no one may seek revenge against, or even try to "get even," with anyone who makes a good faith report, regardless of who is implicated. We take any retaliation allegation very seriously, and if it occurs, it will result in discipline up to and including termination of employment. All acts constituting retaliation must be reported to Management, our HR Function, or our Compliance Function.

**Q:** I CONCLUDE THAT I HAVE EXPERIENCED RETALIATION? **A:** You should report the matter because J&J strictly forbids any retaliation against any person who reports a concern. Reports or complaints made in Good Faith

will not expose you to any sanction, regardless of whether the underlying facts prove to be correct.

NOTE: "Retaliation" can sometimes be subtle or difficult to spot. Some examples include: changes in responsibilities • rudeness or getting the "cold shoulder" • demotion • denial of vacation requests without justification • exclusion from professional development opportunities or special projects. While the preceding examples may not always indicate retaliation, if you are concerned that a negative change you experience at work is connected to having spoken up, we want you to speak up again and use a Reporting Channel.

NOTE: "Good Faith" does not mean being correct about potential Misconduct, it means a reasonable belief that the information you report is true. Our Company's HR Policies have further guidance on our Dispute Resolution Policy, Affirmative Duty to Report Misconduct, and Non-Retaliation/Whistle Blower Policy.

Q: SHOULD I REPORT A CIRCUMSTANCE THAT I BELIEVE IS HARASSMENT FROM MY MANAGER WHEN I FEEL I MAY LOSE MY JOB? A: As a valued member of our Company, you are entitled to work in an environment free from intimidation, harassment, or hostile or offensive behavior. You can use a Reporting Channel but nonetheless, you may contact the HR Function or the Compliance Function to discuss the matter.

## X. CORE VALUE – WE AVOID CONFLICTS OF INTEREST:

Your everyday decisions and acts have an impact on the Company. For this reason, you must make each decision without conflict, objectively, and in the Company's (not your own) best interest.

Generally, a Conflict of Interest exists when a Company employee's private interests interfere with the Company's interests. In short, your working decisions and acts should be based on the Company's needs, rather than (without limitation) your potential personal gain or the interests of your family, friends or any Third Party.

Each of us is expected to use good judgment and avoid situations that can lead to a conflict or even the appearance of a conflict. You must disclose any activity or relationship that may:



COMPETE WITH ANY OF COMPANY'S BUSINESS ACTIVITIES

ENTAIL PROVIDING SERVICES TO A COMPETITOR

INTERFERE WITH YOUR WORK DUTIES AND RESPONSIBILITIES

CONFER AN INAPPROPRIATE PERSONAL BENEFIT TO YOU, YOUR FAMILY, OR ANY THIRD PARTY

If competing actions, interests, or relationships make it difficult to perform your work objectively and effectively, you must disclose the potential Conflict of Interest to Management. Moreover, you must recuse yourself from circumstances where a conflict could impact your judgment.

Any questionable activity should be disclosed to Management as soon as you become aware of it. This is an ongoing responsibility for all J&J Personnel, agents, and contractors. Failure to disclose may result in disciplinary action, up to and including, termination of employment or association.

NOTE: While some circumstances — like (1) acting as a broker, finder, or go-between, any of which may also benefit a Third Party in transactions involving the Company, or (2) receiving improper personal benefits as a result of your position with the Company — constitute a Conflict of Interest and maybe Misconduct, it is impossible to list all the situations that might signal its potential.



An often effective way to determine whether an activity present with or creates a Conflict of Interest is to ask the following questions: (1) Does the activity interfere (or give the appearance of interfering) with the Duties and Responsibilities that you perform at, or owe to, J&J? (2) Are you, a member of your family, or a Third Party receiving an improper advantage because of your position with J&J? (3) Does the activity compete against J&J's interests and may separately violates Laws? If you answered "YES" to any of these questions, the activity may indicate a conflict of interest. You should contact the Company's Management.

Our team members owe J&J a duty to advance the Company's legitimate interests when opportunities arise. Accordingly, our Personnel may not directly or indirectly take for themselves any opportunity that arises through

their position at the Company. Also, our Personnel may not personally profit from any use or diversion of, without limitation, the Company's Assets, including its Company Information.

**Q:** IS IT OK TO HAVE A SECOND JOB (MOONLIGHT)? **A:** Outside employment could pose a Conflict of Interest. You should disclose all relevant facts to your Manager or the Compliance Function. After consultation and the situation has been evaluated, only then will it be determined whether or not the outside activity/job does presents with a conflict in the performance of your Duties and Responsibilities; i.e., it is considered a Conflict of Interest.

**Q:** WHAT IF I OPERATE A SMALL BUSINESS FROM HOME AND MY MANAGER AND THE COMPLIANCE FUNCTION HAVE INFORMED ME THAT THE BUSINESS DOES NOT REPRESENT A CONFLICT OF INTEREST, IS IT OKAY FOR MY CUSTOMERS TO LEAVE MESSAGES ON MY COMPANY VOICEMAIL? **A:** No. Even though there is no Conflict of Interest, you have an obligation to use Company CDIS (including email and voicemail) and other Assets only for Company-related business. Our Personnel are not permitted to use any J&J Asset to support, without limitation, a second job, self-employment venture, or consulting effort.

**NOTE:** When reporting a potential conflict situation, you must truthfully disclose all relevant facts and circumstances (including your identity). Whether approval is granted rests with Management's sole discretion and will depend on Management's assessment of the particular situation. Any approval granted will be limited to the particular facts and circumstances disclosed. The Company retains the right to prohibit, place restrictions on, or require termination of any activity or relationship determined to create an actual or potential conflict of interest. In any case, you have a continuing obligation to report promptly any material changes in the facts and circumstances of an approved conflict situation. The Company must be allowed to reassess any conflict matter on a timely basis.

## XI. CORE VALUE – WE PROTECT OUR COMPANY'S ASSETS AND REPUTATION:

Through our work, we are the caretakers of our Company. It is our responsibility to take all appropriate actions to use and protect J&J's Assets with care and ensure their efficient and proper use for all legitimate business purposes. Indeed, we must all use good judgment to ensure that our Company's Assets are not lost, stolen, misused, or wasted.

Our Company's reputation is one of its greatest Assets. We are each responsible for enhancing and protecting our Company's reputation. For this reason, we are each personally accountable for any views or content published or shared with people outside the Company. Please remember, because our success will always be tied to our reputation, it is up to all of us to bolster and protect it, act with the upmost of care, and always do the right thing.

Always remember that Third Parties routinely provide us with sensitive or confidential information ("Third Party Information") that we use in our operations. We are obligated to protect these Third Party assets as we would J&J's Assets, making sure to use them only for their designated business purposes and to protect them from theft, loss or waste.

**NOTE:** (A) "Assets" include Company "Property" (e.g., Intangible Assets like "Company Information" and Good Will and the Physical Assets that we every day, our office supplies, and our Company Data and Information Systems ("CDIS"), noting that Company Revenue/Funds is deemed to be a Company Asset); (B) "Company Information" includes Confidential Information, Proprietary Information, Company Data & Information ("CDI"), Intellectual Property, Trade Secrets, Official Records, and Know How.

The Company's Assets are to be used only for the Company's legitimate business activities. Personnel may not use Company Assets for personal reasons except as permitted by Company Policies or otherwise approved in advance by their Manager. The misuse or misappropriation of Company Assets, the provision of anything of value to any party not in accordance with Company policy (or other appropriate authorization), and the retention of any benefit that belongs to the Company from any party with whom the Company has business or other dealings are strictly prohibited. Nonetheless, the Company's Assets must not be taken out of our Facility unless necessary to perform Duties and Responsibilities, however, any such action must always be pre-approved by Management and in some cases by the Compliance Function. If an Asset is removed from the Company's Facility for business purposes consistent with our Policy, our Personnel must return the Asset to the Facility as soon as the Asset is no longer needed

for business purposes.

**Q:** CAN I DOWNLOAD INTERNET SOFTWARE USING MY COMPANY ISSUED CDIS? **A:** Accessing the Internet creates the possibility of Malware being introduced to our CDIS/CDI. This can lead to Security Incidents and Security Breaches and generally, the compromise of Confidential Information and Company Information. Separately, this may result in the disruption of CDIS network performance; e.g., system failures. Any Software utilized by Personnel on their Company CDIS Asset must be authorized by a Manager and downloaded/installed only by our IT Function. Company Information/CDI may not be maintained on any personal device unless special circumstances apply, and when advance approval is received from your Manager and the Compliance Function. If you have any question, use one of our Reporting Channels.

**Q:** CAN I USE MY WORK COMPUTER FOR PERSONAL USE? **A:** As a critical corporate Asset, we take steps to minimize risk to our CDIS and safeguard all Company Information. These measures will help maintain confidentiality, provide data integrity, system availability, and User accountability and include the protection of Third-Party Information. While certain job Duties and Responsibilities require Access to the Internet and the use of certain Software, the inappropriate use of the Internet, email, and CDIS/CDI places our Company and others, including Investors, at significant risk. Remember, Company provided CDIS/CDI device for your Use (e.g., desk phones, cell phones, tablets, laptops, desktop computers, iPads, etc.) are important Company Assets and may only be used for Company business.

**NOTE:** Anyone that works with us may not, under any circumstance, use Company CDIS Assets to Transact inappropriate material; e.g., media or web content, without limitation, of an inappropriate nature. Transacting any such material or other inappropriate or discriminatory material via CDIS, is deemed harassment, and will be addressed according to our Compliance Mandate. Personnel violations of Company Acceptable Use or Harassment Policies may lead to disciplinary action up to and including termination. Any CDIS Transaction of content that contains derogatory or inflammatory remarks about any individual's race, age, disability, religion, national origin, physical attributes, or sexual preference is prohibited and can result in disciplinary action that may lead to termination. The preceding prohibitions apply equally to any other electronic equipment, including personal devices owned by the employee, if they are used (or the inappropriate material is Transacted) on Company time.

## XII. CORE VALUE – WE COMPETENTLY TRANSACT CDI & THE INTERNET:

Access to the Internet and Company Data and Information Systems ("CDIS") may be made available to Personnel for the purpose of carrying out the Company's legitimate business and incidental use. In the context of social media where interactions are quick and dynamic and can become highly visible, careless communications can pose a significant risk to our Company's reputation.

As part of this Core Value, you must be mindful and appropriate in your communications and always protect all Company Information, Third Party Information, Confidential Information, and our reputation. Particularly, you must protect Confidential Information and abide by all J&J Core Values, Policies, and Laws online and offline (even when, for example, if a relevant webpage, profile, or forum in which you are posting is listed as "private" or "closed"). We are all responsible for employing careful strategies in all communications and protecting the Company.



ALWAYS REMEMBER: (1) Only authorized individuals may speak on J&J's behalf; (2) Never post anything on the Internet or otherwise that is inconsistent with our Core Values or Policies; (3) Use of social media on CDIS during working time is permitted if the use is for pre-approved Company business (you must disclose the nature of your anticipated business use and the content of your communication with Management and obtain approval prior to each such use); (4) Respect copyright and similar Laws and use Company Information only in compliance with Laws; (5) You may not create a blog or online group related to Company (not including blogs/discussions involving wages or other terms and conditions of employment, or protected concerted activity) without Management's advance approval; (6) Do not publish Company Information without approval or authority; (7) Do not malign our Company, its Personnel or contractors or any Third Party on social media; (8) Any public recommendation or endorsement about J&J's operations on any personal social media site or digital platform must also include a Disclosure that you work for J&J in the post itself (not simply in your bio or

profile). Using a Disclosure in your bio or profile is recommended, but not sufficient. In all cases, you must ensure that any statements about our Company are truthful and substantiated and do not violate any Core Value; (9) If you become aware that a fellow employee has posted something you believe may violate our Core Values, this Code, Laws, or any Policy, report it to, among others, our Compliance Function; (10) Social media is not a substitute to report a concern about the Company, a worker or any other concern which should be reported to, for example, our HR or Compliance Function under our Reporting Channels; (11) Social media is prime ground for hackers to collect information on you that can be used to target the Company. Be careful of what you share online; (12) If you leave the Company, please update your employment information on your profiles/social media.

**Q:** I JUST READ A BLOG POST THAT UNFAIRLY CRITIZES THE COMPANY AND I KNOW IT IS NOT TRUE. SHOULD I POST A REPLY? **A:** You may not respond to any information posted publicly unless you are authorized to speak on the Company's behalf.  Report the matter to your Manager or the Compliance Function.

## XIII. CORE VALUE – WE SECURE OUR COMPANY INFORMATION:

Each of us must understand that our Company Information is a valuable commodity. It is our Core Value that, both inside and outside of the Company, each of us is required to safeguard the confidentiality of information about our business, operations, Intellectual Property, Confidential Information, Proprietary Information, Trade Secrets, Goodwill, and any information that relates to our Investors, Vendors, Personnel, agents, contractors, business relationships and any other Third Party (i.e., the preceding is deemed to constitute "Company Information").

It is your duty to take precautions to avoid improper, inappropriate, illegal, or inadvertent disclosures of Company Information in whatever electronic or physical form it may exist. Generally, you may only share Company Information with Personnel who have a legitimate business "need to know" and only share the minimum necessary. Of course, you may never give Company Information to our competitors, suppliers or outside contractors or other Third Parties without proper authorization. We all must realize the sensitive nature of Company Information and be committed to maintaining its confidentiality both through our words and our actions.

**Q:** I AM LEAVING TO WORK FOR ANOTHER COMPANY. DO MY CONFIDENTIALITY OBLIGATIONS CONTINUE AFTER I LEAVE? **A:** Yes, your obligation to protect Confidential Information continues. When your employment ends, you must not use, retain, or disclose Confidential Information you obtained or learned while forging with us even if you created it.

**NOTE:** Company Information includes "Confidential Information" or any other information which might be of use to competitors (or disclosure of which may be harmful to the Company or any Third Party) including the following sources and types of information, documents, data or materials: (A) Company's confidential and proprietary information and trade secrets that cannot be obtained readily by Third Parties from outside sources including business models, authorization forms, business relationship list(s) or information, Referral Sources and their business relations, (B) legal opinions, (C) Company marketing materials, research or strategies, (D) concepts, ideas, plans, strategies, analyses, and information related to past, present, or anticipated business, agreements, corporate governing documents, or addenda, supplements or resolutions thereto, (E) confidential or proprietary information regarding Vendors or contracts as between Company and Third Parties, (F) expenses or financial information including pricing, revenue and profit projections, revenue and profits actually generated, (G) technical or other confidential information regarding the Company's business, processes, methods of operation, or procurement procedures, (H) information regarding the Company's Personnel, HR Policies, Policies, procedures, or Compliance Program, (I) information regarding members, partners, owners, or individuals or entities that the Company does or may seek to contract with or that are involved in any way with the Company's business, (J) databases, commercial agreements and details of ongoing commercial negotiations, development tools or techniques, training procedures, training techniques, or training manuals, or (K) confidential information and other business information disclosed to the employee by the Company, either directly or indirectly, in writing, orally, or by drawings or observation.

## XIV. CORE VALUE – WE SECURE EVERYONE'S PRIVACY AND INFORMATION SECURITY:

When a Third Party provides information to us, we have a responsibility to safeguard it and use it appropriately.

We may only share the information with others who have a business need to know it and are authorized to receive it. Accordingly, it is our Core Value that, both inside and outside of the Company, each of us is required to strictly safeguard the confidentiality of all Third Party Information. It is your duty to take precautions to avoid improper, illegal, or inadvertent disclosures of Third Party Information in whatever electronic or physical form it may be found.

Generally, you may only Transact Third Party Information with Personnel who have a legitimate business "need to know" and only share the "minimum necessary." Of course, you may never give Third Party Information or any Confidential Information to any person or entity without proper authorization. We all must realize the sensitive nature of Confidential and Third Party Information and be committed to maintaining its confidentiality both in our words and our actions.  We do not sell or obtain any type of Third Party personal, confidential or private information without proper authorization and we protect everyone's personal and sensitive information from unauthorized disclosure and use.

## XV. CORE VALUE – WE COMPLY WITH LAWS AND POLICIES:

Every J&J employee and contractor is expected to adhere to all Laws and our Code, Policies, HR Policies and Compliance Program. This is a fundamental expectation and condition of employment at or association with our Company. Our Policies, HR Policies and Compliance Program cover important aspects of our operations, including corporate compliance, human resources, and Company Data and Information Systems ("CDIS"). They are all in place to help ensure that we comply with Laws governing our business and its operations. They enable us to detect, correct, and prevent non-compliant activities including Misconduct. Please remember, meeting our commitments to the marketplace and our success are always tied to our compliance with Laws and our Policies. We act with the upmost of care and we always do the right thing.

## XVI. CORE VALUE – WE ACCURATELY TRANSACT OUR AND OUR INVESTORS' RECORDS:

Our Company measures our business operations accurately and without omissions. Accordingly, our Company's public statements, financial records, internal and external communications, and all other documentation (collectively, each such memorialization is considered to be a Company "Official Record") must accurately reflect the facts, substance, and context of our actions. Therefore, when we measure or describe our Company's successes, failures, and routine operations, all facts must be accurately represented in our Official Records with sufficient substance and context so that internally we (and externally any Third Party, including our Investors and any Government) may understand the true nature of our activities or transactions.

In short, our Company's Official Records must conform to all applicable industry, accounting and professional standards, Laws, as well as our Company's Policies and procedures. For example, when we report or transmit Official Records — such as (1) investment or payment information, or (2) regarding any item of value provided to Third Parties — the information must be complete and accurate.

Our Company is committed to ensuring that we provide accurate information in our Official Records to allow Governments and, as relevant, Investors and any other Third Party to make informed decisions. Our Company's high standard for documentation also extends to the exacting level of detail that we expect from any Third Party, including any Referral Source.

 **NOTE:** Collectively or individually, any Company Information memorialization (and whether in physical or electronic form) is deemed under our Compliance Mandate to be a Company "Official Record."

Generally, our Personnel must ensure that our financial records and accounts — as well as supporting documentation for which they are responsible — accurately and completely reflect J&J's actual operations, transactions and other activities. For this reason, J&J has a strict zero-tolerance policy against any form of falsification or deception in connection with anyone's Transaction of Company Official Records or as may be otherwise relevant to the Company's books, records, accounts or entries therein and whether by alteration, destruction, omission, or false or misleading recording.

Nonetheless, our transactions and other activities must be recorded as necessary and appropriate to permit

preparation of financial statements in conformity with generally accepted accounting principles and other applicable rules, regulations and criteria, and to ensure full accountability for all Company Assets, liabilities and transactions. All Company Assets, liabilities, receipts and disbursements must be accurately and completely recorded in the regular books, records and accounts of the Company. No undisclosed or unrecorded funds, Assets or accounts may be created or maintained, nor any undisclosed or unrecorded payments received or made, regardless of the purpose.

 All payments made on Company's behalf must be in accordance with applicable legal and regulatory requirements and the Code and other Company Policies and accompanied by appropriate and accurate supporting documentation. In addition, no payment on J&J's behalf may be approved or made with the intention, understanding or knowledge that any part of the payment is to be used for any purpose that is inconsistent with the purpose(s) described in the supporting documentation. All Personnel with responsibility for preparing and maintaining J&J's financial records must strictly comply with the Company's internal accounting and financial Policies.

## XVII. CORE VALUE – WE PROTECT AND RETAIN OUR OFFICIAL RECORDS:

Each of us is responsible for the integrity and accuracy of our Company's Official Records. This is required not only to comply with Government regulatory and legal requirements but also to ensure Official Records are available, for example, to support our business practices at any time. Accordingly, our Official Records must be maintained and stored in a consistent and reliable manner so as to comply with the requirements of Laws as well as to provide for effective operations.

No one may alter or falsify information on any Official Record. Records must never be destroyed to deny any Third Party, including Governments, any information that, for example, may be relevant to a Government Inquiry or other function. Similarly, Official Records relevant to any potential or pending administrative, civil or criminal proceeding or matter may not be destroyed to deny any relevant Third-Party's rightful request for information. "Inquiry" is read to be inclusive of any judicial or other Government proceeding or process ("Process").

Official Records are maintained in accordance with Laws and our Document Retention Policy, which includes specific retention schedules. Official Records include "Company Data and Information" ("CDI") and paper documents (such as letters and Investment documentation) and any of which may be found on our CDIS or any other medium that contains information about the Company or its business activities.

It is paramount to retain and destroy Official Records only according to our Document Retention Policy. No one may remove or destroy records prior a specified date without first obtaining permission as outlined in the Company's Policy. Under no circumstance may any J&J employee Transact the information of a colleague or any other individual or entity's information to personally benefit themselves (e.g., perpetrate identity theft). If you believe or know that any sort of improper or unauthorized Transaction of any Official Records or any other Company Information has occurred, immediately report it.

NOTE: "Company Data & Information" ("CDI") is a Company Asset and means all external and internal electronic data and information, including without limitation, files, documents, e-mails, communications, messages, memoranda, or any other transmissions of data or information including any other Company Information whether Transacted directly or indirectly by, from, or through CDIS or otherwise Transacted by any Company employee or, as relevant to Company, any Third Party.  ALL CDI is deemed to constitute Official Records.

## XVIII. CORE VALUE – WE TRANSPARENTLY COOPERATE WITH THE GOVERNMENT:

In relation to any part of our operations, federal and state Government agencies may conduct, among others, inquiries or investigations (an "Inquiry"). Regardless of the reason for the Inquiry, we are respectful when working with Government representatives, we respond with openness and accurate information, and we cooperate with all legal requests.

Our Core Value in responding to any Inquiry is that we never conceal, destroy, or alter information (in whatever form it may exist), we do not directly or indirectly obstruct or delay, and we never lie or make misleading statements. If you have any doubt about the accuracy, responsiveness, or propriety of the information that you may be producing

regarding an Inquiry, check with our Compliance Function or, if the Company has engaged legal counsel on the matter, do not produce anything inconsistent with their instruction. Of course, you may not attempt to persuade or assist a Company employee, or any other person, to violate any aspect of our Inquiry Core Value.

Finally, you must honor all "Holds" that are placed on our normal document destruction procedures when an Inquiry or Process is pending. You must maintain the "Hold" until you are instructed in writing by the Compliance Function or its designee that it can be released. Any act violating our Inquiry Core Value will result in disciplinary action, up to and including termination.

If you are approached by any person identifying as a Government representative, contact our Compliance Function before responding or providing any information. Our Compliance Function will assist you in following proper procedures for cooperating with any Inquiry. You should not feel pressured to talk to a Government official or investigator without first contacting our Compliance Function. Generally, our Compliance Function will consult with any employee who is contacted in connection with any Inquiry. Request the official or investigator's contact information and inform her that you need to contact the Compliance Function and that someone from the Company will get back to them as soon as possible.

NOTE: No part of the preceding (or any Company Policy) may be construed to prohibit or restrict anyone from truthfully reporting instances of Misconduct or any illegal activity of any nature to any Government (or law enforcement function) separately or before reporting under the Company's Affirmative Duty to Report Misconduct Policy.

## XIX. CORE VALUE – WE PERFOM OUR DUE DILIGENCE IN FINANCIAL OPERATIONS:

Our Company and its affiliates are committed to complying with all anti money laundering Laws. For this reason, we have established our Anti-Money Laundering ("AML") policy. The objective of the AML Policy is to ensure that money laundering and terrorism financing risks identified by J&J are appropriately reported, addressed and mitigated. In short, as part of our Compliance Mandate, our AML Policy is meant to protect our reputation and avoid even the perception of involvement in the illegal receipt of funds from Investors or otherwise.

The AML Policy will be implemented as a system of internal controls designed to facilitate our Company's due diligence, oversight and audits relevant to applicable AML Laws and as part of our Investor documentation.  As part of our internal controls, we implement:



(1) Written internal control documentation forms and systems of internal controls designed to facilitate ongoing compliance with applicable AML Laws; (2) An Investor due diligence documentation system that incorporates individual and entity identification and verification/know your customer principles; (3) An AML Risk Assessment Policy and enhanced due diligence on any Investor that may be assessed as higher risk; (4) Monitoring and reporting of suspicious activity to appropriate regulatory authorities or as further advised by our legal counsel; (5) AML training for appropriate Personnel; and (6) proper record keeping in accordance with required or advisable legal and business standards.

NOTE: The Company may revise its AML Policy from time to time to address the marketplace and any technology advancements (e.g., blockchain technology) and as necessary to ensure that our due diligence practices remain effective and current.  In accordance with appropriate industry standards, J&J will remain vigilant in its AML Compliance Mandate.

Q: WHAT IS DUE DILIGENCE AS RELATED TO OUR INVESTORS? A: As it relates to our Investors, Due Diligence refers to our activities in ensuring that we certify our Investors. In short, that our Investors are who they say they are and that any funds invested are Bona Fide/consistent with AML Laws. This standard is primarily incorporated into our subscription agreements and investor questionnaires.  In practice, this means that, among other factors, we properly identify our Investors through their provision of proper documentation, among other certifications. Moreover, we secure our prospective Investor's information and assign a compliance assessment to the Investor based on our AML compliance standard; i.e., when potential AML Red Flags are identified.

**Q:** WHAT DO WE DO WITH ANY AML RED FLAG CIRCUMSTANCE? **A:** In AML Red Flag circumstances, we act and perform further due diligence before a potential relationship with an Investor inures to the Company. For example, we seek additional identification and source of funds or source of wealth information from our potential Investors. In all cases that present with AML Red Flag circumstances, we will subject our Investor to ongoing monitoring procedures.

**NOTE:** As part of our ALM Red Flag Compliance Mandate, we remain vigilant of the potential of Investor "hidden beneficial owners." For example, relevant to AML Red Flag circumstances, an individual or entity may rely on a variety of structures to hide the beneficial owner of funds or assets. Specifically, we note that a potential investor not meeting our AML Compliance Mandate may attempt to launder money using one of a number of vehicles designed to obscure or disguise the beneficial ownership of assets or Investment Principal transferred to the Company. In these types of circumstances, we evaluate the vehicle's principals, obtain and review financial statements or audits, verify the sources of funds or wealth, evaluate contributors or grantors, and conduct reference checks.



THE FOLLOWING CONSTITUTE BENEFICIAL OWNER AML RED FLAGS AND SHOULD BE IDENTIFIED AS RELATED TO ANY POTENTIAL OR RECURRING INVESTOR:

(1) TRUSTS; noting that assets placed in a trust may be paid out without justification of wealth or funds sourcing; (2) SHELL COMPANY; an entity that does not present with active business operations or assets; set up to achieve specific objectives; e.g., reducing tax liabilities or legal risks, or raising capital. Oftentimes used to launder money, circumvent sanctions, or hide beneficial ownership from law enforcement; (3) FRONT COMPANY; generally, a functioning company presenting with legitimate business characteristics, but serving to disguise and obscure illicit financial activity, including laundering funds (e.g., double or multiple invoicing as a form to repatriate offshore funds); (4) NON PROFITS/CHARITIES; noting that these may be cash driven organizations; (5) BEARER BONDS; noting that possession establishes ownership; or (6) BLOCKCHAIN TECHNOLOGY.

**Q:** WHAT SHOULD I DO IF, AS PART OF OUR SUBSCRIPTION DOCUMENTATION, AN INVESTOR SETS OUT A CAYMAN ISLANDS ENTITY? **A:** In AML Red Flag circumstances, we act and perform due diligence before any further relationship with an Investor inures to the Company. Our Due Diligence activities will include requesting all incorporation documents, bank statements, or recently filed business accounts, among other verification steps. In general, you can always ask for documentation as to a source of funds or wealth (i.e., confirming the source such as a sale of a house, the sale of shares, receipt of a personal injury award, a bequest from an estate or a win from gambling activities).

**Q:** AN INVESTOR WANTS TO INVEST IN BEARER BONDS OR CASH, WHAT SHOULD I DO? **A:** This is an AML Red Flag circumstances; our Investors may not invest with bearer bonds. Report this to our Compliance Function.

**Q:** I HAVE REVIEWED A POTENTIAL INVESTOR'S DOCUMENTATION AND IT IS NOT AS DETAILED AS REQUIRED, WHAT SHOULD I DO? **A:** There may be circumstances that may not present with AML Red Flags because some people do not retain detailed records; that is, slack documentation does not always mean that an AML Red Flag is afoot. Look at the totality of the circumstances and if there is any other information that makes you suspicious. Memorialize these facts and seek advice from Management.

## XX. CORE VALUE – WE PROHIBIT IMPROPER OR ILLEGAL INDUCEMENTS:

Everyone we encounter should be able to rely on us without concern that their or our independent judgment has been improperly influenced by improper or illegal incentives. Accordingly, it is never permissible to offer or provide anything that directly or indirectly benefits any Third Party, including any Referral Source, any of which is intended to secure business or a business advantage for our Company. Our general Compliance Mandate is that anything we may offer any Third Party must be pre-approved by our Compliance Function in conjunction with legal counsel approval.

Similarly, it is not acceptable to offer or provide anything of value as a "reward" for any past or existing Third

Party relationship with our Company. Everyone at our Company must proactively manage Third Party relationships (including Investors, Referral Sources, Vendors, suppliers, marketers, distributors, consultants, or promoters) to ensure that, for example, services performed on our Company's behalf are consistent with our Policies and Laws.

We enter into and manage Third Party relationships mindfully and with due diligence. If we are the recipient of any Third Party relationship service, we only pay Fair Market Value and we always accurately document payments to Third Parties.  If a Third Party Referral Source presents with any unethical or illegal circumstance, we will not do business with such Third Party.  In short, we will only do business with a Referral Source which relationship meets all ethics, operations, and licensing matters germane to, or that governs, the Referral Source.

Nonetheless, our Company reimburses our Personnel for all pre-approved, reasonable, and necessary business expenses. Bona Fide business expenses are acceptable. These include legitimate expenses during the normal course of business. These expenses must be within reason and on par with general practices and local customs. If you are aware of any inappropriate expenditures that are being allocated, gifted, swapped, charged, invoiced, or billed to Company or regarding any Company business activity, this may constitute Misconduct and you must report it to Management.

A.   GIFTS. The offering, giving or receiving of Gifts (see further guidance later in this Code) may be occasionally encountered in our operations. However, there is a fine line that should not be crossed, and it is not always easy to identify. While giving a Third Party Referral Source/referral business relationship a weeklong vacation to a tropical island (which Gift is not pre-approved by the Company) may constitute Misconduct, the offering, giving or receiving of other "Gifts" can also be a violation of our Code — or in some cases, Laws — and often, without our Personnel even realizing that they have committed a violation.

Our Policy at J&J, we do not directly or indirectly seek, accept, offer, promise, or give anything of value from or to any person or entity as a condition or result of doing business with our Company. Of course, Gifts in money or cash equivalent in any amount are prohibited in all circumstances. The occasional exchange of Gifts either of nominal value with employees of other organizations may be appropriate unless the recipient's employer forbids the practice. Remember, any courtesy you extend must comply with our Compliance Mandate and the policies of the recipient's organization. Anyone that we do business with should be informed of, and understand, our Policy as well.

