UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Securities and Exchange Commission,<br><br>Plaintiff<br><br>v.<br><br>Christopher Humphries, et al.,<br><br>Defendants<br><br><br>CJ Investments, LLC, et al.,<br><br>Relief Defendants | Case No. 2:22-cv-00612-CDS-EJY<br><br><br>**Order Denying Motion to Dismiss**<br><br>[ECF No. 199] |

   The United States Securities and Exchange Commission ("SEC") brought this action against defendants Matthew Beasley, Jeffrey Judd, Christopher Humphries, others, and various relief defendants—including CJ Investments, LLC—alleging that they violated the Securities Act and the Exchange Act. *See generally* First Am. Compl., ECF No. 118. Defendant Christopher Humphries and relief defendant CJ Investments, LLC (the "Humphries defendants") move to dismiss the First Amended Complaint ("FAC"). ECF No. 199. The SEC opposes the Humphries defendants' motion. ECF No. 247. I find that the SEC has met its heightened pleading burden in alleging fraud as a cause of action, and further that the SEC's non-fraud claims do not "sound in fraud." Therefore, defendants' motion to dismiss is DENIED.

I.  **Procedural Background**

   The SEC brought this action in April 2022 based on allegations that the defendants were involved in a Ponzi scheme. *See generally* ECF No. 118. The FAC sets forth five claims for relief against the defendants: (1) violations of Section 5(a) and (c) of the Securities Act; (2) violations of Section 17(a) of the Securities Act; (3) violations of Section 10(b) of the Exchange Act and

Exchange Act Rule 10b-5; (4) violations of Section 15(a)(1) of the Exchange Act; and (5) equitable disgorgement. *Id.*

The Humphries defendants move to dismiss the SEC's complaint against them. ECF No. 199. In sum, the Humphries defendants' motion advances two arguments. First, they move to dismiss the FAC against Humphries because the SEC has failed to meet the heightened pleading requirement for fraud under Federal Rule of Civil Procedure 9(b). *See generally* ECF No. 199. Second, Humphries argues that the SEC has failed to allege particularized facts establishing a valid fraud claim against him because his co-defendant and leader of the purported Ponzi-scheme (Beasley) told law enforcement that he acted alone. *Id.* CJ Investment also moves to be dismissed from the FAC but does not include any argument, or points and authorities, in support of its requested relief.

In opposition to the motion to dismiss, the SEC first argues that the Humphries defendants' motion is premised on a misunderstanding of what is required to prove violations of federal securities laws. *See generally* ECF No. 247. The SEC contends that the requisite state of mind for violations of Sections 17(a)(2) and (a)(3) of the Securities Act is negligence, noting that a defendant can violate Section 17(a)(1) of the Securities Act, and Section 10(b) of the Exchange Act, with knowing or consciously reckless conduct. *Id.* at 1. The SEC further argues that strict-liability claims against Humphries under Section 5 of the Securities Act and Section 15(a)(1) of the Exchange Act do not "sound in fraud" simply because Humphries violated those laws while involved in a fraudulent scheme. *Id.*

**II.     Relevant Factual Background**

In order to resolve this motion, I summarize some, but not all, of the allegations set forth FAC against Christopher Humphries and CJ Investments, LLC. *See generally* ECF No. 118. The FAC alleges the following:

- That this case involves a long-running fraudulent offering of securities perpetrated by Matthew Wade Beasley, Esq.; the Beasley Law Group PC; Jeffrey Judd; Christopher

2

- Humphries; and involved other persons and entities. *Id.* at ¶ 1.
- That as part of the scheme, Humphries and others told investors:
    - that they could purchase interests in insurance tort settlements, and that the invested money was used to make advance payments to tort plaintiffs who had reached settlements with insurance companies for tort claims and who were willing to pay a premium to receive a portion of their settlement in advance, rather than wait for payment from the insurance companies;
    - that investors would receive returns on their investments of at least 12.5% every 90 days, for an annualized return of 50%, sometimes more, and that the investment had almost zero risk. *Id.* ¶ 2.
- That the purchase agreements were fictitious. *Id.* at ¶ 4.
- That Humphries and others recruited dozens, if not hundreds, of investors into the scheme and received compensation for bringing in additional investors and more money from existing investors, even though none of them was a registered broker or dealer, nor associated with a broker or dealer, registered with the SEC. *Id.* at ¶ 49.
- That CJ Investments LLC is a Nevada LLC formed in November 2019, and Humphries and his wife, Jessica, were managing members. *Id.* at ¶ 36.
- That CJ Investments LLC received at least $25 million from the Beasley Law Group's Interest on Lawyer Trust Accounts ("IOLTA"), which the SEC alleges were proceeds from the fraud to which it has no legitimate claim. *Id.*
- That Humphries, like co-defendant Judd, promoted the investment scheme to numerous investors, that included personal family and friends. *Id.* at ¶ 48.
- That Humphries told investors that the investment involved funding purchase agreements with personal injury plaintiffs who had settlements with insurance companies but wanted to obtain a portion of their money in advance. *Id.*

