# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Securities and Exchange Commission,

     Plaintiff

  v.

Matthew Beasley, et al.,

     Defendants

The Judd Irrevocable Trust, et al.,

     Relief Defendants

Case No. 2:22-cv-00612-CDS-EJY

**Order Finding Aaron Grigsby, Esq. in Civil Contempt for Failing to Comply with Court Orders and Granting Motion Directing Aaron Grigsby to Turn Over Receivership Assets to the Receiver**

[ECF Nos. 584, 585]

  This order addresses the Receiver Geoff Winkler's motion for contempt (ECF No. 584) against Aaron Grigsby, Esq., who formerly represented Paula Beasley,[1] non-party to this action, and the Receiver's related motion for turn over (ECF No. 585). I held continued proceedings on the motion on Thursday, December 14, 2023, after Grigsby failed to appear for the originally scheduling contempt hearing on December 13, 2023.[2] Following argument on the motion, I granted the Receiver's motion directing Aaron Grigsby to turnover receivership property, the

---

[1] Grigsby served as Paula Beasley's attorney until September 19, 2023. *See* ECF No. 574. Paula Beasley is Matthew Beasley's ex-wife. Matthew Beasley is the lead defendant in the underlying Securities and Exchange Commission (SEC) action alleging a Ponzi-scheme. *See* ECF No. 1. He was arrested following a stand-off with law enforcement when they were attempting to execute a search warrant on March 3, 2022. Grigsby represented both Paula and Matthew in their fast-tracked divorce. *See* ECF No. 333-1 (Joint Petition for Summary Divorce); 333-2 (Divorce Decree). The court describes the divorce as fast-tracked because the divorce action was initiated within days of Beasley's arrest related to the Ponzi scheme, finalized less than 14 days later, and in that short amount of time outlined the division of the Beasleys' significant assets, to include vehicles and multiple real estate properties. *See* ECF 333-2 (Divorce Decree). Thus, at the time Grigsby becomes the attorney for the Beasleys, Matthew's impeding legal battles are public knowledge.

[2] Counsel for Grigsby argued that the motion had only been set one day prior to December 13, 2023, but that is incorrect. The motion was set for hearing on November 20, 2023. *See* ECF No. 608 (setting hearing for November 28, 2023).

Receiver's motion for contempt, and found Grigsby in contempt of court, and ordered Grigsby

to pay $50 a day, starting immediately, and doubling every three days, until Grigsby turned over:

    (1)    $100,000 in attorneys' fees charged to Matthew Beasley's American Express credit card;

    (2)    $10,500 in attorneys' fees charged to Matthew Beasley's Visa credit card;

    (3)    the proceeds from the Ferrari and sale of the Aston Martin; and

    (4)    the full amount of proceeds received from the sale of the Mercedes G-Wagon.

The total amount due and owing to the Receiver is $405,302.40. *See* ECF No. 617.

## I.    Relevant background information

On April 12, 2022, the SEC initiated this action against Matthew Beasley, Measley Law Group PC, Jeffrey Judd, Christopher Humphries, J&J Consulting, Inc., and others, alleging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. *See generally* Compl., ECF No. 1. The next day, the court entered a Temporary Restraining Order[3] (1) Freezing Assets; (2) Requiring Accountings; (3) Prohibiting the Destruction of Documents; and (4) Granting Expedited Discovery, among other things (the "TRO"). TRO, ECF No. 3. The terms and conditions of the TRO were later extended by entry of a Preliminary Injunction. Prelim. Inj., ECF No. 56.

On June 3, 2022, the court entered an Order Appointing Receiver (Receivership Order), which requires the Receiver to take possession of all Receivership Assets, including real property and to marshal and preserve the same for the benefit of the Receivership Estate, amongst other obligations.[4] *See generally* Order, ECF No. 88. As relevant to the contempt motion, the Receivership Order provides that:

> "The Individual Receivership Defendants and the J&J Receivership Defendants' past and/or present officers, directors, agents, attorneys...and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other

---

[3] The TRO was entered by United States District Judge James C. Mahan. ECF No. 3. This matter was later reassigned to this court. ECF No. 102; ECF No. 104.

[4] While irrelevant to the pending motion for contempt, the Receivership Order was subsequently amended by the court on July 28, 2022, to include new defendants. *See* Am. Order, ECF No. 207.

matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants.

. . .

The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and **any persons** receiving notice of this Order by personal service, facsimile transmission or otherwise, **having possession of the property, business, books, records, accounts or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver**, his agents and/or employees.

. . .

All banks, brokerage firms, financial institutions, and other persons or entities which have **possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendants that receive actual notice of this Order** by personal service, facsimile transmission or otherwise shall:

> A.   **Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants** except upon instructions from the Receiver;
>
> B.   Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;
>
> C.   Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,
>
> D.   **Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.**"

*See id.* (emphasis added).

Shortly following his appointment, the Receiver reached out to Grigsby and Paula to discuss the turnover of the vehicles and real property in accordance with the Receivership and Turnover Orders. According to the Receiver, on June 9, 2022, Grigsby and Paula met with the Receiver at which time several vehicles, including a motorhome, Jeep Wrangler, Cadillac Escalade ESV, Chevrolet Tahoe, and Chevrolet Silverado were turned over to the Receiver.[5] At that time, Paula represented that a Mercedes G-Wagon[6] (which was identified as receivership property), was in the shop being repaired. *See* Winkler Decl., Ex. 3, ECF No. 333-4 at ¶ 8. Both Paula and Grigsby represented that it would be turned over to the Receiver at a later date. *Id.* Paula also advised that she would be vacating her current residence (identified as the Ruffian Property) in July 2022.[7] *Id.* at ¶ 6. The Receiver asked for specific information relating to the real property, including the Ruffian property, that had been identified as receivership property. *See* ECF No. 333 at 9.