A.   J&J EMPLOYEE GIFTS. Our Company may provide a Gift reward or recognition (e.g., a Gift card or bonus) to an employee for exemplary service. Gifts provided to Personnel are considered taxable income and must be reported as such. Contact our HR Function for guidance.

B.   VENDORS, SUPPLIERS, BROKERS, AGENTS. J&J employees may accept occasional, unsolicited, and reasonable business meals from actual or prospective suppliers of goods and services, agents, brokers, or other Third Parties (e.g., "Vendors") if the following requirements are met: (1) The Vendor or prospective Vendor providing the meal or entertainment attends the event with the Company employee; (2) The value of the meal or entertainment is modest as judged by local standards; (3) The venue is conducive to informational communication and includes or is contiguous to legitimate business discussions. Of course, the facts and circumstances relevant to the preceding must be transparently disclosed to Management and otherwise properly accounted for in our Official Records.

Q: MAY I ACCEPT A GIFT FROM A VENDOR/SUPPLIER? A: This depends on the nature and value of the Gift. If it is expensive or not considered modest, you may not accept the Gift. You must return the Gift to the Vendor explaining that the Company's policy does not permit expensive Gifts. If the amount of the Gift is modest and considered reasonable, it may be accepted. If the nature of the Gift permits (e.g., box of cookies), the best approach is to share it with your co-workers. Transparency is the key element in either circumstance. That is, notify Management and if you have further questions, contact the Compliance Function.

Q: WHAT SHOULD I DO IF I RECEIVE A GIFT THAT IS KNOW IS INAPPROPRIATE? A: Return the Gift with a polite explanation that J&J policy prohibits you from accepting such generosity noting that this circumstance may present with a Conflict of Interest otherwise prohibited. In some circumstances, other alternatives may be considered, such as displaying the Gift in a public area or donating it to a charity. In any case, you should consult with Management or use a Reporting Channel to inform the Compliance Function.

**NOTE:** Travel or lodging in connection with a meal or entertainment sponsored by a Vendor or prospective Vendor is strictly forbidden. The expenses for business meals and entertainment for any employee's spouse, partner, significant other, or any other guest of the employee are similarly not allowed.

C.   POTENTIAL REFERRAL SOURCES AS MAY BE RELEVANT TO OUR OPERATIONS. Our Company is committed to following the highest ethical standards and complying with Laws. Any Gift or token of appreciation involving Third Parties who are in a position to (directly or indirectly) enter into any agreement with the Company or otherwise refer any business to the Company — must be undertaken in accordance with all Laws and our Policies.

Consistent with our Policies, and as approved by our Management or Compliance Function, J&J Personnel may conduct development, promotional, and other business meetings or conferences involving Third Parties to discuss J&J and its operations. Generally, any such setting should be conducive to effective transmission of knowledge. In appropriate circumstances, modest meals in connection with Compliance Function approved programs may be provided if same are subordinate in time and focus to the program and similarly, regarding reasonable travel and lodging matters.



We conservatively respect the fact that our Company's business interactions with Third Parties may involve the presentation of business information and that such exchanges may be productive and efficient when conducted in conjunction with meals. Accordingly, modest meals may be provided as an occasional business courtesy, but always subject to reporting to the Compliance Function, this Code's guidance on Gifts, and pursuant to Management's pre-approval.

Q: MAY WE PROVIDE A CATERED LUNCH DURING A MEETING WITH A MAJOR J&J THIRD PARTY RELATIONSHIP, e.g., A VENDOR? A: It is acceptable to provide lunch if offered consistent with the letter and spirit of our Gift policy and if it otherwise complies with the value guidelines for what is considered acceptable.

Q: MAY I TAKE A THIRD PARTY OUT FOR A BUSINESS MEAL? A: Generally, it is permissible to take a Third Party for a business meal. Always check with Management or the Compliance Function for policy requirements and monetary limits. If you have any question, you are expected to report under the Reporting Channels.

Q: MAY I ACCEPT A VENDOR'S LUNCH OFFER OR SOCIAL OUTING INVITATION? A: Personnel should decline even the smallest of Gifts. If declining would be perceived as impolite and may cause harm to a business relationship, you may accept the Gift subject to Company approval and in all cases you must nonetheless report same under our Reporting Channels.

Q: MAY I ACCEPT EXPENSE REIMBURSEMENT IF I SPEAK TO A GROUP OR AT A PROFESSIONAL MEETING? A: You should obtain pre-approval from your Manager for related engagement expenses. J&J policy requires that all Third Party relationships be treated fairly and impartially. Therefore, you may not accept anything from a Third Party relationship that could suggest even the appearance of favoritism or Improper Remuneration. Normally, it is inappropriate to accept payment of expenses from any Third Party to speak, for example, at conferences. On the other hand, it may be permissible to accept reimbursement for expenses from associations and professional groups because they are not Vendors and would not be using the speaking invitation to gain favorable treatment.

## XXI. CORE VALUE – WE PROHIBIT CONFLICT, IMPROPER, AND ILLEGAL REMUNERATION:

Our daily work decisions must be based on an impartial and objective assessment of each situation, without being influenced by Gifts that may have the effect of, directly or indirectly, impairing our Personnel's or any Third Party's independent judgment or worse, violate Laws.

Accordingly, J&J Personnel may not accept (or offer) any Gift that compromises (or might be perceived to compromise) our, our representative's, or a recipient's ability to make an objective and fair business decision or, in any case, that might otherwise be perceived by anyone as unfairly influencing a business transaction. The preceding standard applies whether or not the act is contrary to Laws.

Every Third Party with whom we interact (including existing or potential Investors, Third Parties, Vendors, or any Government representative) must make objective and impartial decisions without inappropriate interference.

Accordingly, in or through any business interaction with any Third Party and anywhere, it is our Core Value that J&J representatives may not offer, give or receive any conflicted, improper, or illegal remuneration.

In all business interactions we must use the following criteria to guide our judgment:

 If a gift, fee, loan, service, entertainment, favor, payment, commission, remuneration or, without limitation, any other thing of value (collectively, a "Gift") is received, provided or offered, directly or indirectly, in order to obtain favorable treatment or other improper advantage in a business transaction or germane to any referral of Investors, directly or indirectly applicable to Company or any Third Party, then it is deemed under our Compliance Program to be conflict, improper or illegal remuneration (collectively, "Improper Remuneration"). J&J has a zero-tolerance policy against offering, providing, or accepting Improper Remuneration.

NOTE: Our Compliance Mandate deems a "commission" to constitute a Gift.  If unapproved by the Company, any such commission is deemed to be Improper Remuneration and is strictly prohibited.  Discuss this matter with our Compliance Function.

 GUIDANCE ON THE USE OF COMPANY ASSETS (INCLUDING COMPANY REVENUE/FUNDS) FOR BUSINESS GIFTS TO NON-REFERRAL SOURCES. Gifts may be extended to Non-Referral Source Third Parties on Company expense provided that such Gift strictly complies with the following criteria, that the Gift is: (1) reasonable and not excessive, in nature, frequency or value; (2) made in connection with the conduct of legitimate business or other Company activity; (3) in accordance with all Laws, customary business practice in the governing jurisdiction of both the Company and the Referral Source and in addition consistent with all ethics, operations, and licensing matters germane to or that governs the Referral Source, and Company's Policies; (4) properly pre-authorized and properly reported and recorded; and (5) would not embarrass the Company should the Gift be made public or in any case be construed as Improper Remuneration; (6) does not involve the giving of cash or cash equivalents such (e.g., gift certificates).

GUIDANCE ON THE USE OF COMPANY ASSETS (INCLUDING COMPANY REVENUE/FUNDS) FOR BUSINESS GIFTS TO POTENTIAL REFERRAL SOURCES. Gifts may be extended to potential Referral Sources on Company expense provided that the value of the Gift is otherwise consistent with all Laws, customary business practices, and Company's Policies. Any Gift cost germane to Referral Sources must be reported and strictly accounted for in Company's accounting, financial, and other Official Records. Any Gift to a potential Referral Source must be pre-approved by the Compliance Function.

NOTE: (1) cash or cash equivalents such (e.g., gift certificates) to Referral Sources are prohibited under all circumstances; (2) non-cash Gifts to Referral Sources are prohibited unless approved by the Compliance Function; (3) Gifts to Referral Sources may only be made in connection with the conduct of legitimate business or other activities for or on behalf of the Company; (4) Gifts to Referral Sources must be in accordance with Laws, customary business practices, J&J's Policies, and in addition, all Laws or regulatory standards governing the Referral Source/consistent with all ethics, operations, and licensing matters germane to, or that governs, the Referral Source.

GUIDANCE ON THE USE OF COMPANY ASSETS (INCLUDING COMPANY REVENUE/FUNDS) FOR BUSINESS GIFTS TO OR FROM GOVERNMENT REPRESENTATIVES. (1) J&J Personnel may not offer any Gift — no matter how small the value — to any Government representative in the course of conducting J&J business; and (B) except as otherwise approved by Company's Management, the Company will make no corporate political contributions (even where such contributions may be legal) but encourages Personnel to participate in community affairs and to exercise citizenship responsibilities.

NOTE: In addition to the preceding guidance, always consider the following questions and seek guidance from our Compliance Function if your action or response is not clear: (1) Is this interaction with a Government representative? (2) Is the benefit of minimal or token value, does it occur infrequently? (3) Does any exchange impose or create any perception of obligation on either party? (4) Does the exchange create obligation or embarrassment

on the giver or recipient? (6) Is the exchange common to business relationships? (7) Will it stand up to any public scrutiny?

## XXII. CORE VALUE – WE COMPLY WITH THE FTC IN THE MARKETPLACE:

To the extent that we communicate in the marketplace and provide Third Parties Company Information and materials, we recognize that SEC and consumer protection laws apply, for example, to in person or online operations. We understand that the internet sphere is never static, accordingly, we conduct our communications in appreciation of emerging online or technology developments and always in compliance with Laws. In short, we understand that SEC and consumer protection Laws apply to all mediums, including online platforms like social media. And we always remember that prohibitions on "unfair or deceptive acts or practices" includes online communications, but moreover, extends to all marketing and sales activity.

Accordingly, whether online or otherwise, our marketing and sales Core Value is that our Company will act consistent with all Laws. This means that we compete in the marketplace free of deception and unfair practices. We do not communicate in a manner that confuses Third Parties, including Investors. For these reasons, our Company will only publish truthful communications and incorporate such disclosures, qualifiers, and limitations ("Disclosures") that may be required or advisable. All Disclosures will be "Clear and Conspicuous."

Generally, we do not "bury" Disclosures. We prominently display our Disclosures so that they become unavoidable, including paying attention to the size, font, color, and relative relationship to the communication generally – that is, we review the communication as a whole and determine whether the Disclosure is sufficiently effective in consideration of other communications components, like text type and size, links, sounds or graphics, among others, and any of which may serve as a detractor to any Third Party.

A. "CLEAR AND CONSPICUOUS." To be Clear and Conspicuous, we are mindful that our Disclosures be consistently placed in proximity to 'triggering' express or implied claims (we do not hide or minimize our Disclosures).

 WE CONSIDER THESE FACTORS: (1) Disclosures to an express or implied claim will be presented in proximity to the claim; (2) the Disclosure will be prominent and unavoidable; (3) whether any part of our communication is deficient considering the communication as a whole and whether the communication distracts from any Disclosure; (4) whether a Disclosure should be repeated in a communication and duplicated in other locations of our online or other presence; and (5) whether our Disclosures are adequately understood by the intended recipient; e.g., is the Disclosure of such low volume or presented as such a speed so as to lessen its intended impact on the listener.

 NOTE: A Disclosure cannot "cure" a false express or implied claim. It can be used to clarify, but not contradict a claim in a communication.

 FOR A DISCLOSURE TO BE CLEAR AND CONSPICIOUS IN A COMMUNCATION IT MEANS THAT: (1) we physically place the Disclosure close to the triggering claim; (2) we understand how varied platforms or devices utilized by consumers may work against our Disclosures; and (3) if a Disclosure is ever space-constrained, we will seek expert and legal advice germane to the propriety of linking such Disclosure to a separate communication, if any — noting that in such circumstances when we use a hyperlink to a Disclosure, the link shall be obvious and consistent with the Clear and Conspicuous standard.

 NOTE: A Third Party should never have to search or scroll to access Disclosures. When scrolling is unavoidable, we will consult with legal experts and we will use visual or textual cues to direct and encourage the reader to find Disclosures. As part of our effort, we will seek to be informed regarding such behavior and technology matters relevant to consumer access and utilization; for example, where does the consumer's attention get drawn to and what do consumers tend to ignore.

 If a Disclosure is necessary for a communication to be fair, not deceptive, and consistent with Laws and it is impossible to make a Disclosure "Clear and Conspicuous," then we will not publish the communication and will not allow a Third Party to do so on our behalf. If a communication platform or

medium is not conducive to "Clear and Conspicuous" Disclosures, then we will not use that platform or medium.

We take our communications Disclosure duties as paramount to our operations. We know that Clear and Conspicuous Disclosures in our communications benefit Third Parties including our Investors. Meeting these standards bolsters confidence, benefits our Company, and keeps us compliant with Laws.

B. "TESTIMONIALS AND ENDORSEMENTS." The FTC Act regulates endorsements (e.g., generally industry experts) and testimonials (e.g., generally Third Parties) in any platform or medium through which we communicate. In all contexts, we are subject to liability for: (1) false or unsubstantiated claims made through T&E's, or (2) failing to disclose "Material Connections." If we have a "Material Connection" to the source of any T&E communication — whether such T&E was created (a) by Personnel, or (b) any Third Party, and by whomever or however communicated — such communication will disclose the Material Connection consistent with Laws and our Code and we will ensure that the relevant individual or entity endorser likewise complies. These standards apply to any person which may communicate any aspect of our operations to a Third Party, but nonetheless, may never otherwise violate Laws (including as germane to the provision of any investment or financial advice, which is strictly prohibited).

 NOTE: When a significant minority of Third Parties do not understand a Material Connection between J&J and any person that communicates with such Third Party in any direct or indirect way, a Clear and Conspicuous Disclosure must be implemented.  It is crucial to remind everyone that no one except our Company officers may in any way communicate with Investors and that we do not and will never act or otherwise serve as investment or financial counselors for anyone.  If a Third Party so communicates in violation of our Core Values, it shall be deemed to be contrary to Laws and it must be reported.

NOTE: Remuneration can take many forms. It can be in the form of any Gift or other benefit, including, privileges, special access, prizes, or any other type of "freebie."

## XXIII. CORE VALUE — WE PROMOTE FAIR TRADE AND ENTERPRISE:

In the course of our business operations, we maintain a level playing field. This means that we promote principles of fair and open marketplace dealings and communications. We know that any unfair advantage in our business operations translates to negative disruptions to competition and lead to negative consequences, for example, to our reputation.

Accordingly, it our policy that business decisions — including determining prices, pricing policies, terms, the markets or lines of business to compete in and the Vendors, supplies or any Third Party with whom J&J does business — be made on an independent basis, considering all relevant factors, including the Company's costs and profit objectives, prevailing market conditions, competitive prices and other relevant factors and information, and always in compliance with all Laws.

We will not: (A) enter into agreements or other understandings with industry competitors to fix terms of services or prices; (B) boycott any Third Party; (C) disparage our competitors or misrepresent the value or correctness of their services or products; or (D) trade or allocate territories or Investors or engage in other activities that that anticompetitive or involve exclusive dealing.

Q: AM I ALLOWED TO GATHER INFORMATION ABOUT THE MARKETPLACE, FOR EXAMPLE, ABOUT OUR COMPETITORS AND THEIR PRODUCTS, SERVICES OR TRANSACTIONS? A: Yes; but we note that there are ethical limits that you must not cross when Transacting in any Third Party Information, especially about (or potentially belonging to) a competitor. Act consistent with the following guidance:

(1) it is ok to gather information from public sources; i.e., published articles, advertisements, brochures, other non-proprietary/non-confidential materials, surveys by consultants and conversations with Third Parties, but not if such survey, conversation or activity is likely to suggest at all or to anyone that we are attempting to (a) conspire with our competitors, using for example a Third Party as an intermediary, or (b) gather information in breach of a Third Party's nondisclosure agreement with a competitor or through other wrongful means; or (c) elicit any Confidential, Proprietary or other Third Party Information that, if we become a holder of,

violates any Third Party's pecuniary, beneficial or other proprietary right under Laws or as otherwise contrary to our Code or Policies. If you ever improperly come across information about a competitor or regarding any Third Party or Referral Source contrary to the preceding or Laws/Code of Ethics, you must use a Reporting Channel and identify any source of such information; (2) we will not acquire a Third Party's or a competitor's confidential, trade secret or other proprietary information through unlawful means (e.g., theft, spying, bribery) or breach of a Third Party's or competitor's rights under a nondisclosure agreement with any person or entity; (3) If you have any inkling that information you are being offered was not lawfully received by the party in possession, you must refuse to accept it. If you receive any competitive information anonymously or that is marked "confidential," do not review it. Use a Reporting Channel to visit with our Compliance Function immediately. The improper receipt or use of a Third Party's competitive information could subject the Company, and you individually, to criminal and civil liability. When in doubt, speak up.

## XXIV. CORE VALUE – WE ARE ACCOUNTABLE FOR VIOLATIONS OR MISCONDUCT:

Consistent with your acknowledgment to this Code, you are expected to read, understand, and abide with the Code, our Core Values, Laws, HR Policies, Company's Compliance Program, and all other Company Policies. Accordingly, any claims of ignorance, good intentions, or poor judgment will never constitute an excuse for non-compliance.



CORRECTIVE ACTION RELATED TO ANY NON-COMPLIANCE (OR MISCONDUCT) MAY INCLUDE DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION AND LEGAL ACTION FOR:

(A) Authorization of, or participation in, any violation of our Compliance Mandate or any Misconduct; (B) Improper refusal to cooperate in any Laws, Code or Policy violation or Misconduct investigation; (C) Failure by a violator's Manager to detect or report a violation or Misconduct (e.g., in cases of inadequate supervision on the part of the Manager); (D) Reporting a matter that is knowingly false or intended to, without limitation, intimidate or retaliate against anyone; (E) Any instance of retaliation — including by intimidating, threatening, harassing or maligning any person who has in good faith reported a concern or complaint, or a Code, Laws or policy violation, or any Misconduct.



PLEASE REMEMBER THAT:



COMPLIANCE IS EVERYONE'S RESPONSIBILITY.



THE CODE OF ETHICS IS JUST ONE OF THE COMPLIANCE RESOURCES AVAILABLE TO YOU.



IF YOU HAVE ANY QUESTION (OR ARE UNSURE ABOUT ANY CORE VALUE OR ANY OTHER POLICY) CONTACT YOUR MANAGER OR OUR COMPLIANCE FUNCTION, HR FUNCTION, OR COMPLIANCE EMAIL OR THE COMPANY'S PRESIDENT.

# RESOURCES

I.   CONTACT INFORMATION:

   A.   MANAGER – The best place to start if you have questions on how our Code applies to you is with your immediate Manager.

   B.   COMPLIANCE FUNCTION - The Compliance Function is a corporate resource available to address your questions or concerns about our Company's Core Values and standards of conduct: (1) Email any compliance related question or concern to our Compliance Email.

II.   OTHER RESOURCES:

Policies - Refer to our all our Policies including the HR Policies and any stand-alone Policies.

Employment related questions - Contact Company's Human Resources Function for concerns involving employment conditions, Management and/or other Personnel.

III.   GLOSSARY:

"Access" means to appropriately or with permission obtain, examine or retrieve data or information or the ability or the means necessary to Transact, without limitation, CDIS, CDI, Official Records, Confidential Information, or Company Information.

"Access Control" means control of (or restrictions to) Access of the means necessary to obtain, examine or retrieve data or information or Transact, without limitation, CDIS, CDI, Official Records, Confidential Information, or Company Information.

"Assessment(s)" means the evaluation or estimation of the nature, quality, or ability of Company Personnel and their provision of service to the Company as periodically and regularly documented. An Assessment is meant to review Personnel performance pursuant to consistent standards for such Assessments. Adherence to Policies, Laws and any other regulatory requirement constitute some of the measures of Assessments. "Security Assessment(s)" means and relate to the evaluation and estimation of the nature and quality of the Company's Policies and security or privacy standards and controls all of which are measured to establish that same are correctly implemented and as implemented, are effective. "Risk Assessment(s)" means and relates to the identification, evaluation and estimation of the nature and quality of risks that the Company may face in relation to its Laws compliance, Policies and other compliance related matters. Assessments and Security Assessments/Risk Assessments/Risk Analyses are overseen, documented and respectively managed under the Company's Performance Management Program and its Compliance Function.

"Assets" include Intangible Assets like "Company Information" (whether in physical, electronic, or other form, including CDI) and Good Will and the Physical Assets that we use in our operations and, without limitation, Company's Facilities and CDIS.

"Code" or "Code of Ethics" means the Company's Code of Ethics and Business Conduct.

"Compliance Certification" means such Company Personnel or any Third Party acknowledgment, certification, or other memorialization of compliance, without limitation, germane to the Code of Ethics, HR Policies, Policies, or Laws. Examples include, without limitation, Personnel training attendance acknowledgments, compliance warranties and certifications, conflict of interest forms, Code of Ethics acknowledgment.

"Company Data and Information Systems" ("CDIS") means, without limitation, all Company computing, communication and information technology Assets and Company's equipment, devices, computers, systems, servers, networks, Software, Hardware, websites, databases, smartphones, tablets, computer systems, computing resources, resources, databases, voice mail resources, messaging resources, hard drives, removable

media, thumb drives, external hard drives, intranet resources, internet, or any other data, information, or communication Asset or system (and including the means to Access CIDS, e.g., passwords and other Access authentication requirements). CDIS is a Company Asset.

"Company Data and Information" ("CDI") means all external or internal/physical or electronic data/information, including without limitation, files, documents, e-mails, communications, memoranda, messages or transmissions of data/information of any kind or any other aggregation of data or information including Confidential information, Official Record, Intellectual Property, Proprietary Information, Company Information, Know How and Trade Secrets, whether Transacted directly or indirectly by, from, or through CDIS or otherwise Transacted by Company Personnel or, as relevant to Company, germane to (or by) any Third Party. CDI is a Company Asset (and in most cases) constitutes a Company Official Record.

"Company Information" includes Confidential Information, Proprietary Information, Company Data & Information ("CDI"), Intellectual Property, Trade Secrets, Official Records, and Know How.

"Confidential Information" means (in addition) information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to our Personnel or others, and information developed or learned by our Personnel, contractors, or others, during the course of their association with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company and markets therefor, business relationships (including, but not limited to, Investors or business relations of the Company with which our Personnel, contractors or others have contact with or otherwise become aware of, developments, processes, formulas, technology, designs, drawings, Hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company Assets. Notwithstanding the foregoing, Company Confidential Information will not include any such information which (1) was publicly known or made generally available prior to the time of disclosure by Company; (2) becomes publicly known or made generally available after disclosure by Company through no wrongful action or omission by our Personnel, contractors or others; or (3) is in our Personnel, contractors or others' rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by then-contemporaneous written records.

"Facility" or "Facilities" means any real property (including all offices, operations facilities, buildings, fixtures or other improvements located thereon) now or in the future owned, leased, supervised, operated or used by the Company or any of its affiliates wherein (or germane to) the Company or its Personnel conducts any business or operations. Broadly in relation to any of our Company operations, "Facility" includes in relation to Company, without limitation, all Workstations (e.g., desks and cubicles) offices, reception areas, waiting rooms, hallways, and any other discrete physical location within the Facility.

"Government" means any international, domestic, federal, national, state, county or municipal or other local government, any subdivision, department, office, service, agency, commission, or authority thereof including the judiciary, or any quasi-governmental body exercising any regulatory authority or any other authority exercising authority over Laws, whether civil or criminal.

"HR Function" means any and all Company Personnel or external individuals or entities responsible for the

development, maintenance, support and other business operational aspects germane to Human Resources and employment matters within or for the Company and will (as contextually relevant) include the HR Function's, without limitation, HR Policies, Personnel/Human Resources Files, Performance Management Program, and CDIS/CDI.

"Intellectual Property" means (1) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (2) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (3) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (4) all mask works and all applications, registrations, and renewals in connection therewith, (5) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, techniques, technical data, specifications, business relationships lists and information, pricing and cost information, and business and marketing plans and proposals), (6) all CDI (including data and related documentation), (7) all other proprietary rights, and (8) all copies and tangible embodiments thereof (in whatever form or medium).

"Inquiry" as consistent with Company Code of Ethics, means any Government, without limitation, inquiry, investigation, demand, visit, subpoena, civil investigative demand, or audit any of which may consist of requests of information or any examination of any aspect of Company's operations, CDIS, CDI, Company Information or Official Records.

"IT Function" means any Personnel individuals (or as may be relevant external Vendor) responsible for the development, maintenance, support and other function related to "Information Technology" (including CDIS and CDI) within or relevant to the Company.

"Know How" means all Company technical information, know-how and data, discoveries, trade secrets, specifications, instructions, processes, formulae, materials, expertise and other technology applicable to Company's operations.

"Laws" means all applicable international, supranational, nation state, and United States federal, state, local, or municipal law including as to each of the preceding their common law, constitutions, statutes, codes, treaties, proclamations, judicial precedents, judicial authorities, regulatory policies, judgments, settlements, conventions, directives, requirements, writs, orders or consents, regulations, rules, injunctions, decrees or awards that are or have been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Government, including their interpretation or administration by any Government agency, including courts, charged with their enforcement, interpretation or administration and all applicable administrative or judicial orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Government.

"Malware" is the contraction for "malicious software" and generally consists of computing code or programs designed to damage computing systems (like Company's CDIS) noting that the term Malware will refer to and consists of (among other things) viruses, worms, trojan horses, ransomware attacks, system intrusions, and spyware.

"Management" means the Company's executive managers including as relevant, any Company officer.

"Manager" means such supervisor/manager level Personnel tasked with the responsibility for the Personnel assigned to work under their oversight, training and management, and to whom such Personnel report.

"Misconduct" means any violation or potential violation of any Laws, or any Company Policy, whether stand

alone or as may be found in the Company HR Policies, Code of Ethics or otherwise, or any other type of improper or unprofessional behavior.

"Official Record" means, without limitation, all Company Information whether relating to Company's operations, Assets, or business matters and includes all data, information, books, files, and records of the Company, including Facility, corporate and operating records, correspondence, tax returns, and logs and other records and whether consisting or paper or electronic format and whether it is CDI or Transacted in CIDS.

"Personnel" means our workers and workforce and includes Management and all Company executives, Managers, officers, agents, employees, volunteers, trainees, and other persons whose conduct in the performance of work for Company is under the direct control of the Company. The term Personnel will be deemed to include any contractor that provides services to the Company. Instances in this Code of Ethics of either "worker" or "employee" will be deemed to mean "Personnel."

"Proprietary Information" means all Company Information or Official Record developed or acquired by the Company or any of its affiliates that has not been specifically authorized to be disclosed including, but not limited to, the following items and information relating to the following items: (1) all Intellectual Property and proprietary rights of the Company (including, without limitation, the Intellectual Property), (2) CDIS processing systems and techniques, inputs and outputs (regardless of the media on which stored or located) and Hardware and Software configurations, designs, architecture and interfaces, (3) business research, studies, procedures and costs, (4) financial data, (5) operations methods, (6) marketing data, methods, plans and efforts, (7) the identities of actual and prospective Third Party business relationships, (8) the terms of contracts and agreements with, the needs and requirements of, and the Company's or its affiliates' course of dealing with, actual or prospective operational relationships, (9) Personnel information, (10) Vendor Third Party information, and (11) information received from Third Parties subject to obligations of non-disclosure or non-use. Failure by the Company or its affiliates to mark any Proprietary Information as confidential or proprietary will not affect its status as Proprietary Information.

"Process" means any legal or judicial action, appeal, document instrument or other writing issued, filed or recorded to pursue a claim against person or property, exercise jurisdiction, enforce a judgment, fine a person, put a lien on property, authorize a search and seizure, arrest a person, incarcerate a person or direct a person to appear, perform or refrain from performing a specified act and without limitation includes a complaint, decree, demand, discovery request, indictment, injunction, judgment, lien, motion, notice, order, petition, pleading, sentence, subpoena, summons, warrant or writ.

"Program" means the Company Corporate Compliance Program and all Program constituent components, Policies and procedures, standards, and guidance.

"Referral Source" means any Third Party individual or entity that refers any business to the Company, either directly or through such Referral Source's employees or agents and includes when a Referral Source is an Investor or otherwise directly or indirectly affiliated with an Investor, or as may be germane to any Third Party Beneficiary Insurance Settlement Agreement, or any of which may relate to the Company's operations.

"Security Awareness" means and refers to the knowledge, training, attitude, conscientiousness, and effort the Company's Personnel put forth regarding the protection of Company Assets, CDIS, CDI, Confidential Information and Company Information. The Company requires Security Awareness training and reinforcement for all Personnel. Security Awareness (Assessments) are overseen, memorialized and managed under the Company's Performance Management Program.

"Software" means a set of instructions/computing language that directs a computer/Hardware to perform tasks and includes, without limitation, the following terms: computer software, applications, utilities, operating

systems, courseware, shareware, and other computer language products or services. Software is an included component of CDIS.

"Third Party" means any outside person or entity and includes as germane to Company: Investors, consultants, agents, independent contractors, Vendors, suppliers, business relationships, partners, and affiliates. This definition will include as contextually relevant, any Government agency, department, commission, association or other pertinent governing, body having direct or indirect authority over the Company or its operations. Any Third Party's data or information may be referred to as "Third Party Information." Third Party Information will (as contextually relevant) include its Confidential Information.

"Trade Secrets" means any and all information, including a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. By way of illustration but not limitation, "Trade Secrets" includes without limitation information regarding plans for research, development, current and new services or products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, production and as appropriate, Confidential Information, Third Party Information, Intellectual Property and Know How.

"Transacts" or to "Transact" or (and contextually, "Transacted/Transaction") means: access, accesses, accessed, administer, administers, administered, analyze, analyses, analyzed, collect, collects, collected, compile, compiles, compiled, compose, composes, composed, create, creates, created, creation, disclosure, disclose, discloses, disclosed, deliver, delivers, delivered, edit, edits, edited, modify, modifies, modified, process, processes, processed, read, revise, revises, reviews, reviewed, send, sends, sent, store, storing, stores, transmit, transmits, transmitted, use, uses, used, using, utilize, utilized, or utilized.

"User" means any Company Personnel, and as relevant, without limitation, independent contractors, temporary workers, consultants, agents, and Vendors who directly or indirectly Transact CDIS or CDI.

"Vendor" means any person or entity that provides or facilitates the direct or indirect provision (or that seeks to enter into a relationship with the Company regarding same) to Company of any service or product germane to which Vendor, without limitation, may be a dealer, distributor, seller, merchant or other type of supplier of services or products.