- That Humphries told investors that Matthew Beasley and the Beasley Law Group managed the relationships with various attorneys to supply the purchase agreements. *Id.*
- That Humphries told investors that the purchase agreements were in amounts of $80,000 or $100,000 and paid returns of 13% every 90 days, but would sometimes give different returns to different investors, such as 15% every 90 days, and sometimes gave returns as low as 10% every 90 days. *Id.*
- That Humphries told investors that there was little to no risk on the investment, and that, in one instance, Humphries told one investor in April 2021 that J&J Consulting Services had never had a deal fall through. *Id.*
- That Humphries provided contracts to his investors titled "Investor Agreement." *Id.*
- That investor agreements identified Humphries as the "representative" of J&J and said that Humphries was J&J's "Authorized Agent." *Id.* at ¶ 49.
- That Humphries signed dozens, if not hundreds, of these Investor Agreements with investors dating from at least as early as March 2020 through December 2021. *Id.*
- That Humphries told investors that their capital would be reinvested in a new purchase agreement at the expiration of each prior purchase agreement. *Id.* at ¶ 50.
- That Humphries would repeatedly represent that his investors' principal had purportedly been reinvested in a new Purchase Agreement by sending emails giving the name of the new supposed tort plaintiffs and instructing investors how much return they should expect. *Id.*
- That Humphries sent dozens, if not hundreds, of these emails to investors from at least as early as March 2020 through March 2, 2022. *Id.*
- That Humphries reacted angrily and dismissively when investors asked questions about the specifics of the purported investments. *Id.* at ¶ 51.

- That in one instance, in February 2022, an investor asked Humphries why J&J needed outside investors when the purported returns were so high that J&J could just fund the contracts through a bank loan and still make a profit, to which Humphries responded that the investor asked a "loaded" question and stated that he couldn't "possibly answer that." *Id.*
- That Humphries received compensation for bringing new investors into the scheme and for raising additional money from existing investors. *Id.* at ¶ 52.
- That Humphries told one investor that he received 5% of the investor funds he raised and that he made around $250,000 every three months. *Id.*
- That Judd and Humphries typically instructed investors on where to wire their investment money, usually Beasley Law Group's IOLTA, but sometimes included other accounts, such as an account held in the name of CJ Investments LLC. *Id.*
- That the representations made to investors by Judd, the J&J Entities, and Humphries were materially false and misleading. *Id.* at ¶ 55.
- That a small part of the funds was returned to investors to encourage confidence in the scheme, that these payments were designed to promote confidence in the scheme to encourage more investment(s), but the majority of investor funds were used to fund lavish lifestyles for Beasley, Judd, and Humphries. *Id.* at ¶ 56.
- That on or around December 13, 2021, Humphries sent emails to his numerous investors telling them that J&J "conducted a self-imposed business analysis that took the better part of 2021" and that going forward there was a "requirement . . . that [investors] be at 12.5% return." *Id.* at ¶ 60.
- That Humphries repeatedly told investors that they were not allowed to contact the attorneys or plaintiffs whose names appeared on the purchase agreements. *Id.* at ¶ 61.
- That Humphries and his co-defendants knowingly or recklessly engaged in the fraudulent scheme detailed in the FAC. *Id.* at ¶ 63.