On August 4, 2022, the Receiver, through counsel, sent Grigsby a letter detailing Paula Beasley's non-compliance with his requests and the Turnover Order. Aug. 4, 2022 Letter, Ex. 4, ECF No. 333-5. In that letter, the Receiver specifically requested a date to pick up the Mercedes G-Wagon, and any other vehicle that Paula was continuing to maintain, and requested additional information about the sale of other vehicles and the status of documents related to additional pieces of real property. *Id.* at 3. Grigsby responded via one page letter on August 22, 2022, wherein he disputed that there was ever an agreement about when Paula would vacate the Ruffian property and advised that he had sent information about the vehicles via email on June 28, 2022. Aug. 22, 2022 Letter, Ex. 5, ECF No. 333-6. Absent from the letter was any information regarding the status of the Mercedes G-Wagon. *Id.*  Later, it would be discovered that Grigsby

---

[5] As discussed further herein, Grigsby disputes meeting with the Receiver on June 9, 2022. *See infra*, pg. 7. He contends that he facilitated the transfer of certain property but was not present on June 9 because he was on vacation in Mexico.

[6] The estimated value of this vehicle was $250,000.

[7] After several delays, Paula vacated the Ruffian property, and provided the keys to that property, as well as a property located on Mt. Charleston to the Receiver. Winkler Declaration, Ex. 3, ECF No. 333-4 at ¶ 12.

advised the SEC that "Ms. Beasley is hoping to sell the 2020 Mercedes and apply the proceeds to living and litigation expenses." *See* ECF No. 356 at 60. However, as revealed below, by that time, Grigsby had already initiated the sale of the Mercedes but failed to disclose this information to the SEC, and later failed to disclose this information to the Receiver. According to the Receiver, Grigsby spoke to him on August 23, 2022, at which time Grigsby advised that Paula would turn over the Ruffian Property and Mt. Charleston property on August 29, 2022, and represented (incorrectly[8]) that he had received permission from the SEC to sell the G-Wagon. Winkler Decl., Ex. 3, ECF No. 333-4 at ¶ 13.

In September 2022, the Receiver became aware that the G-Wagon was offered for sale at a Las Vegas dealership, but the vehicle was retrieved before the Receiver could take possession of it. The Receiver was able to contact the person in possession of the vehicle (identified as Nelms) and was advised that Nelms had acquired the vehicle from Aaron Grigsby on or about March 29, 2022, after providing Grigsby with $100,000 in cash. *Id.* at ¶¶ 14–17. Nelms advised that he had no receipt for the cash payment and did not receive the title to the vehicle at that time. *Id.* at ¶ 17. Nelms provided the Receiver with a Bill of Sale which indicates that Nelms purchased the vehicle on April 30, 2022, for $170.000. *See* Bill of Sale, Ex. 9, ECF No. 333-10. Nelms also provided a Certificate of Title that was issued by the Department of Motor Vehicles on June 21, 2022, and copies of two cashier's checks, one issued to Paula Beasley and one issued to her children's private school, that totaled $70,0000. *See* Checks, Ex. 10, ECF No. 333-11.

Also in September of 2022, the Receiver sent Grigsby a letter requesting additional information about funds received by Grigsby and/or the Grigsby Law Group from Paula and any information showing that the funds received were either untainted or not comingled with funds from the alleged Ponzi scheme within 10 days. Sept. 13, 2022 Letter, Ex. 12, ECF No. 333-13.

---

[8] *See infra*, pg. 6.

Almost 30 days later, Grigsby responded via email, providing some additional information requested by the Receiver. In the email, Grigsby:

>   (1) asks the Receiver to be more specific in the items that he is seeking from Paula, and advises that he would do his best to "endeavor to research the item";
>
>   (2) states that he was awaiting confirmation from the SEC regarding permission to sell the G-Wagon;
>
>   (3) represented that "[a]s for the funds received by my office for Paula's representation" that "[his] office received no funds connected to the Ponzi scheme";
>
>   (4) represents that no monies received from the sale of a Ferrari were comingled with monies from the Ponzi scheme; and
>
>   (5) represents that two other vehicles were sold in March of 2022 but neither were "commingled with any monies from the Ponzi scheme."

Grigsby Email, Ex. 13, ECF No. 333-14.

Grigsby provided no documentation to support his representations that monies (either received or related to the sale of vehicles) were not comingled with Ponzi-scheme funds.

On October 17, 2022, the Receiver learned that the SEC never gave Grigsby permission to sell the G-Wagon, but rather Grigsby was explicitly told by counsel from the SEC that she "**did not authorize [Grigsby] or Ms. Beasley to sell the Mercedes**...." Combs Email, Ex. 11, ECF No. 333-12 (emphasis added).

>   A. **The Receiver files his first motion to compel or in the alternative an order to show cause (ECF Nos. 333, 334).**
>
>>   1. *Summary of the Receiver's motion.*

On October 21, 2022, the Receiver filed its first motion to compel or in the alternative motion for an order to show cause against Grigsby and Paula Beasley. ECF No. 333;[9] ECF No. 334. That motion set forth numerous and specific violations of the court's Turnover Order and overall failure to comply with the Receiver's requests. The Receiver asked the court to compel Grigsby to turn over the following:

---

[9] The court only cites to the motion to compel docketed at ECF No. 333.

(1)    An inventory of Paula Beasley's assets still in her possession;

(2)    Proof of Insurance for vehicles the Receiver agreed to allow Paula to maintain for personal use;

(3)    Proof of payment for fees associated with the real property identified as the Schoofey property;

(4)    Documents demonstrating that the SEC approved the sale of G-Wagon, and any and all purchase/sale related documents;

(5)    Documents related to the sale of any Beasley vehicles since March 2022 and the use of proceeds from the same;

(6)    Information regarding the amount of funds Mr. Grigsby and/or his firm received from Paula Beasley and information establishing such funds are not connected to the alleged Ponzi scheme; and

(7)    The G-Wagon or its equivalent value as of April 30, 2022.

ECF No. 333 at 17–22.

### 2. *Summary of Grigsby's opposition (ECF No. 356).*

Grigsby filed an opposition to the motion to compel, arguing that the Receiver's motion was "replete with half-truths, misstatements, unsupported generalities, and outright lies." ECF No. 356 at 3. For example, Grigsby argues that the Receiver made a misstatement based on his representation that he and Grisby "met" in June of 2022 at a time when Grigsby was on vacation in Cancun, Mexico with his family, his law partner, and his law partner's family.[10] *See id.* at 8–9. It appears that Grigsby facilitated the retrieval of certain real property on June 7, 2023, but that Grigsby was not present at the exchange.[11]

The response also claimed that the motion lacked relevant law to support the relief sought and claimed that there was *no violation* of this court's orders by himself or Paula Beasley. *Id.* at 14–17. The opposition also contained information contrary to information asserted by the Receiver. For example, Grigsby asserted that Nelms turned over $100,000 in cash to Paula Beasley from the sale of the G-Wagon (*see id.* at 6–7) whereas Nelms stated that he turned over $100,000 to Grigsby. Grigsby also argued he "was under the impression" there was no objection to the sale of the G-Wagon. *Id.* at 8. He further asserted that he advised the Receiver that $50,000 from the sale of the same was used to pay the mortgage for the Ruffian property. *Id.* at 11.