"Workstation(s)" means generally any identifiable portion of any Facility or otherwise where Company's Personnel perform any duty or responsibility germane to Company's business/operations (e.g., desk, cubicle, work area); Workstation will also refer to CDIS equipment/devices located at Workstations or elsewhere or that are used directly or indirectly by Personnel to fulfill their Duties and Responsibilities

# CODE OF ETHICS AND BUSINESS CONDUCT

# COMPLIANCE CERTIFICATION

# ACKNOWLEDGMENT

I ACKNOWLEDGE AND CERTIFY BY MY SIGNATURE BELOW THAT:

I HAVE BEEN PROVIDED A COPY OF J AND J PURCHASING, LLC'S ("J&J" OR "COMPANY") CODE OF ETHICS AND BUSINESS CONDUCT (THE "CODE").

IT IS MY RESPONSIBILITY TO FULLY READ, UNDERSTAND, AND COMPLY WITH: (A) THE CODE AND ITS POLICIES, GUIDANCE, AND STANDARDS (OUR "CORE VALUES"), AND (B) ALL OTHER J&J POLICIES, PROCEDURES, STANDARDS, GUIDELINES, AND DIRECTIVES (COLLECTIVELY, IN THIS CODE AND AS MAY BE FOUND ELSEWHERE, OUR "POLICIES").

I WILL AT ALL TIMES ACT IN ACCORDANCE WITH ALL FEDERAL, STATE, LOCAL AND APPLICABLE INTERNATIONAL AND FOREIGN NATION LAWS, STATUTES, RULES, AND REGULATIONS (COLLECTIVELY, IN THIS CODE AND ELSEWHERE, "LAWS").

I HAVE A CONTINUING OBLIGATION TO IMMEDIATELY REPORT ANY ACTUAL OR SUSPECTED CODE, LAWS, OR POLICY VIOLATION OR ANY MISCONDUCT TO MY MANAGER OR THE COMPANY'S MANAGEMENT, HR FUNCTION, COMPLIANCE FUNCTION, AND/OR THROUGH THE COMPLIANCE EMAIL.

MY VIOLATION OF THE CODE, LAWS, OR POLICIES MAY RESULT IN CORRECTIVE ACTION UP TO, AND INCLUDING, IMMEDIATE TERMINATION OF EMPLOYMENT OR ASSOCIATION TO COMPANY.

THE CODE AND POLICIES MAY BE REVISED AT ANY TIME AND, IN SUCH A CASE, THE COMPANY WILL NOTIFY ME AND PROVIDE ME WITH A REVISED CODE AND POLICIES.

ONLY A DULY AUTHORIZED COMPANY REPRESENTATIVE MAY ISSUE ANY REVISION OF THE CODE, OUR CORE VALUES, OR OUR POLICIES.

_____

PRINTED NAME

_____

SIGNATURE

_____, 202 \_

DATE SIGNED

# EXHIBIT D
# INVESTOR QUESTIONNAIRE

# J AND J PURCHASING, LLC
# CONFIDENTIAL INVESTOR QUESTIONNAIRE

IN CONNECTION WITH THE PROPOSED ISSUANCE BY **J AND J PURCHASING, LLC** OF UP TO FIVE (5) PARTIAL BENEFICIAL INTERESTS THAT WILL BE HELD BY INVESTOR GERMANE TO COMPANY'S PURCHASE(S) OF INSURANCE SETTLEMENT AGREEMENTS UNDER A PURCHASE CONTRACT BETWEEN COMPANY AND CERTAIN THIRD-PARTY INSURANCE SETTLEMENT AGREEMENT BENEFICIARIES, IN **MINIMUM AMOUNTS AND IN INCREMENTS OF EITHER $80,000.00 OR $100,000.00** (THE "*INSURANCE SETTLEMENT AGREEMENT PURCHASE AMOUNT(S)*"), IN A TRANSACTION INTENDED TO QUALIFY UNDER SECTION 4(2) OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND RULE 506 OF REGULATION D PROMULGATED HEREUNDER, AS AN OFFERING OF SECURITIES EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, THE SUBSCRIBER PROVIDES THE COMPANY WITH THE INFORMATION SET FORTH BELOW AND CERTIFIES THAT SAME IS ACCURATE IN ALL RESPECT.

SUBSCRIBER UNDERSTANDS THAT COMPANY WILL FULLY RELY ON THE INFORMATION FURNISHED BY SUBSCRIBER AND THAT COMPANY WILL EITHER: (A) NOT DO ANY INDEPENDENT INVESTIGATION TO VERIFY OR FALSIFY ANY PROVIDED INFORMATION; OR (B) PROCEED TO SEEK ADDITIONAL INFORMATION AND CERTIFICATIONS FROM SUBSCRIBER CONSISTENT WITH COMPANY'S COMPLIANCE PROGRAM, CODE OF ETHICS AND BUSINESS CONDUCT, AND ITS POLICIES AND PROCEDURES.

The Subscriber represents that the information presented herein and in the Subscription Agreement is complete, true, and accurate as of the date indicated and the Subscriber agrees to notify the Company immediately of any change in any such information that occurs prior to (or during or after) any investment under this offering.

The information disclosed below shall be held as **strictly confidential by the Company** under our compliance program/code of ethics and business conduct and will not be disclosed to any person except to the Company's President, the Investor, their respective counsel, or such other party as the President deems appropriate to establish, among others, the availability of an exemption from registration of the **Partial Beneficial Interests** under the Securities Act and applicable state securities and other laws.

ALL ITEMS MUST BE FULLY COMPLETED

1.  FULL NAME OF THE SUBSCRIBER: _____. I VERIFY THAT THE PHOTOCOPY OF THE STATE OR FEDERALLY ISSUED IDENTIFICATION THAT I SUBMIT WITH THIS QUESTIONAIRE CONSTITUTES A TRUE AND CORRECT COPY OF SAME.

| | |
|---|---|
| I AM A RESIDENT OF: | |
| ADDRESS: | |
| BANK OR FINANCIAL INSTITUTION – SOURCING OF FUNDS FOR INVESTMENT – NAME: | |
| BANK OR FINANCIAL INSTITUTION – SOURCING OF FUNDS FOR INVESTMENT – ADDRESS: | |

2.  PLEASE INDICATE WHETHER YOU QUALIFY AS AN **ACCREDITED INVESTOR** BY INITIALING AT LEAST ONE OF THE FOLLOWING TESTS (IF NONE APPLIES, PLEASE CONSULT THE COMPANY):

| INITIALS | TESTS |
| --- | --- |
| | YOU ARE A NATURAL PERSON AND HAVE HAD AN INDIVIDUAL ANNUAL ADJUSTED GROSS INCOME[1] IN EXCESS OF $200,000 FOR EACH OF THE TWO MOST RECENT YEARS OR JOINT INCOME WITH YOUR SPOUSE IN EXCESS OF $300,000 IN EACH OF THOSE YEARS AND REASONABLY EXPECT THE SAME INCOME LEVEL FOR THE CURRENT YEAR. |
| | YOU ARE A NATURAL PERSON WHOSE INDIVIDUAL NET WORTH[2] OR JOINT NET WORTH WITH YOUR SPOUSE, AS OF THE DATE HEREOF EXCEEDS $1,000,000 (INCLUSIVE OF THE VALUE OF HOME FURNISHINGS AND AUTOMOBILES BUT EXCLUDING THE VALUE OF YOUR PRIMARY RESIDENCE). |
| | YOU ARE AN EMPLOYEE BENEFIT PLAN WITHIN THE MEANING OF TITLE I OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), WHERE THE INVESTMENT DECISION IS MADE BY A PLAN FIDUCIARY (AS DEFINED IN SECTION 3(21) OF ERISA) WHICH IS EITHER A BANK, SAVINGS AND LOAN ASSOCIATION, INSURANCE COMPANY, OR REGISTERED INVESTMENT ADVISER, OR WHERE THE EMPLOYEE BENEFIT PLAN HAS TOTAL ASSETS IN EXCESS OF $5,000,000, OR, IF A SELF-DIRECTED PLAN, WHERE INVESTMENT DECISIONS ARE MADE SOLELY BY PERSONS THAT ARE ACCREDITED INVESTORS. |
| | YOU ARE AN ORGANIZATION DESCRIBED IN SECTION 501(C)(3) OF THE US INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), A CORPORATION, A MASSACHUSETTS OR SIMILAR BUSINESS TRUST, OR A COMPANY, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES OFFERED, WITH TOTAL ASSETS OF AT LEAST $5,000,000. |
| | YOU ARE A TRUST WITH TOTAL ASSETS IN EXCESS OF $5,000,000, NOT FORMED FOR THE SPECIFIC PURPOSE OF ACQUIRING THE SECURITIES OFFERED, WHOSE PURCHASE IS DIRECTED BY A SOPHISTICATED PERSON AS DESCRIBED IN RULE 506(B)(2)(II) UNDER THE SECURITIES ACT. |
| | YOU ARE A COMPANY, CORPORATION, OR OTHER ENTITY IN WHICH ALL EQUITY OWNERS THEREOF INDIVIDUALLY QUALIFY AS ACCREDITED INVESTORS. |
| | YOU ARE NOT AN ACCREDITED INVESTOR. |

3.  TAX INFORMATION.

| | |
| --- | --- |
| U.S. SOCIAL SECURITY NUMBER/FEDERAL TAX I.D. NUMBER: | |
| STATE TAX IDENTIFICATION NUMBER (IF ANY): | |
| IDENTIFY WHICH FORM(S) YOU FILE WITH THE UNITED STATES INTERNAL REVENUE SERVICE FOR UNITED STATES | |

[1]  "Annual adjusted gross income" means "adjusted gross income" as reported for income tax purposes, less any income attributable to a spouse or to property owned by a spouse and increased by the following amounts (but not including any portion of such amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited Company; (iii) any deduction claimed for depreciation; and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

[2]  Net worth for this purpose means your total assets (excluding the value of your principal residence) subtracted by total liabilities (excluding the amount of indebtedness secured by your primary residence up to the value of your primary residence (except that if the amount of indebtedness secured by your primary residence at this time exceeds the amount of such indebtedness 60 days ago, other than as a result of the acquisition of your primary residence, the amount of such excess shall be included in total liabilities)). Indebtedness secured by your primary residence in excess of the value of your primary residence will be deducted from the determination of your net worth.

| | |
|---|---|
| FEDERAL INCOME TAX PURPOSES (E.G., 1040, 1065, 1120, 5500, 990): | |
| PLEASE INDICATE WHETHER YOU ARE TREATED FOR UNITED STATES FEDERAL INCOME TAX PURPOSES AS (CHECK ONE): | AN INDIVIDUAL |
| | A TRUST |
| | A COMPANY |
| | AN S CORPORATION |
| | A CORPORATION |
| | OTHER; PLEASE SPECIFY |

| | | |
|---|---|---|
| ARE YOU A TAX-EXEMPT ENTITY? | ( ) YES | ( ) NO |

| | |
|---|---|
| IF YOU ARE A TAX-EXEMPT ENTITY PURSUANT TO THE IRS CODE, PLEASE SPECIFY THE SECTION OF THE CODE THAT EXEMPTS YOU BELOW AND ATTACH A COPY OF THE DETERMINATION LETTER OR PRIVATE LETTER RULING FROM THE US INTERNAL REVENUE SERVICE CONFIRMING SUCH EXEMPTION. | EXEMPTED UNDER SECTION: |

4.   ENTITY DUE DILIGENCE INFORMATION:

| | | |
|---|---|---|
| FULL LEGAL NAME OF ANY ENTITY DISCLOSED: | | |
| ENTITY REGISTERED AGENT – ADDRESS: | | |
| DATE OF INCORPORATION: | | |
| STATE OF INCORPORATION: | | |
| MAIN LINE OF BUSINESS: | | |
| PRINCIPAL PLACE OF BUSINESS – ADDRESS: | | |
| PHONE/FAX OF PRINCIPAL PLACE OF BUSINESS: | | |
| PERCENTAGE OWNED BY INVESTOR/SUBSCRIBER: | | |
| OFFICER OR OTHER MANAGEMENT POSITION HELD BY INVESTOR/SUBSCRIBER: | | |
| TYPE OF OWNERSHIP: | PUBLICLY TRADED | |
| | PRIVATELY HELD | |
| | PARTNERSHIP | |
| | SOLE PROP. | |
| HAS THE ENTITY DEFAULTED WITH ANY FINANCIAL INSTITUTION? | ( ) YES | ( ) NO |

| | | |
|---|---|---|
| IF YES, HAS THE DEFAULT STATUS BEEN RESOLVED? | ( ) YES | ( ) NO |
| MAIN BANKER OF ENTITY, NAME AND ADDRESS: | | |
| HAS THE ENTITY BEEN AUDITED? | ( ) YES | ( ) NO |
| IF YES, NAME OF AUDIT FIRM AND ADDRESS: | | |
| HAS THE INVESTOR DEFAULTED WITH ANY BANK/FINANCIAL INSTITUTION? | ( ) YES | ( ) NO |
| IF YES, HAS THE DEFAULT STATUS BEEN RESOLVED? | ( ) YES | ( ) NO |

5.   DUE DILIGENCE VERIFICATION AND INFORMATION?

| | | | |
|---|---|---|---|
| IS THE SUBSCRIBER OR ENTITY UNDER ANY SANCTION OR EMBARGO LIMITATION - WHETHER INTERNATIONALLY OR IN ANY APPLICABLE JURISDICTION? IF YES, PLEASE PROVIDE DETAILS IN A SEPARATE PAGE SUBMITTED WITH THIS AGREEMENT. | ( ) YES | | ( ) NO |
| SOURCE OF INVESTMENT FUNDS: (ATTACH ADDITIONAL PAGES IF NECESSARY) | PERSONAL | | |
| | FAMILY | | |
| | BUSINESS | | |
| | THIRD PARTY | | |
| IF FAMILY OR THIRD PARTY – PLEASE SET OUT THE NAME AND CONTACT INFORMATION FOR EACH POTENTIALLY BENEFICIARY OWNER OF ANY FUNDS TRANSFERRED TO COMPANY. | | | |
| DOES THE INVESTOR OR ANY IMMEDIATE FAMILY MEMBER HAVE ANY POLITICAL PARTY LINK. IF YES, PLEASE PROVIDE DETAILS IN A SEPARATE PAGE SUBMITTED WITH THIS AGREEMENT. | ( ) YES | | ( ) NO |
| IS INVESTOR SUBJECT TO ANY PENDING CRIMINAL INVESTIGATION, INDICTMENT, CHARGE/PROCEEDING? IF YES, PLEASE PROVIDE DETAILS IN A SEPARATE PAGE SUBMITTED WITH THIS INVESTOR QUESTIONNAIRE. | ( ) YES | | ( ) NO |
| DOES THE INVESTOR OR ANY ENTITY IDENTIFIED HAVE ANY DIRECT OR INDIRECT BUSINESS OR OTHER LINK TO ANY GAMBLING, DRUG, OR MONEY LAUNDERING ACTIVITY, OR ANY OTHER IMPERMISSIBLE CONFLICT WITH LAWS GERMANE TO THE FUNDS TRANSFERRED UNDER THIS OFFERING OR OTHERWISE. | ( ) YES | | ( ) NO |

6.   HAVE YOU RELIED UPON THE ADVICE OF OTHERS WHEN EVALUATING THE MERITS AND RISK OF THIS INVESTMENT?

( ) Yes            ( ) No

**Note:** You should answer the above in the affirmative only if you have presented this investment to others who in turn have analyzed the investment in depth on your behalf and who, in making such an analysis, were familiar with and took into consideration your financial position and investment objectives, whether or not such third party is properly registered under applicable Laws to serve in such financial advice or investment advice capacity. Do not answer the above in the affirmative if you have merely described the investment to others in broad generalities and sought their advice more on a social (as opposed to a professional) basis.

**Note:** You acknowledge and certify if you answer the above in the negative that the Company and any affiliated individual has not provided you with any sort of financial or investment advice or service; noting that no one at the Company is allowed to do so under its Compliance Program and as consistent with the fact that no such individual is registered or allowed to so provide investment or financial advice under applicable Laws.

7.   IF YOUR ANSWER TO QUESTION 4 IS "YES," PLEASE IDENTIFY SUCH ENGAGED PURCHASER REPRESENTATIVE.

| NAME: |
|---|

8.   HAVE ALL QUESTIONS THAT YOU OR YOUR PURCHASER REPRESENTATIVE(S) HAVE REGARDING ALL RISKS BEEN ANSWERED TO YOUR FULL SATISFACTION?

( ) Yes            ( ) No

| IF NOT, PLEASE SET FORTH HERE ANY SUCH QUESTION: |
|---|
| |

9.   HAVE ALL QUESTIONS THAT YOU OR YOUR PURCHASER REPRESENTATIVE(S), IF ANY, MAY HAVE CONCERNING THE PROPOSED INVESTMENT BEEN ANSWERED TO YOUR FULL SATISFACTION?

( ) Yes            ( ) No

| IF NOT, PLEASE SET FORTH BELOW ANY SUCH QUESTION |
|---|
| |

10.  IF YOU SHOULD CHOOSE TO INVEST UNDER THIS OFFERING, IS IT YOUR OPINION THAT YOUR PRESENT FINANCIAL POSITION IS, AND IS EXPECTED TO CONTINUE TO BE, SUCH AS TO ENABLE YOU:

| TO BEAR THE ECONOMIC RISK OF LOSING ALL OF THE INVESTMENT? | ( ) YES ( ) NO |
|---|---|
| TO BEAR THE ECONOMIC BURDEN OF HAVING ALL SUCH FUNDS CONFINED TO AN ESSENTIALLY ILLIQUID INVESTMENT FOR A PERIOD OF | ( ) YES ( ) NO |

| OVER THREE MONTHS AND SUBJECT TO THE UP TO 30 DAY TIME PERIOD SUBSEQUENT ANY EXERCISE OF THE RIGHT OF REDEMPTION OF THE INVESTMENT PRINCIPAL? | |
|---|---|

11. I CERTIFY THAT I AM ACQUIRING THE PARTIAL BENEFICIAL INTEREST AS A PRINCIPAL, FOR INVESTMENT, AND NOT WITH A VIEW TO RESALE OR DISTRIBUTION AND THAT ALL REPRESENTATIONS MADE BY ME IN THIS INVESTOR QUESTIONNAIRE AND THE SUBSCRIPTION AGREEMENT ARE TRUE, ACCURATE, AND CORRECT IN ALL RESPECTS AND MAY BE FULLY RELIED UPON BY THE COMPANY.  I HAVE NOT ACTED AS A FINDER, AND IF I MAY BE DEEMED TO BE A FINDER AT ANY TIME BY ANYONE, I NONETHELESS CERTIFY HEREBY THAT I HAVE PROVIDED NO INVESTMENT OR FINANCIAL ADVISE TO ANYONE AT ANY TIME AND HAVE NOT VIOLATED ANY SECURITIES OR INVESTMENT LAWS OR REGULATIONS, WHETHER STATE OR FEDERAL.

12. I CERTIFY THAT I HAVE NEVER ACTED DIRECTLY OR INDIRECTLY AS A FINANCIAL OR INVESTMENT ADVISOR GERMANE TO ANY THIRD PARTY AT ANY TIME AND WILL NOT DO SO IN THE FUTURE UNLESS I AM LEGALLY ALLOWED TO DO SO UNDER ALL APPLICABLE LAWS AND REGULATIONS. I FURTHER CERTIFY THAT ANY INVESTMENT I MAKE IN BENEFICIAL INTERESTS OR FUNDS THAT I TRANSFER GERMANE TO THIS OFFERING ARE SOURCED SOLELY AS CONSISTENT WITH MY REPRESENTATIONS AND WARRANTIES UNDER THIS INVESTOR QUESTIONNAIRE, SUBSCRIPTION AGREEMENT AND OTHERWISE, AND WHETHER AS RELEVANT TO MY CERTIFIED STATUS AS AN ACCREDITED INVESTOR OR OTHERWISE, MY CERTIFICATIONS REMAIN TRUE AND ACCURATE THAT ANY SOURCE OF INVESTMENT FUNDS FOR BENEFICIAL INTERESTS ARE COMPLIANT WITH ALL OF MY REPRESENTATIONS AND WARRANTIES MADE HEREIN AND ALL OF WHICH ARE CONSISTENT WITH THE SUBSCRIPTION AGREEMENT AND THE COMPANY'S CODE OF ETHICS AND BUSINESS CONDUCT. I WARRANT TO COMPANY THAT ANY FUNDS OR AMOUNTS THAT I TRANSFER TO COMPANY FOR INVESTMENT IN BENEFICIAL INTERESTS SHALL BE CONSISTENT WITH ALL, WITHOUT LIMITATION, ACCREDITED INVESTOR STATUS AND ANTI-MONEY LAUNDERING WARRANTIES AND CERTIFICATIONS THAT I MAKE IN THIS OR ANY OTHER DOCUMENT. I WARRANT THAT ANY FUNDS, HOWEVER OR FROM WHEREVER SOURCED, THAT I TRANSFER TO THE COMPANY SHALL ONLY BE SOURCED AND ORIGINATE FROM, AND AS CONSISTENT WITH MY STATUS AS, AN ACCREDITED INVESTOR AND THAT DIRECTLY OR INDIRECTLY, HOWEVER SOURCED, THE ACCREDITED INVESTOR IS IN COMPLIANCE WITH ALL ANTI MONEY LAUNDERING STANDARDS, WARRANTIES AND CERTIFICATIONS SET OUT AS A CONDITION OF THIS OFFERING, AND FURTHER ALL OF WHICH I WILL TRANSPARENTLY DISCLOSE TO THE COMPANY IF ANY ACTION BY ME, OR FACT OR CIRCUMSTANCE, DEVIATES FROM THE PRECEDING STANDARDS.

13. I UNDERSTAND AND AGREE THAT THE PARTIAL BENEFICIAL INTERESTS OR ANY INVESTMENT OPPORTUNITY AVAILABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR UNDER ANY APPLICABLE STATE SECURITIES LAWS AND THAT THE COMPANY HAS NOT MADE ANY COMMITMENT TO REGISTER SAME UNDER ANY CONDITIONS OR TO FILE REPORTS WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER FEDERAL OR STATE GOVERNMENT AGENCY OR TO MAKE ANY OTHER ACTION WHICH WILL ENABLE ME TO TRANSFER ANY PARTIAL BENEFICIAL INTEREST UNDER THE OFFERING.

14. I UNDERSTAND THAT THE CAUSES OF ACTION OR LIABILITY CIRCUMSTANCES IMPLICATED OR RELEVANT TO ANY INSURANCE SETTLEMENT AGREEMENT INTEREST THAT IS PURCHASED BY COMPANY THROUGH A PURCHASE CONTRACT, DO NOT INVOLVE ANY PENDING LAWSUIT OR OTHER COURT PROCEEDING. SUCH CONTROVERSY IS NOT BEING PROSECUTED OR DEFENDED IN ANY COURT PROCEEDING WITH THE CONTROVERSY BEING SETTLED THROUGH THE INSURANCE SETTLEMENT AGREEMENT THAT IS BEING PURCHASED.

15. I AGREE TO HOLD THE PARTIAL BENEFICIAL INTEREST FOR AT LEAST THREE MONTHS AND FOR A PERIOD OF AT MOST 90 DAYS SUBSEQUENT MY EXERCISE OF ANY RIGHT OF REDEMPTION AS CONSISTENT WITH MY SUBSCRIPTION AGREEMENT AND THE TERMS OF THE COMPANY

OPERATING AGREEMENT.

16. I HEREBY CERTIFY THAT I HAVE FULLY REVIEWED THE COMPANY OPERATING AGREEMENT AND ANY AMENDMENTS OR SUPPLEMENTS THERETO (THE "COMPANY OPERATING AGREEMENT") AND I ACCEPT AND ADOPT ALL TERMS AND PROVISIONS OF THE COMPANY OPERATING AGREEMENT. SPECIFICALLY, I UNDERSTAND THAT (A) THE TRANSFER OR REDEMPTION OF THE INVESTMENT PRINCIPAL GERMANE TO THE PARTIAL BENEFICIAL INTERESTS IS RESTRICTED BY THE TERMS OF THIS OFFERING AND PURSUANT TO THE DISCRETION GRANTED TO THE COMPANY PURSUANT ITS OPERATING AGREEMENT.

17. I UNDERSTAND AND RECOGNIZE THAT INVESTMENT IN THE COMPANY INVOLVES SIGNIFICANT FINANCIAL AND LEGAL RISKS AND I HAVE TAKEN FULL COGNIZANCE OF AND UNDERSTAND ALL OF THE RISK FACTORS RELATED TO THE ACQUISITION OF THE PARTIAL BENEFICIAL INTERESTS AND RELATIONSHIP TO THE COMPANY.

18. I (AND MY FINANCIAL, TAX, INVESTMENT, AND LEGAL ADVISORS) HAVE BEEN GIVEN SUFFICIENT OPPORTUNITY TO INSPECT ALL DOCUMENTS, BOOKS AND RECORDS OF THE COMPANY (INCLUDING WITHOUT LIMITATION, ANY UNAUDITED FINANCIAL STATEMENTS OF THE COMPANY, IF ANY) TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE FACTS AND LAWS AND EXPECTATIONS DISCLOSED AND DESCRIBED IN THIS OFFERING AND THE COMPANY OPERATING AGREEMENT, THE PRIVATE PLACEMENT MEMORANDUM, AND THE SUBSCRIPTION AGREEMENT.

19. I CERTIFY THAT COMPANY AND ITS REPRESENTATIVES HAVE NOT DENIED ME ANY ACCESS TO ANY DOCUMENT OR OTHER INFORMATION THAT I HAVE REQUESTED BEFORE SIGNING THIS DOCUMENT OR ANY OTHER DOCUMENT ANY OF WHICH MAY BE RELEVANT TO MY INVESTMENT UNDER THIS OFFERING.

20. I CERTIFY THAT I HAVE ALSO BEEN GIVEN THE OPPORTUNITY TO ASK QUESTIONS OF THE COMPANY'S REPRESENTATIVES CONCERNING ANY AND ALL ASPECTS OF COMPANY OPERATIONS, AS WELL AS THE TERMS AND CONDITIONS GERMANE TO THE PARTIAL BENEFICIAL INTERESTS.

21. I CERTIFY THAT NO DISCREPANCY EXISTS BETWEEN ANY ORAL REPRESENTATION BY ANY COMPANY REPRESENTATIVE AND THE INFORMATION PROVIDED IN THE COMPANY OPERATING AGREEMENT, THE PRIVATE PLACEMENT MEMORANDUM, OR THE SUBSCRIPTION AGREEMENT.

22. I CERTIFY THE FACT THAT I HAVE BEEN ADVISED TO CONSULT WITH MY OWN TAX, INVESTMENT, AND FINANCIAL COUNSEL AND ATTORNEY IF I SO CHOOSE PRIOR TO ENTERING THE SUBSCRIPTION AGREEMENT AND EXECUTING THIS QUESTIONNAIRE, AND THAT I WAS AFFORDED SUFFICIENT TIME TO UNDERTAKE AND DID SO CONSULT WITH MY TAX, INVESTMENT, AND FINANCIAL COUNSELOR AND ATTORNEY.

23. I CERTIFY THAT I WILL ABIDE BY ALL RELEVANT FEDERAL AND STATE LAWS REQUIREMENTS AND ALL SUBSCRIBER'S REPRESENTATIONS, WARRANTIES AND COVENANTS IN THE SUBSCRIPTION AGREEMENT AND THIS INVESTOR QUESTIONNAIRE.

24. I CERTIFY THAT I AM NOT AWARE AND HAVE NO DIRECT OR INDIRECT KNOWLEDGE THAT ANY FUNDS TRANSFERRED TO COMPANY UNDER THIS OFFERING ARE SUBJECT TO, AMONG OTHERS, FORFEITURE OR ARE SOURCED IN ANY WAY INCONSTENT WITH MY WARRANTIES, REPRESENTATIONS AND CERTIFICATIONS THAT I MAKE HEREIN. NO LOCAL, STATE OR FEDERAL GOVERNMENT AGENCY, COURT OR ANY OTHER SUBDIVISION OR BRANCH HAS LAID CLAIM TO ANY PART OF ANY FUNDS TRANSFERRED TO COMPANY UNDER THIS OFFERING. NO LOCAL, STATE OR FEDERAL GOVERNMENT AGENCY, COURT OR ANY OTHER SUBDIVISION OR BRANCH MAY LAY A CLAIM TO ANY PART OF ANY FUNDS TRANSFERRED TO COMPANY UNDER THIS OFFERING AS BEING VIOLATIVE OF ANY ANTI MONEY LAUNDERING NATIONAL OR INTERNATIONAL LAWS OR REGULATIONS OR STANDARDS, OR DIRECTIVE OR OTHERWISE.

25. I CERTIFY MY UNDERSTANDING THAT UNDER THE COMPANY'S COMPLIANCE PROGRAM, I MAY OR WILL BE SUBJECT TO VARIOUS DUE DILIGENCE MATTERS AND INQUIRIES AS TO THE SOURCE OF THE FUNDS I TRANSFER TO THE COMPANY UNDER THIS OFFERING AND THAT SAME IS

CONSISTENT WITH ALL NATIONAL AND INTERNATIONAL LAWS REGARDING MONEY LAUNDERING AND ANY ATTENDANT RESTRICTION GERMANE TO SAME.

26. PLEASE ANSWER THE FOLLOWING QUESTIONS (AND IF YOU ARE AN ENTITY, PLEASE INDICATE THE NAME OF THE RELEVANT OWNER OR BENEFICIARY OF THE ENTITY AND RESPOND WITH RESPECT TO SUCH OWNER OR BENEFICIARY):

| | | | |
|---|---|---|---|
| IF YOU ARE AN ENTITY, DO YOU AGREE TO DESIGNATE THE UNDERSIGNED AS THE INVESTOR REPRESENTATIVE AS GERMANE TO TERMS AND CONDITIONS OF THE COMPANY OPERATING AGREEMENT AND AS SIGNATORY FOR THE SUBSCRIBER IN THE SUBSCRIPTION AGREEMENT? | ( ) YES | ( ) NO | ( ) N/A |
| IF YOU ARE AN ENTITY, DO ALL OWNERS, INVESTORS, SHAREHOLDERS OR ANY PERSON OR ENTITY HOLDING AN INTEREST IN THE SUBSCRIBER AGREE TO DESIGNATE THE UNDERSIGNED AS THE INVESTOR REPRESENTATIVE AS GERMANE TO THE TERMS AND CONDITIONS OF THE COMPANY OPERATING AGREEMENT AND AS THE SIGNATORY FOR THE SUBSCRIBER? | ( ) YES | ( ) NO | ( ) N/A |

27. IF YOU OWN AN INTEREST OR ARE ENGAGED IN A BUSINESS OR OTHER ACTIVITY THAT COMPETES WITH THE PARTIAL BENEFICIAL INTERESTS, OR THE COMPANY OR ITS BUSINESS OR OPERATIONS, PLEASE DESCRIBE SUCH INTEREST/BUSINESS OR ACTIVITY:

28. I CERTIFY THAT AN INVESTMENT IN THE COMPANY WILL NOT CONSTITUTE A VIOLATION OF ANY AGREEMENT TO WHICH I AM A PARTY (E.G., PARTNERSHIP, SUBSCRIPTION AGREEMENT, NON-COMPETITION AGREEMENT, ETC.).