5

- That Humphries knew, or was reckless in not knowing, that the purchase agreement investment scheme was a fraud. *Id.* at 68.
- That Humphries was at least aware of indicia that the tort settlements at issue in the investment were fictitious, but nonetheless acted to hide that fact from investors. *Id.*
- That Judd and Humphries acted to hide the fraud from investors by telling them that they were prohibited from contacting the parties to the purchase agreements. Over the years, despite being told not to do so, several investors contacted the attorneys listed on the purchase agreements, and the attorneys denied having such clients or entering the purchase agreements. On information and belief, this information made its way back to the promoters, including Humphries, and ultimately to Judd himself. *Id.* at ¶ 69.
- That despite that Humphries and Judd knew, or were reckless in not knowing, that the purchase agreements were fake, they nonetheless continued to solicit new investors and additional investments from existing investors. *Id.* at ¶ 68.
- That Humphries used an account in the name of CJ Investments LLC and JCH Consulting, LLC, among others, to receive investor funds and also distribute Ponzi payments to his investors. *Id.* at ¶ 81.

III.   **Legal Framework**

The Federal Rules of Civil Procedure require a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal is proper if the complaint lacks a "cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A pleading must give fair notice of a legally cognizable claim and a plaintiff must proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

6

alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

At the dismissal stage, the court only considers the well-pleaded allegations in the plaintiff's complaint. *Id.* at 555. Typically, when a party submits evidence outside the pleadings in a motion to dismiss, the court converts the motion to a motion for summary judgment and imposes Rule 56's standard. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

A plaintiff alleging fraud and misrepresentation must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1145 (9th Cir. 2009). Under Rule 9(b), the plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Rule 9(b) operates "to give defendants notice of the particular misconduct which is alleged," requiring plaintiffs to identify "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (citations omitted). "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Id.* (citations omitted).

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Under Rule 15(a), a court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178 (1962).

## IV. Discussion

Both the Securities Act and the Exchange Act define "security" as, among other things, "any . . . investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). An investment contract is any "contract, transaction[,] or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). Based on the allegations set forth in the FAC,[1] the SEC has sufficiently pled that the investor agreements sold by Humphries meet the aforementioned definition of a "security." Having made that determination, I turn to the substantive claims for relief in the FAC.

### a. The FAC Properly Alleges Violations of Sections 5(a) and (c) of the Securities Act

Sections 5(a) and 5(c) of the Securities Act prohibit offering for sale—or the actual sale of—a security through interstate commerce unless a registration statement has been filed or is in effect as to that security. 15 U.S.C. §§ 77e(a), (c). To sufficiently plead a prima facie violation of Section 5, the SEC must allege that (1) no registration statement covering the securities in question was in effect; (2) the securities were sold; and (3) the sale was carried out through the use of interstate communication or transportation and the mails. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 155–56 (5th Cir. 1972); see also *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). Section 5 liability attaches to those who have a

---

[1] The SEC sufficiently pled that the investor agreements constituted investment contracts because it alleged that they were contracts, transactions, or schemes involving persons purchasing the contract and then expecting a profit based on the efforts of the salesperson or third party, who were then led to expect profits. *Id.* at 4, ¶ 11 ("Defendants were, individually and collectively, involved in the offer and sale of the securities, as that term is defined under Section 2(a)(1) of the Securities Act . . . and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)]; ¶ 44 ("Humphries, like Judd, promoted the J&J Entities investment scheme to numerous investors," and "Humphries told investors that the investment involved funding purchase agreements with personal injury plaintiffs who had settlements with insurance companies but wanted to obtain a portion of their money in advance," and "Humphries told investors that the purchase agreements were in amounts of $80,000 or $100,000 and paid returns of 13% every 90 days. Sometimes Humphries gave different returns to different investors, sometimes giving as much as 15% every 90 days, and sometimes times giving as low as 10% every 90 days."); ¶49 ("Humphries provided contracts to his investors….").

"significant role" in an unregistered sale—that is, if a person is a "necessary participant" and a "substantial factor" in the transaction. *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007) (affirming Section 5 liability when defendant, among other things, directed his company's attorneys to draft a contract for stock sale). A claim for a violation of Section 5 does not require proof that the defendant acted intentionally or with any other requisite mental state. *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 6 (D.D.C. 2000).