---

[10] It is unclear when this two-week vacation was booked or what funds were used to pay for this vacation.

[11] Grigsby represents that he did not meet the Receiver in person until August of 2022. *Id.* at 9.

Grigsby further argued that the court lacked personal jurisdiction over Paula Beasley because she was not a named defendant in the underlying action and because of the Receiver's failure to timely challenge the Beasley divorce proceedings. *Id.* at 12–14. Grigsby further argued that Paula could not be held in contempt based on the sale of the G-Wagon because it was her separate property[12] and the Turnover Order was not yet in effect at the time of the divorce. *Id.* at 16–17. Grigsby argued that "no Receivership assets [were] sold by Paula after the asset freeze."[13] *Id.* at 17. Regarding attorneys' fees, Grigsby argued that with the exception of one payment, totaling $27,781.57, the entirety of the fees[14] came from credit card payments, and therefore the fees could not be sourced (or traced) to tainted funds. *Id.* at 17–18.

### 3. Hearing on the first motion to compel held on December 16, 2022.

A hearing on the first motion to compel was held in front of Magistrate Judge Elayna J. Youchah on December 16, 2022. During the hearing, Judge Youchah detailed the troubling and questionable history of Grigsby's handling of Beasley assets, representations regarding those assets to the Receiver, and handling of the representation of both Paula and Matthew Beasley for their divorce. *See* ECF No. 416 at 4–10; 17–19. Judge Youchah asked Grigsby specific questions about several of the assets in question, to which Grigsby gave vague or incomplete answers and explanations. For example,

| | |
|---|---|
| **Judge Youchah:** | What happened to the . . . . $73,000 that we can't account for? Is there a reason that you and Mrs. Beasley have not been able to put together an accounting of that money or where the half -- where the Ferrari went or what happened to the Aston Martin? |
| **GRIGSBY:** | Yes. The -- the Aston Martin was sold almost immediately because -- well, because it -- |

---

[12] Later in the opposition, Grigsby argued that "Paula [was] free to sell her personal property as she sees fit[,]" referring to the G-Wagon. *Id.* at 20.

[13] This is contradicted by the final transfer of funds and title of the G-Wagon.

[14] Grigsby never advised how much in attorneys' fees he received in his opposition.

| | Judge Youchah: | What happened to the money? |
| | GRIGSBY: | The money was used to pay -- pay off community expenses that were already existing. |
| | | . . . |
| | | And we -- I have a spreadsheet where I |
| | | I've broken down all the expenses that -- |
| | Judge Youchah: | How much did the Aston Martin sell for, Mr. Grigsby? Do you know? |
| | GRIGSBY: | I believe around -- around $50,000. |
| | Judge Youchah: | And the Ferrari? |
| | GRIGSBY: | Around $48,000. It was -- it was encumbered by -- they still owed maybe $176,000 on it and the payment on the Ferrari was approximately $2,500 month. |
| | Judge Youchah: | So we have about $100,000 in those cars. We have $73,000 in the amount that hasn't even attempted to be accounted for with the Mercedes Benz. So that's approximately $173,000. |
| | | I know that living is more expensive than it used to be, but I don't understand where that money went and the receiver has a right to know where it went. |

*Id.* at 20–21.

Grigsby went on to make additional representations while providing no supporting documentation regarding the vehicles in question, admitting that Paula was paying outstanding bills with funds from the vehicles she sold, and states that up until recently, he was paying all her bills.[15] *Id.* at 22–23. Grigsby maintained his argument that the G-Wagon was not receivership property because it was awarded to her in the divorce. *Id.* at 24. And Grigsby argued

---

[15] The source of the funds to pay these bills is, at best, unclear because there was limited documentation provided to support this representation.

that attorneys' fees he received from Paula were from credit card payments (through the company) therefore the Receiver could not prove that they were tainted funds. *Id.* at 27.

The court cautioned Grigsby to be "very careful" about his representations to the court. *Id.* at 28. Judge Youchah again pointed out the troubling information before the court, such as the fact that the bill of sale for the Mercedes G-Wagon was signed *after* the freeze order was in effect, and how Grigsby made a material misrepresentation to the SEC and the court regarding the status of the vehicle. *Id.* at 28–33. Judge Youchah also reminded Grigsby of his fiduciary duties and his duties as an attorney at law. *Id.* at 28.

Judge Youchah then addressed—and rejected—Grigsby's lack of personal jurisdiction argument (*id.* at 36–37; 40–41) and made detailed findings regarding the *lack* of information regarding the assets and monies at issue in the motion, suggesting that they appeared to be anything but not tainted from the alleged Ponzi scheme. *Id.* at 38–41. In the end, Judge Youchah found that "there [was] more than sufficient evidence to support the...law that the receiver's motion to compel is granted." *Id.* at 41–42. Despite that finding, Judge Youchah did not grant the show cause order; instead, she gave Grigsby another chance "to come clean totally with the SEC and reverse the course of action" in an attempt to prevent sanctions against him and Paula. *Id.* at 42. The court gave Grigsby and Paula until January 20, 2023, to provide the following information to the Receiver and the SEC:

(1)    Information about the sale of the Mercedes Benz;
(2)    Evidence of the sale in the possession of either Grigsby or Beasley;
(3)    Copies of any purchase or sale documents in Grigsby's possession, custody, control;
(4)    A turnover of any proceeds in the possession of Grigsby or Paula, or an accounting of any proceeds that are still in either of their possession from the $170,000 that was paid, and no dissipation of that money until there is a further court order;
(5)    An accounting, "down to the penny," of where the money that was paid, the $170,000 spent with supporting documentation;
(6)    Also, information related to the Aston Martin, the Ferrari, and any other cars that were in Matthew or Paula Beasley's possession before the fast track divorce and an accounting of the sale of the vehicles, to include (with receipts) where the money went that was received for those cars (such as for bills or loan payments), whether it was to pay off a loan or to pay a gas bill, with receipts;