( ) Yes            ( ) No

This Statement is made effective as of the ___ day of _____ ___, 202__

[Subscriber/Potential Investor]

_____

By: _____

Name: _____

Title: _____

THE PROSPECTIVE INVESTOR REPRESENTS, CERTIFIES AND WARRANTS TO THE COMPANY THAT THE INFORMATION CONTAINED IN THIS INVESTOR QUESTIONNAIRE IS ACCURATE, TRUE AND COMPLETE, AND UNDERSTANDS THAT THE COMPANY HAS NOT MADE AND WILL NOT MAKE AN OFFER OF ANY PARTIAL BENEFICIAL INTERESTS TO THE SUBSCRIBER UNTIL IT HAS RECEIVED AND REVIEWED THIS INVESTOR QUESTIONNAIRE, AND ONLY THEN IF THE COMPANY DETERMINES THAT

SUCH AN OFFER MAY BE MADE WITHOUT VIOLATING ANY FEDERAL OR STATE SECURITIES LAWS OR ANY ANTI MONEY LAUNDERING LAWS OR ANY OTHER LAWS.

[IF A PURCHASER REPRESENTATIVE WAS NOT USED IN CONNECTION WITH THIS SUBSCRIPTION, THEN INSERT "N/A". IF A PURCHASER REPRESENTATIVE WAS USED IN CONNECTION WITH THIS SUBSCRIPTION, THEN A "PURCHASER REPRESENTATIVE QUESTIONNAIRE" WILL BE PROVIDED TO THE SUBSCRIBER FOR COMPLETION BY THE PURCHASER REPRESENTATIVE.]

**J AND J PURCHASING, LLC**

**ACKNOWLEDGMENT OF USE OF PURCHASER REPRESENTATIVE**

**(IF APPLICABLE)**

I ACKNOWLEDGE THAT _____ HAS SERVED AS MY PURCHASER REPRESENTATIVE(S), IN CONNECTION WITH EVALUATING THE MERITS AND RISKS OF MY PROSPECTIVE INVESTMENT IN THIS OFFERING FOR THE **PARTIAL BENEFICIAL INTERESTS**. I REPRESENT TO YOU THAT IN MY OPINION HE HAS (OR THEY HAVE) SUCH KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS SUCH THAT HE IS (OR THEY ARE) CAPABLE OF EVALUATING THE MERITS AND RISKS OF THAT PROSPECTIVE INVESTMENT AND THAT HE HAS (OR THEY HAVE) REPRESENTED TO ME IN WRITING AS FOLLOWS:

1. HE IS (OR THEY ARE) NOT AN AFFILIATE (AS DEFINED IN RULE 405 UNDER THE SECURITIES ACT OF 1933, AS AMENDED), DIRECTOR, OFFICER, OR OTHER EMPLOYEE OF THE COMPANY OR ANY OF ITS AFFILIATES OR A BENEFICIAL OWNER OF 10 PERCENT OR MORE OF THE EQUITY INTEREST IN THE COMPANY;

2. EXCEPT FOR THE FOLLOWING RELATIONSHIPS WHICH HAVE PREVIOUSLY BEEN DISCLOSED BY HIM (THEM) IN WRITING TO ME, NEITHER HE (THEY) NOR HIS (THEIR) AFFILIATES HAVE ANY MATERIAL RELATIONSHIP WITH THE COMPANY OR ANY OF ITS AFFILIATES, NO SUCH MATERIAL RELATIONSHIP HAS EXISTED AT ANY TIME DURING THE PREVIOUS TWO YEARS AND NO SUCH MATERIAL RELATIONSHIP IS MUTUALLY UNDERSTOOD TO BE CONTEMPLATED. (ANY COMPENSATION RECEIVED AS A RESULT OF SUCH RELATIONSHIP(S) SHOULD ALSO BE PROVIDED BELOW):

I REQUEST THAT COPIES OF ALL MATERIAL DISTRIBUTED TO ME IN CONNECTION WITH THE TRANSACTION BE SENT TO MY PURCHASER REPRESENTATIVE(S).

**DATED**: _____ __, 202__.


**SIGNATURE**:


**PRINTED NAME**:_____

## NON-COMPETE, NON-DISCLOSURE AND
## NON-SOLICITATION AGREEMENT

This Non-Compete, Non-Disclosure and Non-Solicitation Agreement (hereinafter referred to as the "Agreement") is entered into this ___ day of _____, 202_, by and between J and J Purchasing, LLC (hereinafter referred to as the "Business") and _____ (hereinafter referred to as the "Potential Investor").  The Business and the Potential Investor are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

### TERMS

For good consideration and as an inducement for the Business to disclose valuable and confidential information to the Potential Investor, the undersigned Potential Investor hereby agrees as follows:

**Non-Compete:**

The Potential Investor understands that the Business operates throughout the United States.  As such, the Potential Investor agrees not to directly or indirectly compete with the Business and its successors and assigns within the United States for a period of two (2) years following the communication of the confidential information to the Potential Investor.

The term "not to directly or indirectly compete" as used herein shall mean that the Potential Investor shall not own, manage, operate, consult or be employed in a business substantially similar to or competitive with, the Business or such other business activity in which the Business may substantially engage.

The Potential Investor acknowledges that the Business shall or may in reliance of this Agreement provide the Potential Investor access to trade secrets, customers, attorneys, and other confidential data and/or information and good will.  Potential Investor agrees to retain said information as confidential and not to use said information on his/her own behalf or disclose the same to any third-party.

This non-compete agreement shall be binding upon and inure to the benefit of the Parties, their successors, assigns and personal representatives.

**Non-Disclosure:**

Confidential information as it relates to this Agreement refers to all information, whether provided in writing or verbally, that is not generally known to the public.  Confidential information includes, but is

not limited to the Business's trade secrets, customers, customer lists, attorneys, attorney lists, vendors, good will, financial information, concepts, techniques, manuals, syllabi, designs, data, computer programs and business activities and operations.

The Potential Investor agrees that the confidential information to be provided by the Business constitutes valuable information and is the exclusive property of the Business.  Potential Investor agrees not to directly, or indirectly, without the express written consent of the Business, communicate, copy, disclose or make available any confidential information provided by the Business or relating to the Business.   The Potential Investor further agrees to not use any of the confidential information for his/her purposes or on his/her own behalf for any purpose whatsoever.

The Potential Investor agrees that the term of this Non-Disclosure portion of this Agreement is for a period of ten (10) years unless cancelled in writing by the Business.

**Non-Solicitation:**

Potential Investor agrees that after receiving the confidential information from the Business and/or during the term of this Agreement, that he/she will not engage, employ, contact, solicit for employment, interfere with, or endeavor to entice away from the Business, directly or indirectly, any employee, independent contractor, attorney, vendor, client, student, or any and all other person(s) with any affiliation whatsoever with the Business.

The Potential Investor agrees that the term of this Non-Solicitation portion of the Agreement is for a period of ten (10) years unless cancelled in writing by the Business.

**Miscellaneous Terms:**

(a) The Parties agree and acknowledge that they have carefully read and fully understand all of the terms and provisions of this Agreement and have reviewed the same with their attorney of choice, if any, prior to execution of this Agreement.

(b) The Parties agree and acknowledge that this Agreement was determined after negotiations and that the Parties' attorney, if any, participated in the drafting of this Agreement, and as such, should not be strictly construed for or against any of the Parties hereto.

(c) The Parties agree and acknowledge that they are knowingly and voluntarily agreeing to **all** of the terms set forth in this Agreement.

(d) The Parties agree and acknowledge that they knowingly and voluntarily intend to be legally bound by the same and that they entered into this Agreement voluntarily and not as a result of coercion, duress, or undue influence.

(e) The Parties agree and acknowledge that this Agreement shall become binding and effective as of the date and time that it is fully executed by both Parties.

(f)  The Parties agree and acknowledge that this Agreement may be executed in counterparts, and each executed counterpart shall have the efficacy and validity of a signed original and with the same effect as if all Parties hereto had signed the same document.  All counterparts so executed shall be deemed to be an original, shall be construed together and shall constitute the entire Agreement.  Photographic copies of such executed counterparts may be used in lieu of the original.

(g) The Parties agree and acknowledge that this Agreement shall be binding upon the Parties hereto and upon their heirs, administrators, representatives, executors, successors, and assigns, and shall inure to the benefit of said Parties and each of them and to their heirs, administrators, representatives, executors, successors, and assigns.

(h) The Parties agree and acknowledge that this Agreement constitutes the complete and entire agreement between the Parties and supersedes any and all prior communications, agreements and understandings, written or oral, between the Parties.

(i)  The Parties agree and acknowledge that this Agreement may not be altered, amended, supplemented, modified or otherwise changed in any way whatsoever, except by a separate written agreement authorized and executed by all Parties.

(j)  The Parties agree and acknowledge that this Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, without regard to conflict of law principles.

(k)  The Parties agree and acknowledge that in executing this Agreement they did not rely upon any representation or statement made by either Party or by any of the Parties agents, attorneys, or representatives with regard to the subject matter, basis, or effect of this Agreement or otherwise other than those specifically stated in this written Agreement.

(l)  The Parties agree and acknowledge that should any term and/or provision of this Agreement be declared or determined by a Court of competent jurisdiction to be wholly or partially illegal, invalid or unenforceable as a result of any action or proceeding, the validity of the remaining terms, releases

and provisions shall not be affected and said illegal or invalid term, release or provision shall be deemed not to be a part of this Agreement.

(m) The Parties agree and acknowledge that the waiver by either of the Parties hereto of any term, release or provision of this Agreement shall not be construed as a waiver of any other or subsequent term, release or provision.

(n) The Potential Investor understands that his/her failure to comply with this Agreement in any way will cause the Business irreparable harm.  As such, Potential Investor agrees that the Business is entitled to immediate injunctive relief should any such violation of this Agreement occur.

**BY: J AND J PURCHASING, LLC**        **BY: POTENTIAL INVESTOR**

[_____]

_____      _____

Printed Name: Jeffrey Judd,      Printed Name: _____,

Its Authorized Representative      Individually/its Authorized Representative

Date:_____        Date:_____

# MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This Mutual Confidentiality and Non-Disclosure Agreement, (hereinafter the "Agreement"), effective this _____ day of _____, 202_, by and between **J AND J PURCHASING, LLC** and _____.  The entities or individuals named above may also be referred to herein individually as "Party" or collectively as the "Parties." In this Agreement, the "Disclosing Party" shall mean the Party that discloses Confidential Information to the other Party and "Receiving Party" shall mean the Party that receives Confidential Information.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

A.   PARTY ACKNOWLEDGMENTS.   The Disclosing Party represents and warrants that it, he or she has the right and authority to disclose Confidential Information to the Receiving Party.

B.   DISCLOSURE OF INFORMATION. Pursuant to this this Agreement, the Disclosing Party is willing to disclose (through itself or its representatives) to the Receiving Party (or its representatives) certain Confidential Information belonging to the Disclosing Party. The Disclosing Party makes no representation or warranty, express or implied, as to the quality, accuracy or completeness of Confidential Information disclosed hereunder. The Disclosing Party and their, owners, members, partners, officers, directors, and employees shall have no liability whatsoever with respect to the use of or reliance upon the Confidential Information by the Receiving Party (or its representatives).   A disclosure by either Party pursuant to this Agreement will be understood to refer to an anticipated business relationship between the Parties (a "Project").

C.   CONFIDENTIAL INFORMATION DEFINED. Confidential Information regarding a Project may include: the trade secrets and other confidential and proprietary information belonging to Disclosing Party or his, her or its affiliates and includes, but is not limited to: (i) business models; (ii) legal opinions; (iii) marketing research or strategies; (iv) concepts, ideas, plans, strategies, analyses, and information related to a Project's past, present or anticipated business; (v) Project company agreements, private placement memorandums, incorporation documents or addenda, supplements, or resolutions thereto; (vi) names and other information regarding vendors or contracts with third parties; (vii) Project expenses or financial information including pricing, revenue and profit projections; (viii) revenue and profits actually generated by the Project; (ix) technical or other information regarding the Disclosing Party's business, products, services, processes, methods of operation, equipment or procurement procedures and pricing techniques; (x) information regarding Disclosing Party's employees, manuals, policies, procedures, or compliance programs; (xi) information regarding Project members, partners, owners, physicians, physician practices, or individuals or entities that the Disclosing Party may seek to contract with or that are involved in any way with a Project; and (xii) data bases, commercial agreements and details of ongoing commercial negotiations (herein singularly or collectively referred to as the "Confidential Information"). Confidential Information may be verbal, but nonetheless shall include the original of such materials, any copies thereof, any notes derived from such materials, and any derivative work of such materials. Title to all property received by the Receiving Party, including all Confidential Information, shall remain the sole property of the Disclosing Party and any disclosure heretofore shall not be construed to grant to Receiving Party any rights to such property or Confidential Information so disclosed. To declare the Disclosing Party's intent that a disclosure under this agreement constitutes Confidential Information, the Disclosing Party shall strive to designate that such disclosure is made pursuant to this Agreement or otherwise memorialize that such information is "Confidential." Nonetheless, this Agreement shall apply to all of the information disclosed to Receiving Party, without regard to whether such disclosure is by means of written documents or otherwise and without regard to whether such disclosure is marked as being "Confidential."

D.   CONFIDENTIAL INFORMATION SHALL BE PROTECTED BY RECEIVING PARTY. In consideration of the disclosure referred to in Paragraphs B-C hereof, the Receiving Party agrees that Confidential Information shall be kept strictly confidential and shall not be sold, traded, published or otherwise disclosed to any person or entity in any manner whatsoever, including by means of photocopy,

reproduction or electronic media (without the Disclosing Party's prior written consent, except as provided in this Agreement). Moreover, Receiving Party covenants, warrants and acknowledges that the confidentiality and non-disclosure duties and promises that it undertakes herein shall without qualification be the same obligation of all of Receiving Party's associated persons or entities as well as, among others, Receiving Party's and such person's or entities' agents, officers, directors, employees, parent companies, servants, subsidiaries, affiliated companies, successors and assigns all of which will as applicable join this Agreement by their signature below.  The Receiving Party agrees that any breach by the Receiving Party of any of its obligations under this Agreement will result in irreparable injury to the Disclosing Party for which damages will be inadequate.

Receiving Party shall be responsible for any and all authorized and unauthorized disclosures of Confidential Information by Receiving Party or its affiliated entities or individuals. Sections D-E shall survive and continue after any termination of this Agreement and shall bind Receiving Party and its affiliated entities and individuals. The Receiving Party may disclose information without the Disclosing Party's prior written consent only to the extent such information: (a) is already known to the Receiving Party as of the date of disclosure hereunder; (b) is already in possession of the public or becomes available to the public other than through the act or omission of the Receiving Party (or of any other person or entity to whom Confidential Information is disclosed pursuant to this Agreement); (c) is required to be disclosed under applicable law or by a governmental order, decree, or regulation (provided that the Receiving Party shall give prompt written notice to the Disclosing Party prior to such disclosure); (d) is acquired independently from a third party that represents that it has the right to disseminate such information at the time it is acquired by the Receiving Party; or (e) is developed by the Receiving Party independently of the Confidential Information received from the Disclosing Party.

E.     FOR USE IN NEGOTIATIONS ONLY. The Receiving Party shall only use or permit the use of Confidential Information disclosed hereto to evaluate a Project. The Receiving Party shall not use Confidential Information in any way so as to; (i) contact any Project related physician or medical practice, member, partner, owner, or other interested party involved in a Project unless Disclosing Party so agrees; or (ii) compete with the business of the Disclosing Party; or (iii) circumvent the opportunities disclosed and the entities or individuals introduced by the Disclosing Party, either actual or envisaged. Nothing contained herein is intended to confer upon the Receiving Party any right whatsoever to the Disclosing Party's Confidential Information or interest in a Project. Nothing in this Agreement is intended to create any partnership, joint venture, agency, or other joint enterprise between the Disclosing Party and the Receiving Party. Upon termination of any relationship between the Parties, Receiving Party will promptly deliver to Disclosing Party, without retaining any copies, all documents and other materials furnished to Receiving Party by Disclosing Party.

F.     DISPUTE RESOLUTION. This Agreement is governed by and will be construed in accordance with the law of the State of Nevada, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.  Unless otherwise mutually agreed to by the parties, _____ County, Nevada shall be the exclusive venue for any proceeding involving the Parties may be brought, or arise out of, or related to this Agreement.

G.     BURDEN ON RECEIVING PARTY. In any dispute over whether any information or matter regarding any Project is Confidential Information hereunder, Receiving Party acknowledges and agrees without qualification that it shall be the burden of Receiving Party to show both that such contested information or matter is not Confidential Information within the meaning of this Agreement, and that it does not constitute a trade secret under the Uniform Trade Secrets Act or successor or any other similar statute, rule or case law germane to the State of Oklahoma or otherwise.

H.     NO WAIVER/AMENDMENTS. No delay or omission by either Party in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by either Party on any occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion. This Agreement may not be modified, altered, terminated or amended, in whole or in part, except by a writing signed by the Parties.

I.     SEPARABILITY OF COVENANTS. If any provision of this Agreement is invalid or unenforceable, then such provision shall be

construed and limited to the extent necessary, or severed if necessary, in order to eliminate such invalidity or unenforceability, and the other provisions of this Agreement shall not be affected thereby.

J.    BINDING EFFECT UPON SUCCESSORS AND ASSIGNS. Whenever a Party to the Agreement is named or referenced in this Agreement, the heirs, legal representatives, agents, affiliated entities and individuals, employees, successors and permitted assigns of such Party shall be included, and all covenants and agreements contained in this Agreement by or on behalf of the Receiving Party shall bind and inure to the benefit of his, her, or its respective heirs, legal representatives, agents, affiliated entities and individuals, employees, successors and permitted assigns.

K.    SIGNATURES. This Agreement constitutes the entire understanding between the Parties relating to the subject matter contained herein. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the duly authorized representatives of the Parties have caused this Agreement to be executed on the date first written above.

| **J AND J PURCHASING, LLC** | [_____] |
|---|---|
| By: | By: |
| Printed Name: Jeffrey Judd | Printed Name:_____, |
| Its Authorized Representative | Its Authorized Representative |
| Date: | Date: |
| [_____] <br> (INDIVIDUAL) | [_____] <br> (JOINDER, INDIVIDUAL OR ENTITY) |
| By: | By: |
| | Printed Name:_____, |
| Printed Name:_____, | Its Authorized Representative (as applicable) |
| Date: | Date: |

# Exhibit 13

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** February 8, 2021 at 5:10:06 PM PST
**To:** undisclosed-recipients:;
**Subject: Fwd: Fw: SkyBell Information - Subject to NDA signed on 2-8-2021**

Fellow Investors, Some of you have expressed interest in additional investment opportunities. This was shared with me from Shane and I thought I would put it out there for you. If you have any interest, I can let Shane know.

Jason

Jason,
Im going to put probably about 50k into this one. Lmk if anyone else wants in. Looks as though it has potential

Shane

Hello Gentlemen,

Thank you for signing the NDA.

Please find the following;

  1. Executive Overview of our 2020 – 2021 Business that I presented yesterday.

2. Form of Series B – Please find a copy of that.

3. Transfer of Shares Document.

4. Draft Balance Sheet dated 31st December 2021.

Heath will be in touch to follow up with you all.

Regards

Giovanni.

# Giovanni Tomaselli

**917-971 9872**

**SkyBell Technologies Inc.**

**Chief Procurement Officer & Member of the Board.**

**Giovanni Tomaselli | www.skybell.com**



1 Jenner Suite 100

Irvine, CA 92618

*"SkyBell has been named "Best Video Doorbell" by CNET, PC Mag, Wirecutter and Entrepreneur"*

**CONFIDENTIAL**: The information contained in this e-mail message may contain privileged or confidential information and is intended solely for the use of the individual or entity named above. If

you are not the intended recipient or the person responsible to deliver the foregoing to the intended recipient, you are hereby notified that any use, dissemination or duplication of the foregoing is strictly prohibited. If you have received this message in error, kindly notify the sender immediately and delete this e-mail from your system. **nHPC**

**SkyBell is patented**. For more information about our intellectual property portfolio visit http://www.skybell.com/pages/intellectual-property.

--



## Jason Jongeward
509-768-4990
www.jcdspokane.com



POWERING OUR PARTNERS

SkyBell Proprietary and Confidential

1

# SkyBell 2013 - 2019







|  |  |  |
|---|---|---|
| **2013** | **2014 -2016** | **2017 - 2019** |
| SkyBell launched an Indegogo campaign and **pioneered the video doorbell** category | 2014 – 2016 was marked by **continuous innovation** and an expanding array of **partnerships** | By 2017, SkyBell was the established **IP leader** in the video doorbell space and achieved EBITDA Positive in Q4 2019 |

# SKYBELL – 2020



**2020**

**SkyBell has been able to weather the 2020 challenges and was able to bring profitability each quarter.**



### TEAM UPDATE
We strengthened the internal product team. Finance & Operations is coping but will see strong improvement in 2021.



### PARTNER FOCUSED
We have been laser focused to continue to serve Alarm.com and in 2021 we already have their Jan-Jun Purchase Orders locked in.



### FACTORY UPDATE
Vietnam launched very strongly and has avoided a lot of the COVID challenges. Mexico has really struggled and continues to under perfrom.



### PRODUCT ROLL OUT
We struggled with new product development but were able to bring out TRIM 2 & SLIM 2 in Q4 that allowed us to set the stage for strong growth in '21.

3

# SkyBell 2020 – COVID Update





Source: Omdia   Date: 2020/03/03   Related tags: coronavirus, Video Surveillance, IP cameras, Logistics, Cmos, China



Although the coronavirus outbreak has had only a minimal impact on the video surveillance market so far, the industry still faces a risk from falling demand and a potential production bottleneck spurred by labor and component shortages in China, according to Omdia.

https://www.asmag.com/showpost/31246.aspx?name=news

**01** **INDUSTRY**
We continue to see tight supply of parts due to COVID. We have certain countries in lock down which slows the process and calls for greater planning.

**02** **DIVERSIFIED SUPPLY**
We are now firmly in place with production in Mexico and South East Asia.

**03** **MEXICO vs VIETNAM**
Mexico closed during the year but with consistency in Vietnam we were still to maintain EBITDA Positive.

**04** **DEMAND INCREASE**
Industry has seen significant increase in demand for security products. As we live in the age of living at home the need for IoT Products is top of mind.

4

# Executive Summary for 2020



<u>2020 OVERALL</u>

- ✓ Solid Gross Margin Performance for Year
- ✓ TRIM 2 & SLIM 2 have come out of the gate STRONG
- ✓ Continued challenges presented to us in 2020 have been overcome

<u>OPERATIONAL EXECUTION</u>

- ✓ We continue to improve our processes to scale our business
- ✓ We continue to ramp TRIM 2 & SLIM 2 above expectations
- ✓ Vietnam is running well. Mexico has struggled but will bounce back in Q2 2021

| FY 2020 Quarterly EBITDA | | | |
|---|---|---|---|
| **Q1** | **Q2** | **Q3** | *Q4* |
| $ 2,865,797 | $ 2,477,785 | $ 4,448,534 | $ 2,660,781 |
| | | | $ 12,452,897 |

# Customer Update





## 01
Alarm.com has embraced the SLIM 2 and is placing orders above expectations – Firm PO's at over 300K Units.

## 02
Wave has received very solid reports for TRIM 2 with particular interest from the building industry. Again, PO's are coming in ahead of plan. DR Horton leading the way.

## 03
Resideo will grow by about 20% by adding Trim 2 to their portfolio of products and AT&T Digital Life will be our leading new customer.





# SMART HOME CONTINUES TO GROW

The global connected home market will continue its strong growth trajectory with mass adoption iminent

Sources:
Mckinsey Connected Home
Mind Commerce (2019)

Global connected home forecast

**192b**

2017                                      2023



**12m units of VDB in 2024**



CAGR: 25%

2019        2024

Source: Mordor Intelligence

*SECURITY IS THE PRIMARY PURCHASE MOTIVATOR FOR SMART HOME*

*— consumer technology association 2019*

ACCORDING TO A RECENT MCKINSEY REPORT, SECURITY APPLICATIONS ARE MOST READY FOR MASS ADOPTION

8

# Strategic Areas of Focus

## Entry to Home Security



- Video doorbell market leader
- Wired and battery-enabled solutions
- LTE/5G integration for market advancement (telecoms)
- PoE for home builders/MDU's
- Projection systems for enhanced security

## Home Delivery Protection



- Validate at front door, pass to garage solution
- Built in transmitters to garage door opener
- Computer vision in garage for closing the loop
- Integration with door lock ecosystems
- Integration with delivery services and databases

## Perimeter Protection



- Expand eyes on home beyond the front door
- Focus on deterring vs. catching: *prevention*
- Utility monitoring
- IP camera integration into SkyBell Cloud

## Traditional Security System



- Market disruption opportunity for mass adoption
- Innovate in white spaces of well-established market
- Enhancement of the IP
- Significant sales/revenue opportunities
- Seeds our future innovation through new partners/channels

# Market Opportunities for SkyBell











**Home Delivery Solution**

Receive packages in your home via doorbell/ smart lock technology + receive verifications ($430B+ Global)

Theft Market Size: **$9B+**

**Video Products**

See who's at the front door from anywhere, with video, two-way-talk system integrations

Market Size: **$2B+**

**Home IoT**

SkyBell Gen5 Connect delivers a complete solution that allows for monthly recurring revenue

Market Size: **$8B+**

**Home Security**

Smart cameras, sensors, and software to protect dwellings, assets, and people

Market Size: **$53B+**

**Living in Place**

We are living longer and wanting to stay independent. Enormous opportunity to serve this sector

Market Size: **$30B+**

## Creating a Platform that will enable a recurring revenue SaaS model to millions of subscribers

SKYBELL PROPRIETARY AND CONFIDENTIAL

# SKYBELL GEN 5 CONNECT



**Your Complete Backend Solution For The Implementation And Management Of Your Installed Base**

# SKYBELL IS THE ONLY COMPANY IN THIS SPACE FOCUSED ON A **BUSINESS TO BUSINESS TO CONSUMER MODEL**

# 2021 Key Performance Indicators



## Customer Forecast / Purchase Orders – VERY STRONG

- ✓ We have $49.7M for Q1 / Q2 Orders in hand vs $64.6M Plan (77%) as of 12/31/2020
- ✓ Very Strong Position to be in prior to year end
- ✓ We have walked into Jan 2021 and locked up $10M more in Q2 from ADC
- ✓ We have verbal confirmation that we have won the AT&T Digital Life Business
- ✓ We are well over 60% of firm forecasting / PO's for Q1 – Q3 of 2021.



| Unit Comparisons 2020 vs 2021 | | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Total |
| 2020 | 182,604 | 162,659 | 137,442 | 156,658 | 639,362 |
| 2021 | 278,480 | 382,496 | 469,000 | 600,000 | 1,729,976 |

# SKYBELL MAINTAINS THE BROADEST IP PORTFOLIO IN THE INDUSTRY

**Over 220 U.S. and foreign patents, patents pending and patent licenses in the video doorbell market**

**Some of our most notable video doorbell patent coverage:**

- Doorbell communication and electrical systems
- *Silent Mode, Power Jumper*
- Doorbell communication systems and methods
- *Wireless video doorbell, Video Doorbell Night Vision*
- Doorbell chime systems and methods
- *Video Doorbell*
- Doorbell communities
- *Village – digital neighborhood watch*
- Doorbell package and detection systems and methods
- *Home access package delivery*



| **220** US & INTERNATIONAL PATENTS | **21** LICENSED PATENTS | **24+** PATENTS PENDING | VALUATION RANGE | | $300 - $700 MILLION USD |

13

# OUR EMERGING IP WILL ENABLE THE NEXT GENERATION OF HOME SECURITY, AUTOMATION AND IOT WELL BEYOND THE FRONT DOOR



**SMART LOCKS**
Double Validation of visitor identity; near-field charging of smart locks
87   20
Issued / Pending Claims

**SMART BULB**
Receive commands and initiate tasks with appliances
79   30
Issued / Pending Claims

**EMERGENCY NOTIFICATION**
Determine that an emergency is in progress and emit a warning
60   20
Issued / Pending Claims

**POWER OUTLET**
Cameras detect non-motion events and send alerts
96   20
Issued / Pending Claims

**PARCEL DELIVERY**
Receive packages in your home via doorbell/ smart lock technology
89   157
Issued / Pending Claims

**SKYBELL VILLAGE**
Home safety through neighborhood devices communicating
30   73
Issued / Pending Claims

**FACIAL RECOGNITION**
Determines whether the visitor is an unwanted visitor such as a solicitor
26   55
Issued / Pending Claims

SKYBELL PROPRIETARY AND CONFIDENTIAL

# ITC TIMELINE

## Stage 1 - Filing Date 12/18/2020

- File Complaint
- Institution Decision Achieved (Jan 25th 2021)
- Scheduling Conference – 6 weeks from filing

## Stage 3

- Pretrial Conference
- Trial
- Post-Trial Briefing
- ALJ Decision

## Stage 5

- Presidential Review
- Injunction in Effect

**First 2**
Months

**7-12**
Months

**17-18**
Months

**3-6**
Months

**13-16**
Months

## Stage 2

- Complete Fact Discovery and Depositions
- Complete Expert Reports and Depositions
- Summary Judgment Briefing Complete

## Stage 4

- Commission Reviews the ALJ Decision
- Conclusion of the Investigation.

# Strategic & Growth Initiatives

**01** COMPLETE PLATFORM OFFERING

**02** CUSTOMER ACQUISITION

**03** RECURRING REVENUE

**04** IP MONETIZATION

**05** INNOVATIVE SOLUTIONS

# THANK YOU

**SERIES B PREFERRED STOCK PURCHASE AGREEMENT**

**BY AND BETWEEN**

**SKYBELL TECHNOLOGIES, INC.**

**AND**

**[     ]**

**Dated [     ]**

# SKYBELL TECHNOLOGIES, INC.

## SERIES B PREFERRED STOCK PURCHASE AGREEMENT

This SERIES B PREFERRED STOCK PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of this [     ] by and between the SkyBell Technologies, Inc., a Nevada corporation (the "*Company*") and [     ] ("*Purchaser*").

RECITALS

A.      The Company is in the business of developing, marketing and selling door bells with integrated monitoring cameras (the "*Business*"); and

B.      The parties desire that, upon the terms and subject to the conditions and limitations set forth herein, the Company shall issue and sell to Purchaser, and Purchaser shall purchase from the Company, the Shares (as defined below) described below.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties and subject to the conditions contained herein, the parties hereto covenant and agree as follows:

1.      <u>**Authorization of Sale of the Securities**</u>. Subject to the terms and conditions of this Agreement, the Company has authorized the issuance and sale to Purchaser of [     ] shares (the "*Shares*") of the Company's Series B Preferred stock, par value $0.0001 per share (the "*Series B Preferred*").  The Series B Preferred shall have the rights, privileges, preferences, and restrictions set forth in the Second Amended and Restated Articles of Incorporation of the Company, attached hereto as <u>Exhibit B</u> (the "*Restated Articles*").