Here, the FAC states that there was no registration statement in effect while the collective defendants sold their securities. ECF No. 118 at ¶ 104. There is no contrary evidence before the court. Accepting the allegations in the FAC as true, the first prong of the SEC's prima facie case has been met. The SEC further alleges that Humphries and his co-defendants raised money through the sale of investment contracts, which they titled "investor agreements." ECF No. 118 at 9–13 (describing "investor contracts" and Humphries' role in their sale). As noted above, the SEC has sufficiently alleged that the investor agreements constitute securities, so I must therefore determine if there was a valid exemption from the registration requirement. The FAC alleges that no valid exception applied to the sale of the "investor agreements." *Id.* at 24, ¶ 105. Once the prima facie violation is established, the burden of proof to show that the offers and sales were exempt from registration shifts to the defendants. *See SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010). Humphries offered no evidence showing the investor agreements were exempt. Thus, this second element of the SEC's prima facie case—that the securities were sold—has been met.

Finally, the FAC alleges that the Humphries defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged the complaint. *Id.* at 4, ¶ 12. The FAC sets forth sufficient allegations to demonstrate this element of the offense. For example, one paragraph states that Humphries sent dozens of emails to investors regarding their "investments" between March of 2020 and March of 2022. *Id.* at 13, ¶ 50. It is well established that courts recognize email as a channel and

instrumentality of interstate commerce. *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (quoting *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (per curiam) ("As both the means to engage in commerce and the method by which transactions occur, 'the Internet is an instrumentality and channel of interstate commerce.'")); *United States v. Carnes*, 309 F.3d 950, 954 (6th Cir. 2002) (recognizing that telecommunications are channels and instrumentalities of interstate commerce); *see also SEC v. Shehyn*, 2010 WL 3290977, at *4 (S.D.N.Y. Aug. 9, 2010) (use of "telephone and email in furtherance of [the] illegal scheme satisfies the connection to interstate communication requirement"). The FAC further alleges that Humphries directed investors to wire their investment money to Beasley's IOLTA, as well as other accounts. ECF No. 188 at 13, ¶ 53. Wires are indisputably channels or instrumentalities of interstate commerce. *United States v. Laedeke*, 2016 WL 5390106, at *2 (D. Mont. Sept. 26, 2016) (citing *United States v. Jinian*, 725 F.3d 954, 968 (9th Cir. 2013)). Humphries offers no argument or authority disputing that this element has been met. I therefore find that the SEC's sufficiently alleges the third element. Because all three elements of a violation of Section 5 of the Securities Act are established in the FAC, I deny Humphries's motion to dismiss.

      b. *Alleged Violations of Section 17(a) and 10b-5 Claims are Sufficiently Pled in the FAC*

The FAC alleges that Humphries violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act. Both Section 17(a) and Rule 10b-5 prohibit the use of "any device, scheme, or artifice to defraud" in the offer or sale of securities. 15 U.S.C. § 77q(a)(1); 17 CFR § 240.10b-5(a).

To establish a violation of Section 17(a)(2) of the Securities Act, the SEC must plead, in connection with the offer or sale of a security: (1) a material misstatement or omission; (2) made with at least negligence; (3) the receipt of money or property by means thereof; (4) by means of interstate commerce. *SEC v. GLT Dain Rauscher, Inc.*, 254 F.3d 852 at 856 (9th Cir. 2001). Subsection (3) of 15 U.S.C. § 77q(a)(3) prohibits engaging in a "practice or course of business which operates or would operate as a fraud or deceit upon the purchaser" in the offer or sale of

securities. These claims must be supported by allegations of specific acts or omissions under Rule 9(b) of the Federal Rules of Civil Procedure. *See SEC v. Cal-Am Corp.*, 445 F. Supp. 1329, 1335 (C.D. Cal. 1978).

Similarly, in order to establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, the SEC must allege that a defendant, in connection with the purchase or sale of a security: (1) made a material misrepresentation or omission; (2) with scienter; (3) in interstate commerce. *See* 17 C.F.R. § 240.10b-5(b); *see also SEC v. Platforms Wireless Internet Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). This offense is also subject to the heightened pleading requirement—regarding fraud—of Rule 9(b) of the Federal Rules of Civil Procedure.

Rule 9(b) requires fraud claims to be pled with particularity, "but a pleading is sufficient under Rule 9(b) if it identifies 'the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.'" *Gottreich v. San Francisco Inv. Corp.*, 552 F.2d 866 (9th Cir. 1977) (quoting *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973)). For its claims grounded in fraud, the SEC must allege the "who, what, where, when, and how" of the fraudulent conduct. *Vess*, 317 F.3d at 1106.