(7)     Proof of insurance and payments made to date and maintenance records, if any, for the Range Rover;

(8)     All documentation showing payments made to date of taxes, Homeowners Association (HOA), insurance, principal, and interest relating to the Schoofey property;

(9)     An accounting of all attorneys' fees paid using the American Express card;

(10)    Attorneys' fees payments made from any other source, all of that with a specific accounting which must be provided to the SEC;

(11)    An accounting of the property that was taken from the Ruffian property when she vacated it in August 2022; and

(12)    Any information about the Tahoe property, the Mt. Charleston property, or any other property with which the court is not as familiar as the Ruffian and Schoofey property, including any late notice or notices of sale or any other communication from the mortgage-holders on those properties as well as whether the payments have been brought current and the source of those payments.

*Id.* at 42–45. Grigsby never appealed the Magistrate Judge's order.[16]

> ### 4.   *The Receiver files a second motion to compel or in the alternative an order to show cause* (ECF No. 498) *and a motion for turnover* (ECF No. 499).
>
> #### a.   *Summary of the Receiver's second motion.*

On April 13, 2023, the Receiver filed a second motion to compel or in the alternative motion for an order to show cause against Grigsby and Paula Beasley, arguing that the information provided by Grigsby and Paula following the December hearing was inadequate and that neither Grigsby nor his client took the court's order seriously. *See generally* ECF No. 498. The Receiver's motion revealed that three days before the January 23, 2023 deadline, Grigsby sent the Receiver a production of documents that fell materially short of complying with Judge Youchah's December 16, 2022 order.[17] *Id.* at 6 (citing Hendricks Decl., Ex. 1, ECF No. 501-1 at ¶ 5).

---

[16] Local Rule IB 3-1(A) provides that "[a] district judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case under LR IB 1-3, when it has been shown the magistrate judge's order is clearly erroneous or contrary to law. Any party wishing to object to the magistrate judge's order on a pretrial matter must file and serve specific written objections. The deadline to file and serve any objections to a magistrate judge's order is 14 days after service of the order." LR IB 3-1(A).

[17] As set forth in the second motion to compel, this production was merely a summary, apparently created by Grigsby himself, memorializing the representations he made to the court during the December 16, 2022 hearing on the first motion to compel. The information was undated, unsworn, and lacked **any**

Because there was partial compliance with Judge Youchah's order, the Receiver sent a letter to Grigsby on March 3, 3023 in an attempt—yet again—to gain full compliance before seeking further relief from the court. *Id.* at 6. A meet and confer between the Receiver and Grigsby took place via video conference on March 9, 2023, wherein Grigsby failure to fully comply with Judge Youchah's order was discussed. Hendricks Decl., Ex. 1, ECF No. 501-1 at ¶ 5. To accommodate Grigsby's pre-scheduled vacation, the Receiver agreed to extend time for Grigsby to comply with the court's order until March 24, 2023. *Id.* at ¶ 10. While Grigsby did send additional information to the Receiver by the 24th, it was still deemed insufficient and raised additional red flags regarding certain funds and Grigsby's actions related thereto. This production of documents, which was merely a document dump, consisted of three declarations from Paula purportedly relating to the sale of the Mercedes, the Ferrari, and the Aston Martin. *See* Beasly Decl. Re: Mercedes, Ex. 6, ECF No. 501-6; Beasly Decl. Re: Ferrari, Ex. 7, ECF No. 501-7; Beasly Decl. Re: Aston Martin, Ex. 8, ECF No. 501-8.

Attached to the declarations were various credit card statements which allegedly demonstrated where the funds from each sale went, but the production was haphazardly disclosed, forcing the Receiver and his team to spend time sorting through the information to ascertain what, if anything, it showed. This production also included copies of deposit slips and statements from Grigsby's law firms, which were redacted, making it impossible for the Receiver to account for the movement of funds. ECF No. 498 at 9 n. 22.

The lack of production was not the only concern. As set forth in the Receiver's motion, the bank records produced show that over a seven-month period, over $240,000 was deposited into two attorney Interest on Lawyers Trust Account (IOLTA) accounts for the benefit of Paula, and many of those deposits occurred **after the asset freeze** was in place. *See* ECF No. 498 at 12 n. 34 (identifying the deposits and six out of nine that occurred after the freeze order). Further,

---

information that could be verified by the Receiver. *See, e.g.,* Figure 1, ECF No. 498 at 7 (written representations about fees paid); Figure 2, *id.* at 8 (apparent spreadsheet created by Grigsby).

there is no explanation regarding the agreement for Beasley to pay $138,281.57 in attorneys' fees. As recognized by the Receiver in his motion, not only is that number odd standing alone, that amount is actually the approximate $110,000 in fees charged to the American Express plus one-half of the proceeds from the Ferrari, which explains the odd fee ending in $0.57. *Id.* at 18. Moreover, according to Grigsby,[18] he already received the $110,500.00 in credit card payments (which records had still not been produced at the time) five days before the divorce was finalized: this means, not only did he accept funds which were not Paula's separate property, it also defeats his argument that by the time the funds were received, they were Paula's and she could do whatever she wanted with them—the funds were not yet Paula's pursuant to the divorce decree. The Receiver's motion raises other concerning questions about the retainer fee in relation to how the fee was created in relation to when deposits were made. *See id.* at 18. For instance, the retainer agreement is dated March 24, 2022, yet the funds from the sale of the Ferrari were deposited on March 18, 2022, and divided amongst Grisby and Ogata on April 5, 2022. *Id.*

Grigsby did produce some additional documents on March 24, 2023, such as insurance bills and HOA payment history, and a retainer agreement between his firm and Paula Beasley, amongst other items, however the Receiver felt that the production still failed to fully comply with Judge Youchah's orders. For instance, the Receiver still lacked information regarding the location of the $100,000 that was allegedly paid to Paula for sale of the G-Wagon, or any new information regarding the sale of the Ferrari. Instead, the production at best provided partial information regarding the sale of the Aston Martin and Ferrari.