2.      <u>**Agreement to Sell and Agreement to Purchase the Securities**</u>.

2.1      <u>Purchase of Shares</u>.  At the Closing (as defined below), on the terms and subject to the conditions set forth herein, the Company shall issue and sell the Shares to Purchaser, and Purchaser shall purchase, acquire and accept from the Company the Shares.  The Company shall deliver to each Purchaser a certificate representing the Shares purchased by Purchaser against receipt of $[     ](the "*Purchase Price*").

2.2      <u>[Reserved]</u>.

2.3      <u>Closing</u>.  The Closing (the "*Closing*") shall take place at the offices of Ellenoff Grossman & Schole LLP. 1345 Avenue of the Americas, New York, NY and be effective as of 8:00 p.m., local time, within five (5) business days after the date of this Agreement, or at such other time and place as the Company may determine.

2.4      <u>Delivery of the Shares at Closing</u>. At a Closing, against receipt of the Purchase Price, the Company shall deliver to each Purchaser a stock certificate registered in the

1

name of Purchaser representing the Shares and bearing an appropriate restrictive legend in accordance with <u>Section 4.6</u> hereof. The Company's obligation to complete the purchase and sale of the Shares and deliver such stock certificate to each Purchaser at the Closing shall be subject to the Company's receipt of the Purchase Price from Purchaser, in immediately available funds in U.S. dollars by wire transfer (pursuant to the instructions set forth on <u>Exhibit C</u>, attached hereto).

3.      **<u>Representations and Warranties of the Company</u>**.  The Company represents and warrants to each Purchaser that:

3.1     <u>Organization and Good Standing</u>.  The Company is duly organized, validly existing and in good standing under the laws of Nevada (the jurisdiction in which it was formed) with full power to carry on its business as it is now and has since its organization been conducted, and to own, lease or operate its assets.  The Company is duly authorized to do business and is in good standing in such other jurisdictions in which the Company is required to be so authorized and where failure to be so qualified could reasonably be expected to have a Material Adverse Effect.  "**Material Adverse Effect**" as used in this Agreement means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property or results of operations of the Company.

3.2     <u>Authorization of Agreement</u>.  The Company has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all other agreements and instruments to be executed by the Company has been duly executed and delivered by the Company, has been effectively authorized by all necessary action, corporate or otherwise, and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

3.3     <u>Capitalization</u>.

3.3.1     As of January 13, 2020, the authorized capital stock of the Company consists of (i) 150,000,000 shares of common stock, par value $0.0001 per share ("**Common Stock**"), of which 20,194,387 shares are issued and outstanding, and (ii) 100,000,000 shares of Preferred Stock, par value $0.0001 per share (the "**Preferred Stock**"), 425,000 of which are designated Series A1 Preferred Stock, 373,772 shares of which are issued and outstanding; 3,000,000 of which are designated Series A Preferred Stock, 1,425,237 of which are issued and outstanding; and 90,000,000 shares of which are designated Series B Preferred Stock, 70,694,536 of which are issued and outstanding. The Common Stock and the Preferred Stock shall have the rights, preferences, privileges and restrictions set forth in the Restated Articles. The share of Common Stock into which the Series B Preferred Stock are convertible (the "**Conversion Shares**") have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Articles and applicable law, will be validly issued, fully paid and nonassessable.

3.3.2     All of the outstanding shares of the Company have been duly authorized, validly issued (free of all preemptive rights), and are fully paid and nonassessable.  After giving effect to the transactions contemplated hereof (i) all outstanding shares of capital stock of the Company, and (ii) any outstanding or authorized options, warrants,

subscriptions, calls, puts, conversion or other rights, contracts, agreements, commitments or understandings of any kind obligating the Company to issue, sell, purchase, return, redeem or pay any distribution or dividend with respect to any shares of capital stock of the Company or any other securities convertible into, exchangeable for or evidencing the right to subscribe for any shares of capital stock of or other ownership interest in the Company, are listed on Schedule 3.3, hereof.

  3.4  Financial Condition.

   3.4.1 Financial Statements. Attached as Schedule 3.4.1 are the unaudited balance sheet and income statement of the Company from January 2020 to March 2020 (the "**Financial Statements**").  Each financial statement referred to above is complete and correct in all material respects and presents fairly in all material respects the financial condition and results of operations of the Company as of such dates and are correct and complete in all material respects, subject to changes resulting from normal year-end audit adjustments.  There has been no material change in the accounting methods or practices of the business since the earliest date covered by the financial statements. To the Company's knowledge, there are no other liabilities of the Company that are not set forth in the Financial Statements.

  3.5  Reserved.

  3.6  Assets of the Company.  The Company owns, or has valid leasehold interests in, or licenses to, all of the assets required or necessary to operate the Business of the Company as it is now being conducted.

  3.7  Labor and Employment Matters.  No collective bargaining agreement exists that is binding on the Company and no proceedings have been instituted by an employee or group of employees seeking recognition of a bargaining representative.  No organizational effort currently is being made or threatened by or on behalf of any labor union to organize any employees of the Company.

  3.8  Intellectual Property.  "**Intellectual Property**" means all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, tradenames, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes as are necessary to the conduct of the Company's business as now conducted.  The Company owns or possesses or can obtain on commercially reasonable terms sufficient legal rights to (i) all trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and similar proprietary rights and (ii) patents and all other Intellectual Property used in or necessary to the business of the Company as presently conducted and presently proposed by the Company to be conducted.  Attached hereto as Schedule 3.8(a) is a complete list of the Company's patents, trademarks, copyrights and domain names and pending patent, trademark and copyright applications, and licenses thereto.  Except for the material agreements set forth on Schedule 3.8(b), hereof, there are no outstanding options, licenses or agreements relating to the Intellectual Property, and the Company is not bound by or a party to any options, licenses or agreements with respect to the Intellectual Property of any other person or entity.  Except for the Ring, Inc. matter described on Schedule 3.11, to the Company's knowledge, (i) neither the current use of any Intellectual

Property by the Company nor the operations of its business conflicts with, infringes upon, misappropriates or violates any rights of any third party, and the Company does not have any liability for past infringement and (ii) there are no facts which indicate a likelihood of any infringement, misappropriation or violation by, or conflict with any person or entity with respect to any Intellectual Property.  To the Company's knowledge, it will not be necessary to use any inventions of any of its employees or consultants (or persons it currently intends to hire) made prior to their employment by the Company.  Each employee and consultant has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted.

      3.9    <u>Title to Properties and Assets; Liens</u>.  The Company has good and marketable title to all of its material properties and assets, and has good title to all its material leasehold interests, in each case subject to no mortgage, pledge, lien, lease, encumbrance or charge, other than (i) liens for current taxes not yet due and payable, (ii) liens imposed by law and incurred in the ordinary course of business for obligations not past due, (iii) liens in respect of pledges or deposits under workers' compensation laws or similar legislation, and (iv) liens, encumbrances and defects in title which do not in any case materially detract from the value of the property subject thereto or have a Material Adverse Effect, and which have not arisen otherwise than in the ordinary course of business.  With respect to the property and assets it leases, the Company is in compliance with such leases in all material respects and holds a valid leasehold interest free of any liens, claims or encumbrances, subject to clauses (i)-(iv) above.

      3.10    <u>Compliance with Other Instruments</u>.  The Company is not in violation or default of any term of its Articles of Incorporation or Bylaws, each as amended to date, or of any material term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound or of any provision of any federal or state statute, rule or regulation applicable to the Company.  The execution and delivery of the Agreements by the Company, the performance by the Company of its obligations pursuant to the Agreements, and the issuance of the Shares and the Conversion Shares, when issued, will not (i) result in any such violation (ii) conflict with, or constitute a material default under, the Company's Articles of Incorporation or Bylaws, each as amended to date, or any of its agreements, or (iii) result in the creation of any material mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company.

      3.11    <u>Litigation</u>.  All current litigation involving claims against the Company in excess of $100,000 is set forth in <u>Schedule 3.11</u>, hereof.

      3.12    <u>Governmental Consent</u>.  To the Company's knowledge, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or third person or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its property, the violation of which would have a Material Adverse Effect.  No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares and the issuance of the Conversion Shares, when issued, or the consummation of any other transaction contemplated by this Agreement, except (i) filing of the Restated Articles, which as of the date hereof has been filed with the office of the Secretary of State of the State of Nevada,

4

(ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "***Securities Act***") and (ii) such filings as may be required under applicable state securities laws, which have been made or will be made in a timely manner.

3.13   Permits.  To the Company's knowledge, the Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could reasonably be expected to have a Material Adverse Effect, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as presently planned to be conducted.  The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

3.14   Offering.  Subject to the accuracy of the Purchasers' representations and warranties in Section 4, hereof, the offer, sale and issuance of the Shares and the Conversion Shares, when issued, to be issued in conformity with the terms of this Agreement, constitutes a transaction exempt from the registration requirements of Section 5 of the Securities Act and from the registration or qualification requirements of applicable state securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

3.15   Brokers or Finders.  The Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.16   Employee Benefit Plans.  The Company does not have any Employee Benefit Plan as defined in the Employee Retirement Income Security Act of 1974, as amended.

3.17   Insurance.  The Company has in full force and effect business liability insurance policies in amounts customary for companies in similar businesses similarly situated.

3.18   Tax Returns and Payments.  There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

4.   **Representations and Warranties of Purchaser**.  Purchaser, severally and not jointly, represents and warrants to the Company that:

4.1   Investment Intent.  Purchaser is acquiring the Shares with the intention as of the date hereof of holding the Shares and the Conversion Shares for purposes of investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.  Purchaser further represents

5

that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to the Shares or the Conversion Shares.

       4.2     <u>Investment Experience.</u>  Purchaser is an Accredited Investor (as defined in Rule 501 promulgated under the Securities Act) and is able to bear the risk of an investment in the Shares including risks associated with holding the Shares and the Conversion Shares for an extended period of time, and shall submit to the Company such further assurances of such status as may reasonably be requested by the Company.

       4.3     <u>Investigation.</u>  Purchaser has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning this Agreement, the exhibits and schedules attached hereto and thereto and the transactions contemplated by this Agreement, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction.  Purchaser believes that it has received all the information Purchaser considers necessary or appropriate for deciding whether to purchase the Shares.  Purchaser understands that such discussions, as well as any information issued by the Company, were intended to describe certain aspects of the Company's business and prospects, but were not necessarily a thorough or exhaustive description.  Purchaser acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.  Purchaser also acknowledges that it is relying solely on its own counsel and not on any statements or representations (other than the representations provided by the Company herein) of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Agreements.

       4.4     <u>Restricted Securities.</u>  Purchaser understands that the Shares and the Conversion Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of Purchaser's representations as expressed herein.  Purchaser understands that the Shares and the Conversion Shares are "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, Purchaser must hold the Shares and the Conversion Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities or an exemption from such registration and qualification requirements is available.  Purchaser acknowledges that the Company has no obligation to register or qualify the Shares or the Conversion Shares, for resale.  Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares and the Conversion Shares, and on requirements relating to the Company which are outside of Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

       4.5     <u>No Public Market.</u>  Purchaser understands that no public market now exists for the Shares or the Conversion Shares, and that the Company has made no assurances that a public market will ever exist for the Shares or the Conversion Shares.

4.6     Legends.  Purchaser understands that the Shares or the Conversion Shares, when issued, or any other securities issued in respect of or exchange for the Shares or the Conversion Shares, as applicable, may bear any one or more of the following legends: (a) any legend set forth in, or required by, this Agreement; (b) any legend required by the securities laws of any state to the extent such laws are applicable to the Shares or the Conversion Shares represented by the certificate so legend; and (c) the following legend:

THE SECURITIES REPRESENTED HEREBY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR QUALIFIED UNDER ANY APPLICABLE STATE OR FOREIGN SECURITIES LAWS, AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SECURITIES IS EFFECTIVE UNDER THE SECURITIES ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE SECURITIES ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE ISSUER REQUESTS, AN OPINION SATISFACTORY TO THE ISSUER TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

4.7     Accredited and Sophisticated Purchaser.  Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and has executed and delivered to the Company the "Statement of Accredited Investor," attached as hereto as Exhibit D.  Purchaser is an investor in securities of companies in the development stage and acknowledges that Purchaser is able to fend for itself, can bear the economic risk of its investment for an indefinite period of time, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares.  If other than an individual, Purchaser also represents it has not been organized for the purpose of acquiring the Shares.

4.8     Residency.  Purchaser's principal place of business is in the State of New York.

4.9     Authorization.

4.9.1     Purchaser has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements.  All action on the part of Purchaser necessary for the authorization, execution, delivery and performance of this Agreement, and the performance of all of Purchaser's obligations under the Agreements, has been taken or will be taken before the Closing.

4.9.2     The Agreements, when executed and delivered by Purchaser, will constitute valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms except:  (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting

enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

        4.9.3   No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by Purchaser in connection with the execution and delivery of the Agreements by Purchaser or the performance of Purchaser's obligations hereunder or thereunder.

        4.10   <u>Brokers or Finders</u>.  Purchaser has not engaged any brokers, finders or agents to Purchaser's actual knowledge, and neither the Company nor any other person has, nor will, incur, directly or indirectly, as a result of any action taken by Purchaser, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

        4.11   <u>Tax Advisors</u>.  Purchaser has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the Agreements.  With respect to such matters, Purchaser relies solely on such advisors and not on any statements or representations (other than the representations provided by the Company herein) of the Company or any of its agents, written or oral.  Purchaser understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

        4.12   <u>No General Solicitation</u>.  Neither Purchaser nor any of its officers, directors, employees, agents, stockholders or partners, as applicable, has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation with respect to the offer and sale of the Shares, or (b) published any advertisement in connection with the offer and sale of the Shares.

     5.     **Company's Post-Closing Covenants**.  From and after Closing, the Company covenants and agrees as follows:

        5.1   <u>Board of Directors</u>.  Effective upon the Closing, the authorized number of Directors of the Company's Board of Directors shall be fixed at nine (9) members.  The current members of the Board of Directors consist of Ronald Garriques, Dr. Kousay Al-Kourainy, Murray Wikol, Jonathan Doochin, Scott Durchslag, Michael Tatelman, Giovanni Tomaselli, Robert Raymond, and John Chiorando.  Pursuant to the Restated Articles, the holders of the Series B Preferred shall have the right to nominate and appoint the two (2) remaining members of the Board of Directors.

        5.2   <u>Financial Statements</u>. Within 60 days after the end of each of the first three fiscal quarters of each fiscal year of the Company and within 120 days after the end of each fiscal year of the Company, the Company shall furnish its financial statements to each Purchaser, all certified by the Company's officers as presenting fairly in all material respects the financial condition of the Company.

     6.     **Miscellaneous**.

6.1     Notices.  All notices, requests, consents, claims, demands, waivers and other communications pertaining to this Agreement (a "**_Notice_**") will be in writing addressed as follows:

| | |
|---|---|
| *If to the Purchaser, to:* | *with a copy (which shall not constitute notice) to:* |
| [                    ] | |

| | |
|---|---|
| *If to the Company, to:* | *with a copy (which shall not constitute notice) to:* |
| SkyBell Technologies, Inc.<br>1 Jenner Street, Suite 100<br>Irvine, CA 92618<br>Attn:  Desiree Mejia<br>Email: desiree@skybell.com | Ellenoff Grossman & Schole LLP<br>1345 Avenue of the Americas, 11th Floor<br>New York, NY 10105<br><br>Attn:  Jonathan Deblinger, Esq.<br>Email: jdeblinger@egsllp.com |

Notices will be deemed given (i) on the first business day after being sent, prepaid, by nationally recognized overnight courier that issues a receipt or other confirmation of delivery, (ii) on the third business day after being sent by U.S. mail as first class registered or certified mail, return receipt requested, postage prepaid or (iii) when delivered in person or by facsimile (with affirmative confirmation of receipt).  Any party may change the address to which Notices under this Agreement are to be sent to it by giving written notice of a change of address in the manner provided in this Agreement for giving Notice.

6.2     Governing Law; Jurisdiction; WAIVER OF JURY TRIAL.  The Company and the Purchasers agree that this Agreement is made in the State of Nevada and the provisions hereof will be construed in accordance with the laws of the State of Nevada.  The Company and the Purchasers agree that any litigation relating to this Agreement initiated by them or on their behalf shall be venued in any court of competent jurisdiction in the State of Nevada (and any appellate courts thereof).  EACH OF THE COMPANY AND THE PURCHASER IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS WARRANT OR THE MATTERS CONTEMPLATED HEREBY.

6.3     Indemnification for Brokerage.  The Purchasers and the Company each represent and warrant to the others that no broker or finder has acted on its behalf in connection with this Agreement or the transactions contemplated hereby.  Each party hereto agrees to indemnify and hold harmless the others from any claim or demand for commissions or other compensation by any broker, finder or similar agent who is or claims to have been employed by or on behalf of such party.

6.4     Severability.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction will not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of this Agreement, including

9

that provision, in any other jurisdiction.  Any provision of this Agreement held illegal, invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.  To the extent legally permissible, any illegal, invalid or unenforceable portion of any provision of this Agreement will be replaced by a valid provision which will implement the purpose of the illegal, invalid or unenforceable provision.

   6.5 <u>Successors and Assigns; No Third-Party Beneficiaries</u>. This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Purchaser without the prior written consent of the Company. Any attempt by a Purchaser without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void.  Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

   6.6 <u>Knowledge; Due Diligence Investigation</u>.  All representations and warranties contained herein which are made to the knowledge of the Company shall mean to the knowledge of the current Executive Officers of the Company (the "***Executive Officers***").  The Executive Officers shall be deemed to have "knowledge" of a matter for purposes of the warranties and representations contained herein if such matter has come, or should reasonably be expected to have come, to the attention of the Executive Officers of the Company after conducting a reasonable investigation.

   6.7 <u>Expenses of Transactions</u>.  All fees, costs and expenses incurred by the Purchasers or the Company in connection with the transactions contemplated by this Agreement shall be borne by the party incurring the same.

   6.8 <u>Entire Agreement</u>.  This Agreement, the exhibits and schedules attached hereto and the documents delivered pursuant to this Agreement form or will form the entire agreement between the parties hereto with respect to the transactions contemplated herein and shall supersede all previous oral and written and all contemporaneous oral negotiations, commitments, and understandings.

   6.9 <u>Amendment and Modification; Waiver</u>.  Except as otherwise provided herein, this Agreement may only be amended, modified or supplemented by an agreement in writing signed by the Company and the Purchasers. No waiver by the Company or the Purchasers of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

   6.10 <u>Interpretation</u>. The headings of the Sections and other subdivisions of this Agreement are for convenience only and in no way modify, interpret or construe the meaning of

specific provisions of this Agreement.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The words "include" and "including" and other words of similar import when used herein shall not be deemed to be terms of limitation but rather shall be deemed to be followed in each case by the words "without limitation."  The word "if" and other words of similar import when used herein shall be deemed in each case to be followed by the phrase "and only if."  The words "herein," "hereto," and "hereby" and other words of similar import in this Agreement shall be deemed in each case to refer to this Agreement as a whole and not to any particular Section or other subdivision of this Agreement.  Any reference herein to "dollars" or "$" shall mean United States dollars.  The term "or" shall be deemed to mean "and/or."  For purposes of this Agreement, a "business day" shall mean each day of the week except Saturdays, Sundays and days on which banking institutions are authorized by law to close in the State of Nevada.  The parties have participated jointly in the negotiation and drafting of this Agreement.  Consequently, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

6.11   Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.  Signatures delivered by facsimile or by electronic data file shall have the same effect as originals.

6.12   Survival.  The representations and warranties of the Company and the Purchaser set forth herein shall survive the Closings.

6.13   Waiver of Adjustment of Conversion Price for Diluting Issues.  The Purchaser does further consent and agree that the shares of Common Stock to be issued (i) pursuant to the conversion of any shares of Series B Preferred Stock to be issued pursuant to this Agreement, and (ii) pursuant to any agreement entered into by the Corporation as of or prior to the date hereof, including the conversion of any shares of Series B Preferred Stock or the exercise of any warrants, shall, in each such case, be excluded from the definition of "Additional Shares of Common" as used in Section 5(d) of the Restated Articles. In addition, the Purchaser hereby confirms and agrees that the issuance of any of the securities referred to above shall not constitute a "Deemed Issuance of Additional Shares of Common" pursuant to Section 5(d)(iii) of the Restated Articles, and waive any and all rights to any adjustment arising from any such issuance or issuances.

[SIGNATURES ON FOLLOWING PAGES]

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

**SKYBELL TECHNOLOGIES, INC.**

By: _____
Name:  Ronald G. Garriques
Title:    CEO

**PURCHASER**

[                    ]

By: _____
Name: [                    ]

Title:

**EXHIBIT A**

**[INTENTIONALLY OMITTED]**

**EXHIBIT B**

**SECOND AMENDED AND RESTATED
ARTICLES OF INCORPORATION**

**EXHIBIT C**

**INSTRUCTIONS FOR PAYMENT OF INVESTMENT AMOUNT**

Wire to:                City National Bank
                              18111 Von Karman Ave., Suite 120
                              Irvine, CA 92612

ABA Number:        1220 16066

For Credit To:      SkyBell Technologies, Inc.

Account Number:    ████8272

**EXHIBIT D**

**STATEMENT OF ACCREDITED INVESTOR**

To: SkyBell Technologies, Inc. (the "***Company***")

Ladies and Gentlemen:

The undersigned hereby refers to that certain Series B Preferred Stock Purchase Agreement executed and delivered to the Company by the undersigned as of the date hereof.  In connection with the subscription thereunder by the undersigned to purchase securities of the Company, the undersigned hereby represents and warrants that such individual or entity meets at least one of the tests listed below for an "accredited investor" (as such term is defined under Regulation D promulgated pursuant to the Securities Act of 1933, as amended).

"Accredited Investors" are accorded special status under the federal securities laws. Individuals who hold certain positions with an issuer or its affiliates, or who have certain minimum individual income or certain minimum net worth (each as described below) may qualify as Accredited Investors.  Partnerships, corporations or other entities may qualify as Accredited Investors if they fulfill certain financial and other standards, or if all of their equity owners have incomes and/or net worth which qualify them individually as Accredited Investors, and trusts may qualify as Accredited Investors if they meet certain financial and other tests (as described below).

You may qualify as an Accredited Investor under Regulation D promulgated under the Securities Act of 1933 (the "1933 Act") if you meet any of the following tests (please check all that apply):

☐ **The undersigned is an individual who is a director or executive officer of the Company**.  An "executive officer" is the president, a vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the Company.

☐ **The undersigned is an individual that (1) had individual income of more than $200,000 in each of the two most recent fiscal years and reasonably expects to have individual income in excess of $200,000 in the current year, or (2) had joint income together with the undersigned's spouse in excess of $300,000 in each of the two most recent fiscal years and reasonably expects to have joint income in excess of $300,000 in the current year.**  "Income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts:  (i) any tax exempt interest income under Section 103 of the Internal Revenue Code (the "Code") received, (ii) any losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040, (iii) any deduction claimed for depletion under Section 611 of the Code or (iv) any amount by which income has been reduced in arriving at adjusted gross income

pursuant to the provisions of Section 1202 of the Code.  In determining personal income, however, unrealized capital gains should not be included.

☐ **The undersigned is an individual with individual net worth, or combined net worth together with the undersigned's spouse, in excess of $1,000,000.**  "Net worth" means the excess of total assets at fair market value, excluding the value of a primary residence, over total liabilities.

☐ **The undersigned is a Trust with total assets in excess of $5,000,000**, was not formed for the specific purpose of acquiring securities of the Company, and the purchase of the securities is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of the prospective investment in such securities.

☐ **The undersigned is a corporation, partnership, limited liability company or limited liability partnership that has total assets in excess of $5,000,000** and was not formed for the specific purpose of acquiring securities of the Company.

☐ **The undersigned is an entity in which all of its equity owners are "accredited investors".**

Dated: [              ]


                                        Very truly yours,

                                        [              ]


                                        By: _____
                                        Name: [              ]
                                        Title:

## SCHEDULE 3.3

## CAPITALIZATION

SkyBell Technologies, Inc. Sum
*Exported as of 01/13/2020*

| | Outstanding | Conversion Ratio | As Converted | Percent | Authorized |
|---|---|---|---|---|---|
| **Common** | | | | | |
| Common | | | | | 150,000,000 |
| Non-Restricted | 20,194,387 | 1.0x | 20,194,387 | 15.02% | |
| **Total** | 20,194,387 | | 20,194,387 | 15.02% | 150,000,000 |
| **Preferred** | | | | | |
| Series A-1 Preferred | 373,772 | 1.0x | 373,772 | 0.28% | 425,000 |
| Series A Preferred | 1,425,237 | 1.0x | 1,425,237 | 1.06% | 3,000,000 |
| Series B Preferred | 70,694,536 | 1.0x | 70,694,536 | 52.59% | 90,000,000 |
| **Total** | 72,493,545 | | 72,493,545 | 53.93% | 93,425,000 |
| **Warrant** | | | | | |
| Common Warrants | 22,486,193 | 1.0x | 22,486,193 | 16.73% | N/A |
| Series A Preferred Warrants | 40,617 | 1.0x | 40,617 | 0.03% | N/A |
| Series B Preferred Warrants | 5,000,000 | 1.0x | 5,000,000 | 3.72% | N/A |
| **Total** | 27,526,810 | | 27,526,810 | 20.48% | 0 |
| **Service Providers Outside of Equit** | | | | | |
| Authorized | 140,000 | | | | 140,000 |
| Option Issuances | 140,000 | | | | |
| Issued | 140,000 | | | | |
| Issued and Outstanding | 140,000 | | | | |
| Options | 140,000 | | 140,000 | 0.10% | |
| Vested | 140,000 | | | | |
| Unvested | 0 | | | | |
| Remaining Under Plan | 0 | | 0 | 0.00% | |
| **2017 Employee Stock Option Plan** | | | | | |
| Authorized | 4,074,407 | | | | 4,074,407 |
| Option Issuances | 4,508,195 | | | | |
| Issued | 4,508,195 | | | | |
| Cancelled (returned) | 661,320 | | | | |
| Issued and Outstanding | 3,846,875 | | | | |
| Options | 3,846,875 | | 3,846,875 | 2.86% | |
| Vested | 3,846,875 | | | | |
| Unvested | 0 | | | | |
| Remaining Under Plan | 227,532 | | 227,532 | 0.17% | |
| **SkyBell Technologies, Inc. 2019 E** | | | | | |
| Authorized | 10,000,000 | | | | 10,000,000 |
| Option Issuances | 4,250,000 | | | | |
| Issued | 4,250,000 | | | | |
| Issued and Outstanding | 4,250,000 | | | | |
| Options | 4,250,000 | | 4,250,000 | 3.16% | |
| Vested | 4,250,000 | | | | |
| Unvested | 0 | | | | |
| Remaining Under Plan | 5,750,000 | | 5,750,000 | 4.28% | |
| **Total** | | | 134,429,149 | 100.00% | |
| *Convertible Debt* | $0.00 | | | | |

## SCHEDULE 3.4.1

## FINANCIAL STATEMENTS – Balance Sheet

6:21 PM
05/18/20
Accrual Basis

**SkyBell Technologies, Inc.**
**Balance Sheet**
As of March 31, 2020

|  | Mar 31, 20 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Total 10000 · Cash and equivalents | 1,639,488.00 |
| **Total Checking/Savings** | 1,639,488.00 |
| **Accounts Receivable** | |
| 11000 · Accounts Receivable | 9,814,540.78 |
| **Total Accounts Receivable** | 9,814,540.78 |
| **Other Current Assets** | |
| Total 12000 · Inventory | 477,209.53 |
| Total 13000 · Prepaid Expenses | 15,204,583.64 |
| Total Other Current Assets | 2,299,682.01 |
| **Total Other Current Assets** | 17,981,475.18 |
| **Total Current Assets** | 29,435,503.96 |
| **Other Assets** | |
| **Long-Term Assets** | |
| Total Long-Term Assets | 15,796,566.48 |
| **Total Other Assets** | 15,796,566.48 |
| **TOTAL ASSETS** | 45,232,070.44 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Total Accounts Payable | 11,298,919.57 |
| Total Credit Cards | 390,479.21 |
| Total 23100 · Other Current Liabilities | 9,153,063.65 |
| **Total Other Current Liabilities** | 10,025,987.73 |
| **Total Current Liabilities** | 21,715,386.51 |
| **Long Term Liabilities** | |
| Total 25000 · Star Mtn Diversified Credit | 35,000,000.00 |
| 24985 · Lynx Holdings I, LLC | |
| Total 24985 · Lynx Holdings I, LLC | 7,121,333.33 |
| Total 27000 · Other Long-Term Liabilities | 2,208,573.60 |
| **Total Long Term Liabilities** | 44,329,906.93 |
| **Total Liabilities** | 66,045,293.44 |
| **Equity** | |
| 30500 · Preferred Stock | |
| Total 30500 · Preferred Stock | 53,539,663.39 |
| 32000 · Common Stock | |
| Total 32000 · Common Stock | 9,464,762.69 |
| 34000 · Retained Earnings | -84,099,761.89 |
| 34050 · Retained Earnings Adjustment | -485,000.00 |
| Net Income | 767,112.81 |
| **Total Equity** | -20,813,223.00 |
| **TOTAL LIABILITIES & EQUITY** | 45,232,070.44 |

## SCHEDULE 3.4.1

## FINANCIAL STATEMENTS – Profit & Loss

8:09 AM
05/19/20
Accrual Basis

**SkyBell Technologies, Inc.**
**Profit & Loss**
Jan 2020 through Mar 2020

|  | Jan 20 | Feb 20 | Mar 20 | TOTAL |
|---|---:|---:|---:|---:|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| **Total Income** | 4,510,184.26 | 5,483,422.42 | 4,979,880.88 | 14,973,487.56 |
| **Cost of Goods Sold** | | | | |
| **Total COGS** | 2,945,486.81 | 3,499,098.72 | 2,867,528.67 | 9,312,114.20 |
| **Gross Profit** | 1,564,697.45 | 1,984,323.70 | 2,112,352.21 | 5,661,373.36 |
| **Expense** | | | | |
| 60000 · Advertising and Promotion | 79,669.97 | 29,501.84 | 24,893.36 | 134,065.17 |
| 70000 · General and Administrative | 59,701.87 | 135,502.20 | 73,508.30 | 268,712.37 |
| 70350 · Security | 164.13 | 164.13 | 164.13 | 492.39 |
| 72500 · Computer Expense | 123,851.01 | 208,471.81 | 190,900.99 | 523,223.81 |
| 73000 · Professional Fees | 116,567.50 | 130,580.00 | 100,686.50 | 347,834.00 |
| 73500 · Legal Fees | 53,018.27 | 42,073.50 | 17,327.19 | 112,418.96 |
| 74500 · Insurance | 47,418.60 | 39,976.45 | 39,195.44 | 126,590.49 |
| 75500 · Travel, Meals and Entertainment | 60,308.66 | 59,236.96 | 36,920.49 | 156,466.11 |
| 75540 · Auto Expenses | 3,376.66 | 2,847.45 | 2,477.91 | 8,702.02 |
| 78000 · Salaries and Wages | 368,852.18 | 349,356.92 | 386,655.50 | 1,104,864.60 |
| 78500 · Bank Service Charges | 2,372.36 | 1,226.41 | 1,324.41 | 4,923.18 |
| 79000 · Taxes and Licenses | 6,262.20 | -1,355.24 | 4,041.00 | 8,947.96 |
| 79910 · Depreciation and  Amortization | 28,189.89 | 22,477.89 | 22,477.89 | 73,145.67 |
| **Total Expense** | 949,753.30 | 1,020,060.32 | 900,573.11 | 2,870,386.73 |
| **Net Ordinary Income** | 614,944.15 | 964,263.38 | 1,211,779.10 | 2,790,986.63 |
| **Other Income/Expense** | | | | |
| **Other Income** | | | | |
| **Total Other Income** | 0.00 | 0.00 | -1,141.09 | -1,141.09 |
| **Other Expense** | | | | |
| **Total Other Expense** | 749,734.44 | 626,350.69 | 646,647.60 | 2,022,732.73 |
| **Net Other Income** | -749,734.44 | -626,350.69 | -647,788.69 | -2,023,873.82 |
| **Net Income** | -134,790.29 | 337,912.69 | 563,990.41 | 767,112.81 |