Humphries contends that the FAC fails to allege facts sufficient to place him on notice of the basis for its fraud allegations as required by Rule 9(b). ECF No. 199 at 5, 7. He argues that the FAC "consistently and categorically lumps [him] in with other [d]efendants offering very little, if any[,] specificity as to which statements can be linked directly to him." *Id.* Humphries also argues that the SEC ignores exculpatory evidence, that is Beasley's statements to law enforcement that he acted alone. *Id.* at 3–4.

The FAC describes the Ponzi scheme that Beasley, Judd, Humphries, and others are alleged to have perpetrated. The Ninth Circuit has described a Ponzi scheme as "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 759 n.1 (9th Cir. 2000); *see also In re United Energy Corp.*, 944 F.2d 589, 590

n.1 (9th Cir. 1991) ("A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture."). A Ponzi scheme has been found to be itself conduct that is deceptive and fraudulent. *See Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (quoting *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.")).

While not discussed by Humphries in his motion, his role in the alleged Ponzi scheme is clearly set forth in the FAC. *See supra* 4–7 (summarizing allegations) (citing ECF No. 118). The FAC describes the approximate time period that Humphries was involved in the scheme and details his actions in furtherance of the scheme. *Id.* The FAC also details the materially false and misleading representations made by Humphries and his co-defendants. *See* ECF No. 118 at 14–16. A fact is considered material if there is a substantial likelihood that the disclosure of the omitted fact(s) would have been viewed by a reasonable investor as having significantly altered the "total mix" of the information made available. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Certainly, the persons signing the "investor agreements" would have wanted to know that the purported personal injury settlements were fake. Thus, that information was material. The allegations that Humphries instructed investors not to contact the persons allegedly involved in the personal injury agreements is circumstantial evidence that he knew the agreements were fictitious and that that information would be material to the person deciding whether or not to make the investment.

The FAC also establishes scienter.[2] "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)). In a securities-fraud case, scienter can be established if a defendant had "a mental state embracing intent to deceive, manipulate, or defraud." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 (9th Cir. 1990) (quoting *Hochfelder*, 425 U.S. at 194 n.12). The Ninth Circuit has held that

---

[2] Scienter is required to establish violations of Section 17(a) and § 10(b). *SEC v. Glob. Express Capital Real Estate Inv. Fund*, 289 F. App'x 183, 187 (9th Cir. 2008) (citing *Aaron v. SEC*, 446 U.S. 680, 691 (1980)).

"recklessness" is sufficient to satisfy the scienter requirement. *Id.* at 1568–69; *Glob. Express Capital*, 289 F. App'x at 187; *see also Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978) (knowledge or recklessness is required for a finding of scienter under § 10(b)). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569. Reckless conduct has also been described as conduct that "demonstrates an extreme departure from the standards of ordinary care and presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. *Id.*

The FAC alleges that Humphries also knew—or was reckless in not knowing—that the purchase agreement investment scheme was a fraud, and further that he had at least an indicia that the tort settlements at issue in the investment were fictitious, but nonetheless acted to hide that fact from investors. ECF No. 118 at 17, ¶ 68. It also alleges that Humphries was reckless in continuing to participate in and furthering the scheme to invest in fake personal injury settlements. *Id.* at ¶¶ 4, 63, 68. It can be inferred from the allegations in the FAC that Humphries negligently and recklessly promoted and made false representations about the scheme to the investors he recruited—which included members of his own family and friends. *Id.* at 12, ¶ 48 ("Humphries promoted the investment to people at his gym and his church, as well as through friends and family."). Such negligence can likewise be inferred from the allegations regarding the investor agreement that Humphries promoted prohibiting investors from contacting the parties to the personal injury settlements (*id.* at 12–13, ¶ 49), and his own angry reaction and statements when investors asked questions about the investments.[3] *See id.* at 13, ¶ 51.

While there are no direct allegations of negligence in the FAC, the aforementioned information regarding false representations in furtherance of the scheme, the explicit

---

[3] These allegations also directly undercut Humphries' assertion that he was no more than a "victim" of the Ponzi scheme. ECF No. 199 at 6.

prohibition on investors to contact the parties to the personal injury settlements, and Humphries' words and actions when asked about scheme are sufficient to establish that Humphries acted, at a minimum, with negligence in regard to the alleged Ponzi scheme.