The additional production also included credit card statements showing that Paula was spending significant funds on luxury and non-essential items. As an example, for a one-month period on a Discover credit card, there were almost $900 in Uber Eats charges.[19] The bills also

---

[18] *See* Figure 1, ECF No. 498 at 7.

[19] *See* Beasly Decl. Re: Aston Martin, Ex. 8, ECF No. 501-8 at 51–55.

show charges in amounts between $100 and over $400 to places like TopGolf,[20] White House Black Market clothing store,[21] Abercrombie & Fitch,[22] City Wide Pool service,[23] Jose Cervo Las Vegas,[24] North Italia,[25] EZ TV Mounting,[26] N. Kovchan Beauty,[27] Starbucks,[28] and many other charges for restaurants, online streaming services, storage unit rentals, amenities like trash can cleaning services, and more. The production also revealed that receivership property was utilized to pay for expenses for Matthew Beasley's criminal defense,[29] and there are numerous charges related to paying for inmate calls.

The Receiver asked that the court yet again enforce the Turnover Order and to require Grisby to turn over:

"(1)    The 2020 Mercedes G63 G-Wagon (VIN W1NYC7HJXLX350420) or the equivalent value of the G-Wagon at the time of entry of the Appointment Order (and its associated turnover provisions);

(2)     All attorneys' fees paid to the Grigsby Law Group including, but not limited to, any amounts received through any charge to a credit card in the name of Matthew Beasley and any amounts received from the sale of any receivership property including, but not limited to, the sale of the 2016 Ferrari 488 GTB, the 2020 Aston Martin Vantage, or the 2020 Mercedes G63 G-Wagon;

(3)     the Schoofey property occupied by Mrs. Beasley;

(4)     the Range Rover currently in Mrs. Beasley's possession; and

(5)     any receivership property contained in the storage unit Mrs. Beasley has maintained with Receivership funds and an inventory of the unit demonstrating compliance or, alternatively, turnover of the entire unit."

ECF No. 498 at 23.[30]

---

[20] *Id.* at 95 (August 19, 2022).

[21] *Id.* at 105 ($370.10 on September 10, 2022); *id.* at 76 ($208.08 on July 23, 2023); *id.* at 169 ($143.87 on November 19, 2022).

[22] *Id.* at 64 ($406.00 on July 17, 2022).

[23] *Id.* ($140.00 on July 30, 2022).

[24] *Id.* at 76 ($192.18 on August 12, 2022).

[25] *Id.* at 88 ($288.55 charge on August 12, 2022, to North Italia in Phoenix, Arizona).

[26] *Id.* ($1,569.93 charge on August 26, 2022).

[27] *Id.* ($469.00 charge on August 13, 2022, in Arizona).

[28] *Id.* at 122–23 (nine transactions in the amount of $25.00 over the course of eight days).

[29] *Id.* at 153–55 (fees associated with an evaluation by a Dr. McEllistrem; *id.* at 40 ($29.00 charges on June 20 and July 3, 2023 to GTL *TELMATE INMATE SERV); *id.* at 76 ($14.00 charge on August 1, 2023 to GTL *TELMATE INMATE SERV); *id.* at 95 ($29.00 charge on August 20, 2023 to GTL *TELMATE INMATE SERV).

[30] The Receiver also asked for fees and costs.

    *b. Summary of Grigsby's opposition to the motions (ECF No. 505).*

   Grigsby filed an opposition to the motion, arguing that "[m]any of the problems alleged by the Receiver could have been avoided had the Receiver done a more careful review of the documents provided...." ECF No. 505 at 4. He further argued that the spreadsheet he created did account for each transaction relating to his IOLTA account, which thus complies with providing information "down to the penny"[31] and that the information he provided shows money going in and going out of the account. *Id.* at 7. Yet, at the same time, he admits that there were no receipts for certain payments on credit cards. *Id.* at 8. Grisby also asserted that the Receiver was provided with a full accounting and that all efforts were made to ensure that the information was easily verifiable. *Id.* at 10. The opposition provided explanations for funds and transactions in written form. However, Grigsby's written explanations contained limited, unspecific citations to the 40 pages of exhibits he attached to his opposition, making it difficult to verify his written explanations. *See id.* at 4, 12–13, 15, 26.

   In his opposition, Grigsby again argued that the court lacked personal jurisdiction over Paula Beasley, and asserted the defense of insufficient service of process because she is a non-party to the underlying SEC action. *Id.* at 16–19. He further argued—without points and authorities—that Paula maintained a "valid interest" in the assets awarded to her in her fast-track divorce from Matthew Beasley, and unless invalidated, those orders were not the property of a defendant or relief defendant, and therefore presumably (because not explicitly stated) do not constitute receivership property. *See id.* at 19.

   Grigsby also argued that the court could not hold Paula in contempt for failing to comply with this court's orders because the "Receiver must void the transfers of property in the divorce action prior to requesting turnover from this Court. In this matter, the Receiver has offered no

---

[31] Grigsby also asserts that his productions are mischaracterized as "disorganized and incomplete" as inaccurate, and that each accounting was also "down to the penny." ECF No. 505 at 11. Yet, Grigsby did not provide the court with any information showing the full accounting nor verifying the information he provided, instead attaching a series of non-searchable, unorganized, and uncited exhibits. In fact, his exhibits and attachments are required to "be attached as separate files[,]" not as part of the base document. LR IC 2-2(3)(A).

credible evidence of a fraudulent transfer." *Id.* at 23. He acknowledged that the court has the power to find contempt where its order has been willfully violated and where jurisdiction exists," but argued that the court's contempt power should not extend to a non-party who exercised her right to dispose of property awarded to her in the divorce proceedings. *Id.*

Regarding the attorneys' fees, Grigsby reiterated his position that his legal fees were not receivership property because (1) he received payment via credit cards or from the sale of the Ferrari before the asset freeze was in place. *Id.* at 24. He further argued that disgorgement of the attorneys' fees would result in unjust enrichment of the Receivership.[32] *Id.* at 25.

In sum, Grigsby's opposition maintained that he fully complied with this court's orders and again argued that "[i]f the Receiver wants to challenge the divorce proceedings, he should challenge the order in state court." *Id.* at 28.