## SCHEDULE 3.8(a)

## INTELLECTUAL PROPERTY

**Patent Registrations and Pending Applications**

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET CAMERAS | 9,165,444 | 11/6/2014 | 10/20/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET CAMERAS | 9,053,622 | 11/21/2014 | 6/9/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET CAMERAS | 9,142,214 | 11/21/2014 | 9/22/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET CAMERAS | 10,218,932 | 9/9/2015 | 2/26/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET SURVEILLANCE SYSTEMS | 15/060,282 | 3/3/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SMART LOCK SYSTEMS AND METHODS | 8,947,530 | 8/27/2014 | 2/3/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SMART LOCK SYSTEMS AND METHODS | 9,109,378 | 12/17/2014 | 8/18/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SMART LOCK SYSTEMS AND METHODS | 9,342,936 | 7/16/2015 | 5/17/2016 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | SMART LOCK SYSTEMS AND METHODS | 10,204,467 | 4/15/2016 | 2/12/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SMART LOCK SYSTEMS AND METHODS | 15/608,825 | 5/30/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 8,780,201 | 12/6/2013 | 7/15/2014 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 8,823,795 | 12/6/2013 | 9/2/2014 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 8,842,180 | 12/28/2013 | 9/23/2014 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 8,872,915 | 5/12/2014 | 10/28/2014 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,065,987 | 9/22/2014 | 6/23/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,094,584 | 9/30/2014 | 7/28/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,060,104 | 1/5/2015 | 6/16/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,058,738 | 2/3/2015 | 6/16/2015 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,179,109 | 5/30/2015 | 11/3/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,172,922 | 6/18/2015 | 10/27/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/806,322 | 11/7/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,743,049 | 5/16/2016 | 8/22/2017 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/205,959 | 7/8/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | IDENTITY VERIFICATION USING A SOCIAL | 9,197,867 | 6/15/2015 | 11/24/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/701,451 | 9/12/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/701,453 | 9/12/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERAS | 9,113,051 | 2/17/2015 | 8/18/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERAS | 15/292,019 | 10/12/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERAS | 9,997,036 | 6/6/2017 | 6/12/2018 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL METHODS | 8,937,659 | 9/1/2014 | 1/20/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEMS | 8,953,040 | 9/1/2014 | 2/10/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEMS | 9,736,284 | 1/2/2015 | 8/15/2017 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBEL L DIAGNOST | 9,172,920 | 3/27/2015 | 10/27/201 5 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEMS | 10,440,165 | 8/10/2017 | 10/8/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEMS | 10,440,166 | 5/26/2018 | 10/8/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEMS | 16/557,753 | 8/30/2019 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 8,941,736 | 8/19/2014 | 1/27/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 9,013,575 | 10/31/201 4 | 4/21/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 9,055,202 | 2/12/2015 | 6/9/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | POOL MONITOR SYSTEMS AND METHODS | 9,049,352 | 12/10/201 4 | 6/2/2015 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | MONITORING SYSTEMS AND METHODS | 9,769,435 | 5/18/2015 | 9/19/2017 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 15/719,543 | 9/28/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL SECURITY AND SAFETY | 9,060,103 | 11/17/201 4 | 6/16/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 9,172,921 | 4/13/2015 | 10/27/201 5 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL BATTERY | 10,062,251 | 6/2/2015 | 8/28/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 9,118,819 | 3/20/2015 | 8/25/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 9,113,052 | 4/10/2015 | 8/18/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 9,196,133 | 4/24/2015 | 11/24/201 5 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME SYSTEMS AND | 9,179,107 | 5/28/2015 | 11/3/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME SYSTEMS AND | 9,179,108 | 5/28/2015 | 11/3/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME SYSTEMS AND | 9,160,987 | 6/11/2015 | 10/13/201 5 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 16/057,169 | 8/7/2018 | - | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,247,219 | 7/13/2015 | 1/26/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,237,318 | 7/13/2015 | 1/12/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 9,253,455 | 7/30/2015 | 2/2/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNIT | 9,230,424 | 6/23/2015 | 1/5/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNIT | 15/789,121 | 10/20/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNIT | 15/951,534 | 4/12/2018 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNIT | 15/793,720 | 10/25/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | GARAGE DOOR COMMUNICATION SYSTEMS AND METHODS | 15/060,332 | 3/3/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | GARAGE DOOR COMMUNICATION SYSTEMS AND METHODS | 15/293,334 | 10/14/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 10,044,519 | 9/22/2015 | 8/7/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 16/054,961 | 8/3/2018 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME SYSTEMS AND | 9,786,133 | 1/27/2016 | 10/10/2017 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION SYSTEMS AND METHODS | 9,799,183 | 1/27/2016 | 10/24/2017 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION SYSTEMS AND METHODS | 15/785,605 | 10/17/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION SYSTEMS AND METHODS | 9,508,239 | 5/27/2016 | 11/29/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION | 10,043,332 | 10/25/2017 | 8/7/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION SYSTEMS AND METHODS | 15/806,326 | 11/8/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION SYSTEMS AND METHODS | 15/815,490 | 11/16/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION SYSTEMS AND METHODS | 15/815,555 | 11/16/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/214,451 | 7/20/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/341,125 | 11/2/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 15/341,140 | 11/2/2016 | - | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 9,888,216 | 3/10/2017 | 2/6/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 15/811,829 | 11/14/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | OUTDOOR SECURITY SYSTEMS AND METHODS | 16/055,115 | 8/5/2018 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VEHICLE TRACKING SYSTEMS AND METHODS | 9,933,270 | 3/9/2016 | 4/3/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | ACTIVATING BUILDING ASSETS BASED ON AN INDIVIDUAL'S LOCATION | 14/485,990 | 9/15/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | REMOTE IDENTITY VERIFICATION OF LODGING GUESTS | 9,235,943 | 10/10/2014 | 1/12/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | REMOTE INTERACTIVE IDENTITY VERIFICATION OF LODGING GUESTS | 9,426,432 | 12/2/2015 | 8/23/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D711,275 | 7/26/2013 | 8/19/2014 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET | D740,873 | 7/28/2014 | 10/13/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SMART LOCK | D747,640 | 10/27/2014 | 1/19/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR PORTION THEREOF WITH A GRAPHICAL USER INTERFACE | D747,733 | 8/30/2013 | 1/19/2016 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR PORTION THEREOF WITH A GRAPHICAL USER INTERFACE | D737,283 | 8/30/2013 | 8/25/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR PORTION THEREOF WITH A GRAPHICAL USER INTERFACE | D747,732 | 8/30/2013 | 1/19/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR A PORTION THEREOF WITH A GRAPHICAL USER | D762,688 | 5/16/2014 | 8/2/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERA | D736,294 | 7/28/2014 | 8/11/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D729,678 | 8/19/2014 | 5/19/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D727,769 | 12/18/2014 | 4/28/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR A PORTION THEREOF WITH A GRAPHICAL USER | 29/514,707 | 1/15/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR A PORTION THEREOF WITH A GRAPHICAL USER | D760,738 | 1/15/2015 | 7/5/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DISPLAY SCREEN OR A PORTION THEREOF WITH A GRAPHICAL USER | D759,702 | 1/15/2015 | 6/21/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D747,755 | 1/27/2015 | 1/19/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D747,756 | 1/27/2015 | 1/19/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D747,384 | 1/27/2015 | 1/12/2016 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D747,385 | 1/27/2015 | 1/12/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D748,178 | 2/17/2015 | 1/26/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D748,179 | 2/17/2015 | 1/26/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D762,762 | 2/17/2015 | 8/2/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | D748,180 | 5/28/2015 | 1/26/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET SURVEILLANCE SYSTEM | D749,161 | 2/17/2015 | 2/9/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D764,958 | 8/7/2015 | 8/30/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D765,530 | 8/12/2015 | 9/6/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D766,121 | 10/8/2015 | 9/13/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D820,136 | 1/22/2016 | 6/12/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D787,359 | 1/22/2016 | 5/23/2017 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D840,258 | 1/2/2017 | 2/12/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D813,700 | 1/2/2017 | 3/27/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D817,207 | 1/2/2017 | 5/8/2018 | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D813,701 | 1/2/2017 | 3/27/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME | D824,791 | 8/15/2017 | 8/7/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERA | D840,460 | 8/14/2017 | 2/12/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D840,856 | 9/25/2017 | 2/19/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | D840,857 | 9/25/2017 | 2/19/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | CHIME | D852,077 | 2/2/2018 | 6/25/2019 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 29/706,774 | 9/24/2019 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 61/859,070 | 7/26/2013 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 61/872,439 | 8/30/2013 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET CAMERAS | 62/018,605 | 6/29/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET CAMERAS | 62/039,394 | 8/19/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | LIGHT SOCKET SURVEILLANCE SYSTEMS | 62/129,816 | 3/7/2015 | - | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/106,705 | 1/22/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/158,750 | 5/8/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | REMOTE IDENTITY VERIFICATION OF LODGING GUESTS | 62/011,038 | 6/12/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | REMOTE IDENTITY VERIFICATION OF LODGING GUESTS BY SIMULTANEOUSL Y DISPLAYING IMAGES FROM | 62/011,039 | 6/12/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | REMOTE IDENTITY VERIFICATION OF MULTIPLE | 62/011,040 | 6/12/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | IDENTITY VERIFICATION USING A SOCIAL | 62/016,050 | 6/23/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | IDENTITY VERIFICATION USING A SOCIAL NETWORK AND A NAME OF A VISITOR | 62/016,053 | 6/23/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | IDENTITY VERIFICATION OF FREQUENT AND NON- FREQUENT VISITORS | 62/016,057 | 6/23/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/135,133 | 3/18/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | WALL PLUG CAMERAS | 62/016,863 | 6/25/2014 | - | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOOR LOCK CHARGING SYSTEMS AND | 62/018,606 | 6/29/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/035,646 | 8/11/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/072,943 | 10/30/201 4 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME SYSTEMS AND | 62/161,616 | 5/14/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/127,660 | 3/3/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | WIRED HOME AUTOMATI ON | 62/026,639 | 7/19/2014 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/139,497 | 3/27/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNIT | 62/143,032 | 4/4/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | GARAGE DOOR COMMUNICAT ION SYSTEMS AND METHODS | 62/129,814 | 3/7/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | GARAGE DOOR COMMUNICAT ION SYSTEMS AND METHODS | 62/616,287 | 1/11/2018 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/221,489 | 9/21/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME SYSTEMS AND | 62/260,508 | 11/28/201 5 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL PACKAGE DETECTION | 62/571,465 | 10/12/201 7 | - | U.S. |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/400,611 | 9/27/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SMART HOME COMMUNICAT ION SYSTEMS AND METHODS | 62/456,104 | 2/7/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/539,472 | 7/31/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/583,311 | 11/8/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | OUTDOOR SECURITY SYSTEMS AND | 62/560,118 | 9/18/2017 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 62/891,344 | 8/24/2019 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEM | 201510309496 | 6/8/2015 | - | China |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | 201510309104 | 6/8/2015 | - | China |
| SKYBELL TECHNOLOGIES IP, LLC | SMART HOME COMMUNICAT ION SYSTEMS AND METHODS | 2017-159937 | 8/23/2017 | - | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | PCT/US14/4762 2 | 7/22/2014 | - | PCT |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | AU2014293304 | 7/22/2014 | - | Australia |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICAT ION SYSTEMS AND METHODS | CA2917915 | 1/8/2016 | - | Canada |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEM AND METHOD | 2014800526797 | 7/22/2014 | - | China |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEM AND METHOD | 14828831.9 | 7/22/2014 | - | EU |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | PCT/US14/53506 | 8/29/2014 | - | PCT |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | AU2014312083 | 8/29/2014 | - | Australia |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | CA2917926 | 1/8/2016 | - | Canada |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 2014800579366 | 8/29/2014 | - | China |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 14839945.4 | 8/29/2014 | | EU |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | PCT/US16/63833 | 11/28/2016 | - | PCT |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | 2017-549516 | 11/28/2016 | - | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERAS | PCT/US18/36358 | 6/6/2018 | - | PCT |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION SYSTEMS AND METHODS | PCT/US18/44662 | 7/31/2018 | - | PCT |

| Owner of Record | Patent Description/Title | Patent Number (if registered) or Serial Number (if applied for only) | Filing Date | Issuance Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL COMMUNICATION AND ELECTRICAL SYSTEMS | PCT/US19/28906 | 4/24/2019 | - | PCT |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 002386094-0001 | 1/17/2014 | 2/18/2014 | E.U. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 1503072 | 1/24/2014 | 6/20/2014 | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 002613448-0001 | 1/14/2015 | 1/27/2015 | E.U. |
| SKYBELL TECHNOLOGIES IP, LLC | WIFI VIDEO DOORBELL | CN303508623S | 6/12/2015 | 12/16/2015 | China |
| SKYBELL TECHNOLOGIES IP, LLC | VIDEO CAMERA | 002720755-0001 | 6/17/2015 | 7/27/2015 | E.U. |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 2017-018324 | 8/25/2017 | - | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 1601609 | 8/25/2017 | 3/16/2018 | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL CHIME | 1601610 | 8/25/2017 | 3/16/2018 | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | POWER OUTLET CAMERA | 1606870 | 8/25/2017 | 5/25/2018 | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 1623497 | 3/23/2018 | 1/11/2019 | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | DOORBELL | 1623498 | 3/23/2018 | 1/11/2019 | Japan |

**Trademark Registrations and Pending Applications**

| Owner of Record | Trademark | Registration Number (if registered) or Serial Number (if applied for | Filing Date | Registration Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell | 4540717 | 9/18/2013 | 5/27/2014 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | We Have the Outside Covered | 4878219 | 6/17/2014 | 12/29/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell Circle Logo (Color) | 4742565 | 8/11/2014 | 5/26/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell Circle Logo (Black) | 4730715 | 8/11/2014 | 5/5/2015 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBulb | 86527898 | 2/7/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBulb | 88509600 | 7/11/2019 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyWall | 86610657 | 4/27/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyPool | 86611042 | 4/27/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyChime | 5590596 | 4/27/2015 | 10/23/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyTop | 86611170 | 4/27/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Your Home Starts Here | 86691650 | 7/13/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell Tribe | 86805070 | 10/30/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell Village | 86805110 | 10/30/2015 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell HD | 4978196 | 12/30/2015 | 6/14/2016 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Go Anywhere Do Anything | 86973334 | 4/12/2016 | - | U.S. |

| Owner of Record | Trademark | Registration Number (if registered) or Serial Number (if applied for | Filing Date | Registration Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | Keeping up with the Jetsons | 86972903 | 4/12/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | The Connected Home Starts at the Front Door | 87001429 | 4/14/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Micro | 87076316 | 6/18/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Zen | 5492779 | 6/20/2016 | 6/12/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | One | 87076933 | 6/20/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Instacam | 87076982 | 6/20/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Shine | 87077015 | 6/20/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | The Eyes to the Smart Home | 87122879 | 8/1/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Trim | 87193774 | 10/5/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Trim Pro | 5465377 | 10/5/2016 | 5/8/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Max | 87215865 | 10/26/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Trim Plus | 5308248 | 11/9/2016 | 10/10/2017 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Guardian | 5503941 | 11/9/2016 | 6/26/2018 | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Chime | 87232076 | 11/9/2016 | - | U.S. |
| SKYBELL TECHNOLOGIES IP, LLC | Let's be realistic | 88528493 | 7/22/2019 | - | U.S. |

| Owner of Record | Trademark | Registration Number (if registered) or Serial Number (if applied for | Filing Date | Registration Date | Jurisdiction |
|---|---|---|---|---|---|
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell | 1247386 | - | 1/9/2015 | France |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBell | 6048185 | 8/10/2017 | 6/1/2018 | Japan |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBulb | 17225212 | 6/17/2015 | 8/28/2016 | China |
| SKYBELL TECHNOLOGIES IP, LLC | SkyBulb | 17225213 | 6/17/2015 | 8/28/2016 | China |
| SKYBELL TECHNOLOGIES IP, LLC | SkyWall | 17225215 | 6/17/2015 | 5/7/2017 | China |
| SKYBELL TECHNOLOGIES IP, LLC | SkyPool | 17225216 | 6/17/2015 | 11/28/2016 | China |
| SKYBELL TECHNOLOGIES IP, LLC | SkyChime | 17225217 | 6/17/2015 | 8/28/2016 | China |
| SKYBELL TECHNOLOGIES IP, LLC | SkyTop | 17225214 | 6/17/2015 | 10/28/2016 | China |

**Domain Names**

| Registrar | Domain Name |
|---|---|
| GoDaddy | Airhome.net |
| GoDaddy | Airhome.biz |
| GoDaddy | Airhomeconnect net |
| GoDaddy | Airhomeconnect.com |
| GoDaddy | Airhomeconnect.org |
| GoDaddy | Airhomeconnect.info |
| GoDaddy | Skybelldealer.com |
| GoDaddy | Airhomelabs.com |

| Registrar | Domain Name |
|---|---|
| GoDaddy | Airhomelab.com |
| GoDaddy | Skybelllabs.com |
| GoDaddy | Skybelllab.com |
| GoDaddy | Airhomesecurity.com |
| Network Solutions | Skybell.com |
| Network Solutions | Skybell.be |
| Network Solutions | Skybell.uk.com |
| Network Solutions | Skybell.site |

**SCHEDULE 3.8(b)**

**INTELLECTUAL PROPERTY LICENSES**

| Exclusive Agreement | Eyetalk365, LLC (Langer) |
|---|---|
| U.S. Patent No. | 7,429,924 |
| U.S. Patent No. | 7,477,134 |
| U.S. Patent No. | 8,193,919 |

| License Agreement | EyeTalk365, LLC |
|---|---|
| U.S. Patent No. | 8,139,098 |
| U.S. Patent No. | 7,193,644 |
| U.S. Patent No. | 8,144,183 |
| U.S. Patent No. | 8,144,184 |
| U.S. Patent No. | 8,164,614 |
| U.S. Patent No. | 9,432,638 |
| U.S. Patent No. | 9,414,030 |
| U.S. Patent No. | 9,485,478 |
| U.S. Patent No. | 9,516,284 |
| U.S. Patent No. | 9,635,323 |
| U.S. Patent No. | 9,706,178 |
| U.S. Patent No. | 9,648,290 |
| U.S. Patent No. | 9,554,090 |
| U.S. Patent No. | 7,429,924 (partial interest) |
| U.S. Patent No. | 7,477,134 (partial interest) |
| U.S. Patent No. | 8,193,919 (partial interest) |
| U.S. Patent Application No. | 11/929,449 |
| U.S. Patent Application No. | 11/929,457 |
| U.S. Patent Application No. | 15/238,393 |
| U.S. Patent Application No. | 15/238,228 |
| U.S. Patent Application No. | 15/237,933 |
| U.S. Patent Application No. | 15/237,797 |
| U.S. Patent Application No. | 15/237,222 |

| License Agreement | Duke Zinser (May 31, 2013) |
|---|---|
| U.S. Patent No. | 7,583,191 |

## SCHEDULE 3.11

## LITIGATION

1. <u>SkyBell v. Ring, Inc. and related counterclaims</u>, US District Court for the Central of California, Southern Division, Case No. 8:18 cv – 00014-JVS-JDE, filed January 2018; Inter Partes Review of Patents at Issue in District Court litigation, filed by Ring Inc., with United States Patent and Trademark Office, December 7, 2018; SkyBell has sued Ring for infringing on 5 of SkyBell's patents. Ring has challenged the validity of those patents in filings with the USPTO. The District Court case is stayed in the meantime.

| Name | Proceeding Number | Court |
|---|---|---|
| Ring LLC et al v. SkyBell Technologies, Inc. | IPR2019-00443 | Patent Trial and Appeal Board |
| Ring LLC et al v. SkyBell Technologies, Inc. | IPR2019-00444 | Patent Trial and Appeal Board |
| Ring LLC et al v. SkyBell Technologies, Inc. | IPR2019-00445 | Patent Trial and Appeal Board |
| Ring LLC et al v. SkyBell Technologies, Inc. | IPR2019-00446 | Patent Trial and Appeal Board |
| Ring LLC et al v. SkyBell Technologies, Inc. | IPR2019-00447 | Patent Trial and Appeal Board |
| SkyBell Technologies, Inc. v. Ring Inc. | 8-18-cv-00014-JVS-JDE | U.S. District Court, Central District of California |

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "***Agreement***"), dated as of October ___, 2020 (the "***Effective Date***"), is by and between H-Cap Investments LLC, a Utah limited liability company, SkyBell series only ("***Seller***"), and [     ], a [          ] company ("***Buyer***").

### RECITAL

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, Three Million Three Hundred Eighty-Nine Thousand Eight Hundred Thirty (3,389,830) shares of Series B Preferred Stock of SkyBell Technologies, Inc. ("***SkyBell***"), par value $0.0001 (the "***Shares***"), on the date hereof.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

1. <u>Purchase and Sale of Shares; Repurchase Rights</u>.   On the Effective Date, Seller shall sell the Shares to Buyer for an aggregate purchase price of Three Million Sixteen Thousand Nine Hundred Forty-Eight Dollars ($3,016,948*)* (the "***Purchase Price***") and Buyer shall pay Seller the Purchase Price by wire transfer of immediately available funds to the account designated on <u>Exhibit A</u> within one (1) business day following the Effective Date by wire transfer of immediately available funds to an account designated by Seller.

2. <u>Closing; Delivery of Shares</u>.  Upon (a) receipt of the Purchase Price, and (b) Buyer's execution of and delivery to SkyBell of the "Statement of Accredited Investor," attached hereto as <u>Exhibit B</u> (the "***Statement of Accredited Investor***"), Seller will direct SkyBell to transfer the Shares on the stock ledger and books and records of SkyBell into the name of Buyer.

3. <u>Seller's Representations and Warranties</u>.  Seller represents and warrants to Buyer that the following representations are true as of the date of this Agreement.  These representations and warranties shall survive indefinitely:

(a)      The execution, delivery and performance of this Agreement by Seller have been authorized by all requisite action of Seller and will not violate the governing documents of Seller.  Seller is not a party to any other agreement with any other party which would limit or impede the transfer of the Shares.

(b)      Seller is a Utah limited liability company and has full power and authority to execute, deliver and perform this Agreement.  This Agreement, when executed and delivered by Seller, will constitute valid and legally binding obligations of Seller, enforceable against it in accordance with their respective terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, and (c) to the extent the indemnification provisions may be limited by applicable federal or state securities laws.

(c)      Seller owns the Shares free and clear of all liens and encumbrances of any kind.

4. <u>Buyer's Representations and Warranties</u>.  Buyer represents and warrants to Seller that the following representations and warranties are true and complete as of the date of this Agreement.  These representations and warranties shall survive indefinitely.

1

(a)     The execution, delivery and performance of this Agreement by Buyer have been authorized by all requisite action of Buyer and will not violate the governing documents of Buyer or any law, ordinance or regulation or any order, judgment or decree of any court or any governmental authority, or conflict with, result in a breach of or constitute a default under any agreement to which Buyer is a party or by which Buyer or any of its properties or assets may be bound.

(b)     Buyer is a [              ] duly organized, validly existing and in good standing under the laws of the [              ] and has all requisite power and authority to carry on its business as presently conducted and as proposed to be conducted.

(c)     Buyer has full power and authority to execute, deliver and perform this Agreement.  This Agreement, when executed and delivered by Buyer, will constitute valid and legally binding obligations of Buyer, enforceable against it in accordance with their respective terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, and (c) to the extent the indemnification provisions may be limited by applicable federal or state securities laws.

(d)     Buyer has requested and has been provided all information that it requires for purposes of deciding whether to acquire the Shares (including the rights and preferences associated with shares of Series B Preferred Stock of SkyBell and their rights and preferences compared to all other classes and series of equity and debt issued by SkyBell) and has independently made a determination about the appropriateness of the investment in SkyBell.  The Buyer has had an opportunity to review the business, management, offices, and financial affairs of SkyBell and its subsidiaries and affiliates.  Buyer is familiar with SkyBell's business objectives and financial arrangements in connection therewith and believes the Shares that Buyer is purchasing are the kind of securities that Buyer wishes to hold for investment and that the nature and purchase price of the Shares are consistent with the Buyer's investment program.  Buyer acknowledges that SkyBell's governing documents grant broad discretion to the Board of Directors of SkyBell and that Buyer is subject to the decisions made by the Board of Directors pursuant thereto. Buyer is aware of the substantial risks associated with its investment in SkyBell and acknowledges that Buyer may lose its entire investment in SkyBell.  Except as set forth in this Agreement, Buyer is not relying upon any representation or warranty of Seller and its subsidiaries or affiliates, or of any officer, manager, employee or agent of the foregoing for purposes of making its decision to acquire the Shares.  However, this representation by Buyer does not limit or modify the representations and warranties of the Seller in Section 3 of this Agreement or the right of the Buyer to rely thereon.

(e)     This Agreement is made with the Buyer in reliance upon the Buyer's representation to the Seller, which by the Buyer's execution of this Agreement, the Buyer hereby confirms, that the Shares to be acquired by the Buyer will be acquired for investment for the Buyer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Buyer has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Buyer further represents that the Buyer does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares.  The Buyer has not been formed for the specific purpose of acquiring the Shares.

(f)     The Buyer understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Buyer's representations as expressed herein.  The Buyer understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Buyer must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission

and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Buyer acknowledges that additional restrictions on the transfer of the Shares could be imposed by the Board of Directors of SkyBell.  The Buyer acknowledges that the Seller has no obligation to register or qualify the Shares for resale. The Buyer further acknowledges that if an exemption from registration limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Seller which are outside of the Buyer's control, and which the Seller is under no obligation and may not be able to satisfy.

(g)     The Buyer understands that no public market now exists for the Shares, and that the Seller has made no assurances that a public market will ever exist for the Shares.

(h)     The Buyer understands that the Shares and any securities issued in respect of or exchange for the Shares, may bear one or all of the following legends:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE SELLER THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended.

(i)     The Buyer is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and has executed and delivered to the SkyBell the Statement of Accredited Investor attached hereto as Exhibit B. Such Buyer is an investor in securities of companies in the development stage and acknowledges that such Buyer is able to fend for itself, can bear the economic risk of its investment for an indefinite period of time, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares.  Buyer acknowledges that no public market exists with respect to the Shares and no representation has been made to Buyer that such a public market will exist at a future date and that it may not be possible to liquidate this investment readily, if at all, in the case of an emergency or for any other reason.  If other than an individual, such Buyer also represents it has not been organized for the purpose of acquiring the Shares.

(j)     The Shares have not been offered to the Buyer by any form of general solicitation or general advertising, including, without limitation, (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media, or broadcast over television or radio, or (ii) any seminar or meeting whose attendees (including the Buyer) have been invited by any general solicitation or general advertising.

The representations and warranties contained in this Section 4 shall survive indefinitely.

5.     Mutual Indemnification.  Seller agrees to indemnify, defend and hold harmless Buyer and its agents, stockholders, officers, directors, affiliates, employees, insurers, successors, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of its representations, warranties or covenants contained in this Agreement.  Buyer agrees to indemnify, defend and hold harmless Seller and each of their respective agents, stockholders, officers, directors, affiliates, employees, insurers, successors, representatives, attorneys and assigns, from and against any and all losses arising out of or due to a breach of any of the representations, warranties or covenants of Buyer contained in this Agreement.

6.  <u>Remedies</u>.  If any party to this Agreement obtains judgment against any other party hereto by reason of any breach of this Agreement or the failure of such other party to comply with the provisions hereof, a reasonable attorney's fee as fixed by the court shall be included in such judgment.  No remedy conferred upon any party to this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

7.  <u>Waiver</u>.  None of the terms of this Agreement shall be deemed to have been waived by any party hereto, unless such waiver is in writing and signed by that party.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any further breach of the provision so waived or of any other provision of this Agreement.  No extension of time for the performance of any obligation or act hereunder shall be deemed an extension of time for the performance of any other obligation or act.  The waiver by any party of any of the conditions precedent to its obligations under this Agreement shall not preclude it from seeking redress for breach of this Agreement.

8.  <u>Choice of Law and Venue</u>.   THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF SELLER AND BUYER SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF UTAH, WITHOUT REGARD TO CONFLICTS OF LAW RULES OF ANY JURISDICTION.   TO THE MAXIMUM EXTENT PERMITTED BY LAW, SELLER AND BUYER AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND DETERMINED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN UTAH.

9.  <u>Waiver of Jury Trial</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, BUYER AND SELLER EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY FOR ANY ACTION, CAUSE OF ACTION, CLAIM, DEMAND OR PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT, OR IN ANY WAY CONNECTED WITH, RELATED TO OR INCIDENTAL TO THE DEALINGS OF BUYER AND SELLER WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED TO THIS AGREEMENT, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.   TO THE MAXIMUM EXTENT PERMITTED BY LAW, BUYER AND SELLER AGREE THAT ANY SUCH ACTION, CAUSE OF ACTION, CLAIM, DEMAND OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT EACH PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF THIS SECTION WITH ANY COURT OR OTHER TRIBUNAL AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY TO THE WAIVER OF SUCH PARTY'S RIGHT TO TRIAL BY JURY.

10.  <u>Entire Agreement</u>.  This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings with respect to its subject matter.

11.  <u>Amendment</u>.  This Agreement may not be amended, modified or changed in any respect except in writing duly signed by Seller and Buyer.

12.  <u>Assignment and Succession; Benefit</u>.  This Agreement may not be assigned by either party without the prior written consent of the other party, but is binding upon and inures to the benefit of the parties and their respective successors and assigns.