The "Facts" section in the FAC also provides more than sufficient allegations about how the Ponzi scheme involved the receipt of money and property, and it further sets out the fraudulent and misleading statements used as part of the scheme. *Id.* at 10–18. Thus, subsection (3) of 15 U.S.C. § 77q(a)(3), prohibiting a fraudulent or deceitful course of business, has also been met. *See* 15 U.S.C. § 77q(a)(3). And, as already discussed above (*supra* 11), the scheme utilized instrumentalities of interstate commerce to communicate with investors and to move money related to the scheme. Thus, the allegations in the FAC are sufficient to establish alleged violations of Sections 17(a) and 10b-5 and are pled with sufficient particularity to satisfy the heightened requirement of Rule 9(b).

   *c. The FAC Alleges Sufficient Information that Humphries Violated Section 15(a) of the Exchange Act*

Section 15(a) of the Exchange Act requires brokers or dealers who "effect any transaction in, or induce or attempt to induce the purchase or sale of, any security" through the use of interstate commerce, to be registered with the SEC or, if the broker or dealer is a natural person, to be associated with a registered broker or dealer that is not a natural person. 15 U.S.C. § 78o(a). The term "broker" includes "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Section 29(b) of the Exchange Act declares every contract made in violation of Section 15(a)(1) void. Unlike Section 17(a) violations, scienter is not required to prove a violation of Section 15(a). *See* 15 U.S.C. § 78o; *see also SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 826–27 (S.D. Cal. 2021) ("[A] Section 15(a) violation does not require proof of scienter.").

Humphries moves this court to dismiss the "non-scienter" claims for relief. ECF No. 199 at 8–9. I thus construe that Humphries seeks to dismiss the claims alleging violations of Section

5 of the Securities Act and Section 15(a)(1) of the Exchange Act. Having already found that the allegations in the FAC set forth a prima facie violation of Section 5, I turn to the fourth claim for relief alleging a violation of Section 15(a)(1).

Humphries argues that the Section 15(a) claim for relief sounds in fraud and therefore the heightened pleading requirement for claims of fraud must be applied. *Id.* But Humphries fails to explain how the Section 15(a) claim "sounds in fraud." To determine if a claim for relief "sounds in fraud," I must closely examination the "language and structure of the complaint, whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'" *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (quoting *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009)). Here, the FAC does rely on the Ponzi scheme allegations to demonstrate the first three claims for relief. But it also alleges that Humphries and his co-defendants violated Section 15(a) by engaging in the business of securities transactions for others without being registered to do so. That allegation neither alleges fraud nor sounds in fraud. Nor is fraud a necessary element of the violation. There is no evidence before the court that Humphries was registered to offer or sell unregistered securities. Thus, the SEC's allegations are unrefuted, and Humphries' motion to dismiss this claim for relief fails.

### d. *CJ Investments' Motion to Dismiss Under 12(b)(6) is Denied*

I deny CJ Investments' motion to dismiss for failing to cite any points and authorities in support of its requested relief. The motion fails to comply with Local Rule 7-2(d), which provides that failing to file points and authorities in support of a motion constitutes "consent to the denial of the motion." LR 7-2(d). A review of the motion reveals that CJ Investments is mentioned seven times: three times on the cover page, one time on page 2, twice on page 4, and one time in the certificate of service. These instances in which CJ Investments is referenced lack discussion and points and authorities to support how the SEC has failed to state a claim against the business. And a plain review of the FAC reveals that the SEC alleges sufficient facts

supporting why it seeks to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in the FAC. *See* ECF No. 118 at 9, ¶¶ 119–121.

## V. Conclusion

Taking, as I must, as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them, and construing the complaint in the light most favorable to the SEC, I find that the allegations set forth in the FAC are sufficient to survive dismissal as to the SEC's claims for violations of Section 5(a) and (c) and Section 17(a) of the Securities Act and Section 10(b), Rule 10b-5, and Section 15(a)(1) of the Exchange Act against the Humphries defendants. Further, the allegations in the FAC support the SEC's request for equitable disgorgement from CJ Investments, LLC. Accordingly,

IT IS HEREBY ORDERED that defendant Christopher Humphries' and relief defendant CJ Investments, LLC's, motion to dismiss **[ECF No. 199] is DENIED**.

IT IS SO ORDERED.

DATED: December 13, 2022

_____
Cristina D. Silva
United States District Judge