       *c.   Hearing on the second motion to compel is held on August 25, 2023.*

Judge Youchah held a hearing on the second motion to compel or alternatively, show cause order on August 25, 2023. ECF No. 568. Again, Judge Youchah rejected Grisby's argument that the court lacked jurisdiction over the proceeding (*id.* at 4–7) and specifically noted that there is no requirement that the property awarded to Paula in the divorce be voided by family court before the Receiver may exercise his authority in this court. *Id.* at 7. The judge went on to make other findings to include: (1) that Grigsby knew the Mercedes was subject to the freeze order and constituted receivership property, yet he sent an email seeking permission to sell that vehicle knowing it had already been sold; (2) that the funds from the sale of the Mercedes were dissipated without the permission of the Receiver, and title was transferred after entry of the preliminary injunction in this case and after the Receiver was appointed; and (3) that Grigsby

---

[32] Grigsby cited to *W. Charleston Lofts I, LLC v. R & O Const. Co.*, 915 F. Supp. 2d 1191, 1195 (D. Nev. 2013) to argue that returning the fees to the Receivership would be unjust enrichment. The *West Charleston* did not involve a Receivership and Grigsby's argument did not address the purpose behind a Receivership, that is to recover assets in the hopes of distributing equitably to victims of the underlying Ponzi scheme.

failed to provide information regarding Paula and assets to the court as ordered.[33] *Id*. at 8–11. Judge Youchah then detailed the information—some of which was troubling[34]—that Grigsby and Paula only partially complied with her order of production, and stated "the Court finds that the totality of the order and the requirements of that order were not met." *Id*. at 12.

As a result, Judge Youchah granted the Receiver's second request to show cause while also giving Grigsby and Paula a *third* chance to comply, ordered the production of certain items[35] by "September 29th, without exception, to avoid contempt -- or renewed motion for contempt and renewed motion for turnover...." *Id*. at 12–13. At the conclusion of the hearing, the judge reiterated the 29th deadline, stating that "[i]f the parties either refuse or -- to negotiate or no resolution is reached by the close of business on the 29th, the receiver may renew a turnover motion with Judge Silva, a motion for contempt with me [Magistrate Youchah], and any other motions such as disgorgement that the Court -- that the receiver deems appropriate. That is the order of the Court." *Id*. at 28. Grigsby did not appeal this order.

### 5. *Grigsby files an emergency motion to withdraw from representing Paula Beasley* (ECF No. 573).

On September 18, 2023, Grigsby filed an emergency motion to withdraw as counsel for Paula Beasley. ECF No. 573. That motion was granted the next day. ECF No. 574.

### 6. *The Receiver files status reports regarding Aaron Grigsby and Paula Beasley's compliance with Judge Youchah's order* (ECF Nos. 580; 597).

On October 2, 2023, the Receiver filed a notice regarding Grigsby's and Paula's efforts to comply with Judge Youchah's order. ECF No. 580. Therein, the Receiver advised that he contacted Grigsby on August 29, 2023, to set up a meeting to discuss the judge's order. *Id*. at 2.

---

[33] Judge Youchah also reprimanded Grigsby for accepting to represent Paula for this matter when it was clearly outside of his knowledge set. *See id*. at 10–11.

[34] For example, Judge Youchah noted the documentation related to attorneys' fees only related to work performed on behalf of Paula even though initially Grigsby stated that he represented both Paula and Matthew Beasley, and that Grigsby's attorneys' fees included a charge for 3½ hours of texting. *Id*. at 18.

[35] Judge Youchah went through each item and detailed what was produced and what was missing. *Id*. at 14–28.

At Grigsby's request, the meeting was set for September 22, 2023. *Id.* Before the 22nd, Grigsby filed his emergency motion to withdraw as Paula's counsel. The Receiver was then contacted by Dean Kajioka, Esq., who advised that he would be Grigsby's counsel for the pending show cause motion and requested the meeting scheduled for the 22nd be moved. *Id.* The meeting was rescheduled for the 25th of September. *Id.* On the morning of the 25th, Mr. Kajioka advised he had COVID and stated he could not attend the meeting. *Id.* The Receiver organized the meeting on Zoom, but neither Mr. Kajioka nor Grigsby appeared. *Id.* Four days later, the Receiver received a letter from Mr. Kajioka that contained "limited documents and a settlement proposal" which the Receiver deemed insufficient. *Id.*

Also in the Receiver's first notice, the court was advised that Paula Beasley contacted the Receiver directly to advise she was looking for a new attorney and expressed concern about Grigsby's representation of her, as well as Grigsby's communications with the Receiver. *Id.* As a result, the Receiver extended Paula's deadline to comply with Judge Youchah's order by 30 days. *Id.* at 3.

On October 30, 2023, the Receiver filed a second notice regarding compliance. ECF No. 597. Therein, the Receiver reiterated that Grigsby failed to meaningfully negotiate with the Receiver in order to be in full compliance with Judge Youchah's August 25, 2023, order. *Id.* at 2. The Receiver further advised that Paula had contacted the Receiver advising again that she was looking for new counsel and expressed concerns about Grigsby and his representation of her.[36] *Id.* As a result, the Receiver extended the time for Paula to find new counsel and to work with the Receiver in order to comply with Judge Youchah's order until November 20, 2023. *Id.* at 3.

---

[36] The Receiver also advised that Paula intends to file a bar complaint against Grigsby. ECF No. 597.

7. *The Receiver files a motion to hold Aaron Grigsby in contempt for failing to comply with court orders and a motion to compel compliance with the Turnover Order* (ECF Nos. 584; 585).

On October 6, 2023, the Receiver filed a motion to find Aaron Grigsby in contempt for failing to comply with this court's orders. ECF No. 584. The motion outlines the Receiver's efforts to seek the assistance of the court to compel Grigsby to comply, not only with the Turnover Order, but with the other orders issued by Judge Youchah relating to Receivership assets associated with Grigsby and/or Paula Beasley. *Id.*

The court set a hearing to address the contempt motion filed against Grigsby for December 13, 2023, at 1:30 pm. Min. Order Setting Hearing, ECF No. 609. On December 12, 2023, because the court was in a jury trial on a separate matter, the contempt hearing was reset for the same day, but at 4:00 pm. Min. Order, ECF No. 613. Grigsby failed to appear for the December 13, 2023 hearing. ECF No. 616. The court then reset the hearing for the following day and ordered Grigsby to appear. *Id.* Grigsby and his attorney appeared for the rescheduled contempt hearing. ECF No. 617.