13.  <u>Severability</u>.  The invalidity or unenforceability of any particular provision of this Agreement will not affect the other provisions of the Agreement, and this Agreement will be construed in all respects as if those invalid or unenforceable provisions were omitted.

14.    <u>Review by Professionals</u>.  Each party has had the opportunity to seek advice from such party's own business, financial, tax, legal and other relevant advisors as to the contents of this Agreement and the advisability of entering into it.

15.    <u>Headings</u>.  The section headings contained in this Agreement are for convenience only and are not intended to define or limit the contents of those sections.

16.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed to be an original, and all of which shall be taken to be one and the same instrument with the same effect as if each of the parties hereto had signed the same signature page.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signature thereon and may be attached to another counterpart of this Agreement identical in form hereto and having attached to it one or more additional signature pages.  Facsimile signature pages and PDF signature pages transmitted by e-mail shall have the same effect as original signature pages for all purposes.

*(remainder of page intentionally left blank; signature page follows)*

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

H-CAP INVESTMENTS LLC ("**SELLER**")
SkyBell series only

By: _____
Name:
Title:

[        ] ("**BUYER**")

By: _____
Name: [       ]
Title: [       ]

6

**EXHIBIT A**

Wire Instructions for payment of Purchase Price:

**Amount of Wire: $3,016,948**

Bank Name:
Address:
ABA No.:
Account No:
Account Name:

**EXHIBIT B**

**STATEMENT OF ACCREDITED INVESTOR**

To: SkyBell Technologies, Inc. (the "***Company***")

Ladies and Gentlemen:

The undersigned hereby refers to that certain Stock Purchase Agreement executed and by and between H-Cap Investments LLC and the undersigned as of the date hereof.  In connection with the purchase thereunder by the undersigned to purchase securities of the Company, the undersigned hereby represents and warrants that such individual or entity meets at least one of the tests listed below for an "accredited investor" (as such term is defined under Regulation D promulgated pursuant to the Securities Act of 1933, as amended).

"Accredited Investors" are accorded special status under the federal securities laws. Individuals who hold certain positions with an issuer or its affiliates, or who have certain minimum individual income or certain minimum net worth (each as described below) may qualify as Accredited Investors.  Partnerships, corporations or other entities may qualify as Accredited Investors if they fulfill certain financial and other standards, or if all of their equity owners have incomes and/or net worth which qualify them individually as Accredited Investors, and trusts may qualify as Accredited Investors if they meet certain financial and other tests (as described below).

You may qualify as an Accredited Investor under Regulation D promulgated under the Securities Act of 1933 (the "1933 Act") if you meet any of the following tests (please check all that apply):

☐ **The undersigned is an individual who is a director or executive officer of the Company**.  An "executive officer" is the president, a vice president in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the Company.

☐ **The undersigned is an individual that (1) had individual income of more than $200,000 in each of the two most recent fiscal years and reasonably expects to have individual income in excess of $200,000 in the current year, or (2) had joint income together with the undersigned's spouse in excess of $300,000 in each of the two most recent fiscal years and reasonably expects to have joint income in excess of $300,000 in the current year.**  "Income" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts:  (i) any tax exempt interest income under Section 103 of the Internal Revenue Code (the "Code") received, (ii) any losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040, (iii) any deduction claimed for depletion under Section 611 of the Code or (iv) any amount by which income has been reduced in arriving at adjusted gross income

pursuant to the provisions of Section 1202 of the Code.  In determining personal income, however, unrealized capital gains should not be included.

☐   **The undersigned is an individual with individual net worth, or combined net worth together with the undersigned's spouse, in excess of $1,000,000.**  "Net worth" means the excess of total assets at fair market value, excluding the value of a primary residence, over total liabilities.

☐   **The undersigned is a Trust with total assets in excess of $5,000,000**, was not formed for the specific purpose of acquiring securities of the Company, and the purchase of the securities is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of the prospective investment in such securities.

☐   **The undersigned is a corporation, partnership, limited liability company or limited liability partnership that has total assets in excess of $5,000,000** and was not formed for the specific purpose of acquiring securities of the Company.

☐   **The undersigned is an entity in which all of its equity owners are "accredited investors".**

Dated: [            ]

Very truly yours,

[            ]

By: _____
Name: [            ]
Title: [            ]

**SkyBell Technologies, Inc.**
**Balance Sheet**
**As of December 31, 2020**

|  | Dec 31, 20 |
|---|---|
| **ASSETS** | |
|   **Current Assets** | |
|     **Checking/Savings** | |
|       **10000 · Cash and equivalents** | 231,495.63 |
|     **Total Checking/Savings** | 231,495.63 |
|     **Accounts Receivable** | |
|       **11000 · Accounts Receivable** | 14,108,637.11 |
|     **Total Accounts Receivable** | 14,108,637.11 |
|     **Other Current Assets** | |
|       **Other Current Assets** | 4,170,150.46 |
|       **10900 · Undeposited Funds** | 20.01 |
|       **12000 · Inventory** | 421,266.43 |
|       **13000 · Prepaid Expenses** | 17,908,351.92 |
|     **Total Other Current Assets** | 22,499,788.82 |
|   **Total Current Assets** | 36,839,921.56 |
|   **Other Assets** | |
|     **Long-Term Assets** | 22,312,502.44 |
|   **Total Other Assets** | 22,312,502.44 |
| **TOTAL ASSETS** | 59,152,424.00 |
| **LIABILITIES & EQUITY** | |
|   **Liabilities** | |
|     **Current Liabilities** | |
|       **Accounts Payable** | |
|         **20000 · Accounts Payable** | 5,218,783.98 |
|       **Total Accounts Payable** | 5,218,783.98 |
|       **Credit Cards** | |
|         **21000 · Credit Cards Payable** | 16,698.24 |
|       **Total Credit Cards** | 16,698.24 |
|       **Other Current Liabilities** | |
|         **22125 · Accrued Wages (PTO)** | 222,346.67 |
|         **23000 · Deferred Compensation** | 741,947.27 |
|         **23100 · Other Current Liabilities** | 13,545,069.86 |
|         **23200 · American Express Settlement** | 0.00 |
|         **24000 · Notes Payable - Current** | 8,000,000.00 |
|       **Total Other Current Liabilities** | 22,509,363.80 |
|     **Total Current Liabilities** | 27,744,846.02 |
|     **Long Term Liabilities** | |
|       **24985 · Lynx Holdings I, LLC** | 7,363,237.83 |
|       **25000 · Star Mtn Diversified Credit** | 39,625,000.00 |
|       **27000 · Other Long-Term Liabilities** | 2,281,669.49 |
|     **Total Long Term Liabilities** | 49,269,907.32 |
|   **Total Liabilities** | 77,014,753.34 |
|   **Equity** | |
|     **30500 · Preferred Stock** | 57,514,297.28 |
|     **32000 · Common Stock** | 9,464,762.69 |
|     **34000 · Retained Earnings** | -84,084,599.86 |
|     **34050 · Retained Earnings Adjustment** | 0.00 |
|     **Net Income** | -756,789.45 |
|   **Total Equity** | -17,862,329.34 |
| **TOTAL LIABILITIES & EQUITY** | 59,152,424.00 |

# Exhibit 14

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** September 6, 2021 at 6:51:48 PM PDT
**To:** Marshall Gibbs ████████████████
**Subject: Re: Investment opportunity- Grand Desert Behavioral hospital**

Hi Marshall. I didn't have any 100's this last week. I hope to get you placed this week. Hoping for a big.  weeks worth of contracts. 👍

Sent from my iPhone

> On Sep 6, 2021, at 3:31 PM, Marshall Gibbs ████████████████ wrote:
>
> Hi Jason -
>
> Thanks for sharing this.  I'll give it some thought and perhaps call with any lingering questions.
>
> Are you able to place our last $100,000 into the injury settlement investment before October's deadline?
>
> My Best,
> Marshall

>> On Sep 6, 2021, at 10:04 AM, Jason Jongeward <jason.jcd@gmail.com> wrote:
>>
>> Good morning fellow investors,
>>
>>  Happy Labor Day. I hope your enjoying time with family and loved ones this weekend.
>>
>>  You are receiving this email because you have invested or have expressed interest in investing with our group. Some of you have invested in the personal injury settlement investment and some in Magic spoon, Kinder beauty box, and others to name a few.  I was invited to participate in this 'GDBH' investment that Jeff Judd, Shane Jager, and some additional investors that you may be familiar with, are investing in. It is the "Grand Desert Behavioral Hospital" project. This is one of 4  potential facilities in this project package. I have attached approved project plans and projected performa. Please note that the performa is based on the first phase only. The numbers will change dramatically once additional phases started. This first of 4 projects will be located in Las Vegas with Utah, Texas, and Arizona to follow. The first project site, on the corner of west Cheyenne Ave and Clayton Rd, has already been purchased, permits issued, and site preparations are proposed to start in the next 4-6-weeks. This first capital raise is projected to be 10-12 million. This will be for phase 1 which will include 30 rooms and 48 patient beds. The proposed timeframe to complete this first phase is 12-16 months.  The total build out is projected for 300 beds within 4 phases with an adjacent emergency building.
>>
>> Investment information.
>>
>> 1. Buy in:  The minimum buy in is 100,000.00 Dollars. Low entrance amount into a project of this caliber.
>>
>> 2. ROI- the projected ROI, ( Return on investment ) Is 11-15 % from end of year 2-4, capping at 15% in year 4. Distributions will be based on revenue and profits. Projecting end of year 2 to be in the green and in line with the performa.
>>
>> 3. Accelerated Depreciation - The ability to claim depreciation of 30-50 % in the first year, once phase 1 is completed, is a definite tax advantage, with the balance fo depreciation amortized in the following years.
>>
>> 4. Additional investment opportunities with exit strategy-  The group has projected  3-4 additional projects to be built once or even during the first is completed. The plan is to package them all up and be acquired with a good multiple of 4-6x in the next 6-8 years. Investors would have the right for continued ownership and be included in the upside in the acquisition.
>>
>> Plans:
>>
>> https://www.dropbox.com/s/501lvp6lr58pvgs/GDBH%20CD%20100%25%20Final%20Set%20For%20Submittal%20UNLOCKED%204-10-19%20.pdf?dl=0
>>
>> Performa:
>> <Grand Desert Behavioral Hospital Final (2).docx>
>>
>> The Subscription Agreement is  currently being constructed and will be given to those who for review who are interested. Feel free to contact me with any questions. I will be investing in this first phase also and look forward to another unique investment with a great group of experienced and dynamic investors.
>>
>> Regards,
>>
>> Jason Jongeward

# Exhibit 15

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** November 5, 2021 at 4:25:01 PM PDT
**To:** undisclosed-recipients:;
**Subject: Spacestation Mining - investment opportunity**


Fellow Investors,

I would like to present the Spacestation Mining Deck. This is a big deal and I wanted to share it with our group. This is the utilization of landfill bio gas to generate green inexpensive power for bitcoin mining. This deck just came to me. I wanted to get this out to our investor base so each of you had a chance. Those who are interested need to get back to me by this weekend as the window is closing next week. This is their first raise and will potentially do a second raise in the near future as well. Take a look.  Jason Jongeward


https://docsend.com/view/r4r2eazejit5n7v9

# Exhibit 16

**From:** Marshall Gibbs ██████████████ >
**Date:** February 18, 2022 at 8:07:43 AM PST
**To:** Unknown ████████████████ >
**Subject: Fwd: Deck/ Pics**


Best Regards,
Marshall Gibbs, DDS

Begin forwarded message:


     **From:** Jason Jongeward <jason.jcd@gmail.com>
     **Date:** January 14, 2022 at 7:15:36 PM PST
     **To:** undisclosed-recipients:;
     **Subject: Fwd: Fw: Deck/ Pics**




     Hello Everyone,

     I wanted to share this invesment opportunity with you. You are receiving this as you have
     been interested in or are already invested in the legal contract investment. I received this
     Investment deck from Shane Jager today. He is really excited for this company and it's
     potential, so much so that he has joined the group. You will see him in the deck. I am
     sharing this with you as it has an opportunty to get in on the ground floor as this
     company gets ready to take off. We are looking to raise 2 mil by next Friday and see
     another investment window by the last week of February or march 1. Please see the
     attached email and deck from Shane. Take a look and let me know if you are interested.
     Have a great weekend.

     Jason Jongeward

     ---
     I'm forwarding the Eco battery Deck to you, see it attached below as well as cash flow
     analysis for PO's and fulfillment.  I've decided to partner up with them and am infusing
     the business with 4.5mill personally. They have a better mousetrap then the few others

out there. The common golf cart lead acid battery set up weighs anywhere from 480-600 lbs depending on the batteries. Eco batteries "1" battery takes the place of all 6 lead acid and weighs in only at 68lbs or 94lbs depending on the battery size plus provides better consistent power, smart tech, charges in 4-5hrs where lead acid is 10-12 hours and really no maintenance w/ lithium vs the acid. Most acid batteries last  2-4 years before needing replacing and eco's battery will go 3500 life cycles which for traditional use will be 10-14 years before replacing.

I see this as a amazing opportunity and believe this company is well positioned and has the runway to see a multi billion dollar exit when all aspects of their business are firing. The goal is a 3-5 year play then look to get acquired. They have patents and IP to take over and be a big player in the industry.  Their batteries along with solar panels can power most auxiliaries for anything from Rv's, Marine (house boats/yachts) Housing etc. The golf carts are not used in conjunction with solar. They have retrofitted RV's/Houseboats and soon residential housing and these other areas will be other income generating opportunities for the company. They expect to do 75 mill in revenue in 2022 and the company and team is top notch and based in St. George Utah. The Ceo had a previous 40mill exit on his last company. They did nearly 5mill in revenue in 2021 and only just started selling in March also have already developed some big relationships already with the worlds top golf cart Oem's.

They need 20-30 million pretty quickly to lock in discounted rates w/the manufacturers and fulfill Po demands. They are open to exchange equity for investment capital and or looking for lines of credit & will pay 8% on those lines for those that want to diversify and additionally offer some equity in conjunction with the LOC. Also The founder is the majority share holder and will sell some of his equity for the right investor(s). Let me know if you are interested and I can connect you on a call with the team to answer any further questions.

Shane

------

*The vid below shows what their cart can do and you can control speed, regenerative breaking from an app on your smart phone etc. If the kids are driving you can set a governor on the app to restrict faster speeds on the cart. They have been working on a bluetooth connection feature that will be a game changer theres already over 100 units sold and being used currently. By March 1st all units will be Bluetooth controlled. Enjoy

--
Noah Schone
CRO
(435) 879-3116
www.EcoBattery.com



--









<EB- Pitch Deck (1).pdf>

<cm-chat-media-video-e79maRNclUMXY9SyS5nUW.mov>

<Cash Flow in detail - Sheet1.pdf>

# Exhibit 17

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** January 27, 2022 at 11:51:37 PM PST
**To:** undisclosed-recipients:;
**Subject: Fwd: Eco Battery Updates**

Fellow investors,

      A quick update on the Eco Battery.  I was able to visit Eco Battery headquarters in St George, Utah yesterday. I went with one of our fellow investors and met with Casey Shirts and Noah Schone. They were able to give us a tour of the facility, share with us exactly what they do, and bring us up to speed on the opportunities that lie ahead for them in the battery Industry.  I was impressed with the savvy mindset of Casey and Noah as they explained the current market environment and their plans to capture a large portion of the market with their unique battery design and unmatched battery performance. We discussed what sets them apart from their competitors and how they are capturing the largest OEM's in the US. I asked Noah to give me some updated information with OEM's and

market adjustments since the investment deck was created. ( See Below). We also discussed their supply chains and processes in place to acquire overseas components to fill currents demand for their goods. After speaking with them today,  we will see a forecasted 2022 balance Sheet and P/ L  to explain more about their expected performance and growth trajectory this coming week. I see incredible growth for Eco Battery right away and do not want to miss this opportunity to invest in a company that is exploding.

 As we have discussed in previous emails, the real win for us as investors is to reach 5 million, or more, and gain a % of equity in the company. That multiple has a 4x-8x potential. I am wanting to get an idea of those who are interested in investing within our group. We have been given a lengthened 90 day period to gather our capital. Feel free to call me to go over any questions you may have. I would like to get an idea by Sunday of those interested. Another potential investment window may be available if Icon and other OEM's come on board.  I look forward to discussing with you.


Jason Jongeward

509-768-4990


Jason,

Thanks for taking the time to meet with us today. We are excited about the opportunity to have your group be a part of Eco Battery. We know that with the right funding and timing, we can really kick start the growth of our company. Hopefully you now have a better understanding of the company needs, and why urgent funding is vital to our growth.

The lithium supply chain has evolved incredibly in the last 90 days, and has unexpectedly caused turmoil to our cash flow. The good news is that if we can secure funds, we will be well positioned to greatly increase both our market share and profit margins. Many of our smaller competitors will not be able to keep up with the cash demand and may have to drop out of the market entirely.

Most of the information on the deck is up to date. Here are a few updates that may not be on there.

We are opening a 24k Sq ft facility strictly for fulfillment in West Columbia, South Carolina. We will have this up and running by March 1st with a warehouse manager and 3 shipping hands.

This location will greatly reduce customer delivery times, as 75% of our current customers are within 500 miles of this facility. This location also gives us great access to the Port of Charleston, which will help combat the major delays we are currently experiencing at the Port of LA/Long Beach.

We are moving our current headquarters into a larger facility in southern Utah, which will allow us to keep more inventory on hand and make the necessary hires.

We currently have over 260 registered Dealers that purchase batteries from us. We also have a contact list with name, email, address, and phone number of 4000+ dealers that we will market to as inventory becomes available. We believe we will have 700+ dealers collectively purchasing 5000+ batteries per month by the end of 2022.

Sales in 2021 was just shy of 5 million, with sales only beginning in late March. With the right capital, we forecast $75M in revenue in 2022 (golf cart batteries alone). We currently have around $6M in backorders and have over $5M in paid for inventory either at the port or on the water.

The goal of the company is to ramp up and take as much market share as possible in the next 4-5 years, then look to get acquired for a healthy multiple. To get to the exit goal, we will need to venture into other lithium battery markets, including RV, marine, and residential solar storage.

**OEM Golf Cart Manufacturers**
Over the past year, we have developed many key relationships with several of the world's top golf cart OEM's. Currently, we are the exclusive lithium battery supplier to 4 out of the 17 US golf cart manufacturers. We have verbal commitments from 2 more and are currently in negotiations with 1 other. All but 1 of these manufacturers reached out to us first.

Currently Selling:
- ROYAL EV https://www.royal-ev.com/ 1500 carts per month. Currently buying 300-400 batteries. They have verbally committed to double their orders in the next 6 months
- VIVID EV https://vivid-ev.com/ 50-200 carts per month. Currently buying 50 batteries per month, and have sent PO's increasing to 200 per month by June
- Renegade EV https://tidewatercarts.com/ 50-100

carts per month. Currently buying 40-50 batteries per month. Potential to double sales this year.
- Kodiak EV https://drivekodiak.com/ 90-100 carts per month. Currently buying 50-100 batteries per month. Potential to double sales this year.

Verbally Committed:
- MOKE of America https://mokeamerica.com/ 250+ carts per month. Currently not buying lithium batteries. We are designing a new battery specifically for their cart, and they have committed to installing a lithium battery in every cart.
- Pilot Car https://pilotcarev.com/ 75-100 carts per month, increasing to 250+ per month by year end. They are waiting for our new battery design to arrive and will begin buying batteries for about half of their carts sold.

In Negotiations:
ICON https://iconev.com/ 4000+ carts per month, increasing to 8,000 carts per month by year end. ICON ownership directly contacted Eco Battery and asked us to design a battery specifically for their cart. They have tried several other companies' lithium batteries, but so far have not been satisfied with the design or performance. This is a great opportunity for long term stable sales.

**Residential Solar Storage**
This has the potential to be 5X-10X the revenue of the golf cart industry. Our plans are to leverage our current component suppliers and offer a complete solar package to the residential user. With most western lakes at all-time lows, and the population increasing at record paces, the threat of energy shortages and rolling blackouts are real. Having the peace of mind knowing that your house will continue to function in the event of a blackout is priceless. We feel we can penetrate this market heavily by early to mid 2023.

**RV/Marine**
We currently own RV Solar & Battery, LLC and the corresponding website, www.rvsolarandbattery.com. Our plan is to market batteries heavily to RV and marine customers under this brand name. With the RV, van life, and camping craze currently at its peak, we feel there is as huge potential for Eco Battery in the RV space.  We plan to utilize our unique distributorship position with Victron Energy https://www.victronenergy.com/ to market a complete

solar package utilizing our batteries.

Thanks again for your consideration in joining us at Eco Battery, we look forward to hearing from you very soon. Let us know if there is any other information you need.

Thank you



--

# Exhibit 18

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** February 24, 2022 at 2:23:37 PM PST
**To:** Jason Jongeward <jason.jcd@gmail.com>
**Subject: JL2 Investment Group, llc- Eco Battery ( 2nd Agreement). Wire instructions**

Hello JL2 Investment Group Partners,

I have sent you the partnership agreement via docusign. I am awaiting the 2nd agreement from the Eco Attorney. I will send that out for your review. I anticipate it will be very similar to the first agreement. They will become part of the partnership agreement and will be sent to you for your approval.
You may wire your capital contribution to the JL2 inv group/eco account today or tomorrow. I will be wiring this capital on Monday, Feb 28th, 2022, at 12 noon, once each of you approve the documents.

Please wire funds to:

Jason Jongeward -Eco Battery
6311 Crest view Lane
Cheney WA, 99004
Acct # ███████33 14

Wells Fargo Bank
420 Montgomery Ave
San Francisco, CA 94104
RT # 121 000 248

Please review the partnership agreement to ensure the investment amounts are correct and coordinate with your wire amounts.  LMK if you have any questions or concerns.

Sincerely,

Jason Jongeward
--

# Exhibit 19

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** February 24, 2022 at 6:05:42 PM PST
**To:** undisclosed-recipients:;
**Subject: Re: JL2 Investment Group, llc- Eco Battery ( 2nd Agreement). Wire instructions**

Eco Investors, Our march 1st contribution window has been extended to march 7th. This will give us the proper time to see the loan docs from eco and allow others to invest who were not able to make the March 1st timeframe. We will not need to wire capital tomorrow to the Jl2 group account rather we will anticipate that next week. Have a nice evening.

Jason Jongeward

On Thu, Feb 24, 2022 at 5:30 PM Redacted

Redacted

*DISCLAIMER OF TAX ADVICE:  Any discussion contained herein cannot be considered to be tax advice.  Actual tax advice would require a detailed and careful analysis of the facts and applicable law, which we expect would be time consuming and costly.  We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail.  As a result, we are required to advise you that any Federal, state, or local tax advice rendered in this e-mail is not intended or written to be used and cannot be used for the purpose of avoiding penalties that may be imposed by the IRS or state and local taxing authorities.  In the event you would like us to perform the type of analysis that is necessary for us to provide an opinion, that does not require the above disclaimer, as always, please feel free to contact us.*

=================================================================================
This electronic mail message and any attachments may contain confidential or privileged
information and is intended for use solely by the above-referenced recipient. Any

review,
copying, printing, disclosure, distribution, or other use by any other person or entity is
strictly prohibited under applicable law. If you are not the named recipient, or believe
you have received this message in error, please immediately notify the sender by replying
to this message and delete the copy you received.
=================================================================================
================

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Sent:** Thursday, February 24, 2022 4:27 PM
**To:** Redacted
**Subject:** Re: JL2 Investment Group, llc- Eco Battery ( 2nd Agreement). Wire instructions

Redacted



*DISCLAIMER OF TAX ADVICE:  Any discussion contained herein cannot be considered to be tax advice.  Actual tax advice would require a detailed and careful analysis of the facts and applicable law, which we expect would be time consuming and costly.  We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail.  As a result, we are required to advise you that any Federal, state, or local tax advice rendered in this e-mail is not intended or written to be used and cannot be used for the purpose of avoiding penalties that may be imposed by the IRS or state and local taxing authorities.  In the event you would like us to perform the type of analysis that is necessary for us to provide an opinion, that does not require the above disclaimer, as always, please feel free to contact us.*

====================================================================
This electronic mail message and any attachments may contain
confidential or privileged
information and is intended for use solely by the above-referenced
recipient. Any review,
copying, printing, disclosure, distribution, or other use by any other
person or entity is
strictly prohibited under applicable law. If you are not the named
recipient, or believe
you have received this message in error, please immediately notify the
sender by replying
to this message and delete the copy you received.
====================================================================

**From:** Jason Jongeward <jason.jcd@gmail.com>

**Sent:** Thursday, February 24, 2022 4:06 PM
**To:** Redacted
**Subject:** Re: JL2 Investment Group, llc- Eco Battery ( 2nd Agreement). Wire instructions

Redacted , I am just off the phone with Shane and eco. We now have until the 7th of March for the capital infusion. I can make the adjustment for your entity and resend it over to you in the morning. This should be enough time to process comfortably.

Jason Jongeward

Sent from my iPhone

On Feb 24, 2022, at 5:00 PM, Redacted



*DISCLAIMER OF TAX ADVICE:  Any discussion contained herein cannot be considered to be tax advice.  Actual tax advice would require a detailed and careful analysis of the facts and applicable law, which we expect would be time consuming and costly.  We have not made and have not been asked to make that type of analysis in connection with any advice given in this e-mail.  As a result, we are required to advise you that any Federal, state, or local tax advice rendered in this e-mail is not intended or written to be used and*

*cannot be used for the purpose of avoiding penalties that may be imposed by the IRS or state and local taxing authorities.  In the event you would like us to perform the type of analysis that is necessary for us to provide an opinion, that does not require the above disclaimer, as always, please feel free to contact us.*

==========================================================
============================================
This electronic mail message and any attachments may
contain confidential or privileged
information and is intended for use solely by the above-
referenced recipient. Any review,
copying, printing, disclosure, distribution, or other use
by any other person or entity is
strictly prohibited under applicable law. If you are not
the named recipient, or believe
you have received this message in error, please immediately
notify the sender by replying
to this message and delete the copy you received.
==========================================================
============================================

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Sent:** Thursday, February 24, 2022 2:23 PM
**To:** Jason Jongeward <jason.jcd@gmail.com>
**Subject:** JL2 Investment Group, llc- Eco Battery ( 2nd Agreement). Wire instructions

Hello JL2 Investment Group Partners,

I have sent you the partnership agreement via docusign. I am awaiting the 2nd agreement from the Eco Attorney. I will send that out for your review. I anticipate it will be very similar to the first agreement. They will become part of the partnership agreement and will be sent to you for your approval.

You may wire your capital contribution to the JL2 inv group/eco account today or tomorrow. I will be wiring this capital on Monday, Feb 28th, 2022, at 12 noon, once each of you approve the documents.

Please wire funds to:

Jason Jongeward -Eco Battery

6311 Crest view Lane

Cheney WA, 99004

Acct # ████ 33 14


Wells Fargo Bank

420 Montgomery Ave

San Francisco, CA 94104

RT # 121 000 248


Please review the partnership agreement to ensure the
investment amounts are correct and coordinate with
your wire amounts.  LMK if you have any questions or
concerns.


Sincerely,


Jason Jongeward

--


--

# Exhibit 20

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** March 3, 2022 at 9:36:36 AM PST
**To:** undisclosed-recipients:;
**Subject: JL2 Investment Group- Eco Battery Investment 2nd Raise**


Hello Fellow Eco Battery Investors,

Please see the attached partnership agreement with wiring instructions for the Eco Battery 2nd raise.  Please review the document to make sure your information and contribution amount is correct.  I am awaiting the executed promissory note and loan agreement from Eco Battery for the 2nd raise and will send these with the JL2 partnership agreement via docusign once received.

I expect to see the executed documents sometime today.  It is anticipated that each investor will wire their contributions to the JL2 Investment Group- Eco Battery account by Friday March 4th. If you would like to wire funds today, be assured that no contributions will be wired to Eco without signed documents from each investor.  I will make a single wire to Eco Battery on Monday.

Let me know if you have any questions.

Thanks,
Jason

**JL2 Investment Group, LLC**
**PARTNERSHIP/TERM AGREEMENT**

**THIS PARTNERSHIP AGREEMENT** (the "Agreement") made and entered into this 11th day of February, 2022 (the "Execution Date"),

**AMONGST:**

### First Raise Contributors: February 15, 2022

JL2 Investments, LLC of 3084 Regal Ct, Washington, UT 84780

TJI, LLC of 6805 S W Terrace Dr, Cheney, WA 99004

ME14, LLC of 3104 S Park Ln, Spokane, WA 99212,

Bam Investments, LLC of 6408 Crestview Ln, Cheney, WA 99004

CorpInvest, LLC of Ruby Way, Nine Mile Falls, WA 99026

Twelve 27 Inc of 822 N Swing St, Liberty Lake, WA 99019

Ricardo Ramirez 321 243 Ave SE, Sammamish, WA 98074

### Second Raise Contributors: March 2, 2022

TJI, LLC of 6805 S W Terrace Dr, Cheney, WA 99004

Roundy Taxidermy of 950 S 175 W, Glendale, UT 84729

MCMH Investments, LLC of 1715 Saint Charles Rd, Spokane Valley, WA 99037

Crestview Capital, LLC of 6314 Crestview Ln, Cheney, WA 99004

Mountain West IRA, INC FBO Thomas Robinson IRA-Member
13905 W Waynewright Dr, Boise, ID 83713

Ryan Love of 2437 E Glenn Ct, Spokane, WA 99223

WE Capital Investments, LLC of 924 N Wright Blvd, Liberty Lake, WA 99019

PWHE INC. of 5118 S Linke Rd, Greenacres, WA 99016

QIC Investments, LLC of 18712 E 4th Ave, Spokane Valley, WA 99016

Michael Buck of 1682 Summit Park Lane, Creston, IA 50801

(individually the "Partner" and collectively the "Partners").

**BACKGROUND:**

A. The Partners wish to associate themselves as partners in business.

B. This Agreement sets out the terms and conditions that govern the Partners within the Partnership.

**IN CONSIDERATION OF** and as a condition of the Partners entering into this Agreement and other valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the parties to this Agreement agree as follows:

**<u>Formation</u>**

1. By this Agreement the Partners enter into a general partnership (the "Partnership") in accordance with the laws of The State of Utah. The rights and obligations of the Partners will be as stated in the applicable legislation of The State of Utah (the 'Act') except as otherwise provided in this Agreement.

**<u>Name</u>**

2. The firm name of the Partnership will be: JL2 Investment Group, LLC.

**<u>Purpose</u>**

3. The purpose of the Partnership will be: Investments.

**<u>Term</u>**

4. The Partnership will begin on February 10th, 2022 and will continue until terminated as provided in this Agreement.

2

**Place of Business**

5. The principal office of the business of the Partnership will be located at 3084 Regal Ct, Washington, UT 84780, USA or such other place as the Partners may from time to time designate.