## II. Discussion

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). "The moving party has the burden of showing by clear and convincing evidence that the condemners violated a specific and definite order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999).

To establish that civil contempt is appropriate, plaintiff must demonstrate "(1) that [Grigsby] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010) (citation omitted). Once plaintiff makes this showing, the burden shifts to Grigsby to demonstrate that he "took all reasonable steps within

19

[his] power to insure compliance with the" court's order. *Hook v. Arizona Dept. of Corr.*, 107 F.3d 1397, 1403 (9th Cir. 1997) (citation omitted). A showing of "substantial compliance with the court order" is a defense to civil contempt, especially where every reasonable effort has been taken to ensure compliance. *See In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

A sanction for civil contempt is intended to coerce the contemnor to comply with the court's order in the future. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992). "The choice among the various sanctions rests within the discretion of the district court." *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980) (citing Fed. R. Civ. P. 37(b)(2)). However, the Ninth Circuit cautions that a "district court should apply the least coercive sanction (e.g., a monetary penalty) reasonably calculated to win compliance with its orders." *United States v. Alfredoflores*, 628 F.2d 521, 527 (9th Cir. 1980) (internal quotation marks omitted).

As discussed further *infra* and based on the information in the motion for contempt, together with information gathered during the hearing on the motion, as well as the record relating to both of the Receiver's motions to compel or in the alternative, show cause orders, this court found Aaron Grigsby, Esq., in civil contempt of court and issued sanctions on December 14, 2023.[37] ECF No. 617.

---

[37] On December 13, 2023, when Grigsby failed to appear for the contempt hearing, the court took testimony from Paula Beasley relating to the noncompliance with court orders and information related to assets. During her testimony, Paula lodged certain allegations against Grigsby. The court did not take those allegations into account in finding him in contempt. In a thinly veiled attempt to again delay the contempt proceeding, Mr. Kajioka argued at he needed to obtain a waiver of the attorney-client privilege between Grigsby and Paula before the hearing in order to fully respond to Paula's allegations and the contempt motion. The court declined to delay the proceeding on that basis for two reasons. First, the court had no intention of considering Paula's allegations as evidence in support of the Receiver's motion for contempt. Second, the motion for contempt had been scheduled since November 20, 2023. If the waiver was needed, Grigsby should have filed a motion well in advance of that hearing. Counsel's claim that they were unaware of the setting is no excuse; they also made no attempt to file a motion for relief before the rescheduled contempt hearing on December 14, 2023.

**A. This court has jurisdiction over Grigsby.**

As a threshold matter, the court must address Grigsby's repeat argument that this court lacks jurisdiction over the two previously filed motions to compel and this motion to compel. Those arguments were twice rejected by Magistrate Judge Youchah; and twice, Grigsby never appealed those orders. When Grigsby filed his opposition to this contempt motion, the lack of jurisdiction argument was raised once again. ECF No. 590 at 3. Not only were there *no* points and authorities cited to support the argument,[38] Grigsby failed to address the authority cited by Judge Youchah that directly contradicts his argument. *See id.* Grigsby and his counsel are reminded of Nevada Rule of Professional Conduct (NRPC) Rule 3.3, which states "A lawyer shall not knowingly: (1) [f]ail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; (2) [f]ail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." While the court and parties may disagree on the applicability of law, the wholesale failure to disclose authority contrary to Grigsby's jurisdictional argument is unacceptable. When the court confronted Grigsby's counsel about the lack of any points and authorities, counsel did not dispute its absence, but instead attempted to shift the blame by advising that an associate drafted the pleading. Counsel is reminded that NRPC 5.1(b) requires a "lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct." NRPC 5.1(b).

The federal rules "provide for enforcement of judgments against non-parties in limited circumstances." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998). Under Fed. R. Civ. P. 65(d), an injunction is binding upon "the parties to the action, their officers, agents,

---

[38] "The failure of a moving party to file points and authorities in support of the motion constitutes a consent to the denial of the motion." LR 7-2(d); *see also Ilani v. Abraham*, 2019 U.S. Dist. LEXIS 228130, *4 (D. Nev. Sept. 17, 2019) (denying contempt motion, in part, for failure to cite legal authority); *United States v. Johnson*, 180 F. Supp. 2d 1155, 1157 (D. Nev. 2002) (denying motion under LR 7-2(d), in part, for failure to cite authority supporting argument).

servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Ordinarily, a nonparty "must either abet [a] defendant [in violating the court's order] or be legally identified with him," and have notice of the order to be found in contempt. *Peterson*, 140 F.3d at 1323 (quoting *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977)). Courts have interpreted the "non-party" language as requiring the non-party to "knowingly aids or abets a party in violating the court order." *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 61 F.3d 94, 98 (1st Cir. 1995); *accord Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1395 (Fed. Cir. 1996) ("[T]hose who act in concert with the enjoined party may be held in contempt, but only for assisting the enjoined party in violating the injunction.").

There is no dispute that Grigsby and Paula are non-parties to the underlying SEC action in this case. But their non-party status does not immunize them from having to comply with this court's Turnover Order or the orders of Judge Youchah. In *Fed. Trade Comm'n v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1112 (C.D. Cal. 2001), the court found a nonparty in civil contempt for failing to turn over assets to a court-ordered receivership. The court sanctioned the nonparty for costs incurred by its intransigence, and issued a per diem fine that doubled each day the nonparty was out of compliance. *Id.* at 1113. "[T]he inherent equitable power of a district court allows it to freeze the assets of a nonparty when that nonparty is dominated and controlled by a defendant against whom relief has been obtained in a securities fraud enforcement action." *F.T.C. v. Johnson*, 567 Fed. App'x. 512, 514 (9th Cir. 2014) (citing *SEC v. Hickey*, 322 F.3d 1123, 1125 (9th Cir. 2003)); *see also SEC v. Current Fin. Servs., Inc.*, 798 F. Supp. 802, 807–08 (D.D.C. 1992) (finding several individuals in civil contempt who, in contravention of a court-ordered asset freeze, transferred a company's assets back to its investors).