**Initial Capital Contributions**

6. Each of the Partners has contributed or will contribute to the capital of the Partnership, in cash or property or in non-monetary contributions in agreed upon value, as follows (the "Initial Capital Contribution"):

| Partner | Contribution Description | Agreed Value |
|---|---|---|
| **1st Raise** | | |
| JL2 Investments, LLC | Cash: $1,400,000.00 | Cash: $1,400,000.00 |
| ME14, LLC | Cash: $1,000,000.00 | Cash: $1,000,000.00 |
| TJI, LLC | Cash: $100,000.00 | Cash: $100,000.00 |
| BAM Investments, LLC | Cash: $50,000.00 | Cash: $50,000.00 |
| Corp Invest, LLC | Cash: $100,000.00 | Cash: $100,000.00 |
| Twelve 27 Inc | Cash: $100,000.00 | Cash: $100,000.00 |
| Ricardo Ramirez | Cash: $200,000.00 | Cash: $200,000.00 |
| **2nd Raise** | | |
| Crestview Capital, LLC | Cash: $200,000.00 | Cash: $200,000.00 |
| TJI, LLC | Cash: $100,000.00 | Cash: $100,000.00 |
| Roundy Taxidermy | Cash: $100,000.00 | Cash: $100,000.00 |
| MCMH Inv. LLC | Cash: $50,000.00 | Cash: $50,000.00 |
| Ryan Love | Cash: $400,000.00 | Cash: $400,000.00 |
| Mountain West IRA, INC FBO | Cash: $100,000.00 | Cash: $100,000.00 |
| WE Captial INV, LLC | Cash: $200,000.00 | Cash: $200,000.00 |

| | | |
|---|---|---|
| QIC INV. LLC | Cash: $100,000.00 | Cash: $100,000.00 |
| Michael Buck | Cash: $100,000.00 | Cash: $100,000.00 |
| PWHE INC | Cash: $100,000.00 | Cash: $100,000.00 |
| | | |
| | | |
| | | |
| | | |
| | | |
| FUTURE INVESTORS | | |

4

7. All Partners must contribute their respective Initial Capital Contributions fully by February 15, 2022.

**<u>Additional Capital</u>**

8. The capital contribution of a Partner comprises that Partner's Initial Capital Contribution and any additional capital contribution (the "Additional Capital Contribution") made by that Partner to the Partnership at a later date (together the "Capital Contribution"). No Partner will berequired to make an Additional Capital Contribution. When the Partnership requires additional capital, each Partner will have the opportunity to make an Additional Capital Contribution in proportion to that Partner's share of the total Capital Contributions to the Partnership. If an individual Partner is unwilling or unable to meet the additional contribution requirement within a reasonable period, as required by Partnership business obligations, then by a unanimous vote of the Partners the remaining Partners may contribute in proportion totheir existing Capital Contributions to resolve the amount in default.

9. Any advance of money to the Partnership by any Partner in excess of the amounts provided for in this Agreement or subsequently agreed to as Additional Capital Contribution will be deemed a debt owed by the Partnership and not an increase in Capital Contribution of the Partner. This liability will be repaid with interest at rates and times to be determined by a majority of the Partners within the limits of what is required or permitted in the Act. This liabilitywill not entitle the lending Partner to anyincreased share of the Partnership's profits nor to a greater voting power. Such debts may have preference or priority over any other payments to Partners as may be determined by a majority of the Partners.

**<u>Withdrawal of Capital</u>**

10. No Partner will withdraw any portion of their Capital Contribution without the express writtenconsent of the remaining Partners.

**<u>Capital Accounts</u>**

11. An individual capital account (the "Capital Accounts") will be maintained for each

Partner and their Initial Capital Contribution will be credited to this account. Any Additional Capital Contributions made by any Partner will be credited to that Partner's individual Capital Account.

**Interest on Capital**

12. No borrowing charge or loan interest will be due or payable to any Partner on their agreed CapitalContribution inclusive of any agreed Additional Capital Contributions.

**Financial Decisions**

13. Decisions regarding the distribution of profits, allocation of losses, and the requirement for Additional Capital Contributions as well as all other financial matters will be decided by a unanimous vote of the Partners.

**Profit and Loss**

14. Subject to the other provisions of this Agreement, the net profits and losses of the Partnership, for both accounting and tax purposes, will accrue to and be borne by the Partners in proportion to the Partner's Capital Contributions inclusive of any Additional Capital Contributions (the "Profit and Loss Contribution").

**Compensation for Services Rendered**

15. Partners may be compensated for services actually rendered as from time to time may be agreed by unanimous consent of the Partners.

**Books of Account**

16. Accurate and complete books of account of the transactions of the Partnership will be kept in accordance with generally accepted accounting principles (GAAP) and at all reasonable times will be available and open to inspection and examination by any Partner. The books and records of the Partnership will reflect all the Partnership's transactions and will be appropriate and adequate for the business conducted by the Partnership.

**Annual Report**

17. As soon as practicable after the close of each fiscal year, the Partnership will furnish to each Partner an annual report showing a full and complete account of the condition of the Partnership. This report will consist of at least the following documents:

      a. a statement of all information as will be necessary for the preparation of each

b.  Partner's income or other tax returns;

c.  a copy of the Partnership's federal income tax returns for that fiscal year;

d.  a balance sheet; and

e.  any additional information that the Partners may require.

### Banking and Partnership Funds

18. The funds of the Partnership will be placed in such investments and banking accounts as will be designated by the Partners. Partnership funds will be held in the name of the Partnership and will not be commingled with those of any other person or entity.

### Fiscal Year

19. The fiscal year will end on January 1 of each year.

### Audit

20. Any of the Partners will have the right to request an audit of the Partnership books. The cost of the audit will be borne by the Partnership. The audit will be performed by an accounting firm acceptable to all the Partners. Not more than one (1) audit will be required by any or all of the Partners for any fiscal year.

### Management

21. All the Partners will be consulted and the advice and opinions of the Partners will be obtained as much as is practicable. However, the Managing Partner will have management and control of the day-to-day business of the Partnership for the purposes stated in this Agreement. All matters outside the day-to-day business of the Partnership will be decided by a unanimous vote of the Partners.

22. JL2 Investments, LLC will be the Managing Partner. The term "Managing Partner" will also include any party subsequently appointed to that role.

23. In addition to day-to-day management tasks, the Managing Partner's duties will include keeping, or causing to be kept, full and accurate business records for the Partnership according to generally accepted accounting principles (GAAP) and overseeing the preparation of any reports considered reasonably necessary to keep the Partners informed of the business performance of the Partnership.

24. A Managing Partner can voluntarily withdraw from the position of Managing Partner or can be replaced by a majority vote of the remaining Partners. In the event of a withdrawal or removal of the Managing Partner from the position of Managing Partner or from the Partnership, the remaining Partners will have equal rights in the management of the Partnership until they appoint a successor Managing Partner.

25. The Managing Partner will not be liable to the remaining Partners for any action or failure to act resulting in loss or harm to the Partnership except in the case of gross negligence or willful misconduct.

26. The Managing Partner is authorized and may retain, or otherwise secure or enter into contracts with persons or firms as from time to time may be required in the management of the Partnership's business including, but not limited to, arrangements with sales companies, attorneys, accountants, brokers, advertising and insurance companies.

**<u>Contract Binding Authority</u>**

27. Only the Managing Partner will have the authority to bind the Partnership in contract.

**<u>Partnership Representative</u>**

28. JL2 Investments, LLC will be the partnership representative ("the Partnership Representative") with the sole authority to act on behalf of the Partnership in relation to IRS tax audits pursuant to Chapter 63 Subchapter C of the Internal Revenue Code of 1986 ("the Tax Rules").

29. The Partnership Representative is appointed for the current tax year and subsequent tax years until otherwise designated by the Partners.

30. The Partners will indemnify the Partnership Representative from and against all claims, actions, suits, demands, damages, obligations, losses, settlements, judgments, costs and expenses brought by the Partners or any of them in relation to any acts or omissions in the conduct of the role of Partnership Representative provided that the Partnership Representative is a Partner, except to the extent that such losses result from, in whole or in part, the negligence, wilful misconduct or unlawful action of the Partnership Representative.

31. The Partnership Representative will promptly advise the Partners of any audit of the Partnership initiated by the IRS and provide regular updates to the Partners on the progress of such audits and any resulting settlement negotiations. The Partnership Representative will be generally accountable to the Partners and will obtain the majority approval of the Partners for (i) any decisions affecting the tax liability of the Partnership or the Partners; and (ii) any decision finalizing tax settlement with the IRS.

32. The Partnership Representative may resign from the position by serving notice in writing on both the Partnership and the IRS. The Partnership, acting by majority vote, may revoke the designation of the Partnership Representative by serving notice on the Partnership Representative and the IRS and simultaneously appointing a new Partnership Representative for that taxable year.

33. Whether serving in an active capacity or not, any person who has served as Partnership Representative in respect of any given taxable year or portion thereof will remain accountable to the Partnership, throughout the period of limitation relating to that taxable year, in respect of any notification received from the IRS and will promptly advise the Partnership of any and all such correspondence.

34. In the event that a tax settlement reached between the IRS and the Partnership Representative is not satisfactory to one or more of the Partners and the matter cannot be resolved through negotiation in good faith at a meeting of the Partners, then, two weeks, or such longer period as the partners may agree, following such meeting the Partners agree to submit the dispute to mediation.

**<u>Meetings</u>**

35. Regular meetings of the Partners will be held annually.

36. Any Partner can call a special meeting to resolve issues that require a vote, as indicated by this Agreement, by providing all Partners with reasonable notice. In the case of a special vote, the meeting will be restricted to the specific purpose for which the meeting was held.

37. All meetings will be held at a time and in a location that is reasonable, convenient and practical considering the situation of all Partners.

**<u>Admitting a New Partner</u>**

38. A new Partner may only be admitted to the Partnership with a majority vote of the existing Partners, except in the case of a prospective partner, the admission of which would render the Partnership ineligible to elect out of the application of the Tax Rules, in which case a unanimous vote of the existing Partners will be required to admit that partner.

39. Any new Partner agrees to be bound by all the covenants, terms, and conditions of this Agreement, inclusive of all current and future amendments. Further, a new Partner will execute such documents as are needed to effect the admission of the new Partner. Any new Partner will

receive such business interest in the Partnership as determined by a unanimous decision of theother Partners.

**Transfer of Partnership Interest**

40. A Partner may assign their distribution interest in the Partnership and its assets provided that, where the acquisition of the interest by the prospective partner will render the Partnership ineligible to elect out of the application of the Tax Rules, the assigning Partner must first obtain the unanimous consent of the remaining Partners. This transfer will only include that Partner's economic rights and interests and will not include any other rights of that Partner nor will it include an automatic admission as a Partner of the Partnership or the right to exercise any management or voting interests. A Partner who assigns any or all of their partnership interest to any third party will relinquish their status as Partner including all management and voting rights. Assignment of Partner status, under this clause, including any management and voting interests, will require the consent of all the remaining Partners.

**Voluntary Withdrawal of a Partner**

41. Any Partner will have the right to voluntarily withdraw from the Partnership at any time. Written notice of intention to withdraw must be served upon the remaining Partners at least three (3) months prior to the withdrawal date.

42. Except as otherwise provided elsewhere in this Agreement, the voluntary withdrawal of a Partner will have no effect upon the continuance of the Partnership business.

43. In the event that a Partner's interest in the Partnership is to be sold, the remaining Partners have a right of first purchase on that interest. If any of the remaining Partners elect to purchase the interest of the Dissociated Partner, those Partners will serve written notice of such election upon the Dissociated Partner within thirty (30) days after receipt of the Dissociated Partner's notice of intention to withdraw, including the purchase price and method and schedule of payment for the Dissociated Partner's interest. The purchase amount of any buyout of the Dissociated Partner's interest will be determined as outlined in the Valuation of Interest section of this Agreement.

44. A Dissociated Partner will only exercise the right to withdraw in good faith and will act to minimize any present or future harm done to the remaining Partners as a result of the withdrawal.

**Involuntary Withdrawal of a Partner**

45. Events resulting in the involuntary withdrawal of a Partner from the Partnership will include but not be limited to: death of a Partner; Partner mental incapacity; Partner disability preventing reasonable participation in the Partnership; Partner incompetence; breach of fiduciary duties by a Partner; criminal conviction of a Partner; Expulsion of a Partner; Operation of Law against a Partner; or any act or omission of a Partner that can reasonably be expected to bring the business or societal reputation of the Partnership into disrepute.

46. Except as otherwise provided elsewhere in this Agreement, the involuntary withdrawal of a Partner will have no effect upon the continuance of the Partnership business.

47. In the event that a Partner's interest in the Partnership is to be sold, the remaining Partners have a right of first purchase on that interest. If any of the remaining Partners elect to purchase the interest of the Dissociated Partner, those Partners will serve written notice of such election, including the purchase price and method and schedule of payment upon the Dissociated Partner, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the Dissociated Partner. The purchase amount of any buyout of a Partner's interest will be determined as outlined in the Valuation of Interest section of this Agreement.

48. A trustee in bankruptcy or similar third party who may acquire that Dissociated Partner's interest in the Partnership will only acquire that Partner's economic rights and interests and will not acquire any other rights of that Partner or be admitted as a Partner of the Partnership or have the right to exercise any management or voting interests.

**<u>Dissociation of a Partner</u>**

49. Where the remaining Partners have purchased the interest of a Dissociated Partner, the purchase amount will be paid in full, but without interest, within 90 days of the date of withdrawal.

50. The Partnership will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Partnership.

51. Where the voluntary or involuntary withdrawal of a Partner results in only one Partner remaining or where no buyer is found to purchase the interest of the Dissociated Partner then the Partnership will proceed in a reasonable and timely manner to dissolve the Partnership, with all debts being paid first, prior to any distribution of the remaining funds. Valuation and distribution will be determined as described in the Valuation of Interest section of this Agreement.

52. The remaining Partners retain the right to seek damages from a Dissociated Partner where the dissociation resulted from a malicious or criminal act by the Dissociated Partner or where the Dissociated Partner had breached their fiduciary duty to the Partnership or was in breach of this Agreement or had acted in a way that could reasonably be foreseen to bring harm or damage to the Partnership or to the reputation of the Partnership.

53. On any purchase and sale of a Partnership interest, a Dissociated Partner will only have liability for Partnership obligations that were incurred during their time as a Partner. Immediately upon the sale of a withdrawing Partner's interest, the Partnership will prepare, file, serve, and publish all notices required by law to protect the withdrawing Partner from liability for future Partnership obligations.

### **Dissolution**

54. Except as otherwise provided in this Agreement, the Partnership will be dissolved upon a majority vote of all Partners.

### **Distribution of Property on Dissolution of Partnership**

55. In the event of the dissolution of the Partnership, each Partner will share in any remaining assets or liabilities of the Partnership in proportion to the Partners' Capital Contributions inclusive of any Additional Capital Contributions (the "Dissolution Distribution").

56. Upon Dissolution of the Partnership and liquidation of Partnership Property, and after payment of all selling costs and expenses, the liquidator will distribute the Partnership assets to the following groups according to the following order of priority:

      a.  in satisfaction of liabilities to creditors except Partnership obligations to current Partners;

      b.  in satisfaction of Partnership debt obligations to current Partners; and then

      c.  to the Partners according to the Dissolution Distribution described above.

57. The claims of each priority group will be satisfied in full before satisfying any claims of a lower priority group. Any excess of Partnership assets after liabilities or any insufficiency in Partnership assets in resolving liabilities under this section will be shared by the Partners according to the Dissolution Distribution described above.

**Valuation of Interest**

58. In the absence of a written agreement setting a value, the value of the Partnership will be based on the fair market value appraisal of all Partnership assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Partners. An appraiser will be appointed within a reasonable period of the date of withdrawal or dissolution. The results of the appraisal will be binding on all Partners. A withdrawing Partner's interest will be based on that Partner's proportion of the Dissolution Distribution described above, less any outstanding liabilities the withdrawing Partner may have to the Partnership. The intent of this section is to ensure the survival of the Partnership despite the withdrawal of any individual Partner.

59. No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Partnership books immediately prior to valuation.

**Goodwill**

60. The goodwill of the Partnership business will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

**Title to Partnership Property**

61. Title to all Partnership Property will remain in the name of the Partnership. No Partner or group of Partners will have any ownership interest in such Partnership Property in whole or in part.

**Voting**

62. Any vote required by the Partnership will be assessed where each Partner receives one vote carrying equal weight, unless an Additional Capital Contribution has been made which changed the Initial Capital Contribution proportions of the Partners in which case each Partner will have voting strength in proportion to Capital Contributions.

**Force Majeure**

63. A Partner will be free of liability to the Partnership where the Partner is prevented from executing their obligations under this Agreement in whole or in part due to force majeure, such as earthquake, typhoon, flood, fire, and war or any other unforeseen and uncontrollable event where the Partner has communicated the circumstance of said event to any and all other Partners and taken any and all appropriate action to mitigate said event.

## Duty of Loyalty

64. No Partner will engage in any business, venture or transaction, whether directly or indirectly, that might be competitive with the business of the Partnership or that would be in direct conflict of interest to the Partnership without the unanimous written consent of the remaining Partners. Any and all businesses, ventures or transactions with any appearance of conflict of interest must be fully disclosed to all other Partners. Failure to comply with any of the terms of this clause will be deemed an Involuntary Withdrawal of the offending Partner and may be treated accordingly by the remaining Partners.

65. A withdrawing Partner will not carry on a similar business to the business of the Partnership within any established or contemplated market regions of the Partnership for a period of at least three (3) months after the date of withdrawal.

## Duty of Accountability for Private Profits

66. Each Partner must account to the Partnership for any benefit derived by that Partner without the consent of the other Partners from any transaction concerning the Partnership or any use by that Partner of the Partnership property, name or business connection. This duty continues to apply to any transactions undertaken after the Partnership has been dissolved but before the affairs of the Partnership have been completely wound up by the surviving Partner or Partners or their agent or agents.

## Duty to Devote Time

67. Each Partner will devote such time and attention to the business of the Partnership as the majority of the Partners will from time to time reasonably determine for the conduct of the Partnership business.

## Forbidden Acts

68. No Partner may do any act in contravention of this Agreement.

69. No Partner may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Partner in the Partnership.

70. No Partner may do any act that would make it impossible to carry on the ordinary business of the Partnership.

71. No Partner may confess a judgment against the Partnership.

72. No Partner will have the right or authority to bind or obligate the Partnership to any extent with regard to any matter outside the intended purpose of the Partnership.

73. Any violation of the above Forbidden Acts will be deemed an Involuntary Withdrawal of the offending Partner and may be treated accordingly by the remaining Partners.

### Indemnification

74. All Partners will be indemnified and held harmless by the Partnership from and against any and all claims of any nature, whatsoever, arising out of a Partner's participation in Partnership affairs. A Partner will not be entitled to indemnification under this section for liability arising out of gross negligence or willful misconduct of the Partner or the breach by the Partner of any provisions of this Agreement.

### Liability

75. A Partner will not be liable to the Partnership, or to any other Partner, for any mistake or error in judgment or for any act or omission done in good faith and believed to be within the scope of authority conferred or implied by this Agreement or the Partnership.

### Liability Insurance

76. The Partnership may acquire insurance on behalf of any Partner, employee, agent or other person engaged in the business interest of the Partnership against any liability asserted against them or incurred by them while acting in good faith on behalf of the Partnership.

### Life Insurance

77. The Partnership will have the right to acquire life insurance on the lives of any or all of the Partners, whenever it is deemed necessary by the Partnership. Each Partner will cooperate fully with the Partnership in obtaining any such policies of life insurance.

### Amendments

78. This Agreement may not be amended in whole or in part without the unanimous written consent of all Partners.

**Governing Law and Jurisdiction**

79. This Agreement will be construed in accordance with and exclusively governed by the laws of The State of Utah.

80. The Partners submit to the jurisdiction of the courts of The State of Utah for the enforcement of this Agreement or any arbitration award or decision arising from this Agreement.

**Definitions**

81. For the purpose of this Agreement, the following terms are defined as follows:

   a. "Additional Capital Contributions" means Capital Contributions, other than Initial Capital Contributions, made by Partners to the Partnership.

   b. "Capital Contribution" means the total amount of cash or Property contributed to the Partnership by any one Partner.

   c. "Dissociated Partner" means any Partner who is removed from the Partnership through a voluntary or involuntary withdrawal as provided in this Agreement.

   d. "Expulsion of a Partner" can occur on application by the Partnership or another Partner, where it has been determined that the Partner:

      i. has engaged in wrongful conduct that adversely and materially affected the Partnership's business;

      ii. has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Partnership or to the other Partners; or

      iii. has engaged in conduct relating to the Partnership's business that makes it not reasonably practicable to carry on the business with the Partner.

   e. "Initial Capital Contribution" means Capital Contributions made by any Partner to acquire an interest in the Partnership.

f. "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

**Miscellaneous**

82. Time is of the essence in this Agreement.

83. This Agreement may be executed in counterpart.

84. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in the neuter gender include the masculine gender and the feminine gender and vice versa.

85. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

86. This Agreement contains the entire agreement between the parties. All negotiations and understandings have been included in this Agreement. Statements or representations which may have been made by any party to this Agreement in the negotiation stages of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value in this Agreement. Only the written terms of this Agreement will bind the parties.

87. This Agreement and the terms and conditions contained in this Agreement apply to and are binding upon the Partner's successors, assigns, executors, administrators, beneficiaries, and representatives.

88. Any notices or delivery required here will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the parties at the addresses contained in this Agreement or as the parties may later designate in writing.

89. All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

IN WITNESS WHEREOF the Partners have dully affixed their signatures:

JL2 Investments, LLC

Jason M. Jongeward

Per:_____


ME14, LLC
Efrain Ramirez

Per:_____


TJI, LLC
Tammy Jongeward

Per:_____


BAM Investments, LLC
Brent Jongeward

Per:_____


Corp Invest, LLC

Richard Volz

Per:_____


Twelve 27, INC
Scott Williams

Per:_____

19

Ricardo Ramirez

Per:_____


TJI, LLC
Tammy Jongeward

Per:_____


Roundy Taxidermy
Travis Roundy

Per:_____


MCMH Inv, LLC
Ryan Robinson

Per:_____


Crestview Capital, LLC
M.G.

Per:_____


Mountain West IRA, INC FBO
Thomas Robinson

Per:_____


Ryan Love

Per:_____

WE Capital Inv. LLC
Jared Wiberg

Per:_____


PWHE, INC
Kirk Fuhriman

Per:_____


QIC Investments, LLC
Jerry Ward

Per:_____


Per:_____


Per:_____

# TERM AGREEMENT

Let it be known that the terms of this agreement are for the Eco Battery investment.

The terms are as follows:

1. Eco Battery is offering an 8% return on investor contributions within the first year.

2. Investor Contributions will be used as a 12-month line of credit.

3. Contributions will be returned to the investor after said 12 months with associated interest.

4. Eco Battery will offer a percentage of ownership in the company according to the following contribution amounts:

    a. 5 million = 2% equity ownership

    b. 10 million = 4% equity ownership

    c. 15 million = 6% equity ownership

    d. 20 million = 8 % equity ownership

    e. 25 million = 10% equity ownership

    f. 30 million = 12% equity ownership

5. JL2 Investment Group has currently raised 7.6 million and qualifies for the 2% equity ownership.

6. It is anticipated that Eco Battery will sell their company in the next 3 to 5 years at which time the equity ownership valuation will be understood and distributed.

7. Eco Battery will be issuing documentation (Terms and Agreements) to JL2 Investment Group and will be included as an addendum to this agreement.

8. The requested investor contribution time frames are as follows:

    a. First Raise: February 15, 2022

    b. Second Raise: March 7, 2022

    c. Third Raise: May 1, 2022

9. As Eco Battery continues to increase their sales, it is anticipated that there will be additional opportunities to increase investor contributions with potential increased % of equity.

10. It is understood that Jason Jongeward is the Manager for JL2 Investment Group, LLC.  A 2% management fee will be charged to each member of the group which will cover any and all costs associated with the creation, execution, or administration of the LLC.  It is anticipated that final distributions will be issued by the end of the calendar year of 2027 or when Eco Battery sells, whichever comes first. The 2% fee will be assessed by the Manager upon final proceed distributions.



3084 Regal Court
Washington, UT 84780
509-768-4990

## Bank Payment Instructions

<u>ACH</u>

| | |
|---|---|
| Bank Name | Wells Fargo Bank |
| Bank Address | 592 N Mall Dr.<br>St George, UT 84790 |
| Beneficiary Name | Jason Jongeward- Eco Battery |
| Beneficiary Address | 3084 Regal Court<br>Washington, UT 84780 |
| Beneficiary Phone | 509-768-4990 |
| Account # | ████3314 |
| Routing # | 124 002 971 |

<u>DOMESTIC WIRE</u>

| | |
|---|---|
| Bank Name | Wells Fargo Bank |
| Bank Address | 592 N Mall Dr.<br>St George, UT 84790 |
| Beneficiary Name | Jason Jongeward- Eco Battery |
| Beneficiary Address | 3084 Regal Court<br>Washington, UT 84780 |
| Beneficiary Phone | 509-768-4990 |
| Account # | ████3314 |
| Routing # | 121 000 248 |

# Exhibit 21

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** March 8, 2022 at 4:03:18 PM PST
**To:** undisclosed-recipients:;
**Subject:** -Contract Investment Update -

Fellow Investors,

I have some unfortunate information to share of happenings over this past weekend with Matt Beasley, the attorney working with J&J Consulting.

https://www.reviewjournal.com/crime/shootings/attorney-shot-by-fbi-agents-after-pointing-gun-faces-assault-charges-2540851/

I have been in contact with Shane since Sunday and he has sent the following email for me to share with you. I will be reaching out to each of you personally to discuss the details that I know. Please wait for me to reach out to you. I will be spending the next few days giving details to each of you.

The Contract Investment is in "Pause" status currently. Many of you have payments coming this week. Those payments will also be in "Pause ". You will be hearing from me in a mass email like this one as I hear any information from the attorney, Mr. Bell, who has been hired by Shane Jager to represent our group.

Dear Investors,

In light of recent unsettling events regarding Matthew Beasley of Beasley Law and his standoff with the FBI, we are taking steps to freeze any and all monies including but not limited to filing a lawsuit and applying for a TRO (temporary restraining order). We will circulate a draft in the next day or two. Many questions remain unanswered. Our attorney is drafting correspondence containing updates and will be emailing that out later this week.

I ask that any capital return requests should be directed to J&J Consulting by and through Jeffrey Judd. Jeff Judd's email is Jeffbarca@aol.com. We have also been directed to cc Matt Beasleys email matthew@beasleylawgrouplv.com.

We will all diligently pursue attorney Matthew Beasley and provide information as the situation unfolds.

Respectfully,
Shane Jager

# Exhibit 22

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** March 11, 2022 at 9:33:42 AM PST
**To:** undisclosed-recipients:;
**Subject: update 3-11-22**


Fellow Friends,  I am just receiving this from Shane Jager.  Please send your emails today if possible. I will be speaking to another attorney, Egglet-Addams Law Firm,  today to represent our group. I will keep you posted as I have information for us. I will continue to reachout to each of you personally.

Sincerely,  Jason Jongeward


--------------


Dear Family & Friends,

I'm saddened by the recent events surrounding attorney Matthew Beasley. It's affected all of us in so many ways.

Unfortunately, there are many more questions than answers at this time. He's in custody and it's now in the hands of the Legal system. We will all need to be patient with the process. Communication will be limited from me now at the request of my attorney which will be a challenge for me.

Fast forwarding, the end goal in all of this will be to make you "whole" again meaning you would receive your total amount back that you wired into attorney Beasley's Account less any principal withdrawals & payments received throughout your time in the investment. It is our hope that the capital investment funds will be recovered to be able to be dispersed to those that are not whole.

An example of this would be if you originally wired 100k to Beasley & have received 50k back in payments while invested then it would take 50k to make you whole again.

I'd like to be prepared with this detail when the courts request it. To help expedite this reconciliation process please send your individual/entity details requested above direct to my email at

[Stirlingconsulting1@gmail.com](mailto:Stirlingconsulting1@gmail.com)

I will audit your emailed detail individually to confirm it matches what I show.

Recapping, the only detail needed in your email is,
1.  Total amount you or your entity wired to attorney Beasley less any principal withdrawals along the way.
2.  Total dollar amount in payments you've received since your inception in the investment.

I know we all have many questions right now, but I will not be able to respond back to you due to my attorney's request so please do not ask any other questions in the email. Just email the requested detail only, please.

Some of you have asked questions about amending your 1099's for 2021. The tax firm we've been using has let us go due to the recent events so please contact your individual CPAs and ask these questions to them as I am not qualified to answer tax questions.

In the end, we hope justice is served & lost capital will be returned to those that rightfully deserve it.

Respectfully,

Shane Jager

--

# Exhibit 23

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** March 13, 2022 at 11:00:06 AM PDT
**To:** undisclosed-recipients:;
**Subject: update - 3-13-22**


Dear Friends,

I wanted to reach out and update our group with information that I have been finding out  these last couple of days.

1st-  According to the news, Mathew Beasley is in custody and has not been granted bail. He is awaiting his trial as the investigation continues.
The Beasely Law firm IOLTA account has been frozen as well as all of Beasley's assets.

2nd- For those of you who wired money to others through the buyout process, be assured that your documentation with J and J Purchasing will represent all of your monies given to the investment and will be accounted for. This Documentation, along with my spreadsheets, and your individual request for your capital to be returned, are all that is needed at this time. Please be assured that your financial investment is understood.

3rd- Please understand that your documentation is your representation in this matter. The investigation will reveal all of the individuals involved. For those of you who do not want your identity to be associated with this situation, I have alerted my Attorney to those individuals.

I have tried to reach out to each of you personally through this last week. My apologies if I haven't connected with you. I want you all to know of my concern for each of you in this situation and I am remaining positive that we will have some restitution. I will not be discussing any further details until we know what the situation is on the other side of the investigation, per my attorney's request. I know that we can all find resolve and strength from each other during this time.

Very Sincerely,

Jason Jongeward

# Exhibit 24

**From:** Jason Jongeward <jason.jcd@gmail.com>
**Date:** March 22, 2022 at 11:13:30 AM PDT
**To:** undisclosed-recipients:;
**Subject:** group update 3-22-22


Hello Family and friends,

I wanted to reach out to you to let you know that the investigation is ongoing and
that I have retained an attorney. Oronoz/Ericson I met with him yesterday. I asked
him questions specifically in regards to you as the investor and our group. He
encouraged me to let each of you decide on your own how you would like to
move forward. Some of you have been asking me about the FBI Questionnaire
that is available on the Las Vegas Journal articles and other sites and about
retaining a lawyer for yourself personally. Please feel free to do what you feel is
correct for yourself individually.  It is my understanding, that through
the investigation, that all of you will be understood and that your invested capital
information is in the documentation with Jeff Judd as well as my records for each
of you as well. I will be working through my attorneys to provide all of my
records and investor records.  I am anxious to help this investigation along and
looking forward towards restitution for each of us..

The FBI and SEC are both working on this case.

My Family and I pray for each of you. We are staying positive and looking to
help each other during this time. Please know that this may take some time to
identify all the details.

As things progress, I will share the facts as I receive them.

Sincerely,

Jason Jongeward

--