Moreover, this court's ability to exercise jurisdiction over Grigsby is common sense; the absence of a court's ability to enforce its orders over non-parties would require the SEC, or the receiver, to institute a separate action against any third-party holding assets of the receivership

estate, which "would result in a multiplicity of actions in different forums, and would increase litigation costs for all parties while diminishing the size of the receivership estate." *SEC v. Universal Fin.*, 760 F.2d 1034, 1038 (9th Cir. 1985). Accordingly, this court has jurisdiction over Grigsby.

### B.   Grisby violated definite and specific orders of the court.

The Receiver met his burden, by clear and convincing evidence, showing that Grigsby violated three definite and specific orders of the court. First, the Receivership Order states that **all** persons in possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendants that receive actual notice of the order (1) shall not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver; and (2) shall cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver. *See* ECF No. 88 at 9. The record shows that Grigsby was in possession of receivership property since March of 2022. While the Receivership Order was not in place until June of 2022, that does not change the status of the assets from Receivership to non-receivership, and Grigsby offers no authority in support of his argument otherwise. Grigsby knowingly facilitated the sale of the Mercedes G-Wagon *after* the Turnover Order and Receivership Order were in place. Winkler Decl., Ex. 3, ECF No. 333-4 at ¶¶14–17.

The attorneys' fees paid through credit cards constitute receivership property—Grigsby also refused to turn over attorneys' fees charged to Matthew Beasley's credit cards, knowing that the only way those charges could be paid (if at all) would be through funds traceable to the Ponzi scheme. Grigsby's argument that the funds were untainted because his payment was received from the credit card company, not from the Beasleys, is unavailing. First, the Receivership Order defined receivership property as "monies, funds, securities, **credits,** effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents,

profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ...." ECF No. 88 at 4–5 (emphasis added). The fees charged to Matthew Beasley's credit card constitute **credits** and are thus properly receivership property. Further, "[w]hen a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent to hinder, delay or defraud other creditors—regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme." *In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 509 (Bankr. S.D.N.Y. 2002) (citation omitted). Here, the creditor is the Receiver, and charging the attorneys' fees to the credit card, knowing there would be no way to repay them, makes those funds part of the underlying Ponzi scheme. Again, by the time the fees were charged, the Beasley's legal troubles were well known, making Grigsby's decision to charge the fees on a credit card dubious at best. Further, if a Receiver is unable to recuperate funds such as the attorneys' fees placed on Matthew Beasley's credit card, it would undermine the purpose of the Receivership to begin with as individuals covered by the court's preliminary injunction, freeze order, Turnover Order, or Receivership Order, could just charge and benefit from indeterminable amounts to credit cards and the Receiver would never be able recover them.

Second, Grigsby failed to cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver. As the record shows, the Receiver made attempt after attempt to obtain information about funds, assets, and accounts related to Paula Beasley. Judge Youchah issued definite and specific orders, detailing exactly what Grigsby (and Paula) needed to provide to the Receiver. Judge Youchah also accommodated Grigsby, giving him three chances—and almost 10 months—to fully comply with her orders. Instead of fully complying, Grigsby provided—at best—piecemeal information and document dumps. And some of those documents, like the spreadsheet showing certain payments, were self-serving. While the spreadsheet "documented" payments, Grigsby failed to

disclose supporting or backup documents of the payments. The delays, disorganization, and piecemeal production of the information that was required to be turned over did not constitute substantial compliance with the Turnover Order, the Receivership Order, or Judge Youchah's orders.

Grigsby's opposition to the motion for contempt did not offer any new evidence or arguments to support substantial compliance; instead, it mostly rehashed arguments that had already twice been rejected by the court. Grigsby's argument that Judge Youchah's orders were "vague" by picking and choosing certain sections of the transcript of her orders fails to overcome his burden demonstrating substantial compliance. Moreover, failing to address the full and complete orders issued by Judge Youchah demonstrates that Grigsby failed to substantially comply, and is evidence that his interpretation of the orders was not made in good faith nor reasonable. Further, Grigsby could have, but failed to, object to Judge Youchah's orders. Grigsby was given more than a year to comply with the Receivership Order (ECF No. 88), over a year to comply with Judge Youchah's order granting the Receiver's motion to compel, and four months to comply with Judge Youchah's second order granting the Receiver's motion to compel. Grigsby's slow, or outright refusal, to fully cooperate with the Receiver caused unnecessary and multiple court proceedings. More importantly, Grigsby's action (or inaction) undermined and obstructed the primary purpose of equity receiverships, which is "to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) (citations omitted).

Consequently, Aaron Grigsby, Esq., is in civil contempt for violating this court's order, as well as the orders of Magistrate Judge Youchah. While duplicative in nature as a turnover order was already in place, the court nonetheless grants the Receiver's motion for an order directing Grigsby to turnover receivership property to the Receiver (ECF No. 585).

III.     **Conclusion**

IT IS THEREFORE ORDERED that the Receiver's motion for an order directing the turnover of receivership property from Aaron Grigsby **[ECF No. 585] is GRANTED.**

IT IS FURTHER ORDERED that Aaron Grigsby, Esq., must turn over to the Receiver in this action:

(1)     $100,000 in attorneys' fees charged to Matthew Beasley's American Express credit card;
(2)     $10,500 in attorneys' fees charged to Matthew Beasley's Visa credit card;
(3)     the proceeds from the sale of the Ferrari and the Aston Martin; and
(4)     the full amount of proceeds received from the sale of the Mercedes G-Wagon.

The total amount due and owing to the Receiver from Aaron Grigsby is $405,302.40. Grigsby may meet and confer with the Receiver to facilitate compliance with this order. Any meet and confer must be done in good faith.

IT IS FURTHER ORDERED that the Receiver's motion to find Aaron Grigsby in contempt for failure to comply with this court's orders **[ECF No. 584] is GRANTED.**

IT IS FURTHER ORDERED that Aaron Grigsby, Esq., must pay a per diem fine of $50.00 for the first day of noncompliance, effective December 14, 2023, with the amount doubling every third day of noncompliance to the Receiver through the Clerk of the Court for the District of Nevada.

DATED: December 28, 2023

_____
Cristina D. Silva
United States District Judge